FILED
2025 Jan-06  AM 11:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

**GORDON BALL, individually and on behalf of GORDON BALL, PLLC and GORDON BALL, LLC,**

**Plaintiffs,**

**v.**

**PATRICK W. PENDLEY and**
**PENDLEY, BAUDIN & COFFIN, LLC;**

**Defendants.**

**In Re:  Blue Cross Blue Shield Antitrust Litigation**
**MDL No. 2406**
**Master File No:  2:B-CV-2000**

**JURY REQUESTED**

---

## AMENDED COMPLAINT

---

## INTRODUCTION

1.  This action arises from the breach by Patrick W. Pendley ("Pendley") and Pendley, Baudin & Coffin, LLC ("PBC," and together with Pendley, the "Defendants") of their agreement with Gordon Ball to equally divide all fees awarded in connection with the prosecution of antitrust litigation against Blue Cross Blue Shield ("BCBS").

2.  This action is outside of the scope of the Dispute Resolution Clause of the October 2013 MDL 2406 Joint Venture Agreement.  Special Master Edward Gentle stated as follows in his opinion letter of December 5, 2022:

> "I therefore conclude that the disagreement between your Firms does not come within the Dispute Resolution Clause of the Joint Venture Agreement, which applies to "any dispute arising under or related to the terms of this Agreement."  The Agreement, of course, does not apply to disputes between your Firms on how you allocate between yourselves monies awarded to you under the Agreement.  The event that you are speaking of is downstream from the Joint Venture Agreement, its application under the Report and the Court's Approval Order.
>
> Therefore, we conclude that the Dispute Resolution Provision of the Joint Venture Agreement does not apply to this matter."

1

3.      The BCBS case was tentatively settled on September 24, 2020.

4.      Plaintiffs Gordon Ball, on behalf of himself, and on behalf of Gordon Ball, PLLC and Gordon Ball, LLC, bring this action to enforce an agreement, entered into orally in May 2012 and memorialized in writing in November 2016, pursuant to which Plaintiffs and Defendants agreed to equally divide all fees awarded in connection with litigation against BCBS.

## PARTIES

Plaintiffs:

5.      Gordon Ball is a licensed attorney in the State of Tennessee since 1975, Bar Number 001135.   During the periods of time relevant to this case, Ball practiced law using sole proprietorships, including Gordon Ball, LLC, a Tennessee Corporation, and Gordon Ball PLLC, a Tennessee Professional Limited Liability Company.

Defendants:

6.      Pendley is a licensed attorney in the State of Louisiana, and PBC is a corporation incorporated in the State of Louisiana.

## JURISDICTION AND VENUE

7.      This court has the inherent power to resolve a fee dispute between two attorneys after the conclusion of MDL proceedings.  Jurisdiction falls specifically under 18 U.S.C. §§ 1331 and 1332.  This court also has jurisdiction over this matter because it involves a breach of contract suit where the amount in dispute is more than $75,000 among parties with diversity of citizenship.

8.      Venue is proper in the United States District Court for the Northern District of Alabama Southern Division because that is where the multi-district litigation in this matter occurred giving rise to the fees and costs at issue in this case, and the parties submitted themselves to this court's jurisdiction.  Venue is specifically under 28 U.S.C. §§ 1391 and 1407.

2

## FACTUAL BACKGROUND

9.      On May 11, 2012, Ball, as a sole practitioner, along with Memphis lawyer Gerald Easter, filed an antitrust class action captioned *Morrissey v. Blue Cross and Blue Shield of Tennessee, Inc.*, 12 Civ. 2359 (JTF) in the United States District Court for the Western District of Tennessee ("*Morrissey BCBS*").  As of the date of filing of *Morrissey BCBS*, neither Pendley nor PBC had any involvement in litigation against any entity affiliated with BCBS.

10.     Ball had a pre-existing relationship with Pendley.  Both Ball and Pendley were experienced class action attorneys who had participated in many class action matters in various jurisdictions around the country.  Ball and Pendley both understood that (1) the filing of one class action, particularly an antitrust class action, usually resulted in other class actions being filed against the same defendants making the same allegations and, (2) thereafter, the same-issue and defendant class actions likely would be consolidated into one case in one jurisdiction pursuant to 28 U.S.C. § 1407.  They also understood that, once several class actions were consolidated into one jurisdiction, the court would appoint one or a few particular law firms to act as "lead counsel" or other more significant role, thereby causing one or a few firms to control much of the work and strategy in the consolidated cases.

11.     Ball and Pendley each recognized that by teaming up with other experienced class action attorneys, they could enhance the representation of the relevant class(es) in several ways, including by: having a greater number of experienced lawyers available to share the work and responsibility for developing the strategy to litigate the case; making it more likely that they could have counsel familiar with the court and its local practices in the jurisdiction where the case(s) was ultimately consolidated; having more law firms to share the costs of the litigation, which could be significant in class action cases; and making it more likely that one of the lawyers part of the team would be appointed lead counsel or to a more significant role and thereby assure the team of having

counsel with the most significant roles in litigating the case.

12.     In furtherance of these practical realities, Ball and Pendley agreed to join forces on multiple class action cases ("the joint cases") and to share equally in any costs incurred and fees awarded in the joint cases, regardless of which, if either, of their firms was appointed lead counsel or wound up having a more significant role in the litigation or multi-district litigation ("MDL").

13.     One example of a case where Ball and Pendley did this was *Hale v. State Farm* ("*State Farm*"), a case that Ball filed with Pendley as co-counsel in May 2012, the same year *Morrisey BCBS* was filed.  Ball was appointed co-lead counsel in *State Farm*.  Pendley and PBC were not assigned significant roles in that case.  The written agreement in *State Farm* was that each firm would receive an equal share of any fees awarded in the case.  That case proceeded apace in the same time frame as the instant BCBS case but settled earlier than the instant case.  The parties settled *State Farm* in December 2018 for $250,000,000.  Despite Pendley playing a minimal role in *State Farm*, and the view of several counsel in that case that Pendley should not get an equal fee share, Ball insisted that Pendley receive, and in August 2019 Pendley did receive, an equal $9 million share of the attorneys' fees in *State Farm*, along with Ball and 7 other law firms (9 law firms total) involved in prosecuting that case.

## ORAL AGREEMENT TO SHARE EQUALLY

14.     Pursuant to the practice described above, just after Ball filed *Morrissey BCBS*, Pendley met with Ball in Ball's Knoxville, Tennessee office on May 13 and 14, 2012 to discuss *State Farm* and cases against BCBS.  As to BCBS cases, they recognized that *Morrissey BCBS*, Ball's filed case, would cause others to file similar class actions against BCBS and that the series of BCBS cases would likely wind up being the subject of a multi-district litigation ("MDL").  Pendley and Ball strategized that they should quickly file many state class action cases against BCBS in order to increase the likelihood that one of them would be assigned a senior role in

litigating the expected MDL. As they had done in other cases, Pendley and Ball orally agreed they would split costs equally and split equally any fees that they and their firms might eventually be awarded from the BCBS cases, regardless of whether the cases proceeded in state or federal court, whether the cases proceeded in federal court in the expected MDL, and what roles, if any, the respective firms were assigned in the expected MDL.

15.     Pendley was deposed on October 18, 2023, regarding the fees at issue in this matter. (Copy of deposition attached hereto as Exhibit 1). Among other things, he acknowledged that in May 2012 the oral fee agreement he entered with Gordon Ball in the BCBS cases was to share equally in any fees awarded, without regard for where the cases wound up being litigated:

> Q.     So the case or the opportunity to get involved in the case originated, from your perspective, with Gordon?
>
> A.     Absolutely.

*Deposition of Patrick Pendley, Attached as Exhibit 1, p. 17, Line 6 – 9.*

> Q.     Was there any understandings addressed or reached about how attorneys• fees would be handled in the Blue Cross matters during the meeting in May of 2012?
>
> A.     No. Gordon and I agreed that for the state cases that we filed, we would split the fee 50/50.

*Id. at p. 29.*

> Q.   Let me ask it again. Is it accurate that at no time during that meeting did you or anyone else expressly say, but we will only split fees in state cases, or words to that effect?
>
> A.     No. Not that I know of, not that I recall.
>
> BY MR. BIENERT: Q.   Is it accurate that at no time during that meeting did you or anyone present put any limitations on the fee sharing agreement to suggest that the fee sharing would not apply to any type of cases that you might bring against Blue Cross?
>
> THE WITNESS: Not that I recall.

*Id. at pp. 32-33.*

> Q.     The bottom line is: From the jump in May of 2012, you discussed potential ways to bring claims against different Blue Cross Blue Shield entities in different states, but you

didn't distinguish or make any deal that you had with Mr. Ball contingent on whether it was in federal court or state court?

THE WITNESS:  We did not.

*Id. at p. 39-40.*

16.    Pendley also confirmed in his filing with this Court that the agreement he entered with Ball in May 2012 was to prosecute the BCBS cases regardless of whether the cases were prosecuted in state or federal courts separately or wound up in a consolidated MDL proceeding.  In his Opposition to the Fee Petition of Gordon Ball, Mr. Pendley represented to this Court:

> "At this stage, the focus was just on initiating class action case filings in different states against the BCBS entity operating in that state so that the firms would have a leadership position in the antitrust litigation against BCBS entities. Whether the cases were prosecuted separately in the states in which they were filed, or in a consolidated proceeding such as an MDL."

*Pendley Opposition to Ball Petition for Fees*, at p. 6.

17.    After the May 2012 meetings at Ball's office in Knoxville, Pendley and Ball put into action the strategy and agreement they had formulated during their May meetings.  In conjunction with other attorneys they enlisted to team up with them, they filed class action lawsuits against BCBS in Alabama, Arkansas, Florida, Idaho, Illinois, Indiana, Tennessee and Texas.

18.    As both Ball and Pendley had expected, *Morrisey BCBS* and the other class action lawsuits against BCBS were consolidated in an MDL in December 2012 in this Court in the Northern District of Alabama, under the case name *In Re Blue Cross Blue Shield Anti-Trust Litigation* (the "*BCBS MDL*").

19.    In 2013, this Court issued its order regarding the roles of lead counsel in this case. Pendley and PBC were selected to head the Damages Committee.

**HEART TRANSPLANT 2016**

20.    In April 2016 and while both the *BCBS MDL* and *State Farm* were pending, Gordon

Ball was diagnosed with heart failure and given less than one year to live by his doctors. On October 21, 2016, Gordon Ball underwent a heart transplant at Vanderbilt Hospital in Nashville, Tennessee. As of the date of his heart transplant, Ball was up to date on all of the cost assessments in the *BCBS MDL*, which included funding half of the cost assessments owed by PBC in the *BCBS MDL*.

21.    For the next few years, Ball was unable to practice law full-time due to his heart transplant and lengthy recovery. His incapacitation and inability to practice full time led to significant diminishment in his financial wherewithal. At no time relevant to the instant dispute did Pendley or any other representative of PBC indicate that they viewed Ball as having breached the May 2012 oral agreement to share fees and costs in connection with prosecuting the litigation against BCBS.

### WRITTEN AGREEMENT CONFIRMING EQUAL SHARING OF FEES

22.    Ball recognized that due to his need for a heart transplant and the difficult and uncertain recovery that followed, he should memorialize the May 2012 oral agreement that he had with Pendley regarding fees in the *BCBS MDL*. In late 2016, Ball sent Pendley a letter memorializing their agreement regarding the *BCBS MDL*. The Letter Agreement, written on Gordon Ball, PLLC letterhead, reads:

> "This letter will memorialize our agreement that our respective law firms will share equally in any attorneys' fees ultimately awarded to either of our firms in the state cases we filed concerning the Blue Cross Blue Shield Antitrust Litigation."

23.    Pendley signed the Letter Agreement on November 26, 2016. *See Copy attached hereto as Exhibit 2.*

24.    After signing the written Letter Agreement with Ball, Pendley continued working and associating with Ball. Between May 3, 2017 and late 2022:

a.    In February 2021 they filed a new case together, entitled *Accord v. Anderson County, et al,* United States District Court, Middle District of Tennessee, No. 3:21-cv-00077.

b.  In September 2021 they filed another new case together, entitled *Moore v. Koninklijke Phillips,* United States District Court, Eastern District of Tennessee, No. 2:21-cv-00136.

c.  On May 11, 2017, Pat Pendley invited Gordon Ball into another case.  *See Email attached hereto as Exhibit 3.*

d.  Ball and Pendley became partners in an airplane in February 2022.  *See Email attached hereto as Exhibit 4.*

25.    Pendley continued to treat Ball as a participant in the *BCBS MDL*.  For example,

a.  On October 22, 2019, Pendley sent Ball an email concerning settlement negotiations in the instant case.

b.  On November 26, 2020, Pendley asked Ball if he had reviewed documents withdrawing Pendley and Ball from the Texas state case that was one of the Blue Cross cases.

        *Copy of emails, attached hereto as Exhibit 5.*

26.    Pendley acknowledged in his deposition that during this multi-year period he never indicated to Ball that he viewed anything as changed regarding their agreement in the *BCBS MDL* to share fees and costs equally.

Q.  Is it accurate -- it's your testimony that during that whole roughly four years, you never told Gordon Ball that it was your view that he wasn't entitled to a half-share of any fees in Blue Cross?

A.  Well, let me -- half of the fees that our firm got were fees he got from overall he was going to get.  Didn't matter to me, but I never told him that I was objecting -- well, I guess objecting or not willing to pay half of the fees that PBC earned to Gordon in that time frame.

Q.   Well, you never told him that you were objecting to him getting half of any fees, right?

THE WITNESS:  Half of what fees?  No.  I never told him anything about fees.  We didn't really communicate that much.

*Deposition of Patrick Pendley, p. 196.*

27.    *State Farm* settled in December 2018.  Several of the other law firms in that case opposed Pendley and PBC's request for an equal share of the fees in that case because Pendley had such a de minimis role in the case.  Ball was true and loyal to his agreement with Pendley to equally

share fees, resisting those who opposed Pendley's getting an equal share and successfully lobbying them to treat him equally.   In August 2019, Pendley received a full and equal share of fees in that case, namely a fee to Pendley's firm of $9,000,000, the same amount received by other firms.

28.    Pendley acknowledged the efforts Ball made in *State Farm* to honor their agreement to share equally and recognized the importance of his doing so.  In his deposition, Pendley testified:

BY MR. BIENERT: Is it true, sir, that once the settlement was in play, but before everything was dispersed, that there were members of the other law firms that took the position that you should not get an equal payout?

MR. COFFIN:  Object to the form.

THE WITNESS:  Gordon told me that.

BY MR. BIENERT:

Q.  And Gordon was the person who, on your behalf, fought with them to make sure that you got a nine million dollar payout?

THE WITNESS:  Gordon told me that.

Q.        And Gordon was the person who, on your behalf, fought with them to make sure that  you got a nine million dollar payout?

THE WITNESS:  He says he was.  I accept Gordon's word on that.  I don't know.  I  wasn't part of the discussions, but I did get a  phone call from the other lead at one point subsequent to Gordon telling me what you just  referenced, or asking me to give up a significant  part of my fee to him and I said -- my response  was what about State Farm I, the work that I did  in that case and the $717,000 in expenses  that I  never recovered, and he said, Oh, well, okay,  thanks.

*Deposition of Patrick Pendley, pp. 193-194.*

*BY MR. BIENERT:*

Q.  So you heard anecdotally from Gordon, and you say you at least believed him, that there were others trying to say you should get less than a full share, and then after the fact someone called you and said they should have gotten more money than you?

A.  Yes, that's correct.

Q.  But one thing you know is that -- whatever it would actually would work out to as to who did what, hours, motions work, Gordon  stood by you getting an equal share to him, right?

THE WITNESS:  As far as I know he did.

*Deposition of Patrick Pendley, pp. 194-195.*

29.    After receiving his $9 million fee in *State Farm*, Pendley emailed Ball:

**On Sep 6, 2019, at 1:52 PM, Patrick Pendley <pwpendley@pbclawfirm.com> wrote:**

**I am out of debt for first th time in 58 years.**

> **From:** "Gordon Ball" <gball@gordonball.com>
> **To:** "Patrick Pendley" <pwpendley@pbclawfirm.com>
> **Subject:** Re:
> **Date:** Fri, 6 Sep 2019 12:36:03 -0700
> **Importance:** Normal

I couldn't be happier for you. You deserve it and you have been a good friend

30.    In July 2019, Ball, Pendley and their wives attended an awards ceremony in San Diego, California where *State Farm* was awarded the case of the year award.  *See Copy of picture of Pat Pendley, Helen Pendley and Gina Ball attached hereto as Exhibit 6.*

31.    Following the significant fees they each received in *State Farm*, Ball called Pendley, and inquired how much he owed to be caught up on payments in the *BCBS MDL* case.  Pendley told Ball that he did not have to make any payments at that time.  Instead, he told Ball that they could deal with the issue of any money owed later.  The context of the call and Pendley's telling Ball he didn't need to pay anything at that time suggested that, given the huge amount of money he had gotten on State Farm where he had a minimal role and Ball had a significant role, he was fine with Ball and him settling up on any amounts later when the *BCBS MDL* resolved.  Pendley did not in any way shape or form demand that Ball make payment at that time.  Pendley did not in any way shape or form suggest that he viewed their agreement as breached, voided or otherwise not in effect.

32.    Indeed, Pendley testified extensively about this conversation in his deposition:

BY MR. BIENERT:

Q.        So you never notified him [Ball] that it was your view that he needed to get you paid?

MR. COFFIN:  Object to the form.

THE WITNESS:  No.
*Deposition of Patrick Pendley, pp. 198-199.*

Q.  Did you give him [Ball] a notice of the breach?

A.  You mean like wrote him a certified letter saying you're in breach?

Q.  Well, that would be one way to do it.

A.  I didn't do that.

Q. Did you take any other methods to say you were in breach?  Like how about just an  email saying, Hey, you need to get me that money?

A.  I don't remember.

*Id. at pp. 204-205.*

Q.  If you had written some sort of an email like, Hey, Gordon, you owe money, you got to pay it, that would be in this file that your counsel keeps referencing, and we would have had it, right?

A.  Oh, yeah.

Q.  I'll represent you we haven't seen it.

A.  I never saw one either.

Q.  Because you never wrote one?

A.  I never wrote one.

Q.  Did you ever pick up the phone and say, Hey, Gordon, man, you're behind your thing?

A. No.

Q. So when you gave us an example of not informing him of the breach and you said, Well, you mean did I send a certified letter, not only did you not send a certified letter, but you didn't give him any kind of a notice of a breach,  did you?

A. No, I didn't.

Q. To your knowledge no one at your firm did, right?

A. No.  Nobody at the firm did.

Q.   In the same vein you never then put him on notice and gave him an opportunity to cure the breach, did you?

A. No, because that's when he had open heart surgery.

Q. Then when he called you and said, in essence, Hey, I want to pay you what I owe, you declined?

A. That was years later.  That's right, I did decline.

Q. But you didn't say there was an issue.  You just said, We'll deal with it later?

A.  We'll deal with it later.

*Id. at pp. 205-206.*

Q. Did you in any way directly, or in sum or substance, let him know that he hadn't abided by, from your perspective, your agreement, and you didn't view it as an enforceable deal?

A. No.

*Deposition of Patrick Pendley, p. 187.*

Q.  And so -- and, by the way, you let Mr. Ball know that you were very pleased with the money that you got in State Farm, and it really helped out you and your firm, right?

A.  Well, sure.

12

Q.  So Mr. Ball calls you and says, Hey, I'd like to pay you anything I owe –

A.  Right.

Q.  -- and you say, Don't worry, we'll deal with it later, and you're saying this to him against the backdrop where you had already been  telling him how pleased and excited you were,  that you made a huge amount of money on the State  Farm case with him.

THE WITNESS:  I don't know if I ever told him that.  I really have no memory of actually telling him that, but, obviously, anybody that makes a nine-million dollar fee is going to be a little pleased.

Q.  As you sit here now, you're pretty confident that you would have profusely thanked Gordon for his involvement with you in getting that large fee in the State Farm case, right?

A.  THE WITNESS: Sure. That goes all the way back to 1997.

*Id. at pp. 188-189.*

## CAUSES OF ACTION

### COUNT 1
### BREACH OF CONTRACT

33.  Plaintiffs reallege paragraphs one through thirty-two as set forth above.

34.  There was an enforceable agreement between Pendley and Ball that they would share

fees and costs 50/50 in the *BCBS MDL*.  Ball performed under the agreement, and in the event that

Ball failed to perform under the agreement, such performance was excused.  And even if it was not

excused, such alleged lack of performance cannot provide a basis for Pendley to avoid the

agreement because Pendley did not put Ball on notice that he viewed the agreement as breached or

demanded that he cure the alleged breach, as required by Alabama law.

35.  Pendley and his law firm breached the agreement by informing Ball, and others, that

Pendley and his firm would not share fees equally with Ball.  Ball has suffered and will suffer

damages as a result of Pendley's breach.

**COUNT TWO**
**JOINT VENTURE**

36.    Plaintiffs reallege paragraphs one through thirty-five as set forth above.

37.    Plaintiffs and Defendants created a joint venture and as such the parties owed each other fiduciary duties, including the duty of utmost good faith, fairness and honesty.  Defendants' conduct violated all of their fiduciary duties.

**COUNT THREE**
**EQUITABLE ESTOPEL**

38.    Plaintiffs reallege paragraphs one through thirty-seven as set forth above.

39.    The facts presented indicate that Pendley's conduct, assuring Ball that everything was fine, was misleading communication. This conduct led Ball to believe that the agreement with Pendley would be honored, causing him to rely on this belief to his detriment.

**COUNT FOUR**
**UNJUST ENRICHMENT**
**(PLED AS ALTERNATIVE TO CONTRACT CLAIM )**

40.    Plaintiffs reallege paragraphs one through thirty-nine as set forth above.

41.    Pendley and Ball entered agreements in two cases that were proceeding in the same time frame to share fees and expenses equally with one another: *the BCBS MDL* and *State Farm*. They recognized that given the manner in which class actions proceed, there was value in their firms joining together as it made it more likely that one of the firms would get a position of authority in each case, which would give that firm a better chance of having influence over that case and being awarded significant compensated in the case.  By teaming up to share fees and costs in both cases, they made it more likely that both firms could receive significant compensation if they had agreed to share fees.  As it turned out, Ball was given a more influential role in *State Farm* and Pendley

14

was given a more influential role in the *BCBS MDL*.  *State Farm* settled first, and Ball honored their agreement to share equally, resulting in Pendley receiving $9 million in fees in *State Farm*, the same amount that Ball received.  Now that the *BCBS MDL* has settled, Pendley is attempting to ignore their agreement.  Failure to honor the agreement between Pendley and Ball in the *BCBS MDL* would result in Pendley being unjustly enriched by over $6 million.  The fees preliminarily awarded by this Court collectively to PBC and Ball total $12,914,532.52.  Pursuant to their agreement, Pendley and Ball should split that fee and each receive $6,457,267.26.   It would be unjust to allow Pendley to receive more than Ball given their agreements, the fact that Ball contributed financially to assessments made to PBC, and Pendley's receipt of a full share in *State Farm*.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully requests that the trier of fact:

A.    Award Plaintiffs actual damages, namely one half of all monies awarded to Ball and Pendley, including expenses, in the *BCBS MDL* case No. MDL 2406, pending in this District.

B.    Award Plaintiffs pre and post judgment interest.

C.    Award Plaintiffs the costs of this action, including reasonable attorney fees.

D.    Award Plaintiffs any other appropriate relief as may be deemed to be just, equitable and proper by the court.

*/s/ Thomas H. Bienert, Jr.*
Thomas H. Bienert, Jr.
903 Calle Amanecer, Suite 350
San Clemente, CA 92673
Telephone: (949) 369-3700
Facsimile: (949) 369-3701
tbienert@bklwlaw.com

EXHIBIT 1

**In The Matter Of:**

*IN RE: BLUE CROSS BLUE SHIELD*
*ANTITRUST LITIGATION, (MDL NO.: 2406)*

---

*Video Deposition of Patrick W. Pendley*
*October 18, 2023*

---

*Susan D. Murillo, LCR, CCR*
*118 Wheaton Hall Lane*
*Franklin, Tennessee 37069*
*Phone: (615) 479-7511*

Original File Pendley10-18-23.TXT

**Min-U-Script® with Word Index**

---

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT FOR
          THE NORTHERN DISTRICT OF ALABAMA
 2                  SOUTHERN DIVISION

 3   IN RE:  BLUE CROSS BLUE  )
                    SHIELD     )
 4   ANTITRUST LITIGATION      )   Master File
     (MDL NO.: 2406)           )   2:13-CV-20000
 5
     ----------------------------------------------
 6

 7

 8                VIDEO DEPOSITION OF

 9                 PATRICK W. PENDLEY

10             Wednesday, October 18, 2023

11

12   ----------------------------------------------

13

14

15

16

17

18

19

20

21

22

23

24

25
```

---

**Page 2**

```
 1  APPEARANCES:

 2     For the Plaintiffs:

 3         Mr. Thomas Bienert, Jr., Esq.
           Mr. Daniel E. Goldman, Esq.
 4         Bienert Katzman Littrell
               Williams LLP
 5         903 Calle Amanecer
           Suite 350
 6         San Clemente, CA  92673
           949-369-3700
 7         tbienert@bklwlaw.com
           dgoldman@bklwlaw.com
 8
       For the Defendants:
 9
           Mr. Christopher L. Coffin, Esq.
10         Mr. Stanley P. Baudin, Esq.
           Pendley, Baudin & Coffin, LLC
11         24110 Eden Street
           P.O. Drawer 71
12         Plaqemine, LA  70765
           888-725-2477
13         ccoffin@pbclawfirm.com
           sbaudin@pbclawfirm.com
14
       The Videographer:
15
           Ms. Cheryl Erwin
16         Erwin Video
           1013 River Ridge Terrace
17         Nashville, TN  37221
           615-646-1615
18         cerwinvideo@comcast.net

19     Also Present:

20             Gordon Ball

21

22

23
     Reported By:
24   Susan Murillo, LCR, CCR

25
```

---

**Page 3**

```
 1        The video deposition of Patrick W. Pendley,

 2   individually, and the F.R.C.P 30(b)(6) designee of

 3   Pendley, Baudin & Coffin, LLC, was taken by

 4   counsel for the Plaintiffs at the office of

 5   Pinnacle Financial Partners, 2300 West End Avenue,

 6   Nashville, Tennessee, on Wednesday, October 18,

 7   2023, beginning at 9:50 a.m. for all purposes

 8   allowed under the Federal Rules of Civil

 9   Procedure.

10        It is agreed that Susan Murillo, Licensed

11   Court Reporter, Certified Court Reporter for the

12   State of Tennessee, may swear the witness, take

13   the deposition, and afterwards reduce same to

14   typewritten form, and that the reading and signing

15   of the completed deposition by the witness was

16   reserved.

17        All formalities as to caption, certificate,

18   transmission, filing, etc., are waived.  All

19   objections except as to the form of the question

20   are reserved to on or before the hearing.

21

22

23

24

25
```

---

**Page 4**

```
 1                    I N D E X

 2                                            Page

 3   PATRICK W. PENDLEY

 4   Examination by Mr. Bienert . . . . . . . . . 8

 5   Examination by Mr. Coffin . . . . . . . . . 214

 6   Reexamination by Mr. Bienert . . . . . . . . 220

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 2:25-cv-00014-RDP    Document 2    Filed 01/06/25    Page 19 of 105

IN RE: BLUE CROSS BLUE SHIELD                    Video Deposition of Patrick W. Pendley
ANTITRUST LITIGATION, (MDL NO.: 2406)                              October 18, 2023

Page 5

```
 1              E X H I B I T S
 2                                              Page
 3   NUMBER
 4    1   emails . . . . . . . . . . . . . . . 17
 5    2   PBC Time Sheets . . . . . . . . . . . 25
 6    3   Omnibus Response to Gordon Ball, LLC's
         Petition to Apportion Common Funds
 7       Award submitted to the
         court and the special master . . . . 43
 8
 9    4   Class Action Complaint, Davidson v.
         Blue Cross and Blue Shield of Alabama,
10       et al. . . . . . . . . . . . . . . . 76
11    5   Class Action Complaint, Galactic Funk
         Touring, Inc. v. Blue Cross Blue Shield
12       Of Alabama, et al. . . . . . . . . . 80
13    6   Letter of June 25, 2013 from Gentle,
         Turner and attachment . . . . . . . . 93
14    7   Letter to Ed Gentle of July 11 and
15       attachment . . . . . . . . . . . . . 97
16    8   Wire information and a deposit slip to
         Plaquemine Bank & Trust reflecting
17       $35,000 to PBC law firm from Mr. Ball . 98
18    9   Notice of Voluntary Dismissal Without
         Prejudice, Northern District of
19       Alabama, Southern Division . . . . . . 102
20   10   Letter of November 18, 2016
         (agreement) . . . . . . . . . . . . . 104
21   11   MDL 2406 Blue Cross Blue Shield
22       Antitrust Litigation Monthly Time
         Sheet . . . . . . . . . . . . . . . . 139
23   12   Order Regarding Protocols for
         Plaintiffs' Counsel, Time and Expense
24       Submissions . . . . . . . . . . . . . 146
25
```

Page 6

```
 1            E X H I B I T S  cont.
 2                                              Page
 3   NUMBER
 4   13   May 3, 2017 letter . . . . . . . . . 164
 5   14   email of September 6, 2019 . . . . . 200
 6   15   email and CPAP complaint . . . . . . 212
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
 1        THE VIDEOGRAPHER: My name is
 2   Cheryl Erwin. I'm a videographer. My business
 3   address is 1013 River Ridge Terrace, Nashville,
 4   Tennessee, 37221. I'm here today to take the
 5   video deposition of Mr. Patrick W. Pendley at
 6   2300 West End Avenue in Nashville, Tennessee.
 7        This deposition is being taken
 8   pursuant to the Federal Rules of Civil Procedure
 9   and Civil Action Number 2:13-CV-2000 in the
10   United States District Court for the Northern
11   District of Alabama, Southern Division.
12        This deposition is in regard to
13   Blue Cross Blue Shield Antitrust Litigation.
14   Today is Wednesday, October the 18th, 2023, and
15   the time is now 9:50. The court reporter is Susan
16   Murillo. Will the attorneys please introduce
17   yourselves at this time.
18        MR. COFFIN: My name is Chris
19   Coffin with Pendley, Baudin & Coffin, and I
20   represent Pendley, Baudin & Coffin in this
21   30(b)(6) deposition.
22        MR. BAUDIN: Stan Baudin with
23   Pendley, Baudin & Coffin.
24        MR. BIENERT: Thomas H. Bienert,
25   Jr., on behalf of Gordon Ball, and I'm also
```

Page 8

```
 1   joined by my partner Dan Goldman from the same law
 2   firm.
 3        THE COURT: Mr. Pendley, would you
 4   please raise your right hand so the court
 5   reporter can swear you in, please.
 6
 7        PATRICK W. PENDLEY,
 8   having been first duly sworn, was examined and
 9   deposed as follows:
10
11   EXAMINATION BY MR. BIENERT:
12   Q.       Okay, Mr. Pendley, once again my
13   name is Thomas Bienert or Tom, and I'm going to
14   be doing the questioning of you today. First of
15   all, the name of your law firm that's obviously
16   involved in this dispute is Pendley, Baudin &
17   Coffin, correct?
18   A.       Correct.
19   Q.       Are you okay if I just call it PBC?
20   A.       That's the way we normally refer to
21   it.
22   Q.       All right. How many years have you
23   been practicing law?
24   A.       Since 1967.
25   Q.       How many depositions have you been
```

Page 9

1 part of?
2 A.        Probably 5,000.
3 Q.        So you're familiar with how
4 depositions work.  I assume you don't need me to
5 go through how depositions work and how someone
6 should view questions and answers, right?
7 A.        I am and you do not.
8 Q.        The only thing I'll add to that is
9 -- the one thing I will say is it is not my
10 intent to confuse you, and if at any point I ask
11 a question that you think is unclear, just let me
12 know, and I'll try to rephrase it.  Fair enough?
13 A.        Oh, yes.
14 Q.        Because if you don't say that, then
15 I'm going to assume you understood my question.
16 Fair enough?
17 A.        Not a problem.
18 Q.        So obviously, we're here as a
19 general subject matter in a dispute between Mr.
20 Ball and his firm and you and your firm about
21 fees relative to what we'll call the Blue Cross
22 Blue Shield Antitrust Litigation, right?
23 A.        Correct.
24 Q.        In relation to that dispute, did
25 you have a meeting with Judge Proctor, the judge

Page 10

1 who presided over the case earlier this year in
2 his chambers relative to this dispute?
3 A.        We did.
4 Q.        Do you recall when that was?
5 A.        Sometime in the spring, the best of
6 my memory.
7 Q.        Does it sound like it could have
8 been February of 2023?
9 A.        Could have been.
10 Q.        And do you recall who was there?
11 A.        Oh, Lord.  There was probably 80
12 lawyers and the judge and his staff and Ed Gentle
13 and, you know, all the court personnel.
14 Q.        So I assume that -- am I -- I take
15 it from what you're saying, that what you have in
16 mind is a proceeding that was more than just your
17 dispute with Mr. Ball?
18 A.        That was my understanding.
19 Q.        Was there a point in time in which
20 you had a chambers conference?
21 A.        We did.
22 Q.        And that chambers conference was
23 limited to fewer people, correct?
24 A.        Correct.
25 Q.        And that would be the people

Page 11

1 relevant to this dispute, right?
2 A.        That's correct.
3 Q.        Who do you recall being in the
4 judge's chambers as it related to that discussion
5 or conference about this dispute?
6 A.        The judge, Ed Gentle, myself,
7 Chris, Stan, Gordon, and Ed had somebody, I
8 believe, with him and, of course, what I assume
9 was several law clerks for the judge.
10 Q.        When you say Ed, do you mean Special
11 Master Gentle?
12 A.        Yeah.  If I say Ed I -- I can say
13 Mr. Gentle, if that makes it better, but he was --
14 Q.        I don't know Mr. Ed or Mr. Gentle,
15 so I'm going to call him Mr. Gentle.
16 A.        Ed Gentle.
17 Q.        Special Master Gentle.
18 A.        Special Master.
19 Q.        Do you recall whether, during that
20 meeting Judge Proctor asked you the reason or
21 reasons that you were disputing Mr. Ball's claim
22 in this matter?
23 A.        I do not, but he probably did.
24 Q.        Do you recall what you replied to
25 him?

Page 12

1 A.        I do not.
2 Q.        Is it true, sir, that what you told
3 him was you were disputing Gordon's claim because
4 Gordon didn't pay the capital contributions that
5 you believed he was required to pay on this case?
6          MR. COFFIN: Object to the form.
7          THE WITNESS: Yeah.  Probably.  I
8 don't have any specific memory.  It was a fairly
9 short conference with the judge in his chambers,
10 and I just -- I don't remember.  And I didn't -- I
11 wasn't taking notes either, so there's nothing I
12 could look at to refresh my memory.
13 BY MR. BIENERT:
14 Q.        Well, do you remember that the
15 judge asked you why you were disputing the claim?
16          MR. COFFIN: Object to the form.
17          THE WITNESS: Again, I don't
18 remember that, but I would assume he probably
19 did.
20 BY MR. BIENERT:
21 Q.        If he did, would you have viewed it
22 as important to be as accurate as you could with
23 him?
24 A.        Absolutely, always.
25 Q.        Is it true that when you did

Case 2:25-cv-00014-RDP    Document 2    Filed 01/06/25    Page 21 of 105

IN RE: BLUE CROSS BLUE SHIELD          Video Deposition of Patrick W. Pendley
ANTITRUST LITIGATION, (MDL NO.: 2406)                    October 18, 2023

Page 13

1  respond, you didn't mention any reason other than
2  the alleged failure to pay contributions, capital
3  contributions on the case?
4          MR. COFFIN: Object to the form.
5          THE WITNESS: I do not.
6          MR. COFFIN: Mr. Pendley, if I
7  could, sometimes I may object to a question that
8  counsel asks, so if you would just slow your
9  answer down, because your counsel might want to
10  make an objection. Thank you, Tom.
11          MR. BIENERT: You got it.
12          THE WITNESS: And I don't want to
13  talk over either counsel.
14          MR. BIENERT: Fair enough, thank
15  you.
16  BY MR. BIENERT:
17  Q.        So let's back up. When did you
18  start working on cases with Gordon Ball?
19  A.        1991.
20  Q.        What would be the general subject
21  matter of the types of cases that y'all worked on
22  together?
23  A.        I'm trying to recall or
24  differentiate between environmental type cases
25  and contract cases. I mean, that's over 30 years

Page 14

1  ago so ...
2  Q.        Were they typically class action
3  cases?
4  A.        Yes.
5  Q.        Is it fair to say that your -- the
6  cases that you would have worked with Mr. Ball on
7  occasion would all be class action cases?
8  A.        I think that would be fair to say.
9  Q.        By the time we got to what I'll
10  call the new millennium, and let's say kind of a
11  time pertinent to this lawsuit, would be sort of
12  2012 through the present; is that right?
13  A.        I'm not sure I understand.
14  Q.        The time that this, what I'm going
15  to call the BCBS case, the Blue Cross Blue Shield
16  case that we're here talking about today, got
17  started and all these issues relevant to today,
18  they were from 2012 through the present, right?
19  A.        That's correct.
20  Q.        To the last ten, 11 years, right?
21  A.        Correct.
22  Q.        And during that same time did you
23  have any other cases pending with Mr. Ball in
24  that decade?
25  A.        Yes.

Page 15

1  Q.        And what would they be?
2  A.        Well, one of them would have been
3  the State Farm case. I'm sorry. Yeah, the State
4  Farm case, and there was one other case I can
5  think of that was here in Tennessee involving
6  people that were arrested, but that case really
7  didn't go anywhere.
8  Q.        So is it accurate then that during
9  the time frame, let's say, 2012 through the
10  present, you had, in essence, two cases with Mr.
11  Ball that had a fair amount of activity going on?
12  A.        Oh, yeah, yes.
13  Q.        And the two cases were the Blue
14  Cross Blue Shield case that we're here about
15  today and the State Farm case, right?
16  A.        Certainly those two.
17  Q.        And those are the only two you
18  recall that were really active as you sit here
19  now?
20  A.        No. We had the other, the
21  Tennessee case involving people who were
22  arrested.
23  Q.        And that went nowhere, as you said?
24  A.        Well, Gordon handled it because it
25  was here in Tennessee, and it got dismissed, as I

Page 16

1  remember, on motion to dismiss. It didn't -- it
2  just didn't go very far.
3  Q.        So suffice it to say, the two cases
4  you had with Mr. Ball from 2012 to the present
5  that would have had activity that led to fruition
6  and some recovery was the Blue Cross Blue Shield
7  case and the State Farm case?
8  A.        I think that's correct.
9  Q.        So how did the Blue Cross -- and,
10  by the way, are we all okay if I just say Blue
11  Cross case to refer to our case?
12          MR. COFFIN: Sure.
13  BY MR. BIENERT:
14  Q.        How did the Blue Cross opportunity
15  first present itself to you?
16  A.        I got a telephone call from Gordon.
17  Q.        And what do you recall about that?
18  A.        Gordon called me and said that
19  there was litigation in North Carolina. You
20  understand I'm kind of paraphrasing this, because
21  obviously, 11 years ago. I can't remember
22  exactly, but there was litigation in North
23  Carolina that had been filed by Mike Hausfeld
24  involving antitrust claims against Blue Cross
25  Blue Shield of North Carolina.

Page 17

1        And it would -- the nature of the
2   allegations in that case could be made against
3   the other Blue Cross Blue Shield entities
4   throughout the country, and Gordon was interested
5   in pursuing those claims in other states.
6   Q.       So the case or the opportunity to
7   get involved in the case originated, from your
8   perspective, with Gordon?
9   A.       Absolutely.
10  Q.       What, if anything, came of that
11  call after you and Gordon discussed the case?
12  A.       We decided to have a meeting at his
13  office in Knoxville to discuss the litigation in
14  more detail.
15  Q.       The first exhibit we're going to go
16  ahead and look at will be Exhibit One.  If you can
17  pass that one around.
18       MR. BIENERT: Do you want to mark
19  it?  We'll mark the witness' copy.
20
21       (Exhibit One was marked
22       to this deposition.)
23
24  BY MR. BIENERT:
25  Q.       So first of all, sir, when you have

Page 18

1   a chance, I'm directing your attention to Exhibit
2   One.  I'm going to ask if you look at the front
3   page, and once you've had a chance to look at it,
4   tell me if you recognize what it is.  And I'm
5   just going to say for the record, and I want you
6   to clarify.
7        I don't believe the back pages are
8   related.  I that's just how you produced it, but
9   if you can -- after you've looked at it, tell me
10  if you agree that the back page -- the back of
11  the page is unrelated.
12  A.       The back of the page of Exhibit One
13  is unrelated.
14  Q.       So now Exhibit One, the one page
15  that we can see, the front of it, do you
16  recognize what that is?
17  A.       I do.
18  Q.       Tell me what it is.
19  A.       This is an email from me to Meagan
20  Brannan, who at that time was my paralegal.
21  Q.       And it was about the matter that
22  you discussed with Mr. Ball involving Blue Cross,
23  right?
24  A.       Correct.
25  Q.       And if we go down to the bottom of

Page 19

1   this, which would be the first email in time,
2   Tuesday, April 17, 2012, a guy named Dan or Don
3   Daugherty sends an email to you with a cc to
4   Gordon entitled Blue Cross, and it indicates he
5   is passing along a draft, Blue Cross complaint.
6   Do you see that?
7   A.       I do see that.
8   Q.       And do you recall getting a draft
9   Blue Cross complaint from Mr. Ball?
10  A.       Independently, no, but I have no
11  reason to contest this representation.
12  Q.       And so the -- not only did the idea
13  for the case come from Mr. Ball, but he sent you
14  a draft complaint?
15       MR. COFFIN: Object to the form.
16       THE WITNESS: Yes, sir.
17  BY MR. BIENERT:
18  Q.       Now if you look at the email above
19  that from you to Mr. Daugherty, you say, "Don,
20  the Louisiana information would be very helpful if
21  you could get that to me."
22       Do you see that?
23  A.       I do see that.
24  Q.       What are you referring to there?
25  A.       I cannot -- I cannot recall.

Page 20

1   Q.       It would have been related to the
2   Blue Cross matter, right?
3   A.       Oh, yeah.
4   Q.       And is it -- is it accurate that
5   what you and Mr. Ball discussed was that, as you
6   indicated a few moments ago, the Blue Cross
7   allegations could replicate themselves in many
8   different locations in the country, right?
9   A.       Correct.
10  Q.       And you happened to not only have a
11  law firm in Louisiana, but be admitted to the bar
12  there and a specialist in Louisiana law, right?
13       MR. COFFIN: Object to the form.
14       THE WITNESS: Yes.
15  BY MR. BIENERT:
16  Q.       So would you -- to the degree that
17  Mr. Ball was providing you information about
18  considering a case against Blue Cross, do you
19  believe that he would have sent you information
20  about Blue Cross in Louisiana?
21  A.       He could have.
22  Q.       Do you believe that's what this is
23  a reference to?
24  A.       Well, clearly, it's a reference to
25  Louisiana information, but what information, I

Page 21

1 just don't remember at this time.
2 Q.        Are you confident that whatever
3 information Mr. Ball's firm provided you about
4 Louisiana, it would have related to the potential
5 Blue Cross case?
6 A.        Oh, yes.
7 Q.        And it would have related to
8 potentially bringing a case against Blue Cross
9 based on its Louisiana Blue Cross?  Back up.
10 That's a -- even I know that was poorly worded.
11         MR. COFFIN: Thank you.
12 BY MR. BIENERT:
13 Q.        Is it accurate that whatever he
14 would have sent you, it would have related to
15 potentially bringing a suit against Blue Cross of
16 Louisiana?
17 A.        I think that's correct.
18 Q.        And then if we go up a little
19 further, there is another email from someone
20 named Tabbatha Benson at Ball & Scott to you on
21 April 23rd, 2012, and it says, "Attached is the
22 booklet on health insurance."
23         Do you see that?
24 A.        I do see that.
25 Q.        And, by the way, all these

Page 22

1 references to Ball & Scott dot com, these are
2 folks at Mr. Ball's law firm, right?
3 A.        As far as I know.
4 Q.        Do you know what the booklet on
5 health insurance that was provided would have
6 been?
7 A.        I believe that was an AMA booklet
8 that's published either annually or every two
9 years.  I believe that's what the reference is
10 to.
11 Q.        And it would have been information
12 relevant to Blue Cross?
13 A.        Oh, absolutely.
14 Q.        And then at the top there's an
15 email from you to a Meagan Brannan indicating
16 that you needed her to print the booklet for you
17 on the, quote, new Blue Cross file.  Do you see
18 that?
19 A.        I do see that.
20 Q.        Is Meagan someone who works for
21 you?
22 A.        Meagan -- at that time Meagan was my
23 paralegal.
24 Q.        So is it accurate that after you
25 got this information from Mr. Ball's firm, and

Page 23

1 after speaking to him on the phone, you were
2 pursuing or considering pursuing the Blue Cross
3 matter?
4 A.        Absolutely.
5 Q.        Now, subsequent to this email
6 exchange in April of 2012, did you travel to
7 Knoxville in May of 2012, to meet with Mr. Ball
8 related to the Blue Cross matter?
9 A.        I did.
10 Q.        Why did you travel there?
11 A.        To meet with Gordon and Don about
12 the Blue Cross litigation.
13 Q.        And Don you viewed as being a
14 lawyer at Mr. Ball's firm?
15 A.        He's not a lawyer.
16         MR. COFFIN: Object to the form.
17         THE WITNESS: I'm sorry.
18 BY MR. BIENERT:
19 Q.        Who is Don?
20 A.        It's Don Daugherty.
21 Q.        And who did you understand Don to
22 be relative to Mr. Ball's firm?
23 A.        Don was an employee of Gordon's
24 office.  He, as I understand it, was a graduate
25 of law school, but had never taken -- or at least

Page 24

1 never passed the Bar.  He was not a lawyer.  He
2 was more of a paralegal, operated more as a
3 paralegal.
4 Q.        Does it sound right that the
5 meeting would have been on May 14th, 2012?
6 A.        Sounds about right.
7 Q.        Who would have been at that meeting
8 other than you and Gordon and Don?
9 A.        Nick Rockforte, who was a lawyer
10 with my office at the time, and Charles Barrett I
11 remember was there.
12 Q.        Who is Charles Barrett?
13 A.        He is a lawyer from -- he is
14 originally from Mississippi with the Barrett law
15 office, but he was practicing in -- I believe he
16 was practicing in Nashville at that time.
17 Q.        Was he somebody who you understood
18 was also considering whether to get involved with
19 Mr. Ball and you in the Blue Cross matter?
20 A.        Yes.
21 Q.        What, if anything, do you recall
22 being discussed at the meeting?
23 A.        We talked about the Blue Cross
24 litigation and the potential litigation, how to
25 go about proceeding with the litigation, you

Page 25

1 know, things like that.
2 Q.          And by the way, do you keep time
3 sheets when you do these types of meetings?
4 A.          Yes.  I try to.
5 Q.          So do you believe you would have
6 done time sheets on this one?
7 A.          Yes.
8 Q.          And that would be your normal
9 course and practice?
10 A.          Normal course and practice,
11 although I will tell you that I do the best I can
12 keeping time sheets, but I don't capture every
13 minute.
14 Q.          We're going to go ahead and look at
15 Exhibit Two, which are some PBC time sheets.
16
17                (Exhibit Two was marked
18                to this deposition.)
19
20                (Discussion held off the record.)
21 BY MR. BIENERT:
22 Q.          So Exhibit Two is a multi-paged
23 document.  I'm certainly not asking you to have
24 to look at each and every entry, but can you
25 generally skim it and tell me if you recognize

Page 26

1 what it generally is?
2 A.          Yes, I can.
3 Q.          What is it?
4 A.          This is -- this is the timekeeping
5 for the staff at PBC, and this particular case
6 being the Blue Cross Blue Shield litigation by
7 all of the timekeepers.
8          MR. COFFIN: Tom, if I could just
9 make a clarification, an objection that this is
10 not the actual time that is recorded by Pat at
11 PBC.  This is a generation of that from somewhere
12 else, so you might want to just clarify that.
13          MR. BIENERT: Sure.  And we can
14 just clear that up.  I'm not trying to be
15 difficult.  I just want to be sure.
16          MR. GOLDMAN: This was the time
17 that was provided by Ed Gentle to our respective
18 law firms as to the time that was submitted to
19 him for the MDLs.
20          MR. COFFIN: That's right.  That we
21 agree on.  I just wanted to clear that up with
22 you.
23 BY MR. BIENERT:
24 Q.          Do you agree with that, Mr.
25 Pendley?

Page 27

1 A.          Yes.  This is a -- while this is
2 apparently a compilation of the PBC time in BCBS,
3 this is not the format that we routinely print out
4 our time but -- go ahead.
5 Q.          This document, Exhibit Two, is a
6 compilation of time and expenses that was
7 submitted to the special master in relation to
8 the Blue Cross MDL in the Northern District of
9 Alabama, right?
10 A.          That's my understanding.
11 Q.          If we go ahead and we look at what
12 I believe is the fourth page, at the bottom of it
13 say page one of 49?
14 A.          One of 49?
15 Q.          Yes, sir.
16 A.          These are the double sided,
17 correct?
18 Q.          Yes, but luckily this one faces us,
19 a little easier.
20 A.          Okay.
21 Q.          If you go ahead and you look at the
22 top two entries on that page, there is one for
23 5-13, 2012, and one for 5-14, 2012.  Do you see
24 that?
25 A.          I do.

Page 28

1 Q.          Do these time entries relate to the
2 meeting that you had with Mr. Ball and Mr.
3 Barrett and others in May of 2012, to discuss the
4 Blue Cross cases?
5 A.          Yes.
6 Q.          Now, why did you submit time for
7 that meeting related to the initial Blue Cross
8 cases meeting to the court in the MDL in Atlanta
9 -- sorry, in Alabama.
10 A.          Because it's my understanding that
11 when Judge Proctor issued an order in 2013, that
12 we could -- we, being the lawyers that were
13 involved in BCBS, could submit pre-MDL time, but
14 at that point nobody knew whether we would get
15 paid for that time or we wouldn't get paid.  It
16 was just submit it and see what happens down the
17 road.
18 Q.          You had an understanding though
19 generally, that you were to submit time that was
20 related to the Blue Cross matters?
21 A.          Oh, yes.
22 Q.          Now, in addition to discussing --
23 well, first of all, what do you recall were the
24 general topics that were discussed at the meeting
25 in May of 2012, in Knoxville, as it related to

Page 29

1 the Blue Cross matter?
2          MR. COFFIN: Object to the form.
3          THE WITNESS: I already mentioned --
4 responded to that question, but I'll respond
5 again.
6 BY MR. BIENERT:
7 Q.          Help me out.
8 A.          Sure.  The discussion was about the
9 litigation, what Gordon knew about the litigation
10 at that time.  When I talk about the litigation,
11 I'm talking about the North Carolina litigation
12 and the allegations there and whether or not we
13 could bring similar cases in other states against
14 Blue Cross Blue Shield in the other states, and,
15 if so, how would we go about it to bring those
16 cases.
17 Q.          Was there any understandings
18 addressed or reached about how attorneys' fees
19 would be handled in the Blue Cross matters during
20 the meeting in May of 2012?
21 A.          No.  Gordon and I agreed that for
22 the state cases that we filed, we would split the
23 fee 50/50.
24 Q.          You say Gordon and I agreed, quote,
25 for the state cases, unquote.  That's what you

Page 30

1 just said, right?
2 A.          Because that's what we were --
3 that's what we were discussing was filing cases
4 state by state.
5 Q.          Well, when you were in that meeting
6 in May and talking about potential claims or
7 cases against Blue Cross, did you identify any
8 particular types of cases that would not be part
9 of your fee sharing?
10          MR. COFFIN: Object to the form.
11          THE WITNESS: Any particular types?
12 I'm not sure I understand the question, because
13 we were -- we were talking about filing these
14 cases state by state.
15 BY MR. BIENERT:
16 Q.          You were talking about cases.  You
17 guys had a strategy session to get background
18 about the cases, right?
19 A.          Right.
20 Q.          And you talked about what potential
21 claims or cases you might be able to bring
22 against Blue Cross, and by you I mean that group,
23 right?
24 A.          Right.
25 Q.          And you went over the different

Page 31

1 types of matters that you thought you might be
2 able to bring relative to the allegations against
3 Blue Cross, right?
4 A.          Right.  Well, it was allegations in
5 the North Carolina complaint.
6 Q.          And the fee sharing agreement that
7 you discussed was to apply to the types of cases
8 that you were describing?
9 A.          No.  The cases that we were going to
10 be filing in each state.
11 Q.          Is it accurate though that you
12 never -- you nor anyone else at that meeting ever
13 singled out and said, but this will only apply to
14 state cases?
15          MR. COFFIN: Object to the form.
16          THE WITNESS: That was the
17 agreement.  It would apply to the state cases
18 that we filed.
19 BY MR. BIENERT:
20 Q.          Do you have my question in mind,
21 sir?
22 A.          I'm sorry?
23 Q.          Did you understand my question?
24 A.          No.  There -- there was no other
25 discussion other than as with respect to the fees

Page 32

1 that I remember other than we were going to file
2 cases state by state, and Gordon and I would
3 split the fees, if any, that was on a 50/50
4 basis.
5 Q.          Let me ask it again.  Is it
6 accurate that at no time during that meeting did
7 you or anyone else expressly say, but we will
8 only split fees in state cases, or words to that
9 effect?
10          MR. COFFIN: Object to the form.
11          THE WITNESS: No.  Not that I know
12 of, not that I recall.
13 BY MR. BIENERT:
14 Q.          Is it accurate that at no time
15 during that meeting did you or anyone present put
16 any limitations on the fee sharing agreement to
17 suggest that the fee sharing would not apply to
18 any type of cases that you might bring against
19 Blue Cross?
20          MR. COFFIN: Object to the form.
21          THE WITNESS: Not that I recall.
22 BY MR. BIENERT:
23 Q.          And by the way, you indicated that
24 you and Gordon reached a 50/50 fee share at that
25 meeting.  Wasn't Mr. Barrett or someone from his

Case 2:25-cv-00014-RDP    Document 2    Filed 01/06/25    Page 26 of 105

IN RE: BLUE CROSS BLUE SHIELD                                Video Deposition of Patrick W. Pendley
ANTITRUST LITIGATION, (MDL NO.: 2406)                                        October 18, 2023

Page 33

1 firm at the meeting?
2 A.        Yes, and -- you know, I just -- at
3 the time I just remember I was surprised to see
4 Charles at the meeting, but, I mean, I've known
5 Charles since before he was in law school, and
6 Gordon has done work with the Barrett firm.  I've
7 done work with the Barrett firm.  We've done work
8 together with the Barrett firm.
9          I wasn't -- I was surprised he was
10 there, but I wasn't surprised that they may be
11 involved in the litigation since it was Gordon's
12 idea.
13 Q.       Well, is it true that during the
14 meeting in May of 2013 -- sorry.  Is it true that
15 during the meeting of May of 2012, that the fee
16 sharing that y'all discussed, which to be a third,
17 a third, a third among your firm, Mr. Ball's firm
18 and the Barrett firm?
19          MR. COFFIN: Object to the form.
20          THE WITNESS: It's possible.  I
21 don't -- don't recall.
22 BY MR. COFFIN:
23 Q.        But at a minimum you and Gordon
24 were going to get an equal share of the Blue
25 Cross matters that y'all discussed in May of

Page 34

1 2012?
2          MR. COFFIN: Object to the form.
3          THE WITNESS: You know, now that
4 we're talking about it, I'm wondering if the
5 50/50 didn't arise a few weeks later after we had
6 to drop the Barrett firm, because I can remember
7 that when we filed the first suit, we included
8 Barrett law office.
9          And I remember getting a call from
10 Don saying no, no, no.  I'll represent
11 Mississippi Blue Cross in some -- some litigation
12 unrelated, and they're very upset with me that
13 I'm going to be suing them on the antitrust
14 litigation, and I said -- he said, You got to get
15 me off that litigation.
16          I said, Sure, we can do that, and
17 I'm wondering if that's not when -- when Don or
18 Barrett law office withdrew, that Gordon and I
19 talked the 50/50.  I just -- you know, it's
20 just so long ago, but the point is at some point
21 there Gordon and I agreed to split the fee on the
22 state cases 50/50.
23 BY MR. BIENERT:
24 Q.        Well, are you clarifying that what
25 might have happened is that there would have been

Page 35

1 originally a one-third, one-third, one-third
2 agreement with the Barrett firm, which shortly
3 thereafter you were made aware that the Barrett
4 firm had a conflict and dropped out?
5 A.        That's more probable than not.
6 Q.        And then the end result, regardless
7 of whether it happened in the first meeting on
8 May 12, or it happened sometime thereafter, was
9 that the Barrett firm was out of the picture, and
10 the fee share was going to be 50/50 between your
11 firm and Mr. Ball's?
12 A.        That's the way I recall.
13 Q.        Now on the topic of what y'all
14 discussed or didn't, y'all discussed bringing
15 cases against various Blue Cross entities in
16 various states, right?
17 A.        Yes.
18 Q.        But you didn't limit filing the
19 cases to only in-state court, correct?
20 A.        I don't recall.  I don't remember
21 that, although I am aware that Mississippi state
22 procedure does not have a class action, Article
23 23, and so that state we were going to have to
24 file in federal court if we filed as a class
25 action, and all the other states, to the best of

Page 36

1 my memory, were going to be filed as state cases.
2 Q.        Well, so in other words, sir,
3 sometimes a state class action claim will be
4 filed in federal court in that state?
5          MR. COFFIN: Object to the form.
6          THE WITNESS: Only in Mississippi,
7 to my memory.
8 BY MR. BIENERT:
9 Q.        Well, in your career as a class
10 action lawyer, you've had other matters where you
11 brought state class action claims in federal
12 court, right?
13 A.        No question about that.
14 Q.        It's a common occurrence, right?
15 A.        Absolutely.
16 Q.        And when you were sitting there in
17 Mr. Gordon's -- Mr. Ball's office in 2012, you
18 didn't say words to the effect of, now, hold on,
19 Gordon.  You're only going to get a fee share if
20 we file it in state court and pursue it there,
21 right?
22          MR. COFFIN: Object to the form.
23          THE WITNESS: There was no
24 discussion that I'm aware of.
25 BY MR. BIENERT:

Page 37

1  Q.        The discussion was, hey, can we
2  bring cases against Blue Cross, and where can we
3  bring them, regardless of which forum we actually
4  are able to bring the cases in, right?
5            MR. COFFIN: Object to the form.
6  BY MR. BIENERT:
7  Q.        Right?
8  A.        That's correct.
9  Q.        And in Mississippi, in particular,
10 when you sat in that meeting in 2012, before you
11 even got out of the room, you had an
12 understanding that at least one of your cases
13 would be filed in federal court, right?
14 A.        If we filed in Mississippi.
15 Q.        And you discussed it that day?
16           MR. COFFIN: Object to the form.
17           THE WITNESS: I don't remember that
18 detail.  I'm just making the observation that I
19 knew then and would have known that if we filed
20 in Mississippi, it was going to have to be in
21 federal court as a class action.
22 BY MR. BIENERT:
23 Q.        And did y'all file in Mississippi?
24 A.        Yes.  A Mississippi case was filed.
25 Q.        In federal court?

Page 38

1  A.        I believe that's correct.  I would
2  have to look at the documents, but I think that's
3  correct.  There was no reason for us to file a
4  class action in state court just to be poured
5  out.
6  Q.        And speaking of being poured out, I
7  assume you are familiar with the Class Action
8  Fairness Act, right?
9  A.        Somewhat, yes.
10 Q.        What does the class Action Fairness
11 Act dictate as it relates to whether or not a
12 case filed in state court can wind up going to
13 federal court?
14           MR. COFFIN: Object to the form.
15           THE WITNESS: I'm not sure I
16 understand your question.
17 BY MR. BIENERT:
18 Q.        Is it your -- was it your
19 understanding in the time relevant to this case,
20 that even if you filed a state class action claim
21 in state court, that under the Class Action
22 Fairness Act, a defendant had a strong chance of
23 moving the case to federal court?
24           MR. COFFIN: Object to the form.
25           THE WITNESS: I would say that

Page 39

1  there's always a chance it's going to get removed
2  to federal court when you file a state court
3  class action, but the two reasons why we were
4  filing in state courts, number one was the fact
5  that each Blue Cross Blue Shield entity is a
6  separate entity.
7            In other words, it's not like Aetna
8  or Allstate.  It's one national entity so that we
9  would have venue in each state, and hopefully
10 that would keep the cases in state court.  I'm
11 trying to remember now.  There was another
12 reason, but I can't recall now what it was.
13 BY MR. BIENERT:
14 Q.        The bottom line is:  From the jump
15 in May of 2012, you discussed potential ways to
16 bring claims against different Blue Cross Blue
17 Shield entities in different states, but you
18 didn't distinguish or make any deal that you had
19 with Mr. Ball contingent on whether it was in
20 federal court or state court?
21           MR. COFFIN: Object to the form.
22           THE WITNESS: We did not.
23 BY MR. BIENERT:
24 Q.        By the way -- strike that.  Did
25 y'all also discuss the State Farm case during

Page 40

1  this meeting in May of 2012?
2  A.        Probably.  No.  I don't have any
3  real recollection of that but -- it would have
4  seemed strange if we hadn't said something about
5  it.
6  Q.        Were the same players who were
7  sitting in this meeting in Mr. Ball's office,
8  were y'all also together in a fee sharing
9  agreement in the State Farm case?
10 A.        Yes, plus more.
11 Q.        But you had a fee sharing agreement
12 specifically in the State Farm case with your
13 firm, Mr. Ball's firm and Mr. Barrett's firm,
14 right?
15 A.        I think -- I think that was not in
16 place in May of 2012, but it was --
17 Q.        When did it come in place?
18 A.        My best recollection would have
19 been sometime shortly after that, once the
20 decision was made about getting the State Farm II
21 case filed.
22 Q.        So during the same rough time frame
23 that you're addressing the potential Blue Cross
24 cases, you guys are also contemplating taking
25 another run at the State Farm cases after many

Page 41

1  years of litigation earlier, right?
2  A.       Oh, yeah.
3  Q.       And y'all did take another run
4  against State Farm, right?
5  A.       We did.
6  Q.       And although the case involved
7  firms beyond your firm, Mr. Ball's firm and Mr.
8  Barrett's firm, you had a particular agreement, a
9  fee sharing agreement with Mr. Barrett's firm and
10 Mr. Ball's firm, right?
11 A.       Talking about State Farm?
12 Q.       Yes, sir.
13 A.       Oh, yes.  It's the letter
14 agreement.  It was a written agreement.
15 Q.       Among you three firms?
16 A.       And others.  Yes, and others.
17 Q.       Well, is it true that you had a
18 separate agreement with Mr. Ball's firm and your
19 firm, and Mr. Barrett's firm that did not involve
20 other lawyers at the get-go?
21 A.       In State Farm?
22 Q.       Yes, sir, initially.
23 A.       No.  Not that I -- not that I
24 remember.
25 Q.       Now, during the same meeting when

Page 42

1  y'all talked about Blue Cross potential cases,
2  and you came up with the fee share that you
3  mentioned, was there any discussion during that
4  meeting about apportionment of costs in the Blue
5  Cross cases that y'all contemplated going
6  forward?
7          MR. COFFIN: Object to the form.
8          THE WITNESS: Not that I recall.
9  BY MR. BIENERT:
10 Q.       Is it true that at the time that
11 you had the meeting with Mr. Ball and Mr. Barrett
12 in May of 2012, y'all's focus was on initiating
13 class action filings in different states against
14 the different state Blue Cross entities, right?
15 A.       Yes.
16 Q.       And you guys were focusing on that
17 whether the cases were prosecuted separately in
18 the states in which they were filed, or in a
19 consolidated proceeding such as an MDL?
20         MR. COFFIN: Object to the form.
21         THE WITNESS: Not that I recall.
22 BY MR. BIENERT:
23 Q.       Well, sir, you filed in opposition
24 to Mr. Ball's position or petition in the very
25 action that we're here discussing today, right, a

Page 43

1  written opposition?
2  A.       Yes.
3  Q.       You filed a 43-page opposition,
4  right?
5  A.       Yes.
6  Q.       And you authored it, right?
7  A.       No.
8          MR. COFFIN: Object to the form.
9  BY MR. BIENERT:
10 Q.       You signed it?
11 A.       I signed it.
12 Q.       You read it?
13 A.       Yes.
14 Q.       You represented to the court that
15 it was your position, right?
16 A.       Yes.
17 Q.       That's what you're doing when you
18 are signing a document in your name, right?
19 A.       Correct.
20 Q.       Go ahead and take a look at that as
21 Exhibit Three.
22
23         (Exhibit Three was marked
24         to this deposition.)
25

Page 44

1  BY MR. BIENERT:
2  Q.       Do you have Exhibit Three in front
3  of you, sir?
4  A.       I do.
5  Q.       Do you recognize what it is?
6  A.       Yes.
7  Q.       If we go to the very last page,
8  page 43 of 43, this is a 43-page document, right?
9  A.       Yes.
10 Q.       And it was submitted to the court
11 and the special master in relation to the dispute
12 we're here talking about, right?
13 A.       That's my understanding.
14 Q.       And there's only one signature,
15 name on page 43; is that right?
16 A.       Correct.
17 Q.       That's you, Patrick W. Pendley?
18 A.       Yes.
19 Q.       You reviewed this and then stand by
20 it, right?
21 A.       Yes.
22 Q.       So if you go ahead and look at page
23 six of 43.  Are you there?
24 A.       Oh, yes.
25 Q.       If you look at the first full

Page 45

1 paragraph on that page, which is kind of the top
2 half of the page.  Do you see it?
3 A.        Yes.  Starts with "Although no
4 terms"?
5 Q.        Yes, sir.  If you look at this
6 pleading, in your pleading right here, what
7 you're doing is you're discussing the May 14,
8 2012 meeting that we just talked about, right?
9 A.        That's what it appears to be.
10 Q.        Well, when you say appears to be,
11 that's what it is, right?
12 A.        I'm just saying that's what it
13 appears to be, because it references the May
14 14th, 2012 meeting in Knoxville.
15 Q.        And the words that you signed off
16 on here in describing that meeting, if we look at
17 the bottom third of that paragraph or quote, at
18 this stage, do you see that?
19 A.        I do.
20 Q.        And by the way, When you say "at
21 this stage," you mean the stage of the
22 discussions that you had with Mr. Ball and Mr.
23 Barrett on May 14th, 2012, right?
24 A.        Actually, I think "at this stage"
25 references the stage of the litigation.

Page 46

1 Q.        The stage of the litigation as of
2 May of 2012?
3 A.        Yes.
4 Q.        Which was a strategy session about
5 the litigation that you hadn't even commenced
6 yet, right?
7 A.        Yes.
8 Q.        At this stage, quote, the focus was
9 just on initiating class action case filings in
10 different states against the BCBS entity
11 operating in that state so that the firms would
12 have a leadership position in the antitrust
13 litigation against BCBS entities.
14        Do you see that?
15 A.        I do.
16 Q.        And then you go on to say, "Whether
17 the cases were prosecuted separately in the
18 states in which they were filed, or in a
19 consolidated proceeding such as an MDL," unquote.
20        Do you see that?
21 A.        I do see that.
22 Q.        That's what you told the court is
23 your position in this case, right?
24        MR. COFFIN: Object to the form.
25        THE WITNESS: Yes.

Page 47

1 BY MR. BIENERT:
2 Q.        That is what you were telling the
3 court as an officer of the court, was your mindset
4 in May of 2012, when you had this initial meeting
5 with Mr. Ball, right?
6 A.        Yes.
7 Q.        That is what you had in your mind
8 when you agreed to split fees 50/50 with Mr.
9 Ball, right?
10        MR. COFFIN: Object to the form.
11        THE WITNESS: I'm sorry, I --
12 BY MR. BIENERT:
13 Q.        Sir, what you told the court in
14 this pleading that you signed recently, is that
15 your mindset back in May of 2012, when you entered
16 the fee agreement with Mr. Ball, was to  do
17 exactly what I just read to you, your quote, the
18 last sentence of that paragraph, right?
19 A.        Yeah.  We were discussing the fact
20 that having done a number of MDL cases and class
21 action in the state courts, that there was always
22 the possibility that the litigation could be
23 thrown into a multi-district litigation
24 proceeding.
25 Q.        And you knew that, and Mr. Ball

Page 48

1 knew that, and Mr. Barrett knew that in May of
2 2012, when you were meeting to discuss Blue
3 Cross, right?
4 A.        There's no doubt in my mind.
5 Q.        That y'all all knew that?
6 A.        We all knew that.
7 Q.        And the fee share agreement you
8 were discussing, you didn't put any limitations
9 on the fee share agreement that you discussed
10 that day, did you?
11 A.        I disagree.
12 Q.        Tell me the limitations in the
13 meeting on May 12 -- strike that.  In the meeting
14 on May 14, 2012, that you put on the fee share
15 agreement.
16 A.        I don't recall if the fee sharing
17 agreement was worked out on a 50/50 basis at that
18 meeting.
19 Q.        Because it could have been
20 one-third.  Is that what you mean?
21 A.        Yeah, it could have been one-third.
22 Q.        My bad.  So let's clarify.  The fee
23 share that you discussed, May 14, 2012, that you
24 are referring to at page six of 43 of your
25 pleading with the court was, in essence, an

Page 49

1 agreement, that however it shook out with Mr.
2 Barrett's firm, which you don't recall, your firm
3 and Mr. Ball's firm would get an equal share,
4 right?
5 A.        I think that's correct at that
6 time.
7 Q.         And at that time what you had in
8 mind was trying to get these BCBS cases filed to
9 try to get leadership positions regardless of
10 whether the cases were prosecuted separately in
11 the states in which they were filed or in a
12 consolidated proceeding such as an MDL, right?
13        MR. COFFIN: Object to the form.
14        THE WITNESS: That was -- that
15 could -- that may have been the discussion.  I
16 just don't recall specifically.
17 BY MR. BIENERT:
18 Q.         Why did you write it in this
19 pleading?
20 A.        Because I was trying to set forth a
21 historical fact.  Also, too, I may have had
22 available to me some -- the notes that I had made
23 at the meeting.
24 Q.         Did you produce those notes to us?
25 A.        I don't know.  If we produced the

Page 50

1 whole file, then they're in there somewhere.
2        MR. BIENERT: We don't have those
3 notes, do we?
4        MR. GOLDMAN: If they exist, we
5 don't have them.
6        MR. BIENERT: Can we get those
7 notes, or could we get them so I can continue to
8 question him on these?  Maybe somebody on a break
9 can send them over?
10        MR. COFFIN: We have no idea such
11 notes exist.
12        MR. BIENERT: He just said he may
13 have had them.
14        MR. COFFIN: May, may, sir, may.
15 He doesn't know that he had them.  He didn't
16 testify to that, but we would be happy to check
17 the file.
18        MR. BIENERT: Maybe on a break you
19 and your client can talk about the notes he just
20 referenced, okay?
21        MR. COFFIN: May have had.
22        MR. BIENERT: Yeah.
23        MR. COFFIN: But here's what I can
24 tell you.  We've produced the entire file to you,
25 but we'll be happy to talk.

Page 51

1        MR. BIENERT: We'll come back to
2 that after the break.  Anyway, I request the
3 notes.  Okay?  Fair enough?
4        MR. COFFIN: Sure.
5 BY MR. BIENERT:
6 Q.         So anyway, whether you had notes in
7 front of you or not, as recently as sometime this
8 year when you submitted this to the court, you
9 were telling the court the status of play and
10 what was being and discussed and addressed in May
11 of 2012, right?
12 A.        That's what was being discussed in
13 May of 2012.
14 Q.         And you flat-out told the court, and
15 you say in your pleading, that at the discussions
16 in May of 2012, the cases you were contemplating
17 bringing against Blue Cross Blue Shield could
18 wind up being consolidated in proceedings such as
19 an MDL, right?
20 A.        That was always a possibility.
21 Q.         And, by the way, that's exactly
22 what happened here in this case, right?
23 A.        As it turns out that's what
24 happened.
25 Q.         Now the filings that y'all did file

Page 52

1 in the individual suits that you filed, they made
2 conspiracy claims against Blue Cross Blue Shield,
3 right?
4 A.        Uh-huh, yes.
5 Q.         In other words, you didn't just
6 file, for example, a case in Louisiana only
7 alleging that Louisiana or Blue Cross of
8 Louisiana did bad.  You allege that Blue Cross of
9 Louisiana was in cahoots in a conspiracy with
10 other Blue Cross entities in other states, right?
11 A.        To the best of my knowledge the
12 allegations that were made state by state were
13 virtually identical.
14 Q.         My question is a little different.
15 Is it true, sir, that when you made the
16 state-by-state allegations, you alleged in each
17 state allegation that that Blue Cross entity in
18 that state conspired with Blue Cross entities in
19 other states to do wrong?
20 A.        I would -- I would have to look at
21 the Louisiana complaint to see if that's correct,
22 but my memory is that the allegations from state
23 to state were identical.  So if that allegation
24 was made in Louisiana, it was made in Montana,
25 Idaho, Illinois, Kansas, et cetera, et cetera.

Page 53

1 Q.        And one of the reasons -- strike
2 that.  During this meeting one of the strategy
3 discussions you had was about getting out and
4 filing in as many places as you could because the
5 more different cases you could bring and the more
6 different Blue Cross Blue Shield entities you
7 could sue or areas you could cover, then the more
8 you increased the odds that down the line when
9 other people are trying to get into the cases,
10 that you could have a leadership position, you or
11 Mr. Ball or Mr. Barrett, right?
12        MR. COFFIN: Object to the form.
13        THE WITNESS: Sure.
14 BY MR. BIENERT:
15 Q.        And by the way, that's not
16 something just specific to what y'all did in this
17 case.  That's kind of a practical strategic
18 reality of being in the class action business,
19 right?
20 A.        Correct.
21 Q.        When you go in the class action
22 business, and somebody like Mr. Ball comes up
23 with a good idea for a case, you know that once
24 the cases are out there, there are a whole bunch
25 of other lawyers who are going to try to get

Page 54

1 involved in that case, right?
2 A.        There's no doubt about that.
3 Q.        So at the end of the day in class
4 action cases, you often wind up with sort of an
5 unholy alliance of a bunch of lawyers who are
6 trying to go after the bad guy defendants, right?
7 A.        Aptly described.
8 Q.        But that within that bunch of
9 lawyers there are subgroups of people who might
10 try to take more from the others than maybe
11 someone might think is fair?
12 A.        I think your analysis is correct.
13 Q.        So what are the types of things
14 that you, as a class action specialist, do as it
15 relates to other class action counsel who you
16 know and trust and like, to try to put yourself
17 and your firm and your colleagues in a better
18 position to deal with that unholy alliance of the
19 other lawyers in the firm?
20 A.        You form virtual firms.
21 Q.        Does forming a virtual -- and by
22 the way, for purposes of what we're discussing
23 today on the State Farm case and on the Blue
24 Cross case, the virtual firms that you were
25 trying to put in place was one that involved

Page 55

1 three firms:  Yours, Mr. Ball's and Mr.
2 Barrett's, right?
3 A.        No.
4 Q.        Initially?
5 A.        Oh, initially, yes, because we were
6 the three that were in the meeting in Knoxville
7 at the time.
8 Q.        And by forming that virtual firm,
9 what does that do as a practical matter down the
10 line when the issues come up about who's going to
11 do what in the case, and at the end of the day
12 who's going to get what money?
13        MR. COFFIN: Object to the form.
14        THE WITNESS: Well, it maximizes or
15 attempts to maximize your ability to be part of
16 the leadership in any given case.
17 BY MR. BIENERT:
18 Q.        And is it fair to say that
19 maximizes that ability in at least two ways?  One
20 is, there's strength in numbers, so when the
21 three of y'all with all your experience are
22 working together, it puts you in a position of
23 going to the court and saying look at how much
24 experience the three of us have, we work well
25 together, and we would be the perfect group to be

Page 56

1 a lead on the case or to run important
2 committees.
3        Is that one way it helps?
4 A.        Oh, yes.
5 Q.        And is it fair to say that another
6 way it helps, is it just helps you playing the
7 odds.  If, at the end of the day, only certain
8 lawyers or law firms are going to get the
9 positions of power and influence, lead counsel,
10 committee chairs, if there are three of you, your
11 firm, Mr. Ball's firm, Mr. Barrett's firm,
12 there's a better chance that one of you three
13 will get some position of authority than you by
14 yourself?
15 A.        Correct.
16        MR. COFFIN: Object to the form.
17 BY MR. BIENERT:
18 Q.        I'm correct?
19 A.        Oh, yeah.
20 Q.        So one of the reasons that you form
21 virtual firms where you agree at the outset to
22 share fees, is by going into an agreement at the
23 outset where y'all will equally share fees, with
24 all the uncertainty of what may or may not happen
25 in the case down the line, you are willing to do

Page 57

1 a share, because you want to do that to get a
2 better chance of collectively or individually,
3 one of your three firms, getting in a position of
4 authority in the case?
5 A.        The three firms plus the other
6 firms.
7 Q.        But at the time you went to your
8 virtue firm, you don't know who the other firms
9 are, right?
10 A.        No, I didn't at that time, but I
11 was constantly over the next couple of years
12 adding to the firm.
13 Q.        Right.  And sometimes that could be
14 a good thing for you, if it's firms that treat
15 you fairly and you can work well with, and
16 sometimes that can be a tough thing, because
17 there are firms that maybe aren't simpatico with
18 you, right?
19        MR. COFFIN: Object to the form.
20        THE WITNESS: Well, if it's the
21 latter then you're not going to deal with them to
22 start with.
23 BY MR. BIENERT:
24 Q.        And, by the way, having a virtual
25 firm of three experienced class action guys puts

Page 58

1 you in a better position right out of the box to
2 decide who gets in the case down the line because
3 you have more say over it, right?
4        MR. COFFIN: Object to the form.
5        THE WITNESS: Yes.
6 BY MR. BIENERT:
7 Q.        Now, if we go down just looking at
8 the next -- the bottom paragraph on page six, you
9 write that over the next several months leading
10 up to the JPML Transfer Order -- what's JPML
11 Transfer Order?
12 A.        The -- I'm having a senior moment
13 here.  I know what --
14 Q.        Is that a multi-district
15 litigation order?
16 A.        It's the multi-district litigation.
17 Judicial Panel Multi-district Litigation is JPML.
18 That is the entity that will or will not transfer
19 cases from federal courts around the country into
20 an MDL proceeding.
21 Q.        So the reference at the bottom of
22 page six, it says over the next several months
23 leading up to the JPML Transfer Order, that's a
24 reference of what actually happened in this case
25 to the potential that you recognize could have

Page 59

1 happened two paragraphs above when you're talking
2 about your state of mind in May of 2012, namely
3 that the cases could be consolidated in a
4 proceeding such as an MDL, right?
5 A.        Yes.
6 Q.        But anyway, if we go down to the
7 bottom of that page, page six, you go on to say,
8 PBC, your firm, and various local counsel were
9 able to file additional state class action cases
10 against BCBS entities in different states, and
11 then you list several of them, right?
12 A.        Yes.
13 Q.        Is it accurate that the fee share
14 with your firm and Mr. Ball's getting equal
15 fees, if any fees came in on the cases, would
16 have applied to all of these matters that you
17 list there?
18 A.        Yes.  Fees -- fees allocated to
19 these states and more, because this is not an
20 extensive list of all the cases ultimately.
21 Q.        That's just some of them, right?
22 A.        Just some of them.
23 Q.        So here it applied to cases in
24 Illinois, Indiana, Texas, Idaho, Florida,
25 Arkansas and Alabama, right?

Page 60

1 A.        At that point in time, yes.
2 Q.        By the way, the Florida case that
3 y'all filed was actually filed in federal court,
4 right?
5 A.        I believe that's correct, yes, in
6 federal court.
7 Q.        So that would be another example of
8 a Blue Cross Blue Shield case, of the ones that
9 y'all contemplated in the May, 2012 meeting that
10 wound up getting filed in federal court, not state
11 court?
12 A.        Yes, yes, because I deferred to
13 local counsel.
14        MR. BIENERT: Give me just a second
15 because I'm getting disorganized.
16        THE WITNESS: Not a problem.  Take
17 your time.
18 BY MR. BIENERT:
19 Q.        You indicate in your filing with
20 the court in this matter, Exhibit Three, you
21 indicate that you -- strike that.  Let me back
22 up.  In Exhibit Three the filing with the court
23 stating your position --
24 A.        Uh-huh.
25 Q.        -- you say that you had an oral

Page 61

1 agreement with Mr. Ball to equally share costs
2 and expenses in the Blue Cross litigation; is that
3 right?
4          MR. COFFIN: Object to the form.
5          THE WITNESS: That was an
6 assumption at the time.
7 BY MR. BIENERT:
8 Q.        First of all, am I right that that
9 is a position that you take out, a position you
10 take in your filing with the court in this
11 matter?
12 A.        Right.
13 Q.        So let's talk about that.
14          MR. COFFIN: Can you refer to what
15 you're talking about?
16          MR. BIENERT: Sure.
17 BY MR. BIENERT:
18 Q.        We're going to be back at Exhibit
19 Three.
20 A.        I've got it in front of me.
21 Q.        It said several times, so let me
22 skim it.
23          MR. GOLDMAN: Page 37 of 43, bottom
24 paragraph, the second sentence.
25          THE WITNESS: Which paragraph are we

Page 62

1 in?
2          MR. GOLDMAN: The bottom paragraph.
3          THE WITNESS: Starting with further
4 answer?
5          MR. GOLDMAN: Yes.
6 BY MR. BIENERT:
7 Q.        Let me know after you've had a
8 chance to read that.
9 A.        Okay. I've read -- well, it goes up
10 on the next page. Okay.
11 Q.        So if you look at the paragraph
12 that Mr. Goldman just directed you to, the second
13 sentence there says rather, quote, there was an
14 oral agreement to equally share in funding of the
15 capital contributions for Pendley and Ball,
16 unquote. Do you see that?
17 A.        I do see that.
18 Q.        Of course, you're talking about the
19 Blue Cross litigation that we're here about,
20 right?
21          MR. COFFIN: Object to the form.
22 What portion? I'm sorry. Can you be more
23 definitive?
24 BY MR. BIENERT:
25 Q.        When you make the statement, rather,

Page 63

1 there was an oral agreement to equally share in
2 funding of the capital contributions for Pendley
3 and Ball, you're talking about capital
4 contributions on the Blue Cross litigation
5 matters, right?
6          MR. COFFIN: Object to the form.
7          THE WITNESS: In the MDL
8 litigation.
9 BY MR. BIENERT:
10 Q.        So let's break that down then. So
11 is it your position -- let's first start with
12 pre-MDL. Is it your position that there was no
13 agreement or understanding on how costs and
14 expenses would be shared or not?
15 A.        Not that I recall.
16 Q.        But you say that there was an oral
17 agreement to equally share in funding after it
18 was an MDL?
19 A.        Yes.
20 Q.        By the way, the MDL came in pretty
21 quickly by January of -- strike that. By the end
22 of 2012, y'all were already transferred to
23 Alabama in the MDL, right?
24 A.        Actually, December 12th of 2012, if
25 I remember correctly.

Page 64

1 Q.        Right. So the MDL transfer came
2 seven months after y'all had the initial meeting
3 on the case, right?
4 A.        That sounds right.
5 Q.        So tell me when this oral agreement
6 to equally share in the funding of the capital
7 contribution for Pendley and Ball occurred?
8 A.        For the MDL proceeding, when we got
9 the first capital call in 2013. I think, if I
10 remember correctly, Gordon called me and said
11 Look, we're going to have these capital calls,
12 why don't we pay -- we'll each pay 50 percent,
13 and I said that's fine with me, and that's what
14 we did for the first call.
15 Q.        And we have other exhibits that
16 I'll get to that show when you got a capital call
17 from, it would be from the special master, right?
18 A.        Yes.
19 Q.        And that will help us bracket that
20 date, right?
21 A.        It was about the time of the first
22 capital call, because at that point there was no
23 need -- prior to that there was no need to have a
24 discussion about capital calls in the MDL,
25 because it either, A, didn't exist, or no capital

Case 2:25-cv-00014-RDP    Document 2    Filed 01/06/25    Page 34 of 105

IN RE: BLUE CROSS BLUE SHIELD                                          Video Deposition of Patrick W. Pendley
ANTITRUST LITIGATION, (MDL NO.: 2406)                                                     October 18, 2023

Page 65

1  calls had been made.
2  Q.        Now during that conversation did
3  you at all -- well, first of all, let's just
4  break this down.  Was this a telephone call that
5  you had with Mr. Ball?
6  A.        That's my recollection.
7  Q.        Was anyone else on the call other
8  than you and Mr. Ball?
9  A.        Not that I recall.
10 Q.        And you believe that Mr. Ball
11 initiated the call?
12 A.        I believe so.
13 Q.        During that call was there any
14 reference to the fee share agreement, the oral
15 one that had been in existence since the May 12 --
16 strike that.  May 14, 2012 meeting?
17 A.        Not that I recall.
18 Q.        Did you raise it with Mr. Ball when
19 he talked about the issue of potentially paying 50
20 percent of the costs?
21 A.        Of the capital calls?
22 Q.        Yes.
23 A.        I make a distinction between
24 capital calls and court costs, general court
25 costs.

Page 66

1  Q.        We'll say capital calls.  Tell me
2  your view of the differences between the two.
3  A.        Well, the capital calls was
4  specific calls made by Ed Gentle, the special
5  master, to fund the litigation, the MDL
6  litigation.  Court costs -- I had been incurring
7  court costs since June of 2012, in terms of
8  filing fees, travel expenses, because I was
9  traveling to a lot of different states meeting
10 with local counsel to encourage them to file
11 suits in their state.
12          So the discussion that we had about
13 the time of the first capital call involved only
14 the capital call contributions that Ed was
15 requesting from the people involved in the
16 litigation.
17 Q.        Right.  So these -- to use your
18 words, the capital calls were to fund the
19 litigation?
20 A.        The MDL litigation.
21 Q.        Separate and apart from expenses if
22 you take a trip, or there's a fairly de minimis
23 court cost from filing and the like, right?
24 A.        The general case expenses, right.
25 Q.        Now, did you ever say words to the

Page 67

1  effect to Gordon of, well, you're not a 50/50 fee
2  share person in this case, so you don't have to
3  pay 50 percent of the capital calls?
4  A.        I did not.
5  Q.        Did you ever even bring up the
6  topic of the fee share agreement that you and Mr.
7  Ball had entered earlier that year?  Strike that.
8  Earlier in 2012?
9  A.        We did not.
10 Q.        Did you understand at the time when
11 Gordon was talking to you about capital
12 contributions, that Mr. Ball believed that you
13 guys had a 50/50 fee share?
14 A.        I don't know -- I don't know what
15 Gordon believed at that time, because the
16 discussion in the fall of 2013, or whenever the
17 first call was made by Ed Gentle, was about how
18 we were going to pay the capital calls.
19 Q.        And the capital call, by the way,
20 that Mr. Gentle sent was to ask Mr. Ball to
21 pay the same amount of money as you, was it?
22 A.        It was not.
23 Q.        Did you ever raise with Mr. Ball a
24 question or a comment along the lines of why
25 would you pay 50 percent on a case when you are

Page 68

1  only being asked to pay less than 50 percent and
2  when you're not going to be treated as a partner?
3  A.        I did not.
4  Q.        Why not?
5  A.        We were trying to address the issue
6  of how the capital calls were going to get paid.
7  Q.        But at the time you got that call,
8  Gordon was under no court request or order or
9  anything to pay more than a much smaller
10 percentage, right?
11 A.        Ten thousand, that's correct.
12 Q.        Ten thousand out of, in essence, 60
13 paid by your firm and ten by him, right?
14 A.        That's right.
15 Q.        So Gordon, according to the court,
16 would only have to pay one-sixth of what you
17 paid, right?
18 A.        Right.
19 Q.        And Gordon is offering to pay 50
20 percent instead of one-sixth, right?
21          MR. COFFIN: Object to the form.
22          THE WITNESS: I'm sorry.  Say that
23 one more time.
24 BY MR. BIENERT:
25 Q.        According to you, during this

Page 69

1 conversation, Gordon was offering to pay 50
2 percent of something when the court was only
3 asking or expecting him to pay one-sixth of what
4 you paid, right?
5        MR. COFFIN: Object to the form.
6        THE WITNESS: That's correct.
7 BY MR. BIENERT:
8 Q.       And you knew that the 50 percent
9 contribution that Gordon was suggesting was the
10 same percentage that you and Gordon had discussed
11 for fee sharing amongst your firm and his back in
12 May and in the subsequent weeks after the Barrett
13 firm dropped out, right?
14        MR. COFFIN: Object to the form.
15        THE WITNESS: That's correct but --
16 but in my mind the two were not one and the same,
17 because I knew and Gordon knew that Judge Proctor
18 at the very first meeting that he had of all
19 counsel in Birmingham, was going to, if the
20 plaintiffs were successful, refund the expenses
21 plus -- I'll call it a bump for the people that
22 had put up money to litigate the MDL.
23        We didn't know what the bump would
24 be, but it would be an enhancement to whatever
25 you put in, pro rata.  You put in one percent,

Page 70

1 then you were going to get one percent of the
2 bump or whatever it was.
3 Q.       Well, first of all, what you just
4 said to us, this idea that you would get a bump,
5 and Gordon might get a bump based on how much
6 money was contributed in the capital call, did
7 you at any time raise that during the discussion
8 that you claim you had about contributing 50/50
9 with Mr. Ball?  And this would have been in 2013.
10        MR. COFFIN: Object to the form.
11        THE WITNESS: I didn't raise it
12 because we both were aware of the fact that the
13 money that you paid with respect to capital calls
14 was basically an investment, and that was going
15 to have a return, not knowing what the return was
16 going to be, but it was going to be a return over
17 and above what any firm actually put into the
18 case.
19 BY MR. BIENERT:
20 Q.       So the answer is you didn't raise
21 it?
22        MR. COFFIN: Object to the form.
23        THE WITNESS: No, I didn't raise --
24 I didn't raise it because we were looking at it --
25 I say we.  I was certainly looking at it as an

Page 71

1 investment the litigation.
2 BY MR. BIENERT:
3 Q.       By the way, the entire fee share was
4 an investment in the litigation, right?
5 A.       Well, yeah.
6 Q.       Right?
7 A.       Yeah.
8 Q.       When you sit down in any case, and
9 in this case in May of 2012, and y'all are
10 contemplating bringing a whole bunch of cases
11 against a major corporation all over the country,
12 you're making a business investment decision as
13 to whether or not you are willing to invest your
14 time and effort into what could be a herculean
15 task in exchange for what is an uncertain
16 recovery at the end, right?
17 A.       No doubt about it.
18 Q.       So to the degree that there is an
19 investment being made in these cases, both your
20 firm and Mr. Ball's were making investment
21 decisions from the beginning and all the way
22 along as to what to invest into this case, right?
23 A.       I certainly was.
24 Q.       And you understand he was too?
25 A.       Well, that's my belief.

Page 72

1 Q.       Let me ask you this.  Why is it
2 that you seem to know what he is thinking when
3 you claim he knew that by giving you 50 percent
4 of what you paid when he didn't have to, but you
5 claim that you don't know what he was thinking
6 when he decided to invest 50 percent with you in
7 the cases?
8        MR. COFFIN: Object to the form.
9 Excuse me, Mr. Pendley.  I'm objecting to the
10 form.  Now you can answer.
11        THE WITNESS: He was sitting in the
12 courtroom in the first status conference when
13 Judge Proctor said, This is not going to be a Dow
14 Corning fiasco in my court with respect to
15 plaintiffs' expenses and costs to litigate.  I
16 will -- if plaintiff is successful I will award a
17 bump for the people who were financing the case
18 at the end of the day.
19 BY MR. BIENERT:
20 Q.       And he was sitting in the room with
21 you in May of 2012, when he told you about an
22 opportunity to go after Blue Cross Blue Shield
23 cases, and he decided to ask you if you wanted to
24 participate, and he agreed to split fees with you
25 equally in those cases, right?

Page 73

1          MR. COFFIN: Object to the form.
2          THE WITNESS: Yeah.  He was sitting
3 there.  It was his office.
4 BY MR. BIENERT:
5 Q.          So he had every bit the knowledge
6 of what the fee share and the costs and risks
7 associated with it were on the fee share, as you
8 claim he did on the contribution share, right?
9          MR. COFFIN: Object to the form.
10          THE WITNESS: Not necessarily but --
11 because I consider them two separate situations.
12 BY MR. BIENERT:
13 Q.          By the way -- and again I led you
14 to this so it's my fault, not yours, but we have
15 kind of gotten a little out of order, because
16 this whole issue of the fee contributions you're
17 saying happened when the special master asked for
18 a contribution, that's jumping ahead to 2013.
19 A.          Talking about the cost
20 contribution?
21 Q.          Yes, sir.
22 A.          You said fee.
23 Q.          My bad.  The cost contribution.
24 A.          Yeah, right.
25 Q.          So we jumped ahead in time, but by

Page 74

1 the time this discussion that you're describing
2 happened, the case had already been in the MDL
3 for many, many months, right?
4 A.          Since December of 2012, yes.
5 Q.          And at the time that you had this
6 discussion, all of the state cases that you had
7 originally filed to try to get a group together
8 and get involved in the cases, had been dismissed
9 because they were now -- the claims were part of
10 the MDL, right?
11 A.          That's incorrect.
12 Q.          Well, let's break it down.  Is it
13 true that there were dismissals of the state
14 cases after the case had gotten into MDL?
15 A.          Yes.
16 Q.          Is it true that at the time that
17 the discussion that you're talking about, the
18 purported discussion about contributions, at the
19 time of that discussion the originally filed
20 cases in state and federal court had been
21 dismissed?
22 A.          No.
23 Q.          Had some of them?
24 A.          Not that I know of.
25 Q.          Then we'll come back, and after a

Page 75

1 break I'll clean up that timing because it will
2 be easier to do with documents.
3 A.          Sure.
4          MR. BIENERT: Why don't we take
5 like a five-minute break?
6          THE WITNESS: Oh, yeah, sure.
7          THE VIDEOGRAPHER: Going off the
8 record.  The time is now 11:04.
9          (Recess was taken at 11:04 a.m.)
10          THE VIDEOGRAPHER: We're back on
11 the record.  The time is now 11:22.
12 BY MR. BIENERT:
13 Q.          Okay.  Mr. Pendley, picking up on
14 some of the things that we discussed.
15 A.          Sure.
16 Q.          So in your submission to the court,
17 you noted several cases that you guys filed prior
18 to the transfer order, and one of those cases
19 included the case you filed in Florida, right?
20 A.          Yes.  It's on six, right?
21 Q.          Yes, sir.
22 A.          Let me get to six.  Okay.  Go
23 ahead.
24 Q.          Am I correct, one of the cases is in
25 Florida?

Page 76

1 A.          That's correct, Florida.  The
2 Florida case was filed early on.  I don't
3 remember exactly when, but it was filed early on.
4 Q.          And the Florida case specifically
5 would have been covered by the 50/50 fee share
6 agreement that you and Mr. Ball arrived at in May
7 of 2012, or in the subsequent weeks after Mr.
8 Barrett dropped out?
9          MR. COFFIN: Object to the form.
10          THE WITNESS: Yes.
11 BY MR. BIENERT:
12 Q.          Let's go ahead and look at that
13 Florida case, which will be Exhibit 22.  I got
14 the cover page of it.
15 A.          Okay.
16 Q.          And I've got the last page of it.
17          MR. COFFIN: It will be exhibit --
18          MR. BIENERT: Twenty-two.  I had
19 put them in a different order.  Make it four and
20 we'll adjust.
21
22          (Exhibit Four was marked
23          to this deposition.)
24
25          MR. BIENERT: This was an exhibit to

Page 77

1 your submission.
2        THE WITNESS: I have Exhibit Four in
3 front of me.
4 BY MR. BIENERT:
5 Q.        Is it accurate, sir, that Exhibit
6 Four is the first page and the last page of the
7 class action suit that you and other lawyers
8 filed in Florida in district court relative to
9 the Blue Cross cases, right?
10 A.        I think that's -- yes.  To my
11 knowledge that's correct.
12 Q.        And as Mr. Goldman said, this
13 complaint was an exhibit to your filing with the
14 court in this matter that we're discussing here,
15 the dispute over the fees?
16 A.        I'm not sure.  If you say it was,
17 then, yeah, okay, yes.
18 Q.        And if we focus on the caption,
19 first of all, this is in United States District
20 Court for the Northern District of Florida,
21 correct?
22 A.        Correct.
23 Q.        And this is the state case that you
24 reference at the bottom of page six in your
25 submission, Exhibit Three, that we talked about

Page 78

1 several times today, right?
2 A.        Oh, yes, yes, okay.
3 Q.        And it was filed -- if we look at
4 the top of Exhibit Four, it was filed in November
5 of 2012, correct, November 15, 2012?
6 A.        That's correct.
7 Q.        That is before the MDL transfer,
8 right?
9 A.        Well, it would have had to have
10 been.  It's the chicken and the egg.
11 Q.        So the answer is yes?
12 A.        The answer is yes.
13 Q.        And if we look at this, you didn't
14 just file this against Blue Cross of Florida.
15 You filed it against all of the Blue Cross
16 entities across the country, right?
17 A.        Yes.
18 Q.        So you did allege, as part of this
19 filing and the others, a conspiracy of action
20 among all of the Blue Cross entities nationwide,
21 right?
22 A.        Without looking at the factual
23 allegations, I assume that that's correct.
24 Q.        Well, regardless of whether there
25 was a word "conspiracy" in it, you filed against

Page 79

1 all of these Blue Cross entities?
2 A.        We did.
3 Q.        Then if you look at the last page,
4 we can see that there were four lawyers or law
5 firms that were part of filing this case in
6 Florida in November of 2012, right?
7 A.        Yes.
8 Q.        And the four firms include Mr.
9 Ball's firm, right?
10 A.        Yes.
11 Q.        And yours, correct?
12 A.        And my firm.
13 Q.        Now if we look at who is the
14 plaintiff here, the plaintiff in this suit that
15 you and Mr. Ball filed in Florida, a Jennifer Ray
16 Davidson, right?
17 A.        That's correct.
18 Q.        She is the lead plaintiff in you
19 and Mr. Ball's case, right?
20 A.        Yes.
21 Q.        Now, let's go ahead and look at
22 Exhibit Five, which is the consolidated class
23 action complaint in the Northern District of
24 Alabama in the multi-district litigation.
25

Page 80

1
2        (Exhibit Five was marked
3        to this deposition.)
4
5 BY MR. BIENERT:
6 Q.        Tell me once you've had a chance to
7 look at Exhibit Five.  Do you recognize what
8 Exhibit Five is?
9 A.        This is the master complaint that
10 was filed in the MDL proceeding.
11 Q.        This is the MDL master complaint,
12 and it was filed seven months after the Florida
13 suit had been filed, namely, the master MDL class
14 action complaint was filed in July of 2013, in the
15 Northern District of Alabama, correct?
16 A.        That's what the stamp says, yes.
17 Q.        Does that sound correct?
18 A.        It does sound correct.
19 Q.        And if we look at -- first of all,
20 if we look at Exhibit Five and Exhibit Four next
21 to one another --
22 A.        All right.
23 Q.        -- and you literally just look at
24 the defendants in the MDL master class action
25 suit in Alabama and compare it to the list of the

Page 81

1 defendants in the case that you and Mr. Ball
2 filed in Florida, it's the same defendants in the
3 same order on both, right?
4        MR. COFFIN: Object to the form.
5        THE WITNESS: I haven't compared
6 them, but I have no reason to not believe that
7 that's correct.
8 BY MR. BIENERT:
9 Q.        Well, if you just take a gander at
10 the first six or seven of the many, many
11 defendants listed, is it accurate that in
12 comparing Exhibit Four to Exhibit Five, they
13 literally mirror each other in the same order and
14 the same defendants?
15        MR. COFFIN: Object to the form.
16        THE WITNESS: Again I would have
17 the same answer. I haven't gone through it but --
18 BY MR. BIENERT:
19 Q.        I'm asking you to go through the
20 first three lines. Let's make it easy.
21 A.        Oh, the first three lines?
22 Q.        Sure. Is it true that on both
23 Exhibit Four and Five, the first defendant listed
24 is Blue Cross Blue Shield of Alabama?
25 A.        Correct.

Page 82

1 Q.        Is it true that the second
2 defendant listed in both Exhibit Four and Five is
3 Primera Blue Cross Blue Shield of Alaska?
4 A.        Yes, that's correct.
5        MR. COFFIN: Wait, wait, wait. I'm
6 sorry. What document are you two looking at?
7        MR. BIENERT: We're comparing
8 Exhibit Four, which is the lawsuit that Mr. Ball
9 and Mr. Pendley and others filed in Florida --
10        MR. COFFIN: Okay.
11        MR. BIENERT: -- Exhibit Four, to
12 Exhibit Five, which is the MDL class action
13 lawsuit filed seven months later in the Northern
14 District of Alabama.
15        MR. COFFIN: Okay. And you went
16 through the first one, which is Blue Cross Blue
17 Shield of Alabama, correct?
18        MR. BIENERT: Correct.
19        MR. COFFIN: What's the -- the
20 second one is where I'm having a problem, because
21 I must have a different document. Who's the
22 second one, Mr. Pendley? I don't mean to take
23 your --
24        MR. BIENERT: Well, you kind of
25 are.

Page 83

1        MR. COFFIN: I'm sorry. I'd like
2 to know what the second one is because I must
3 have the wrong document.
4        MR. BIENERT: Okay. Well, why
5 don't we have him read the second one --
6        MR. COFFIN: Go ahead. And that's
7 Exhibit Four?
8        MR. BIENERT: Do you want me to
9 start with four? I want to make it easy for you.
10 How would you like me to proceed? Seems like you
11 want to be -- I can --
12        MR. COFFIN: Go ahead. I'm not
13 trying to take over, but I must have a different
14 document, but go ahead.
15        MR. BIENERT: Anything else? Okay.
16 I'm going to go forward.
17        MR. COFFIN: Can I look at his
18 exhibit? That will probably help us.
19        THE WITNESS: That's four, and then
20 this is five.
21        MR. COFFIN: So there's one, right?
22        THE WITNESS: Right.
23        MR. COFFIN: And there's two,
24 right?
25        THE WITNESS: Two is -- yeah.

Page 84

1        MR. COFFIN: Okay. I just want to
2 make sure I have the same document. Thank you.
3 Go ahead.
4 BY MR. BIENERT:
5 Q.        So the first defendant on both is
6 Blue Cross Blue Shield of Alabama, right?
7 A.        Blue Cross Blue Shield of Alabama,
8 yes.
9 Q.        The second one is Primera on
10 Exhibit Four. Says Primera Blue Cross of Alaska,
11 and on Exhibit Five it says Primera d/b/a Primera
12 Blue Cross Blue Shield of Alaska and Primera Blue
13 Cross of Washington, right?
14 A.        Well, there's a little problem. On
15 four the second entity is Anthem, Inc., whereas
16 on five the second entity is Primera d/b/a
17 Primera Blue Cross Blue Shield of Alaska.
18 Q.        Okay. You're right. So we'll say
19 there is a -- so we have Anthem in between the
20 two on Exhibit Four, and then we go to Primera on
21 both, right?
22 A.        Yes.
23 Q.        Then we have Arkansas Blue Cross
24 and Blue Shield. Do we have that? Hold on a
25 second.

Page 85

1 A.        Oh, yeah, let me see.
2 Q.        If you look at Exhibit Four, it
3 lists Arkansas Blue Cross and Blue Shield, right?
4 A.        I'm trying to find it.  Oh, oh, I
5 see, yeah, okay.  Arkansas Blue Cross and Blue
6 Shield.
7 Q.        Then if we look at Exhibit Five,
8 it's one, two, three -- it's the fifth one.  It's
9 Arkansas Blue Cross Blue Shield.  Do you see
10 that?
11 A.        I see Primera Blue Cross of
12 Washington.
13 Q.        Blue Cross Blue Shield of Arizona?
14 A.        Oh, Arkansas is -- yeah, it's
15 further down.
16 Q.        Yes.  So is it safe to say --
17 strike that.  Is it fair to say that the
18 defendants in the Northern District of Florida
19 suit that you and Mr. Ball filed and the
20 defendants in the MDL in Alabama, overlap?
21        MR. COFFIN: Object to the form.
22        THE WITNESS: They apparently
23 somewhat overlap.
24 BY MR. BIENERT:
25 Q.        The bottom line is we have the long

Page 86

1 list of defendants in each, and it's a very long
2 list in both cases, correct?
3 A.        Yes, that's correct.  I can tell
4 you it was certainly my intention to list every
5 Blue Cross Blue Shield as a defendant in Florida.
6 We may have missed, we may not.  I don't know
7 without going through this thing.
8 Q.        Was that also the intention in
9 Alabama?
10 A.        Yes, although I didn't -- the
11 leadership of the MDL was the one that drafted
12 the MDL, the master complaint.
13 Q.        Meaning Exhibit Five?
14 A.        In Exhibit Five, correct.
15 Q.        All right.  Now, if we go to the
16 plaintiff side of it in the Florida case, the
17 case that you and Mr. Ball filed, the plaintiff
18 is Jennifer Ray Davidson, right?
19 A.        That's correct.
20 Q.        Now, if we look at Exhibit Five, if
21 we look at the plaintiffs in the master MDL,
22 Jennifer Ray Davidson is one of the plaintiffs,
23 right?
24 A.        Yes.
25 Q.        So the master MDL in the Northern

Page 87

1 District of Alabama -- strike that.  So the
2 allegations by Jennifer Ray Davidson that you and
3 Mr. Ball and the other counsel in Florida
4 brought, were transferred into and made part of
5 the master MDL in Alabama?
6        MR. COFFIN: Object to the form.
7        THE WITNESS: Yes.
8 BY MR. BIENERT:
9 Q.        All right.  Let's talk a little bit
10 about the contributions and -- oh, let me go
11 back.  I want to revisit one topic.  You talked
12 earlier about this call that you claim you had in
13 2013, where you and Mr. Ball discussed
14 contributing to the costs of funding the
15 litigation, right?
16 A.        The cash calls.
17 Q.        Right.  And this was prompted by
18 the special master sending out a letter
19 suggesting amounts that he wanted paid?
20 A.        I disagree with the term
21 suggesting.
22 Q.        Ordered?
23 A.        Ordering.  If you wanted to stay in,
24 this is what you had to pay.
25 Q.        And you said that you thought that

Page 88

1 there would be a bump where people would get paid
2 back on more than they contributed, right?
3        MR. COFFIN: Object to the form.
4        THE WITNESS: No.
5        MR. BIENERT: Let me clean that up,
6 because I realize as I said it, I said it
7 improper.
8 BY MR. BIENERT:
9 Q.        You indicated to us that it was
10 your view that the amount of money contributed by
11 a law firm, if there was a successful recovery
12 later, that there would likely be a bump so that
13 your recovery would be enhanced beyond just the
14 ratio of what you put in?
15 A.        That's what Judge Proctor said, and
16 I believed it.
17 Q.        Now, as it related to Mr. Ball
18 paying money to your firm, is it true that Mr.
19 Ball -- strike that.  Is it true that as it
20 relates to the contribution payments that Mr.
21 Ball's firm did make, that some of them were made
22 directly to the fund, but some of them were made
23 back to your firm to reimburse you for money that
24 you had already paid to the fund?
25        MR. COFFIN: Object to the form.

Case 2:25-cv-00014-RDP    Document 2    Filed 01/06/25    Page 40 of 105

IN RE: BLUE CROSS BLUE SHIELD                    Video Deposition of Patrick W. Pendley
ANTITRUST LITIGATION, (MDL NO.: 2406)                              October 18, 2023

Page 89

1      THE WITNESS: I'm trying to figure
2  out how to answer that question, because it's a
3  compound question.  Let me just -- let me just
4  explain how --
5      MR. BIENERT: Sure.
6      THE WITNESS: How it worked, if you
7  will.  When the first cash call came out, Gordon
8  and I talked, and we said okay, we'll pay --
9  Gordon said, I'll pay half yours, and you pay
10  half of mine, and we'll go like that, which we
11  did on the first cash call.  Then --
12  Q.      So in other words -- they were all
13  paid directly to the fund?
14  A.      No.  Paid to me.
15  Q.      So you paid it, and he reimbursed
16  you half?
17  A.      Or he sent me the money, and then I
18  paid it.  Six of one and a half dozen of the
19  other.  That was the first cash call.  It was his
20  part, and my part was divided 50/50.  Then the
21  second cash call came out, and it is my
22  understanding that Gordon sent his contribution
23  directly to Ed Gentle, not through my office, and
24  then I paid my cash call, and Gordon had sent me
25  half of that.

Page 90

1  Q.      Okay.
2  A.      So that's the first two cash calls
3  that were made.  Okay.  So ...
4  Q.      And is it accurate that at the end
5  of the day in what came out of the recommendation
6  for payments based upon the end of the case and
7  the JBA and those things, that the special master
8  and/or the court only factored in a part of what
9  Mr. Ball had paid in, namely, the part that he
10  sent directly in and did not factor in the money
11  that he sent you to pay you half of what you
12  paid?
13      MR. COFFIN: Object to the form.
14      THE WITNESS: I don't know if
15  that's the situation, but it seems to be but --
16  BY MR. BIENERT:
17  Q.      Well, if you're right that it seems
18  to be, or if it turns out that that seems to be
19  is correct, then Mr. Ball didn't even get paid
20  based upon what he actually sent in for the
21  contributions?
22      MR. COFFIN: Object to the form.
23      THE WITNESS: The judge's order is
24  the judge's order.  That's in black and white.
25  BY MR. BIENERT:

Page 91

1  Q.      Do you have my question in mind?
2  A.      Yeah, but -- I don't -- the answer
3  is I don't know because the judge -- I don't know
4  how the calculation was made with any specific
5  firm, is what I'm trying to tell you.  I know
6  what we got.
7  Q.      The judge didn't lay out, or the
8  special master didn't lay out an order as to how
9  they arrived at what they came up with?
10  A.      I don't --
11      MR. COFFIN: Object to the form.
12      THE WITNESS: I don't remember
13  seeing anything like that.
14  BY MR. BIENERT:
15  Q.      So now let's talk a little bit --
16  I've got some documents that I think will just
17  let us give some dollar and cents to some of
18  these discussions we just had.
19  A.      Okay.
20  Q.      First of all, is it accurate that
21  as part of the MDL, the court gave each of the
22  parties instructions on, for example, how they
23  were to keep time and what time they could submit
24  to the MDL case?
25  A.      Judge Proctor issued a specific

Page 92

1  order to that effect.
2  Q.      And is it true that Judge Proctor
3  ordered that only time spent on matters relating
4  to the MDL should be submitted as time for the
5  MDL?
6  A.      That's partially true.
7  Q.      Tell me what --
8  A.      He did -- my recollection is he did
9  give the lawyers an opportunity at the very
10  beginning of the MDL proceeding to account for
11  pre-MDL work, and I don't know whether he -- I
12  can't remember whether Judge Proctor said it in
13  open court, or perhaps said it in that order,
14  that you may or may not get paid for pre-MDL
15  time, but I'm going to give you the opportunity
16  to list it.
17  Q.      So setting aside the distinction
18  that you made just now that may or may not apply
19  to matters that were before the MDL, was it your
20  understanding that at least once the MDL was in
21  place, which was early 2013 -- it was already in
22  place, right?
23  A.      Yes.
24  Q.      That anything that was submitted as
25  part of the MDL, you should only be submitting

Page 93

1 time that was part of the MDL?
2 A.          Of course, yes.
3 Q.          All right.  So let's go ahead, and
4 we'll look at a couple of these exhibits that
5 relate to what you explained about the suggestion
6 that really was an order by Special Master
7 Gentle, so we're going to look at Exhibit Seven.
8 It's six.
9          THE WITNESS: Still be six.  Okay.
10
11          (Exhibit Six was marked
12          to this deposition.)
13
14 BY MR. BIENERT:
15 Q.          Once you look at Exhibit Seven, let
16 me know if you recognize it.
17 A.          Six?
18 Q.          I'm sorry, six.  Do you recognize
19 it?
20 A.          Yeah, I recognize it.
21 Q.          Tell me what it is.
22 A.          This is the initial contribution
23 cash call from Ed Gentle, June 25, 2013, in the
24 Blue Cross Blue Shield MDL proceeding, and my
25 contribution, according to Mr. Gentle, was

Page 94

1 $50,000.
2 Q.          And if you look at the second
3 couple of pages, the exhibit attached to this
4 letter, this is an exhibit where he lays out to
5 all the lawyers in the case what he at that time
6 views their contribution to be?
7 A.          Yes, that's correct.
8 Q.          So if we look at Exhibit A -- first
9 of all, it demonstrates that there are at least a
10 couple of dozen lawyers and law firms involved in
11 this case, right?
12 A.          More than a couple of dozen, but
13 it's a bunch.
14 Q.          And he not only says what he
15 believes your contribution for each lawyer should
16 be, but he also gives a percentage in a column.
17 That would be the fourth column over; is that
18 right?
19 A.          Correct.
20 Q.          What's your understanding of what
21 that, quote, percentage is or was?
22 A.          You know, I don't -- it was -- had
23 to do with the level of contribution by any given
24 firm with respect to the total cash call.
25 Q.          So it appears he came up with a

Page 95

1 formula, right, and he used that formula.  In
2 some way there's a ratio based on his percentages
3 column as to how much contribution he wanted each
4 lawyer to make?
5 A.          I think that's correct.
6 Q.          And if we look at this among the
7 many names on here, if we look at the bottom of
8 the first page of the subscriber fund, initial
9 capital call that is Exhibit A, we see your name
10 Patrick Pendley, third from the bottom, $50,000,
11 right?
12 A.          Correct.
13 Q.          Then if we look at the second page,
14 about midway down the page it lists Chris Coffin,
15 $10,000.  Do you see that?
16 A.          I do see it.
17 Q.          That's Mr. Coffin who's present
18 today?
19 A.          Yes.
20 Q.          And he was at the time and still is
21 your partner, right?
22 A.          Correct.
23 Q.          Do you have an understanding as to
24 why Mr. Coffin is listed separately than you,
25 even though y'all are in the same law firm?

Page 96

1 A.          Because he was a committee member
2 in -- in a different committee from the committee
3 that I was involved in.
4 Q.          So the bottom line is, at least at
5 this time in the way that the special master
6 approached it, he was basing his demands of
7 payment on individual lawyers, not individual law
8 firms?
9 A.          That's right.
10 Q.          And then on the last page, almost
11 last, but certainly not almost least, we have
12 Gordon Ball, and it shows $10,000 is what he
13 should contribute, right?
14 A.          I see that.
15 Q.          And this happened in June of 2013,
16 correct, this letter of demand?
17 A.          June 25th, 2013.
18 Q.          And so this is the time frame that
19 you had in mind earlier today when you were
20 telling us that you and Mr. Ball thereafter, or
21 sometime around this time frame talked about
22 contributions?
23 A.          It would have been about this time
24 or shortly after this cash call came out.
25 Q.          So now if we look at the next

Case 2:25-cv-00014-RDP    Document 2    Filed 01/06/25    Page 42 of 105

IN RE: BLUE CROSS BLUE SHIELD                    Video Deposition of Patrick W. Pendley
ANTITRUST LITIGATION, (MDL NO.: 2406)                            October 18, 2023

Page 97

1 exhibit, which I guess we'll call Exhibit
2 Seven ...
3          THE WITNESS: Seven.
4
5          (Exhibit Seven was marked
6          to this deposition.)
7
8 BY MR. BIENERT:
9 Q.          Let me know when you've had a
10 chance to look at that and recognize what it is.
11 A.          Okay.  Yes, I've looked at it.
12 Q.          And what is it?
13 A.          This is a letter that I wrote to Ed
14 Gentle on July 11 in response to that first cash
15 call, and reference the 10,000 to Gordon and the
16 50,000 to me in this -- and the 10,000 to Chris,
17 and I was awaiting receipt of half the money from
18 Gordon for mine and his.
19          And I just wanted to let Ed know
20 that, hey, I'd written the check, because I sent
21 a copy of the check, and that the funds were
22 coming because it was -- and the reason for that
23 is there was a -- unfortunately, there was a very
24 short fuse in my view in the amount of time that
25 any firm had from the time you got the assessment

Page 98

1 notice to the time you could pay the assessment
2 notice, and so that's what the purpose of this
3 letter, was saying, hey, the money, the money is
4 coming.
5 Q.          Okay.  And, by the way, you
6 attached a copy of the check, so really you sent
7 him the money.  You just said it will clear in a
8 couple of days?
9 A.          Yeah, I don't -- well, I'm not
10 going to say -- I don't remember whether I sent
11 the check or not.  I probably -- based on the
12 tenor of the letter, I don't think I sent the
13 check.  I think I sent a copy of the check so Ed
14 would know, hey, the check is written.
15 Q.          Gotcha.  Okay.  Then if we look at
16 the next exhibit, which will be eight ...
17
18          (Exhibit Eight was marked
19          to this deposition.)
20
21 BY MR. BIENERT:
22 Q.          Exhibit Eight is wire information
23 and a deposit slip to Plaquemine Bank & Trust
24 reflecting $35,000 to your firm from Mr. Ball,
25 correct?

Page 99

1 A.          Correct.
2 Q.          This would be Mr. Ball paying you
3 50 percent or half of what you had told Mr.
4 Gentle, the special master, you would be paying,
5 right?
6 A.          Yes.
7 Q.          So Gordon -- Mr. Ball paid not only
8 half of what you paid, but he paid half of what
9 your whole firm paid, including the 10,000 that
10 was allocated to Mr. Coffin?
11 A.          Yes, but that was a mistake, and we
12 never paid -- anyway, Mr. Ball was not supposed
13 to be paying half of Mr. Coffin's 10,000, but he
14 did send -- there's no question he did send
15 35,000.
16 Q.          Which was half of the total amount
17 that your firm paid to the fund, on behalf of the
18 amount sought from you, Mr. Coffin of your firm
19 and Mr. Ball?
20 A.          Yes.
21 Q.          And, of course, the 50 percent that
22 Mr. Ball paid at that time was also the same
23 percentage split, namely 50 percent of the
24 original fee agreement that you and Mr. Ball had
25 back in 2012, you know, what I'll call the early

Page 100

1 days of the Blue Cross litigation, right?
2          MR. COFFIN: Object to the form.
3          THE WITNESS: Well, the 50 percent
4 in the early days, as you reference it, had to do
5 with fee, earned attorney fee.
6 BY MR. BIENERT:
7 Q.          It's the same number, is my point.
8 A.          Well, it is 50 cent -- 50 percent is
9 50 percent.
10 Q.          And 50 percent applied in both of
11 these, right?
12 A.          Yeah.  It applied to my
13 contribution and to Gordon.  That was my
14 understanding.  My contribution and Gordon are
15 the same.  Mr. Coffin's contribution was totally
16 separate and apart from ours.  And I'm trying to
17 remember -- we put $5,000 that Mr. Ball had sent
18 me in our trust account, and that money stayed in
19 the trust account for many years until most
20 recently.
21          Quite frankly, I had forgotten
22 about it, and the bookkeeper brought it to my
23 attention, and we refunded it to Gordon this year
24 sometime.  I think it's going to be a check or
25 something in these exhibits.

Page 101

1 Q.        Okay.  Well, we can address that,
2 if need be, a bit later.
3          Now back, just to tie up the
4 timing, because you corrected me earlier that I
5 was incorrect when I said or asked you whether
6 the cases -- the state cases that had been filed
7 in state or federal court before MDL, had all
8 been dismissed prior to your talk with Mr. Ball
9 about contributions.
10         You corrected me to say that
11 happened later, and so I just want to clean that
12 up, because I think we do have things that
13 indicate the timing.  Bear with me.  I know I had
14 a document.
15 A.        Sure.
16         MR. BIENERT: What exhibit number
17 is this?
18         MR. GOLDMAN: Previously eleven.
19 What's the exhibit now?
20         THE WITNESS: This would be nine.
21
22         (Exhibit Nine was marked
23          to this deposition.)
24
25 BY MR. BIENERT:

Page 102

1 Q.        Look at this and just tell me if
2 you recognize what it is.  Make sure you look at
3 each page, because I'll tell you it's kind of
4 face pages or documents from more than one case.
5 A.        Yes.  I recognize -- I recognize
6 this document.  I should say documents, plural.
7 Q.        What do you recognize these to be?
8 A.        These are voluntary -- voluntary
9 dismissals of the state cases that we filed, some
10 of them, not nearly all.
11 Q.        It's some of them.  It's not all of
12 them, right?
13 A.        It's not all of them.
14 Q.        Is it accurate to say that these
15 documents reflect that the -- what we're calling
16 the state cases were being dismissed in the
17 October of 2013, time frame?
18 A.        Some of them were, that's correct.
19 Q.        Which, as you correctly pointed out
20 earlier, was after the discussions you claim you
21 had with Mr. Ball around the time that the
22 special master asked for money?
23 A.        Yes.
24 Q.        Now, if we look at a couple of
25 things, just to know, if we look at the first

Page 103

1 case that's reflected as being dismissed on
2 Exhibit Nine, this is the Alabama case, but it
3 was also in federal court, right?
4 A.        Yes.
5 Q.        And if we look at a second Alabama
6 case, which is the second case in here in the
7 Northern District -- let me back up.  The first
8 case is one that was filed in the -- scratch
9 that.  I'm confusing myself with Northern
10 District versus Southern Division.  Okay.  So
11 that is an Alabama case entitled Godwin versus
12 Blue Cross of Alabama, right?
13 A.        That's right.  And I don't know.  I
14 can't remember whether it was filed initially in
15 state court and removed, or filed in federal
16 court because Steve Dampier, as you sit here, is
17 the one that filed.
18 Q.        I'll move on from this.  The bottom
19 line is:  They occurred in the -- many of them
20 occurred in the October time frame?
21 A.        Yes, that's correct.  It was a
22 process, if you will.
23 Q.        Let's now turn our attention to the
24 2016 agreement and that is -- that's our exhibit
25 next.

Page 104

1
2          (Exhibit 10 was marked
3          to this deposition.)
4
5 BY MR. BIENERT:
6 Q.        Do you recognize Exhibit 12? (sic.)
7 A.        I do.
8 Q.        What do you recognize it to be?
9 A.        This is a document that
10 memorializes the oral agreement that Gordon and I
11 had discussed in mid to late 2012.
12 Q.        May of 2012?
13 A.        I'm not going to say May because I
14 don't recall that.  I just -- it was in 2012
15 though.
16 Q.        Is your hesitation in part because
17 you had initial discussions, but then when
18 Barrett fell out there were follow-up
19 discussions?
20 A.        Yes.  I can't believe Charles would
21 have sat there and Gordon and I would have
22 divvied the case up 50/50.  Charles was there and
23 going to be part of it.  That wasn't going to
24 work.  That's why I'm -- It's sometime in 2012.
25 Q.        Is it fair to say that what you're

Page 105

1 telling us is you recognize Exhibit 10 to be the
2 agreement in writing that Mr. Ball sent you to
3 memorialize the terms of the agreement that you
4 and he had reached in 2012, in the early stages?
5 A.　　　　I think that, yes.
6 Q.　　　　Obviously, there are signatures at
7 the bottom, and one of them is a signature of the
8 name Patrick W. Pendley. Do you recognize that
9 as your signature?
10 A.　　　　Yes.
11 Q.　　　　You did, in fact, sign this?
12 A.　　　　I did sign it.
13 Q.　　　　Then you see there's a signature
14 over the name Gordon Ball. Do you recognize that
15 as Mr. Ball's?
16 A.　　　　I recognize Mr. Ball's signature.
17 Q.　　　　First of all, what discussions, if
18 any, do you recall with Mr. Ball, or
19 communications with him in this time frame? --
20 and this letter is November 18, 2016, right?
21 A.　　　　Yes.
22 Q.　　　　Do you recall any discussions with
23 Mr. Ball that kind of explained or addressed why
24 he was doing this then?
25 A.　　　　Yes.

Page 106

1 Q.　　　　Tell us about that.
2 A.　　　　I got a call from Gordon somewhere
3 around November the 18th. Prior to November the
4 18th is when it occurred. Gordon called me and
5 said that he was getting ready to go in for a
6 heart transplant surgery, and he was concerned
7 that he may not make it, which was certainly
8 understandable, because I'm aware of the fact
9 that Gordon has had cardiac issues for -- at that
10 point in time almost 20 years.
11 　　　　　Anyway, he said, look. He says, I
12 want to memorialize the agreement that we have in
13 connection with the Blue Cross Blue Shield
14 litigation in case I don't come off the table,
15 don't make it. I said that's fine, Gordon, no
16 problem. He said, I'll send you a document, and
17 if you'll sign it and just send it back to me.
18 Fine.
19 　　　　　This document was a result of that
20 telephone call, and I read it, and it stated to
21 the best of my recollection what our agreement
22 was, and so I signed it, and I assume Gordon has
23 the original. I sent it back to him, yeah.
24 Q.　　　　Let me ask you a couple of
25 questions also related to just sort of the

Page 107

1 timing. First of all, when you did the oral
2 agreement back in 2012, did you consult with or
3 need to consult with anyone else in your firm or
4 any -- to get approval to be able to enter that
5 agreement in 2012, to Mr. Ball?
6 A.　　　　No.
7 Q.　　　　And similarly, in November of 2016,
8 did you consult with any others in your firm
9 about whether you should sign this agreement?
10 A.　　　　No.
11 Q.　　　　Did you -- based on however your --
12 and I'm not asking the details, but based on
13 however your firm was set up from a management or
14 an ownership or partnership level, is it fair to
15 say that you had the authority and ability both
16 in 2012, and in 2016, to sign this on behalf of
17 your firm?
18 A.　　　　As far as I know I did.
19 Q.　　　　Well, as far as your --
20 A.　　　　It was my case.
21 Q.　　　　Was it your firm, at least in part?
22 A.　　　　Oh, yeah. I mean, the ownership
23 percentage between the three of us -- no, I can't
24 say that because things have changed recently. I
25 mean, yeah. The three of us were equal partners.

Page 108

1 Q.　　　　Back in 2012 and 2016?
2 A.　　　　To the best of my recollection.
3 Q.　　　　Okay. So let's go ahead and look
4 at this. So is it a fair characterization to say
5 that in your pleading with the court you made
6 much of the fact that it is such a short
7 document? You reference that several times,
8 right?
9 A.　　　　I'll reiterate that, yes.
10 Q.　　　　So there's not a lot of doc words in
11 this document, and so it's pretty easy to focus
12 on words that are there, right? So let's review
13 them. First of all, on the re: line it says, In
14 Re: Blue Cross Blue Shield Antitrust Litigation,
15 MDL 2406. Do you see that?
16 A.　　　　I do.
17 Q.　　　　What case is that literally a
18 reference to?
19 A.　　　　Blue Cross Blue Shield Antitrust
20 Litigation MDL 2406 pending in the Alabama
21 Federal Court in front of Judge Proctor.
22 Q.　　　　It is not a read to an older state
23 case in any number of the states where you and/or
24 Mr. Ball had filed in either federal or state
25 court, is it?

Page 109

1        MR. COFFIN: Object to the form.
2        THE WITNESS: Doesn't appear to be,
3  no.
4  BY MR. BIENERT:
5  Q.        And you would have recognized that
6  back in November of 2016, right?
7  A.        Oh, yes.
8  Q.        And it says it memorialized our
9  agreement that our respective law firms will
10 share equally in any attorneys' fees ultimately
11 awarded to either of our firms in the state cases
12 we filed concerning the Blue Cross Blue Shield
13 Antitrust Litigation, right?
14 A.        Correct.
15 Q.        And again the, quote, Blue Cross
16 Blue Shield Antitrust Litigation, unquote, is the
17 name of the MDL case that was pending in the
18 Northern District of Alabama, right?
19 A.        Yes.
20 Q.        That was not the name of the cases
21 that you had filed in several different states,
22 was it?
23        MR. COFFIN: Object to the form.
24        THE WITNESS: You mean the caption?
25 BY MR. BIENERT:

Page 110

1  Q.        Yes.
2  A.        No.
3  Q.        They had different captions, right?
4  A.        They had different captions, yes.
5  Q.        And you recognized that when you
6  read this letter back in 2016, namely that you
7  referenced a second time in the body of this
8  short agreement, that it was concerning the Blue
9  Cross Blue Shield Antitrust Litigation, right?
10        MR. COFFIN: Object to the form.
11        THE WITNESS: As a generic
12 description, yes.
13 BY MR. BIENERT:
14 Q.        Is that -- is it fair to say that
15 when you guys would generically talk about all of
16 these cases, literally from the very first one
17 that you guys contemplated and then filed, all
18 the way through the end, that you and Mr. Ball
19 would refer to these cases once you got to the
20 MDL level, as the Blue Cross Blue Shield Antitrust
21 Litigation?
22 A.        We just -- just referred to all the
23 cases as Blue Cross Blue Shield litigation.
24 Q.        Antitrust litigation?
25 A.        Well, yeah.

Page 111

1        MR. COFFIN: Object to the form.
2        THE WITNESS: I'm sorry.  That's
3  what it was, antitrust.  That was the
4  allegations.
5  BY MR. BIENERT:
6  Q.        So my question, just to clean it
7  up, because I asked a bad question, and I think
8  it's a fair objection.  Am I correct that you
9  guys -- by that I mean you and Mr. Ball, referred
10 to all of these cases from beginning to end as
11 the Blue Cross Blue Shield Antitrust Litigation?
12 A.        Unless we were talking about a
13 specific case.
14 Q.        But when you weren't talking about
15 a specific case, that's how you referred to them?
16 A.        It was an umbrella reference, if
17 you will.
18 Q.        So is the answer yes, that's how
19 y'all would refer to them?
20        MR. COFFIN: Object to the form.
21        THE WITNESS: Yes.  That's the
22 words we would use.
23 BY MR. BIENERT:
24 Q.        Now, you signed this on November
25 26, at least according to the date there.  Do you

Page 112

1  think that's the day you actually signed it?
2  A.        Yes.
3  Q.        But the letter was dated on the
4  18th.  Do you think that you got it later and
5  signed it immediately, or did you get it and then
6  think about it or ruminate or do anything like
7  that before signing it?
8  A.        No.  I got the letter, and I signed
9  it and sent it back, and actually, I can't
10 remember how I got the letter, whether Gordon had
11 mailed me a quote, quote, or whether
12 he had faxed it over and then I printed it and
13 signed it and sent it back.  My memory is I
14 didn't hold the letter, if that's what you're
15 asking.
16 Q.        You did it fairly quickly is your
17 recollection?
18 A.        Yeah, because the intention was to
19 memorialize the agreement that we had in 2012.
20 Q.        And you felt like this document did
21 that, right?
22 A.        Right, because, you know, it
23 references the state cases we filed, which is our
24 discussion in 2012.  We're to split 50/50 on the
25 state cases we filed.

Page 113

1 Q.         At the same time that you were
2 contemplating that those state cases might play
3 out either in state court or in a consolidated
4 action like an MDL, right?
5          MR. COFFIN: Object to the form.
6          THE WITNESS: It was possible.
7 BY MR. BIENERT:
8 Q.         And you knew that.  You recognized
9 it in 2012, right?
10 A.         Sure.
11 Q.         In fact, as you ruminated in 2012
12 could happen during the meetings with Mr. Ball,
13 thought about and talked about, it did happen.  A
14 case consolidated and went MDL, right?
15 A.         In retrospect it did.
16          MR. BIENERT: Let me take a five-
17 minute break real quick.  I might be able to get
18 out of a fair amount of what I have.
19          THE VIDEOGRAPHER: Going off the
20 record.  The time is now 12:09.
21          (Recess was taken at 12:09 p.m.)
22          THE VIDEOGRAPHER: We're back on
23 the record.  The time is now 12:27.
24 BY MR. BIENERT:
25 Q.         Back looking at Exhibit 12.  Is it

Page 114

1 Exhibit 10?
2 A.         Ten.
3 Q.         The agreement that Gordon and you
4 signed in 2016?
5 A.         Yes.
6 Q.         So this is 2016, so this is well
7 after the filing of the various dismissals that
8 we talked about earlier that were filed after the
9 case went to MDL, right?
10 A.         Except Illinois.
11 Q.         So everything in your view was
12 dismissed except for Illinois?
13 A.         Yes.  Illinois state case, it was
14 never dismissed.
15 Q.         By the way, I just want to ask you.
16 When you use the term "state case," tell me what
17 you mean by that, as it relates to these series
18 of cases.
19 A.         The state case to me is a case
20 against Blue Cross Blue Shield that operated in
21 that state.
22 Q.         Okay.  But if we look at the
23 complaint in this case, and we've seen examples,
24 and you've told us from memory you thought they
25 were correct; namely, every single one of the

Page 115

1 cases, regardless of where it was filed, named all
2 or certainly many of the Blue Cross entities from
3 many states, correct?
4          MR. COFFIN: Object to the form.
5          THE WITNESS: That's my
6 recollection.
7 BY MR. BIENERT:
8 Q.         So there wasn't any case as part of
9 the series of cases that was only against one
10 Blue Cross state entity, correct?
11 A.         I would have to look at the
12 complaints.  I can -- I'm not sure that that's
13 correct.
14 Q.         As you sit here now, you know that
15 most, at a minimum, involved many Blue Crosses
16 nationwide, right?
17 A.         Yeah.  Most of them did.
18 Q.         And you can't tell me a single
19 example of one that was only against one Blue
20 Cross in one state, right?
21 A.         Illinois.
22 Q.         In other words, your best
23 recollection is that if we pulled the Illinois
24 case, it would literally just be a case against
25 Blue Cross of Illinois and no other parties?

Page 116

1 A.         I think BCB -- BCBS Association was
2 also a defendant in that case.
3 Q.         And where were they based?
4 A.         Illinois.
5 Q.         And who were the lawyers on that
6 case, that Illinois filing?
7 A.         You mean plaintiff lawyers or
8 defense?
9 Q.         Plaintiff.
10 A.         It was me.  On the original
11 complaint was listed me, Bob Foot, Gordon, Trish
12 Murphy, Tim Keller.  Let's see who else.  I think
13 Greg Davis was listed on that one.  That's the
14 extent of my memory.
15 Q.         Okay.  And why was the Illinois
16 case not dismissed?
17 A.         Because it was not in federal
18 court.  It never went to federal court.  They
19 couldn't -- the defendants could not remove it
20 because there was no diversity of citizenship.
21 Q.         So it stayed in state -- it was
22 filed in state court and did not get moved to
23 federal court because it had no basis to go to
24 federal court?
25 A.         It was filed in Union County,

Page 117

1 Illinois.
2 Q.        Any other cases that you can tell
3 me that you believe were limited to either solely
4 being in a state court or naming only entities in
5 that particular state as defendants?
6 A.        I can't think of any off the top of
7 my head but ...
8 Q.        So I think your answer is you can't
9 recall any others?
10 A.        I can't recall any others without
11 actually looking at the petitions that were filed
12 in each state.
13 Q.        Is it true that ultimately the
14 Illinois case was -- the lawyers were paid out of
15 the MDL resolution as well?
16 A.        The --
17            MR. COFFIN: Object to the form.
18            THE WITNESS: Yeah.  The short
19 answer is no, and the second part of that answer
20 is hopefully.
21 BY MR. BIENERT:
22 Q.        So your view is they haven't been
23 paid yet?
24 A.        If they've been paid, I didn't get
25 any money.

Page 118

1 Q.        Did you have an expectation that
2 there is -- that there has been at least an
3 agreement in principle to pay them out of that?
4            MR. COFFIN: Object to the form.
5            THE WITNESS: Well, the settlement
6 agreement speaks for itself.
7 BY MR. BIENERT:
8 Q.        Does the settlement agreement say
9 they're going to get money?
10 A.        In the Blue Cross Blue Shield
11 litigation.
12 Q.        It does say that?
13 A.        It's to resolve the entire
14 litigation, is my understanding.
15 Q.        Including ...
16 A.        Including the Illinois case being
17 dismissed.
18 Q.        So back to the agreement in
19 November of 2016, with the exception of the
20 Illinois case, which has now been resolved at
21 least in part in an agreement, the other cases,
22 it's your understanding, had all been dismissed
23 by them after the MDL was in place, right?
24            MR. COFFIN: Object to the form.
25            THE WITNESS: All dismissed without

Page 119

1 prejudice.
2 BY MR. BIENERT:
3 Q.        What is your position in November
4 of 2016, when Mr. Gordon wrote to memorialize his
5 agreement with you?  As you sit here now and
6 based on your paperwork that you filed, what is
7 your position of what it was that Gordon in this
8 November, 2016 agreement was confirming that he
9 could get half of?
10 A.        The state cases we filed.
11 Q.        They were dismissed by then, right?
12 A.        They were dismissed without
13 prejudice.
14 Q.        Did you ever have any discussions
15 with Mr. Ball about resurrecting and refiling
16 those cases?
17 A.        No.
18 Q.        Why not?
19 A.        No reason to.
20 Q.        Why not?
21 A.        The MDL was pending.
22 Q.        There was no reason to because the
23 claims in those cases were now part of the MDL?
24            MR. COFFIN: Object to the form.
25            THE WITNESS: The claims, that's

Page 120

1 correct.
2 BY MR. BIENERT:
3 Q.        So to -- in other words, just like
4 you say in page -- I think it's page six of your
5 pleadings to the court, the state claims that you
6 had earlier filed wound up being consolidated in
7 the MDL, right?
8            MR. COFFIN: Object to the form.
9            THE WITNESS: I don't know if I
10 would use the word "consolidated."
11 BY MR. BIENERT:
12 Q.        That's the word you used in your
13 submission to the court, right?
14 A.        Well, I understand.  They were
15 taken over, if you will, by the MDL proceeding.
16 Q.        You used the word -- let me back
17 up.  You just said, "I don't know that I would
18 say consolidated."  You literally said
19 consolidated to the court in the filing, right?
20            MR. COFFIN: Object to the form.
21            THE WITNESS: I said what I said.
22 As I sit here today from a legal standpoint those
23 claims were in -- subsumed into the MDL
24 proceeding.  Now, the state case, the actual
25 vehicle was dismissed without prejudice.

Page 121

1  BY MR. BIENERT:
2  Q.         And in 2012, when you were sitting
3  in meetings with Mr. Ball kicking around how
4  y'all could approach potential BC cases, you guys
5  specifically talked about the fact that those
6  cases, if you file the whole bunch of them in
7  many different locations, they may ultimately go
8  by way of individual state cases or by an MDL?
9  A.         Either way, yes.
10 Q.         And that was the same conversations
11 when you and Mr. Ball discussed the equal fee
12 share, right?
13          MR. COFFIN: Object to the form.
14          THE WITNESS: Say it one more time.
15 BY MR. BIENERT:
16 Q.         Those same -- that conversation
17 where you mapped out how the Blue Cross cases
18 could proceed in 2012, with the same strategy
19 meetings and conversations where you and Mr. Ball
20 also agreed to equally share the attorneys' fees.
21          MR. COFFIN: Object to the form.
22          THE WITNESS: In the state cases we
23 filed.
24 BY MR. BIENERT:
25 Q.         You discussed all that in the same

Page 122

1  conversation?
2          MR. COFFIN: Object to the form.
3          THE WITNESS: Yeah.  Well, the
4  answer to that would be no from the standpoint
5  that the equal sharing agreement didn't occur
6  until some weeks or months later -- and I
7  shouldn't say months.  Probably more like weeks
8  because Barrett was on the phone probably pretty
9  quickly.
10 Q.         Whether Barrett was involved or
11 not, you always were envisioning an equal share
12 with Mr. Ball?
13          MR. COFFIN: Object to the form.
14 BY MR. BIENERT:
15 Q.         Right?
16          MR. COFFIN: Object to the form.
17          THE WITNESS: Yes.
18 BY MR. BIENERT:
19 Q.         So it was an equal share that you
20 agreed to with Mr. Ball in 2012, whether it was a
21 third, a third, third or 50/50, right?
22          MR. COFFIN: Object to the form.
23          THE WITNESS: Exactly what this
24 Exhibit 10 says.
25 BY MR. BIENERT:

Page 123

1  Q.         And it's exactly what you wrote in
2  Exhibit Three?
3          MR. COFFIN: Object to the form.
4          THE WITNESS: Exhibit Three.
5  BY MR. BIENERT:
6  Q.         We can look at it again.
7  A.         Exhibit Three is the --
8  Q.         It's your filing with the court.
9  A.         Yes.
10 Q.         Now, back to the timing of your
11 signing Exhibit 10, the 2016 agreement, you signed
12 it pretty quickly upon receipt, right?
13 A.         Yes.
14 Q.         And you didn't feel the need to,
15 nor did you speak with your partners before you
16 signed it about whether you could or should sign
17 it, right?
18          MR. COFFIN: Object to the form.
19          THE WITNESS: The same answer I
20 gave earlier.  No.
21 BY MR. BIENERT:
22 Q.         When was the first time that you
23 discussed with your partners the fee arrangement
24 that you signed with Mr. Ball, ball park?
25 A.         I have no idea.  I mean, this case

Page 124

1  has gone on since 2012.  That's 11 years.
2  Q.         But we're starting the end of 2016.
3  That's when you got this and signed it, right?
4  A.         Right, but that's not the -- the
5  question is not when I signed this.  It's when I
6  discussed it with my partners, and I can't tell
7  you whether there was a discussion about what the
8  fee arrangement with Gordon was before 2016, or
9  after 2016.  I just -- I just don't have any
10 recollection.
11 Q.         Well, let's start with we know that
12 this document was signed in late November, 2016,
13 Exhibit 10, right?
14 A.         Right.
15 Q.         How long after 2016 did you -- let
16 me back up.  Have you ever had discussions with
17 your partners about Exhibit 10 prior to this
18 actual litigation?
19          MR. COFFIN: Object to the form.
20          THE WITNESS: Yes.
21 BY MR. BIENERT:
22 Q.         And when do you recall speaking
23 with them about this exhibit, namely a written
24 agreement that you had with Mr. Ball that states
25 the words that are here?

Case 2:25-cv-00014-RDP   Document 2   Filed 01/06/25   Page 49 of 105

IN RE: BLUE CROSS BLUE SHIELD                           Video Deposition of Patrick W. Pendley
ANTITRUST LITIGATION, (MDL NO.: 2406)                                      October 18, 2023

Page 125

1         MR. COFFIN: Let me just state an
2 objection to the extent it calls for privileged
3 information in our role as counsel to the firm.
4 He's not going to answer that, but if he can
5 answer outside of that, you are welcome to
6 answer, Mr. Pendley.
7         MR. GOLDMAN: Well, the question
8 was framed in terms of before --
9         MR. COFFIN: Excuse me.
10         MR. GOLDMAN: The question was
11 framed in terms of before the litigation was
12 commenced.
13         MR. COFFIN: Which litigation?
14 That's why I objected.
15         MR. GOLDMAN: This litigation,
16 right.
17         MR. COFFIN: That wasn't defined.
18 He said before the litigation, and I objected to
19 it because it was an improper question, but let
20 me just make sure I'm clear.  If the response
21 requires you to discuss any attorney-client
22 privileged discussions, then it's privileged and
23 you don't have to answer.  If it doesn't, then go
24 for it.
25 BY MR. BIENERT:

Page 126

1 Q.        So when did you discuss the
2 agreement, the written agreement that you signed
3 with Mr. Ball in late 2016, with your partners
4 since then, the first time you remember
5 discussing it with them?
6 A.        I have no recollection of the first
7 time.
8 Q.        Did you talk about it with them
9 many times?
10 A.        We talked about it.  I just don't
11 remember.  I can't give you a month, date or year
12 of when we talked about it.
13 Q.        Prior to Mr. Ball filing his
14 grievance claim -- let me back up just so I know
15 nomenclature wise.  What are we calling --
16         MR. GOLDMAN: We'll call it a
17 petition.
18         THE WITNESS: Petition, okay.
19 BY MR. BIENERT:
20 Q.        Before Mr. Ball filed the petition
21 against your law firm seeking half of the fees in
22 this case, so before that time, did you discuss
23 this agreement with your partners?
24 A.        Yes.
25 Q.        About how many times?

Page 127

1 A.        Oh, again, no idea, no recollection
2 of how many times.
3 Q.        Well, using 2016, when it was
4 signed as the benchmark, did you discuss this
5 with them, for example, in 2016, or early 2017,
6 or not until later?
7 A.        It would have been later.
8 Q.        Is it fair to say that something
9 that would have precipitated your talking to them
10 about this would have been once there seemed to
11 be a settlement that was going to happen in the
12 Blue Cross MDL case?
13 A.        That's -- I just -- I just really
14 don't remember when -- I can say this, that we --
15 from time to time we would -- we, as in Chris and
16 Stan and I, would talk about BCBS case just in
17 general, where are we, where's it going, heard
18 any news, as well as other cases in the firm too,
19 so it wasn't something, you know, hey, we got to
20 have a meeting and got to talk about this.
21 Q.        Why would you discuss it if it had
22 nothing to do with the MDL?
23 A.        I didn't say we talked about this
24 necessarily.
25 Q.        Maybe I misunderstood.

Page 128

1 A.        Maybe I misunderstood the question,
2 too.
3 Q.        Let's back up.  My question to you
4 is:  At some point in time you had whatever would
5 be the first conversation out of what sounds like
6 many that you had with your partners about this
7 agreement, Exhibit 10, prior to the petition filed
8 by Mr. Ball.
9         MR. COFFIN: Object to the form.
10         THE WITNESS: Yeah.  I wouldn't say
11 we had many.  I will say that certainly -- I
12 believe that it was discussed, but I wouldn't use
13 the term many.
14 Q.        What was discussed about it?
15 A.        I don't --
16         MR. COFFIN: This is where an
17 objection comes in with regard to attorney-client
18 privilege.
19         MR. GOLDMAN: Just to put it on the
20 record, this is before the litigation.  Before
21 the petition is filed there's a contract that's
22 entered into by the firm, and is it your position
23 that discussions amongst the partners about a
24 contract that's entered into by the firm before
25 there's a dispute is covered by the privilege?

Page 129

1     MR. COFFIN: My position is that if
2 his testimony involves discussions for the
3 purposes of litigation, in preparation for
4 litigation or in preparation for this proceeding
5 that brings us here today, then he is not to
6 speak about that, and I can tell you, if you want
7 to know the answer, we did not talk about it
8 before the petition as filed here today.  That's
9 why I'm objecting, because it's privileged.
10     MR. GOLDMAN: Well, that's totally
11 improper.
12     MR. COFFIN: You asked -- you asked
13 me why --
14     MR. GOLDMAN: To put your testimony
15 on the record is totally improper.
16     MR. COFFIN: That's not my
17 testimony.  You asked my position.  That's my
18 position.
19     MR. BIENERT: Again, I've been
20 careful to frame my questions as before the
21 petition was filed.  Make a big line in the sand
22 at least for that.  I'm not asking you about
23 anything since Mr. Ball's petition was --
24     MR. GOLDMAN: Do we know the
25 approximate date of that?

Page 130

1     MR. BIENERT: I'm sorry.
2     THE WITNESS: He's asking --
3     MR. GOLDMAN: I'm trying to get the
4 date of when --
5     THE WITNESS: The date of Gordon's
6 petition.
7     MR. COFFIN: I have no idea.
8     THE WITNESS: It was this year
9 sometime.
10     MR. BIENERT: Right.  There's a lot
11 of time between November of '16 and when the
12 petition was filed this year.
13     MR. GOLDMAN: February 21st of this
14 year.
15 BY MR. BIENERT:
16 Q.     So prior to February of this year,
17 did you have conversations with your partners
18 about this agreement with Mr. Ball?
19 A.     I have no recollection one way or
20 the other.
21 Q.     Prior to -- let's say between the
22 end of 2016, all the way through January of 2023,
23 did you have conversations with your partners
24 about your fee arrangement with Mr. Ball
25 regardless of whether you referenced the written

Page 131

1 document or not?
2 A.     What were the dates again, January
3 of '16?
4 Q.     Say December of 2016, right after
5 this was signed, all the way through January of
6 this year before the petition was filed against
7 you.
8 A.     I don't remember us having a
9 specific discussion in that time frame.
10 Q.     When did you learn -- ball park --
11 that the Blue Cross case was being settled?
12 A.     Twenty -- my best recollection is
13 sometime in 2020.
14 Q.     So in 2020, when you learned that
15 the Blue Cross case was being settled, that was
16 really good news, right?
17 A.     Yes.
18 Q.     There are certain days that we all
19 remember in our offices that are days of joy, and
20 probably few lawyers achieve the level of joy
21 that you would have felt in 2020, when you
22 learned that this huge case that you'd been
23 working on for a decade was settling, and that it
24 would involve many, many millions of dollars,
25 right?

Page 132

1 A.     Yeah.
2 Q.     You talked to your partner about
3 the settlement, right, partners?
4 A.     I'm sure I told them that the case
5 was at least preliminarily settled.
6 Q.     And it was a cause for joy, not
7 just with you, but among everyone in the firm?
8 A.     To the extent people knew about it,
9 yes.
10 Q.     And certainly your partners were
11 made to know about it, right?
12 A.     I think so.
13 Q.     And you continued to have
14 conversations about the fact that the case was
15 settling sporadically between when you first
16 learned that the case looked like it would settle
17 in 2020, all the way up until you got the
18 petition from Mr. Ball in February of 2021,
19 right?
20 A.     You know, not -- not -- we may have,
21 but I don't remember any specific conversations
22 because --
23 Q.     Was there ever any time that you
24 and any of your partners in the firm discussed
25 generally, approximately or the like, how much

Page 133

1 money your firm might get if the case settled
2 along the lines of what it appeared to be
3 settling for?
4 A.        Certainly none before the court
5 order.
6 Q.        And when was the court order?
7 A.        I don't remember.  Made the
8 attorney fee award.
9 Q.        So prior to the attorneys' fee
10 award you knew approximately how much money was
11 being discussed for the overall settlement,
12 right?
13 A.        Oh, yes.  It was public knowledge.
14 Q.        You guys didn't talk at all about
15 how much money your firm might get out of such a
16 settlement?
17 A.        No, because there were several
18 hundred -- not several hundred.  I take that
19 back.  There were several tens of firms involved
20 in the litigation.  The other problem was that
21 certainly I, and I'm sure that Kristin Steen had
22 no idea about how much time all these other firms
23 had put into the litigation.  I knew how much
24 time I had put in.  I didn't even know how much
25 time Gordon had put in until Ed Gentle sent out

Page 134

1 the accounting of time.
2 Q.        Well, then let's just say after you
3 got the fee award notification from the court,
4 you then had discussions at some point with your
5 partners about what fees might be -- were in the
6 recommendation of your firm, right?
7 A.        Oh, yeah.
8 Q.        And then at that point somewhere in
9 there you would have discussed with them this
10 agreement, correct?
11       MR. COFFIN: Object to the form.
12       THE WITNESS: Not -- not
13 necessarily, not necessarily.
14 BY MR. BIENERT:
15 Q.        Is it your testimony that it never
16 came up, the agreement you had or didn't have
17 with Mr. Ball?
18 A.        That's not my testimony.  My
19 testimony is I don't recall having any
20 discussions about this letter or this agreement
21 with the partners until Gordon raised the issue
22 that he was entitled to half of everything that
23 PBC was going to receive in the settlement.
24 Q.        You indicated a little earlier when
25 I asked you about whether you had approval to

Page 135

1 sign the earlier agreements, the oral and then
2 this one, about your ownership and position in
3 the firm, and you said you did, and then you said
4 your ownership has changed recently, right?
5 A.        Right.
6 Q.        When did the ownership change, and
7 to what degree has your position changed to have
8 less ability to unilaterally make a decision?
9 A.        It changed because Jessica Perez
10 became a junior partner, so there was a reduction
11 in the ownership interest in, I guess, January.
12 Q.        Of what year?
13 A.        This year, I believe.  Maybe it was
14 January of last -- maybe it was January of last
15 year.
16 Q.        So at some point in the last year
17 or two, you guys got a new partner, and therefore
18 is what you're saying is that your percentage
19 would have diminished, presumably along with
20 others to make that new partner?
21 A.        Everybody's percentage went down.
22 Q.        Since the time that you entered the
23 agreement with Mr. Ball in 2012, has your either
24 ownership or ability to manage and make decisions
25 for the firm changed?

Page 136

1 A.        Yes.
2 Q.        When did it change and how?
3 A.        It changed last year, and I'm now
4 of counsel to the firm.
5 Q.        So when did that happen?  When last
6 year?
7 A.        Maybe fall.
8       MR. COFFIN: I can't answer for
9 you.
10       THE WITNESS: In the fall, I think,
11 in the fall.
12 BY MR. BIENERT:
13 Q.        So fall of 2022.
14 A.        Yeah.
15 Q.        So prior to fall of 2022, you were
16 an owner of the firm, right?
17 A.        Right.
18 Q.        And you had ability to make
19 decisions on behalf of the firm, right?
20 A.        Yes.
21 Q.        Since fall of 2022, you were no
22 longer an owner of the firm, right?
23 A.        I don't know if I would
24 characterize it like that.  I'm of counsel to the
25 firm, whatever that is, but, you know, I still

Page 137

1 have the cases that I was working on and have
2 been working on, some cases for years, and I
3 continue to work on. I make decisions concerning
4 those cases, so from a practical standpoint with
5 respect to those cases, nothing has really
6 changed.
7 Q.        Well, from a technical standpoint,
8 a business protocol standpoint, there are
9 different people who now are managing the firm
10 and make the decisions for the firm than there
11 were before the change, right?
12 A.        No. It's the same people, just not
13 me.
14 Q.        Who are the people?
15 A.        Chris and Stan.
16 Q.        And prior to that change in the
17 fall of 2022, were you always a manager of the
18 firm?
19 A.        One of the managers.
20 Q.        Was there a point in time -- was
21 there ever a point in time where you -- whether
22 we want to call it a benign dictatorship or
23 whatever, where you could make decisions for the
24 firm, whether these two gentlemen liked it or
25 not?

Page 138

1 A.        No.
2 Q.        And that's been true since 2012, is
3 what you're telling me?
4 A.        Before that.
5 Q.        But as of fall of last year you no
6 longer had from a business standpoint the ability
7 to make the final decisions for the firm,
8 correct?
9 A.        For the firm, that's correct. I
10 think that's aptly stated.
11 Q.        Did you at one point in time last
12 year in a phone call, in essence, tell Gordon
13 that you were being sort of removed from the
14 firm --
15 A.        No.
16 Q.        -- or words to that effect.
17 A.        I told him that I was going to
18 retire, or try to retire, semi-retire, maybe is
19 the words I used. I forget the exact words, but
20 anyway, semi-retire.
21 Q.        Did you indicate either in that
22 call or in that time frame to Gordon, that, in
23 essence, you were no longer going to have the
24 ability to control the firm in whatever words you
25 used?

Page 139

1 A.        I don't believe I would have told
2 Gordon that.
3 Q.        Let's look at exhibit --
4          MR. BIENERT: We'll look at the
5 next exhibit, which will be 11.
6
7          (Exhibit 11 was marked
8          to this deposition.)
9
10 BY MR. BIENERT:
11 Q.        Tell me if you recognize what this
12 is once you've had a chance to look.
13 A.        Quite frankly, I've never seen a
14 form like this from our office.
15 Q.        Remember earlier we looked -- well,
16 first of all let's just cover a couple of bases.
17 So Exhibit 11 is a one -- half a page document
18 that on the top says MDL 2406, Blue Cross Blue
19 Shield Antitrust Litigation Monthly Time Sheet.
20 Do you see it?
21 A.        That's correct.
22 Q.        Is this, you believe, one of the
23 documents that your firm would prepare, like the
24 one we looked at earlier to submit to the court in
25 the MDL litigation?

Page 140

1 A.        I think that's correct.
2 Q.        So this document, which is related
3 to the MDL litigation and you believe would have
4 been submitted to the court, it shows that on
5 November 28, 2016, you billed a point five.
6 You'll have to tell me what that is, or somebody
7 billed them -- take that back, sorry -- for a
8 drafted letter to Gordon Ball requesting a copy
9 of signed letter agreement regarding attorneys'
10 fees. Do you see that?
11 A.        Yes. I see the description. The
12 0.5 is 30 minutes in our accounting. Yeah.
13 Q.        Somebody is --
14 A.        In our accounting, yeah. I don't
15 know -- I don't know who CA018 is. That's --
16 Q.        If you look at it, it says billing
17 code. Do you agree with me that's probably the
18 type of thing being billed, as opposed to the
19 person?
20 A.        In -- that may very well be the
21 type of work that was done --
22 Q.        Well, whatever --
23 A.        -- in the Blue Cross Blue Shield
24 litigation.
25 Q.        Right. Whatever the billing code

Page 141

1  is, this billing entry has to do with the
2  agreement that we just looked at, namely Exhibit
3  10, right?
4          MR. COFFIN: Object to the form.
5          THE WITNESS: It appears to be
6  that, but there's no reference to the specific
7  letter so -- but it certainly appears to be.
8  BY MR. BIENERT:
9  Q.        Let's look at what the words here
10  are. It says drafted letter to Gordon Ball
11  requesting a copy of signed letter agreement
12  regarding attorney fees, right?
13  A.        Yes.
14  Q.        And this entry is on November 28,
15  2016, and if we look at Exhibit 10, you signed
16  Exhibit 10, the agreement with Mr. Ball, on
17  November 26, 2016. Do you see that?
18  A.        I do.
19  Q.        So can you think of any agreements,
20  any signed letter agreement regarding attorneys'
21  fees with Mr. Ball in the November of 2016 time
22  frames other than this one?
23  A.        No, but we had a lot of letter
24  agreements regarding attorney fees with other
25  lawyers, and that's why -- certainly it appears

Page 142

1  to be that, but I'm not going to categorically
2  state that it is, because we did have a lot of
3  other fee agreements with other lawyers.
4  Q.        Is there any reason why you would
5  want to do a fee agreement relative to other
6  lawyers in 2016, right around the time that you
7  signed a fee agreement with Gordon Ball?
8          MR. COFFIN: Object to the form.
9          THE WITNESS: Not that I can think
10  of.
11  BY MR. BIENERT:
12  Q.        I mean, sitting here now, do you
13  agree that it is highly likely that this was a
14  reference to the agreement that Mr. Ball and you
15  signed in late 2016?
16  A.        I would say more probably than not.
17  Q.        Now, you agree with me, am I right,
18  that your firm should only be submitting as
19  billing in the MDL case things that you did that
20  relate to the MDL case?
21  A.        No.
22  Q.        Why not?
23  A.        Because Judge Proctor said we could
24  submit work that we did prior to the MDL.
25  Q.        Well, this entry is November 28 of

Page 143

1  2016. This is many years after the MDL
2  commenced, right?
3  A.        Wait. Maybe I misunderstood your
4  question.
5  Q.        Let me go back. I'll try to clean
6  it up.
7  A.        I clearly misunderstood.
8  Q.        My bad. This entry here is in
9  November of 2016, right?
10  A.        Number 11, yes.
11  Q.        And you understood in that time
12  frame that your firm should only be submitting to
13  the MDL court billing entries that relate to work
14  on the MDL case, right?
15  A.        Oh, in that time frame?
16  Q.        Yes, sir.
17  A.        Yes.
18  Q.        And so this letter that was drafted
19  to Gordon Ball requesting a copy of a signed
20  letter agreement regarding attorneys' fees, was
21  in relation to the MDL case, right?
22  A.        It would have been allocated to
23  that case, yes.
24  Q.        And you certainly weren't going to
25  submit to the court that you did work to be

Page 144

1  allocated to the MDL case when the work you did
2  wasn't for the MDL case, right?
3          MR. COFFIN: Object to the form.
4          THE WITNESS: I, myself, would not
5  submit time to Ed Gentle for work that didn't
6  apply to the Blue Cross Blue Shield case for
7  payment or compensation, whatever. As I look at
8  this, you see above the blacked-out part, it says
9  attorney, back slash employee, email M. Collier,
10  PBC law firm?
11  Q.        Yes.
12  A.        As I look at this, I believe that
13  this is my paralegal who was doing a letter to
14  Gordon asking for a copy of the signed letter
15  agreement.
16  Q.        Well -- I'm sorry. So she would
17  have known that -- the work that she did, any
18  work that she did that was involved in Blue Cross
19  Blue Shield, State Farm, any case, especially a
20  class case, she had to account for her time, and
21  she would do that just rotely and I -- I think
22  that's what this is. This is Meagan drafting a
23  letter to Gordon asking for a copy of the letter
24  agreement. That's what I think this is. This is
25  not -- not me.

Page 145

1  Q.        Okay.  Well, not only would you not
2  submit something to the MDL case and the judges
3  there that wasn't related to the MDL case, but
4  you would want to make sure that no one in your
5  firm did, right?
6  A.        Ideally, yes.
7  Q.        Because you could get in a lot of
8  trouble with a federal judge if you start
9  submitting things that weren't accurate, right?
10 A.        Especially Judge Proctor.
11 Q.        And you would have made clear to
12 your employees, that the entries that go to the
13 MDL court, in relation to the MDL case, are only
14 part of the MDL work, right?
15 A.        Well, we would have that
16 discussion, yes.
17 Q.        And you didn't just rely on
18 paralegals, no matter how good they were, to just
19 on their own start sending things to the court.
20 You would have someone, a lawyer, tasked with
21 reviewing things to ensure that what got sent to
22 the MDL court was properly going there, right?
23        MR. COFFIN: Object to the form.
24        THE WITNESS: I don't know if we
25 ever had that level of discussion.

Page 146

1  BY MR. BIENERT:
2  Q.        Well, you recall we talked earlier
3  about the fact that the court actually issued an
4  order regarding protocols for counsel in
5  submitting time in trial submission -- I'm sorry,
6  time and expense submissions, right?
7  A.        Yes.
8  Q.        And we just talked about it very
9  quickly earlier, but you basically recognized
10 that the court -- you told me that you realized
11 the court had issued such an order, and they were
12 to be followed, right?
13 A.        Clearly.
14 Q.        Well, if we go ahead and look at
15 the next exhibit, which I think will be Exhibit
16 12 ...
17
18        (Exhibit 12 was marked
19        to this deposition.)
20
21 BY MR. BIENERT:
22 Q.        Tell me once you've had a chance to
23 look at it and satisfy yourself that this is, in
24 fact, an order, that the first couple of pages of
25 the order from the court in the Northern District

Page 147

1  of Alabama in the MDL litigation in a Blue Cross
2  case about protocols for plaintiffs' counsel, time
3  and expense submissions.
4  A.        Yes.  This is -- are we missing
5  part of it?
6  Q.        Yes.  It's not the whole thing.  It
7  looks like it's a longer document, 17 pages.
8  A.        Yeah.  I remember it as being much
9  longer.
10 Q.        And you would have reviewed it,
11 right?
12 A.        Oh, yes.
13 Q.        And you would make sure that either
14 through you or other partners in the firm, that
15 you guys followed the protocols, right?
16 A.        Yes.
17 Q.        And if we look at the back page of
18 the first page, which actually looks like it's
19 page four on the bottom if you open it up --
20 A.        Right.
21 Q.        -- do you see at the top it says
22 all submissions shall be certified by a partner
23 in each firm attesting to the accuracy and
24 correctness of the submission, end quote.  Do you
25 see that?

Page 148

1  A.        Let's see.  Where are you reading?
2        MR. GOLDMAN: Right here.  Take off
3  the paper clip.
4        THE WITNESS: Oh, yeah, okay, I see
5  it now, the top of the page.
6  BY MR. BIENERT:
7  Q.        So you were ordered by the court to
8  make sure that all submissions shall be certified
9  by a partner in each firm attesting to the
10 accuracy and correctness of the submission,
11 right?
12 A.        Yes, that's standard.
13 Q.        Y'all would have done that, right?
14 A.        Yes.
15 Q.        Who in your firm?  Which partner
16 was tasked with doing that?
17 A.        Doing --
18 Q.        Certifying -- well, attesting to
19 the accuracy and correctness of billing
20 submissions.
21 A.        That would have been whoever was
22 available to sign the monthly report.
23 Q.        And the list of partners that might
24 have been in that pool would have been who?
25 A.        The three of us.

Page 149

1  Q.        So it's the three named guys in the
2  firm, right?
3  A.        Yes.
4  Q.        And the reason you do that is to
5  make sure that things are being properly and
6  accurately submitted to the court, right?
7  A.        Right.
8  Q.        And one of the reasons you do that
9  is so that years after the fact, a bunch of
10 people like us might be sitting around looking at
11 an entry, we can have confidence that the entry
12 actually is as indicated, and in this case, that
13 the entry relates to work done on the MDL case,
14 right?
15 A.        Well, that's -- yes.  That's the
16 purpose of it.
17        MR. BIENERT: I think we're kind of
18 at the -- I don't have a lot more, but I do have
19 more so we probably -- we're at 1:07.  Maybe we
20 take our lunch break, and then we come back.  I'm
21 cool with as short of one as y'all want.
22        MR. COFFIN: Depends on what is
23 around here.  We can go off the record.
24        THE VIDEOGRAPHER: Going off the
25 record.  The time is now 1:08.

Page 150

1        (Recess was taken at 1:08 p.m.)
2        THE VIDEOGRAPHER: We're back on the
3  record.  The time is now 2:08.
4  BY MR. BIENERT:
5  Q.        So we're back after the lunch break.
6  Are you good to go, Mr. Pendley?
7  A.        I'm ready.
8  Q.        Let's get started.  Let's go ahead
9  and look at Exhibit 11 again.
10 A.        Eleven, all right.
11 Q.        The time sheet entry?
12 A.        Oh, yeah, sure.  Okay, I got it.
13 Q.        So this is the November 28, 2016
14 billing entry apparently submitted in the MDL
15 case that we discussed earlier.  It literally is
16 saying that someone billed for drafting a letter
17 to Gordon Ball requesting a copy of the signed
18 letter agreement.  Where is that letter that's
19 referenced in here?  Do you know?
20 A.        It's in the file somewhere.
21 Q.        Because I can represent we have not
22 seen in the file any letter around this date
23 requesting any kind of agreement or anything like
24 that.  So we'd ask for you to go check and make a
25 production to us.

Page 151

1  A.        You can look and see -- I'm sorry.
2  Go ahead.
3        MR. COFFIN: We can look.  We
4  produced everything, unless it was some kind of
5  an objection, obviously, but I don't think it
6  was.
7        THE WITNESS: It may have been an
8  email too.  It's possible it was an email, as
9  opposed to traditional written letter.
10 BY MR. BIENERT:
11 Q.        That would be on your system too,
12 though, right?
13 A.        That would be on the system.  It
14 wouldn't be --
15 Q.        But when you do your production you
16 would check your system for relevant documents,
17 right?
18 A.        Oh, yeah, yeah.
19        MR. BIENERT: Okay.  I'd ask that
20 we be given a copy of that, or, at least, you
21 know, go back and confirm that you don't have it
22 or whatever.
23        MR. COFFIN: Yeah.  We can confirm
24 that.
25        THE WITNESS: Sure.

Page 152

1  BY MR. BIENERT:
2  Q.        Because, sir, if the reality is
3  that you drafted a letter, and it had to do with
4  this agreement, Exhibit 10, then that letter  very
5  well could make reference to whether the agreement
6  is in relation to the MDL case,  couldn't it?
7        MR. COFFIN: Object to the form.
8        THE WITNESS: I would say that's
9  very improbable.
10 BY MR. BIENERT:
11 Q.        Why is that?
12 A.        Just because Meagan wouldn't have
13 done anything like that, and I'm thinking that we
14 mailed the original letter -- the document I
15 signed.  Let me phrase it like that.  I'm
16 thinking we mailed the document I signed back to
17 Gordon, and a copy of it wasn't kept, and that's
18 why we got to looking for it and said, well,
19 where is it, and said, well, get Gordon to send
20 us a copy.
21 Q.        First of all, you say Meagan
22 wouldn't do anything like that when I asked you
23 whether you thought it made sense that she might
24 reference whether the agreement in question
25 related to the MDL matter.  But Meagan literally

Page 153

1 billed her time for whatever she did on the MDL
2 matter, right?
3 A.        Oh, absolutely.
4        MR. COFFIN: Object to the form.
5        THE WITNESS: But we don't know
6 what she did other than she drafted a letter.  We
7 don't know what the contents of the letter is, is
8 the point I'm making.
9 BY MR. BIENERT:
10 Q.        And I think the term you used
11 before lunch, was you agreed that it was
12 substantially likely that it was related to Mr.
13 Gordon's agreement?  What term did you use?  I
14 forget.
15 A.        I said more probable than not.
16 Q.        There you go.  More probable than
17 not.  Okay.  I'll take that.  On the same topic
18 we are only on the notes that we discussed
19 earlier that you said that you thought you might
20 have -- maybe had been looking at notes that you
21 would have made during the May, 2012 meeting with
22 Mr. Ball and the other lawyers in Knoxville?
23 A.        You will have to ask my counsel.
24        MR. COFFIN: We don't have any
25 notes.  We discussed it.  We've produced

Page 154

1 everything we had, unless it was subject to an
2 objection, but we don't believe it was.
3        MR. BIENERT: An objection by whom?
4 I mean, I'm trying to understand what you mean by
5 that term, because you said a minute ago on
6 this letter.  I'm talking about subject to -- some
7 sort of an objection.
8        MR. COFFIN: Yeah, objection to
9 produce it.  Why would we have not produced it?
10 We have no notes to answer your question
11 directly.  There are no notes other than what was
12 produced, and we produced the entire file.
13        MR. BIENERT: If you made something
14 like that subject to an objection, would you have
15 had a log that would at least flag for us that
16 that letter existed when you objected to it?
17        MR. COFFIN: I don't know whether
18 we did that or not.  I don't know the answer to
19 that.
20        MR. BIENERT: Do we know of any, Mr.
21 Goldman, any privilege log?
22        MR. COFFIN: We produced the paper
23 file.
24        MR. BIENERT: We'll tell you.
25 We'll represent that we do not have any privilege

Page 155

1 logs, so I guess I would say if there's anything
2 that you had an objection to, we would ask for a
3 privilege log, because, to me, these two entries,
4 if there was an objection, or some other classic
5 reason we need a privilege log, because otherwise
6 we have no idea how to even try to address
7 whether we should see it or not.
8        MR. COFFIN: Send me a request.
9        MR. BIENERT: I'm giving you a
10 request right now.  You just said it might have
11 been objected to.
12        MR. COFFIN: I don't know if it
13 was.  It may have been.  I have no idea.
14        MR. BIENERT: Are you going to take
15 it upon yourself to look?
16        MR. COFFIN: Sure, I will.
17        MR. BIENERT: Thank you.
18        MR. COFFIN: Would you like me to?
19        MR. BIENERT: I absolutely would
20 like you to.
21        MR. COFFIN: Then we'll do that.
22        MR. BIENERT: Thank you.
23 BY MR. BIENERT:
24 Q.        Now we go back to the agreement in '
25 Exhibit 10.

Page 156

1 A.        All right.
2 Q.        The agreement that we've been
3 talking about here that you signed and Mr. Ball
4 signed in late 2016, it's on letterhead of Gordon
5 Ball, PLLC.  Do you see that?
6 A.        Well, not yet.  I'm looking for it.
7 I'm trying to find it again, but I recall that it
8 is on Gordon Ball's letterhead.
9 Q.        Not Gordon Ball's letterhead.
10 Gordon Ball PLLC.
11 A.        All right.  Gordon Ball's PLLC's
12 letterhead.  Okay.  Hold on.  Let me find number
13 ten.  It's got to be stuck to something else.  I
14 got it now.
15 Q.        So this agreement that you and Mr.
16 Ball signed about sharing fees equally in 2016,
17 is the agreement signed there.  It's on the
18 letterhead of Gordon Ball PLLC, right?
19 A.        Yes.
20 Q.        And do you remember -- well, when
21 you were speaking back in 2012, and you had the
22 oral agreement, that if I understand your
23 testimony, you viewed was similar to this one in
24 2016.  Did you have any entity in mind that you
25 were orally contracting with in 2012?

Page 157

1 A.        No.
2 Q.        Is it fair to say that from your
3 standpoint, both times, both in the oral
4 agreement in 2012, and in this written agreement
5 in 2016, you were negotiating with or not even
6 negotiating with.  You were entering an agreement
7 with Gordon Ball, the person?
8 A.        Or whatever entity he wanted.  I
9 mean, I was dealing with Gordon, and I know
10 Gordon had changed the name of his firm a number
11 of times, but I was dealing with Gordon.
12 Q.        And you never really gave it any
13 thought or consideration beyond I'm making an
14 agreement with Gordon Ball?
15 A.        No, no.  PLLC or Gordon Ball, APLC
16 or whoever.
17 Q.        That didn't factor into your
18 analysis?
19 A.        No.
20 Q.        Let's talk a little bit about the
21 circumstances of this, because I was thinking
22 about it over the break.  So the reason you
23 understood that Mr. Ball was asking you to
24 memorialize what y'all had agreed to orally, was
25 because he thought he might die, right?

Page 158

1 A.        That was my understanding.
2 Q.        And we're not talking about some
3 anxiety based phobia that maybe was misleading.
4 He was literally given very little to live
5 because his heart was about to stop, right?
6        MR. COFFIN: Object to the form.
7        THE WITNESS: That was my
8 understanding.
9 BY MR. BIENERT:
10 Q.        You understood he was going
11 literally for a heart transplant where they were
12 going to remove his heart and put another human
13 being's in him, right?
14 A.        That's my understanding of the
15 procedure.
16 Q.        And you had an understanding that
17 he had been somewhat incapacitated for many
18 months leading up to this discussion he had with
19 you about it, and then would have a very long
20 road to recovery even assuming he survived the
21 heart transplant, right?
22        MR. COFFIN: Object to the form.
23        THE WITNESS: I'm not aware of the
24 first part of the question, but I'm aware that
25 heart transplant patients have a very significant

Page 159

1 recovery time.
2 BY MR. BIENERT:
3 Q.        Assuming it even works out?
4 A.        Well, it's real short if it doesn't
5 work out.
6 Q.        But when I asked you what your
7 understanding was given what you stated as your
8 position about what this agreement was sharing
9 fees on and wasn't, you said he was memorializing
10 that he would have the right to sometime later
11 resurrect cases that had been dismissed without
12 prejudice in states and pursue those cases.  Is
13 that your position?
14        MR. COFFIN: Object to the form.
15        THE WITNESS: Yes.  Either Gordon
16 could do it, I could do it.  Our local counsel
17 could do it if the MDL proceeding went away.
18 Q.        So your position is -- is that your
19 understanding in 2016, when Gordon was giving you
20 what could have been a deathbed letter to
21 memorialize his agreement, he was doing this so
22 that he could potentially restart dismissed cases
23 related to what was at that point a four-year
24 litigation?
25 A.        That and the fact that Illinois was

Page 160

1 still pending, was never dismissed.
2 Q.        And it was pending in a way that
3 when -- if and when the case got settled, which
4 now you have a tentative schedule, settlement,
5 but no money has come through yet --
6 A.        Right.
7 Q.        -- the Illinois case would go away
8 because it would be taken care of in the
9 settlement?
10        MR. COFFIN: Object to the form.
11        THE WITNESS: I assume that.
12 BY MR. BIENERT:
13 Q.        Did you ever think to yourself or
14 worry that maybe Gordon wasn't in control of his
15 full faculties, if that's what you thought he
16 really was attempting to do?
17 A.        No.  I've never thought Gordon had
18 impaired faculties.
19 Q.        You've always known that Gordon was
20 not only a good lawyer, but a shrewd businessman,
21 right?
22 A.        And a better golfer.
23 Q.        Is my answer correct?
24 A.        Yes.
25 Q.        And you knew, as a shrewd

Page 161

1 businessman, that he didn't just walk away or
2 give up on money in cases readily, did he?
3 A.        No.  Not to my knowledge.
4 Q.        And you understood in 2016, that
5 what Gordon was referring to when he memorialized
6 -- what was memorialized in writing in this
7 letter, what y'all had talked about back in 2012,
8 was memorializing how y'all would structure fees
9 on any recovery that came from any of the Blue
10 Cross Blue cases that y'all had discussed back in
11 2012, wherever they played out in court, right?
12        MR. COFFIN: Object to the form.
13        THE WITNESS: No.  The agreement
14 and the way that the letter is written, it's fees
15 ultimately awarded to either of our firms in the
16 state cases we filed, and we filed a lot of state
17 cases, or caused to be filed a lot of state
18 cases.
19 BY MR. BIENERT:
20 Q.        Obviously, we've talked about this
21 ad nauseum, both what we talked about in 2012,
22 and in this letter.  I'm assuming that your
23 explanation of how you interpreted it and
24 whatever answers you have for my questions, are
25 the same now as they were before the lunch break,

Page 162

1 right?
2 A.        Yeah.  I'm thinking that's correct.
3 I hadn't thought about changing anything.
4 Q.        Now, let's go ahead and look at the
5 next exhibit.  It's the -- just to wrap up while
6 we're on the agreement.  Was there any point in
7 time from 2012, until we'll say 2020, the end of
8 2020, when you ever indicated directly or in sum
9 and substance to Mr. Ball, that what you -- that
10 what he got in his agreement with you was
11 basically an ability to go after dismissed cases?
12        MR. COFFIN: Object to the form.
13        THE WITNESS: Run that by me one
14 more time.  I lost you there.
15 BY MR. BIENERT:
16 Q.        You've told us your position on
17 what you're saying in this -- in defense of this
18 matter.  You've told us how you viewed -- you say
19 you viewed this agreement, right?
20 A.        Right.
21 Q.        Did you ever tell Gordon that
22 that's how you viewed the agreement?
23 A.        No, because in my mind that's class
24 action 101.
25 Q.        Well, class action 101 meaning

Page 163

1 what?
2 A.        Meaning that if you do class action
3 work, you understand that if the litigation case
4 doesn't settle, litigation class doesn't get
5 certified, that you go back to the position you
6 were in before the cases got removed to the MDL,
7 and in this case, because cases have been
8 dismissed without prejudice, they would have had
9 to have been refiled.
10 Q.        And you're now saying -- I want to
11 make sure we're clear.  We're after lunch and
12 after we've been going for two or three hours,
13 that your understanding with Gordon was that,
14 whether it was in 2012 or in 2016, that if the
15 cases went to MDL, then he wasn't going to be an
16 equal share in the case?
17        MR. COFFIN: Object to the form.
18        THE WITNESS: No.  I mean, my
19 position hasn't changed.  This is not something
20 we -- he and I talked about on a monthly, annual
21 or any basis.
22 BY MR. BIENERT:
23 Q.        What y'all talked about, in 2012 at
24 least, is what you told us before the lunch break
25 y'all talked about in 2012, right?

Page 164

1 A.        Right.
2 Q.        So then we go to the next exhibit --
3 A.        Which is --
4 Q.        Which is 13.  It's the May letter.
5 A.        May letter?
6 Q.        Here it is right here.  May 3rd,
7 2017 letter, which is now Exhibit 13.
8
9        (Exhibit 13 was marked
10        to this deposition.)
11
12        THE WITNESS: It's May 3, 2017?
13        MR. BIENERT: May 3, 2017, yes.
14 BY MR. BIENERT:
15 Q.        Tell me when you've had a chance to
16 look at Exhibit 13, and tell me if you recognize
17 what it is.
18 A.        Yes, I do recognize what it is.
19 Q.        And what is this?
20 A.        This is a letter to Gordon that was
21 written at his request to find out how much money
22 we, as in PBC, had put into the MDL because --
23 MDL.
24 Q.        So you tallied things up basically,
25 right?

Page 165

1 A.        Basically, we tallied it up.
2 Q.        And at the end of it all, is it
3 true that, in essence, what you told Gordon, was
4 that the amount of money that he owed you was
5 half of that?
6 A.        Half of the difference between what
7 he had previously paid and what we had paid
8 altogether.
9 Q.        Right, and this letter is
10 reflecting that as of May of 2017, your view was
11 that you and Mr. Ball were paying 50 percent each
12 on the contributions towards maintenance of the
13 Blue Cross Blue Shield case, capital funds,
14 right?
15 A.        Yeah, the capital contributions.
16 Q.        By the way, you're noting -- if we
17 look at the second page to this, which has a
18 little list of checks, if you see it, it says Blue
19 Cross Blue Shield plaintiffs' common benefit,
20 subscriber fund.  Do you see that?
21 A.        Wait a minute.  Are you talking
22 about this page here?
23 Q.        No.  The one there's an attachment.
24 A.        The attachment.  Okay, yes, I see
25 the attachment.

Page 166

1 Q.        And that attachment, it has typed
2 up entries in July of 2013, through March of 2017,
3 and what it does is it lists what you paid, and
4 then it lists what Gordon Ball paid, right?
5 A.        Yes.
6 Q.        And so what it reflects is that as
7 of at least through March of 2017, Gordon Ball
8 had paid your firm $30,000 and $9,804, then
9 $19,608, correct?
10 A.        Let's see.
11       MR. COFFIN: Object to the form.
12       THE WITNESS: Okay.  Let's see.
13 Okay.  Yes, okay.  I see what you're -- I see
14 what you're talking about.  I was a little
15 confused about -- yeah, Gordon paid 30,000, 9800
16 and then nineteen thousand six.
17 Q.        And if you look, the total of that
18 is -- it's in the middle of the page.  It says
19 total contributions, and it shows that as of that
20 date you had contributed $117,092.50 on this
21 chart, and that Gordon had then reimbursed you
22 $59,412 of that, right?
23 A.        Is that --
24       MR. COFFIN: Object to the form.
25       THE WITNESS: I believe that's true,

Page 167

1 correct.
2 BY MR. BIENERT:
3 Q.        First of all, I'll just call it
4 just under $60,000 that Gordon paid to your firm?
5       MR. COFFIN: Object to the form,
6 object to the form.
7 BY MR. BIENERT:
8 Q.        Are you okay if I call that just
9 under $60,000, or do you want me to say it's ...
10 A.        No.
11       MR. COFFIN: That's not what I was
12 objecting to.  I'll restate my objection.
13       THE WITNESS: Just under 60 is
14 fine.
15 BY MR. BIENERT:
16 Q.        Okay, thank you.  This just under
17 $60,000 that Mr. Ball paid for his contributions,
18 this is money paid to your firm to reimburse you
19 for half of what your firm paid, among others on
20 his behalf, right?
21       MR. COFFIN: Object to the form.
22       THE WITNESS: Yes.
23 BY MR. BIENERT:
24 Q.        This does not include a separate
25 money that Mr. Ball had sent directly to the

Page 168

1 court that you referenced earlier before the
2 lunch break as to at least one of the payments?
3       MR. COFFIN: Object to the form.
4       THE WITNESS: That's fine.
5 BY MR. BIENERT:
6 Q.        And that amount was about $22,000.
7 Is that true?
8       MR. COFFIN: Object to the form.
9       THE WITNESS: That's what's reported
10 by Ed Gentle.
11 BY MR. BIENERT:
12 Q.        By who?
13 A.        Ed Gentle, the special master.
14 Q.        And how do you know that?
15 A.        Because I've seen it on his report.
16 Q.        So you know that Special Master
17 Gentle reported that Mr. Ball contributed
18 $22,000, right?
19 A.        Directly through his office.
20 Q.        Do you know whether Special Master
21 Gentle reported or recorded that Mr. Ball had
22 contributed any of the money that went to your
23 firm?
24 A.        Under Gordon's column?
25 Q.        Uh-huh.

Page 169

1  A.        No.  He would have -- he would have
2  recorded it under my column since it came from my
3  office.
4  Q.        So he wouldn't have made an extra
5  entry for Mr. Ball?
6          MR. COFFIN: Object to the form.
7          THE WITNESS: I've never seen an
8  extra entry.
9  BY MR. BIENERT:
10  Q.        So now if we go to your description
11  earlier of your position that paying the
12  contributions was a good opportunity because one
13  would not only get reimbursed if there was
14  recover based on how much contributions you made,
15  but would get a kicker or a little more than -- a
16  bump, I think was the term you used, right?
17  A.        Right.
18  Q.        Then if it turns out that Mr.
19  Gentle only factored in the $22,000 or so that
20  Mr. Gordon paid directly to the fund and did not
21  factor in the just under $60,000 that he paid to
22  your firm --
23  A.        Right.
24  Q.        -- then even under the court and
25  special master suggested payouts in the case, Mr.

Page 170

1  Ball was not given the full benefit in the payout
2  side of what he contributed, right?
3          MR. COFFIN: Object to the form.
4          THE WITNESS: The distribution of
5  the money, which I'll call the bump money, as
6  well as reimbursement of the actual expenses, is
7  subject to Judge Proctor's order, and what Judge
8  Proctor does, he will issue an order, and we'll
9  see what that order says.  Everything is still
10  fluid as far as I'm concerned.  You know,
11  everybody, I'm sure, has high hopes, but it's
12  still a fluid situation.
13  Q.        Well, then as far as you're
14  concerned, if money that Mr. Ball paid to your
15  firm wasn't factored in, in the equation of the
16  court or the special master for determining how
17  much you should get paid, would you agree that
18  that should be corrected and he should have that
19  factor?
20          MR. COFFIN: Object to the form.
21          THE WITNESS: I would say this.
22  Gordon needs to make whatever correction needs to
23  be made if he feels like there's an error.  And
24  the other part of it is, Gordon has had a chance
25  for years to make a, quote, correction, because

Page 171

1  this money is from the 2013 or 2014 cash call.
2  That was eight, nine years ago.  And what I'm
3  saying is:  He can do whatever he feels like is
4  appropriate for him to do.
5  BY MR. BIENERT:
6  Q.        So in terms of my question to you,
7  you are not taking any position on whether, if it
8  wasn't factored in, that should be resolved
9  properly or -- strike that.  That should be
10  resolved so it gets factored in for Mr. Ball?
11  A.        Yeah, whatever -- you know, we --
12  not only me, but Gordon and everybody else is
13  bound by what the judge does, presumably based on
14  what the special master recommends.
15  Q.        Even if at some point you recognize
16  that maybe they had a mistaken understanding of
17  facts?
18          MR. COFFIN: Object to -- object to
19  the form.
20          THE WITNESS: I can't testify as to
21  what Gentle or his staff thought or didn't think.
22  Well, I mean, they issue their reports.  I get
23  them, Gordon gets them; been getting them since
24  day one.
25  Q.        Am I correct that it has been your

Page 172

1  testimony, at least in this deposition, that you
2  had an oral agreement with Mr. Ball where he was
3  supposed to get the benefit of what comes with
4  contributing 50 percent of the contributions to
5  support the lawsuit, right?
6          MR. COFFIN: Object to the form.
7          THE WITNESS: And he was going to
8  get the benefit of the bump for the money he put
9  up.  I was going to get the benefit for the money
10  I put up, and we were each going to put up 50
11  percent.
12  Q.        And if it turns out that you got
13  the benefit, not just of some of the money you
14  put up, but money that Mr. Gordon paid you and
15  the court's not aware of, it's your position that
16  from your standpoint nothing should done?
17          MR. COFFIN: Object to the form.
18          THE WITNESS: No.  What my position
19  is, that I'm going to do what the judge says,
20  what award the judge makes, and if there's
21  mistakes or errors, then Gordon needs to deal
22  with it.
23  BY MR. BIENERT:
24  Q.        Even if those mistakes inure to
25  your benefit because that money went into your

Page 173

1 firm's account, and you got paid, or at least
2 recommended being paid on money that you paid,
3 and it turns out Gordon paid you back?
4        MR. COFFIN: Object to the form.
5        THE WITNESS: No.  All I can say is
6 again, whatever the judge, who's the ultimate
7 authority says, is what we're going to do.
8 BY MR. BIENERT:
9 Q.        Let me say this.  When you
10 submitted money to the fund as recommended or --
11 not even recommended, as ordered by Judge or
12 Special Master Gentle, did you ever apprise
13 Special Master Gentle that you had an oral
14 agreement with Mr. Ball that was different than
15 what he ordered?
16        MR. COFFIN: Object to the form.
17        THE WITNESS: Not -- well, first
18 answer is not to my knowledge.  The second part
19 of that answer is that the orders by Special
20 Master Gentle was to each firm as to the amount
21 of their particular contribution.
22 BY MR. BIENERT:
23 Q.        So the answer is:  You never did
24 let Special Master Gentle know about your claimed
25 oral agreement with Mr. Ball to contribute more

Page 174

1 than the special master had ordered that he could
2 participate in?
3        MR. COFFIN: Object to the form.
4        THE WITNESS: Well, no.  The answer
5 is that I never told Ed Gentle about any
6 arrangement between Gordon and I to split the
7 expenses 50/50.
8 BY MR. BIENERT:
9 Q.        Why not?
10 A.        Just never occurred to me to do
11 that, because everything was going to be equal at
12 the end of the day.  Gordon was going to put up
13 hundreds of thousands, because we knew it was
14 going to cost millions and millions of dollars.
15 I would have put up the same amount, and so the
16 award would have been made, and there we were.
17 Q.        Sir, am I accurate that in your
18 opposition to Mr. Ball's petition in your 43-page
19 document, you multiple times make the -- take the
20 position, that independent of whether you had an
21 oral agreement with Mr. Ball to split fees, a
22 written one or anything else, that you could
23 never enforce or do such an agreement because it
24 would run afoul of the JVA and the court's
25 position on how people would be paid?

Page 175

1        Is that a position that you took in
2 your opposition?
3        MR. COFFIN: Object to the form.
4        THE WITNESS: I don't know.  You'll
5 have to show me the -- show me which --
6 BY MR. BIENERT:
7 Q.        It's Exhibit Three.
8 A.        Exhibit Three.  Let me find it.
9 What page are we talking about?
10 A.        I would have to look.  I think it's
11 multiple pages.
12 A.        No problem, okay.  I got Exhibit
13 Three here.
14        MR. GOLDMAN: Page 23.
15        THE WITNESS: Which page?
16        MR. COFFIN: Twenty-three of 43.
17        THE WITNESS: Twenty-three.
18 BY MR. BIENERT:
19 Q.        Do you see it?  You're on page 23,
20 sir?
21 A.        I am.
22 Q.        Do you see towards the middle of
23 the page, section four?
24 A.        Yes.
25 Q.        Talks about in the alternative.

Page 176

1 Ball has no valid claims to any work attorneys'
2 fees allocated or named plaintiff, origination
3 awards slash credits to be allocated to be PBC.
4 Do you see that heading in your document?
5 A.        I do.
6 Q.        And you go on in the first
7 paragraph and say that the 2013 JVA conclusively
8 superseded and made null and void any and all
9 pre-MDL attorneys' fee agreements firms may have
10 had with regard to the BCBS state cases they
11 filed prior to the entry of the transfer order.
12 Do you see that?
13 A.        I see that.
14 Q.        You took the position that the JVA
15 and the way it set out apportionment of attorney
16 positions and workload and/or later fees, would
17 supersede any agreements, if any, that you and Mr.
18 Ball would have had about fees, right?
19 A.        Yes.  My understanding is that was
20 the intention of the JVA.
21 Q.        Well, why is it that, as it relates
22 to your claim, that Mr. Ball agreed to pay 50
23 percent of the cost for some purported
24 opportunity of a bump, in your view, when it is
25 different than what the court and the special

Page 177

1 master set forth in terms of his allocation of
2 costs, and therefore the commensurate opportunity
3 to get the bump?  Why are they different?
4 A.       Because on the -- on the request by
5 the special master to contribute to the fund,
6 Gordon quit paying.
7 Q.       Okay, so let's break that down
8 timewise.  So let's take before Gordon quit
9 paying.  So let's go back and look at Exhibit 13.
10 A.       Exhibit 13.
11 Q.       And you look at the payments we
12 just went over, Gordon's 30,000, 9800, 19,000, and
13 that's in addition to the 22,000 or so that he
14 sent directly, right?
15         MR. COFFIN: Object to the form.
16         THE WITNESS: I believe that adds
17 up correct.
18 BY MR. BIENERT:
19 Q.       And all of these payments are after
20 -- not all.  Let me back up on that.  Yeah.
21 These payments are after the special master's
22 allocation demand that he sent to you and the
23 other attorneys in 2013, right?
24         MR. COFFIN: Object to the form.
25         THE WITNESS: Well, of course.

Page 178

1 BY MR. BIENERT:
2 Q.       In other words, he was paying 50
3 percent on this, and you were accepting it from
4 him?
5         MR. COFFIN: Object to the form.
6         THE WITNESS: My recollection is
7 Gordon paid 50 percent of the first assessment,
8 and he paid 50 percent of the second assessment.
9 That's my recollection.
10 BY MR. BIENERT:
11 Q.       Let's look at the exhibit we just
12 looked at, the second page of Exhibit 13 where,
13 according to your own firm's records, he paid you
14 30,000, 9,804, and 19,608 to be his half-portions
15 as of that time of what you paid into the special
16 master fund, right?
17         MR. COFFIN: Object to the form.
18         THE WITNESS: Well, I lost you
19 there.  I see that -- I can see the numbers under
20 my name, and then I see the contribution under
21 Gordon's name, which are two, 10,000 and 9800,
22 $19,804.
23 Q.       I think you misspoke.  You said
24 10,000.  You meant 30,000, right?
25 A.       No.  Let's see.  I'm sorry.  You're

Page 179

1 probably -- yeah, you're correct.
2 Q.       In other words, through that time
3 frame -- so through February 17th, 2016, Mr. Ball
4 was paying half and you half of what you paid,
5 right?
6         MR. COFFIN: Object to the form.
7         THE WITNESS: Of the first two
8 assessments.
9 BY MR. BIENERT:
10 Q.       And all of that was after Special
11 Master Gentle's order telling you how much you
12 each were to pay into the fund, right?
13 A.       On the first two assessments,
14 correct.
15 Q.       Did you ever go to Gordon and say
16 Gordon, I can't take this money from you because
17 it would run afoul of special -- the special
18 master's proportional order of what you're
19 allowed to contribute?
20         MR. COFFIN: Object to the form.
21         THE WITNESS: No.
22 BY MR. BIENERT:
23 Q.       Why?
24 A.       No.  Because Gordon -- Gordon was --
25 and I was paying 50 percent each.

Page 180

1 Q.       I thought your position -- we just
2 went over it in Exhibit Three.  I thought your
3 position was that agreements that you and Gordon
4 had, that predate the special master's or the
5 court's orders become null and void.
6         MR. COFFIN: Object to the form.
7         THE WITNESS: There are three parts
8 in my view to this litigation.  There is the
9 common cost assessments, which is stand alone
10 separate part.  There is the cost of the
11 litigation incurred by a firm.  That's one part,
12 and there is the attorneys' fee, which is a
13 separate part.  Gordon and I had an agreement,
14 and he paid 50 percent, and I paid 50 percent of
15 those first two assessments.
16         Thereafter there were no more
17 payments, and you got to realize too, at that
18 time there's only been two assessments in almost
19 four years.  There was immediately -- after that
20 second assessment, the assessments started coming
21 in like crazy, and they were 50 and 60 and 80,
22 $100,000 just to me started coming in.
23 Q.       So let me go back to my question.
24 A.       I'm not finished.
25 Q.       Okay.

Page 181

1 A.          And there was no more Gordon
2 helping to pay these assessments, and after that
3 second one he never contributed any more to me
4 on mine.  I believe that he did make a $3,000
5 payment on the common costs in '21 or '22,
6 somewhere in there,  but that was not any part of
7 the assessment to me.
8 Q.          Let me go back to my question.  As
9 of -- let me get the date again here.  Hold on.
10 As of March of 2017, Mr. Ball had reimbursed your
11 firm half of what you had paid to this fund
12 pursuant to the special master's direction for
13 how much to pay, right?
14        MR. COFFIN: Object to the form.
15        THE WITNESS: At that time, yes.
16 BY MR. BIENERT:
17 Q.          And then all these payments that
18 Mr. Ball paid you were after the special master
19 had sent out his order for how much participation
20 each of the payors would get and how much they
21 had to pay, right?
22 A.          Yes, that's correct.
23 Q.          Given that your position on the
24 attorneys' fee portion, alternatively in your
25 paperwork, is that, as a matter of law, that

Page 182

1 agreement was null and void because of the
2 subsequent JVA and court orders about how fees
3 would be apportioned, why did you not take a
4 similar position when Gordon was paying you in
5 2016 and '17, that you couldn't take that money
6 pursuant to the so-called oral agreement because
7 it was null and void?
8        MR. COFFIN: Object to the form.
9        THE WITNESS: Because the attorney
10 fee agreement Gordon and I had didn't apply to
11 the MDL to start with.
12 BY MR. BIENERT:
13 Q.          Are you talking about the agreement
14 that you claim -- first of all, you've only
15 mentioned one agreement that you and Gordon had
16 about paying for costs, or I should say
17 contributions, right, and that was post MDL, and
18 the fee agreement was discussed at the outset of
19 whatever the cases were when y'all were just
20 strategizing about whether you could even bring a
21 case and, if so, how to do it, right?
22        MR. COFFIN: Object to the form.
23 BY MR. BIENERT:
24 Q.          Is your position somehow -- strike
25 that.  Is your position that when the judge

Page 183

1 issued an order in the MDL setting forth how
2 attorneys should be allocated on fees, that that
3 somehow cancels any prior agreement?  You
4 wouldn't have the same view if you and Mr. Ball's
5 fee share agreement was about the MDL?
6        MR. COFFIN: Object to the form.
7        THE WITNESS: It didn't cancel the
8 agreement, because it really didn't apply to MDL
9 fees.  It applied to state court fees.
10 Q.          And again, I can rehash all of this
11 with you, but as you say that, you are not
12 changing the testimony you gave us earlier before
13 lunch, are you?
14 A.          I'm not changing it.
15 Q.          You've rethought your testimony
16 from earlier this morning, haven't you?
17 A.          I have not.
18 Q.          Because during the lunch break you
19 thought a lot about what you wrote and what you
20 acknowledge were your thoughts in 2012, right?
21        MR. COFFIN: Object to the form.
22        THE WITNESS: I was eating my
23 sandwich.
24 BY MR. BIENERT:
25 Q.          Never crossed your mind about what

Page 184

1 you conceded earlier today?
2        MR. COFFIN: Object to the form.
3        THE WITNESS: No.
4 BY MR. BIENERT:
5 Q.          So now going back to the
6 contributions, is it true that you had phone
7 conversations -- well, first of all, the timing
8 of your letter in May of 2017, this was shortly
9 after Gordon had had his heart removed and
10 another one put inside of him and when he was in
11 a long, uncertain road to recovery, right?
12        MR. COFFIN: Object to the form.
13        THE WITNESS: I believe that could
14 be correct.
15 BY MR. BIENERT:
16 Q.          Mr. Ball was not, as a practical
17 matter, able to work a normal schedule, and he
18 wasn't, right?
19 A.          I don't know that.
20 Q.          You talked to him, didn't you?
21 A.          No.
22 Q.          You never talked to him after his
23 surgery to see how he was doing?
24 A.          Oh, I mean, I'm sure that I talked
25 to him, and if we would have spoken I would have

Page 185

1 asked about his surgery, but just pick up the
2 phone and call him and say how are you doing, I
3 don't remember ever doing that.
4 Q.        Sir, you knew in 2017, he was in a
5 very difficult and compromised position
6 physically, right?
7 A.        I know he had the surgery in
8 sometime very late '16, and beyond that -- and I
9 knew he was still alive, but beyond that I didn't
10 know how -- I'm not going to say easy, but how
11 hard the recovery he was undergoing.
12 Q.        Is it true, sir, that subsequent to
13 the email that you sent in 2017 -- strike that.  A
14 letter that you sent in 2017.
15 A.        All right.
16 Q.        That you did have conversations
17 with Mr. Ball where you told him not to worry
18 about making you whole because y'all could settle
19 it up later?
20        MR. COFFIN: Object to the form.
21        THE WITNESS: I don't -- I don't
22 recall when that occurred.  I think that was --
23 that was much later.  That wasn't around 2017.
24 BY MR. BIENERT:
25 Q.        When did that happen?

Page 186

1 A.        2020.
2 Q.        Tell me about that.
3 A.        It was just a phone call that
4 Gordon said, Well, we've gotten the State Farm
5 money now, and I want to catch up, and he was
6 referring, of course, to the BCBS litigation,
7 which I knew.  Then I said, we'll deal with it
8 later.
9 Q.        Why did you tell him that?
10 A.        Because at that point we had put
11 up -- we, as in PBC, had put up probably -- we
12 can look at the documents and see, but close to a
13 million dollars, and he put up 19,000 or 49,000,
14 whatever it was, and I simply didn't want to tell
15 him, hey, as far as I'm concerned the deal is
16 off.
17        I just said look -- there was
18 nothing at that time.  The case hadn't settled.
19 Of course, it was looking good, but it hadn't
20 settled, and so I just wanted to defer any
21 discussion about it.
22 Q.        But you never told him any of what
23 you just said?  In other words --
24 A.        I didn't tell him -- yeah, I told
25 him that.  We were on the phone together.  No, no,

Page 187

1 I'm sorry.  I apologize.  I told him we would deal
2 with it later.  I said okay, and that was it.
3 Q.        I want to pay you what I owe you,
4 and you say we'll deal with it later?
5 A.        We'll deal with it later.
6 Q.        Did you tell him that your view was
7 y'all didn't have a deal?
8 A.        I did not want to tell him that,
9 and did not tell him that.
10 Q.        Did you tell him that your view was
11 that he was not entitled to a 50 percent share of
12 the case?
13 A.        What part of the case?  You got to
14 remember, as far as I'm concerned there are three
15 parts to this case.
16 Q.        Any part.
17 A.        I didn't say any -- I didn't say
18 part one, part two, part three or any part.
19 Q.        Did you in any way directly, or in
20 sum or substance, let him know that he hadn't
21 abided by, from your perspective, your agreement,
22 and you didn't view it as an enforceable deal?
23 A.        No.
24 Q.        Did you let him know in any way,
25 shape or form, that you saw things as

Page 188

1 problematic?
2 A.        Well, of course, the case was
3 problematic, but other than that ...
4 Q.        First of all, other than that, yes
5 or no?
6 A.        I don't know what else it would
7 have been.  I mean, the whole thing hinges on the
8 case being resolved favorably so we all have
9 money to distribute.
10 Q.        Well, you say this conversation you
11 believe occurred in 2020, right?
12 A.        I believe it occurred in 2020,
13 because it occurred after we got paid on State
14 Farm.  My recollection of what we got paid in
15 State Farm was July of 2019, so it would have had
16 to have been after that date.
17 Q.        And so -- and, by the way, you let
18 Mr. Ball know that you were very pleased with the
19 money that you got in State Farm, and it really
20 helped out you and your firm, right?
21 A.        Well, sure.
22 Q.        So Mr. Ball calls you and says, Hey,
23 I'd like to pay you anything I owe --
24 A.        Right.
25 Q.        -- and you say, Don't worry, we'll

Page 189

1  deal with it later, and you're saying this to him
2  against the backdrop where you had already been
3  telling him how pleased and excited you were,
4  that you made a huge amount of money on the State
5  Farm case with him.
6      MR. COFFIN: Object to the form.
7      THE WITNESS: I don't know if I
8  ever told him that. I really have no memory of
9  actually telling him that, but, obviously,
10  anybody that makes a nine million dollar fee is
11  going to be a little pleased.
12  BY MR. BIENERT:
13  Q.      As you sit here now, you're pretty
14  confident that you would have profusely thanked
15  Gordon for his involvement with you in getting
16  that large fee in the State Farm case, right?
17      MR. COFFIN: Object to the form.
18      THE WITNESS: Sure. That goes all
19  the way back to 1997.
20  BY MR. BIENERT:
21  Q.      Did you say sure? Was that your
22  answer?
23  A.      No. I said the relationship in
24  State Farm goes back to 1997, and I'm saying I
25  think anybody would have been pleased and happy

Page 190

1  to get a nine million dollar fee after 20 some
2  odd years.
3  Q.      And you expressed that to Mr. Ball?
4  A.      I don't remember expressing that to
5  him.
6  Q.      By the way, in terms of the fee on
7  that case, you know, that case, you were not lead
8  counsel on that case, were you?
9  A.      No.
10  Q.      You were not a co-lead, right?
11  A.      No.
12  Q.      Mr. Ball was a lead counsel on the
13  case, right?
14  A.      He was one of two, yes.
15  Q.      He started off as a lead, and then
16  he was a co-lead, right?
17  A.      Yeah. He was certainly a co-lead.
18  Q.      And he spent a lot more hours on
19  the case than you did, correct?
20      MR. COFFIN: Object to the form.
21      THE WITNESS: You know, we'd have
22  to go back and look. I don't know if that's true
23  or not. I just don't -- I don't remember. I
24  can't remember how many hours any particular
25  lawyer spent. It's accounted for.

Page 191

1  BY MR. BIENERT:
2  Q.      It's the norm that the leads and
3  the co-leads tend to spend more time on the cases
4  than the other lawyers, right?
5      MR. COFFIN: Object to the form.
6      THE WITNESS: As a general matter,
7  yes.
8  BY MR. BIENERT:
9  Q.      And you have no reason, as you sit
10  here now, to think that that State Farm case was
11  any different, right?
12  A.      I do.
13  Q.      And the reason for that is what?
14  A.      Because Gordon got in a fight with
15  the other co-lead from Chicago, and Gordon's --
16  Gordon's participation in State Farm fell off, in
17  my view, considerably over a number of years.
18  Q.      What years would those have been?
19  A.      Well, let's see. The case was
20  filed in 2012, and I'm thinking somewhere in the
21  2014 range, 2015 range perhaps, until towards the
22  very end of the case. That's my best
23  recollection without looking at actual time
24  slips.
25  Q.      Now, in the State Farm case you had

Page 192

1  an agreement with Gordon and Mr. Barrett, that
2  y'all would each participate equally in any
3  result in the State Farm case, right?
4  A.      It was more than that. All nine
5  firms agreed that each firm would be paid
6  equally.
7  Q.      But that was at the end, right?
8  A.      No. That agreement was from the
9  get-go, because Don was adamant that there will
10  be a letter agreement, and rightfully so, and all
11  the nine firms signed off on it. I have that
12  letter agreement somewhere in my State Farm file,
13  but my best recollection is that would have been
14  in about 2013 roughly, but it was -- I do
15  remember it was early in the litigation.
16  Q.      During a break, because we'll take
17  one while I look for that agreement, because we
18  may have one that at least I can put in front of
19  you.
20      Is there any doubt in your mind that
21  a significant factor in getting the ultimate
22  result in State Farm was Mr. Ball's efforts in
23  leading the resurrection of the case?
24      MR. COFFIN: Object to the form.
25      THE WITNESS: The idea of the

Page 193

1 concept of the second -- the Hale case, which is
2 State Farm II, was Gordon's idea.
3 BY MR. BIENERT:
4 Q.        And that's the case that ultimately
5 resulted in the settlement, right?
6 A.        Yes.
7 Q.        And at the end of that case you got
8 a nine million dollar payout, the same amount
9 that Gordon's firm got, right?
10 A.        Each firm got nine million.  I got
11 nine million.  I didn't see the checks to
12 everybody else, but I'm assuming everybody got
13 nine million.
14 Q.        Is it true, sir, that once the
15 settlement was in play, but before everything was
16 dispersed, that there were members of the other
17 law firms that took the position that you should
18 not get an equal payout?
19         MR. COFFIN: Object to the form.
20         THE WITNESS: Gordon told me that.
21 BY MR. BIENERT:
22 Q.        And Gordon was the person who, on
23 your behalf, fought with them to make sure that
24 you got a nine million dollar payout?
25         MR. COFFIN: Object to the form.

Page 194

1         THE WITNESS: He says he was.  I
2 accept Gordon's word on that.  I don't know.  I
3 wasn't part of the discussions, but I did get a
4 phone call from the other lead at one point
5 subsequent to Gordon telling me what you just
6 referenced, or asking me to give up a significant
7 part of my fee to him and I said -- my response
8 was what about State Farm I, the work that I did
9 in that case and the $717,000 in expenses  that I
10 never recovered, and he said, Oh, well, okay,
11 thanks.
12 Q.        Who was that counsel?
13 A.        I'm sorry?
14 Q.        Who was that?
15 A.        That was Gordon's co-lead from
16 Chicago and -- Clifford, Bob Clifford.  Thank
17 you.
18 BY MR. BIENERT:
19 Q.        So you heard anecdotally from
20 Gordon, and you say you at least believed him,
21 that there were others trying to say you should
22 get less than a full share, and then after the
23 fact someone called you and said they should have
24 gotten more money than you?
25 A.        Yes, that's correct.

Page 195

1 Q.        But one thing you know is that --
2 whatever it would actually would work out to as
3 to who did what, hours, motions work, Gordon
4 stood for you getting an equal share to him,
5 right?
6         MR. COFFIN: Object to the form.
7         THE WITNESS: As far as I know he
8 did.
9 BY MR. BIENERT:
10 Q.        And that's what happened?
11 A.        Yes, as far as I know.
12 Q.        And you were sitting with that nine
13 million dollars in your pocket shortly before you
14 had the talk with Mr. Ball where he said, Hey, do
15 I owe you any money, how do I catch up on this,
16 and you said don't worry about it, we'll address
17 it later?
18         MR. COFFIN: Object to the form.
19         THE WITNESS: The time sounds
20 right.
21 BY MR. BIENERT:
22 Q.        So we are covering a lot of ground
23 timewise because now we've gone from the
24 agreement that memorialized the prior oral
25 agreement in November of 2016, all the way up to

Page 196

1 sometime in 2020, and so we're talking about, you
2 know, more or less a four-year time frame, right?
3 A.        Correct.
4 Q.        Is it accurate -- it's your
5 testimony that during that whole roughly four
6 years, you never told Gordon Ball that it was
7 your view that he wasn't entitled to a half-share
8 of any fees in Blue Cross?
9 A.        Well, let me -- half of the fees
10 that our firm got were fees he got from overall he
11 was going to get.  Didn't matter to me, but I
12 never told him that I was objecting -- well, I
13 guess objecting or not willing to pay half of the
14 fees that PBC earned to Gordon in that time
15 frame.
16 Q.        Well, you never told him that you
17 were objecting to him getting half of any fees,
18 right?
19         MR. COFFIN: Object to the form.
20         THE WITNESS: Half of what fees?
21 No.  I never told him anything about fees.  We
22 didn't really communicate that much.
23 BY MR. BIENERT:
24 Q.        You have the agreement in 2012, and
25 we already discussed that.  You had the written

Page 197

1 agreement in 2016.  We already discussed that,
2 and that's it until this whole thing kind of blew
3 up, I'll say in, what, 2022 or '23?
4 A.          That's fair to say, yes.
5 Q.          Now similarly -- strike that.  The
6 time frame, if we go back to the chart on your
7 May 3rd letter -- here we go.  The time frame
8 after which Gordon was no longer -- strike that.
9 Let me try it again.  If we look at the dates of
10 when Gordon was not paying you 50 percent, that's
11 the time frame when he was really sick and
12 recovering, right?
13          MR. COFFIN: Object to the form.
14          THE WITNESS: Well, I don't know --
15 I would have to say partially because I don't
16 know how long it took him to recover from the
17 heart transplant.
18 Q.          Did you ever -- after the May 3rd,
19 2017 letter, did you ever send a notice or a
20 demand or the like to Gordon saying, Hey, you
21 need to send me more money for your half of the
22 contributions?
23 A.          No, because he was getting the
24 statements from Ed Gentle, which reflected the
25 assessment to each firm.

Page 198

1 Q.          So you never notified him that it
2 was your view that he needed to get you paid?
3          MR. COFFIN: Object to the form.
4          THE WITNESS: No.
5 BY MR. BIENERT:
6 Q.          Well, if he was getting assessments
7 from the court or from Special Master Gentle,
8 then the assessments he would have gotten would
9 have only been in the one-sixth of what your firm
10 would pay, not in the 50 percent that you claim
11 he entered a separate agreement with you on,
12 right?
13 A.          Right.  The assessment directly to
14 him would have been 10,000 -- well, one-sixth is
15 about right, yeah, because it varied.  The amount
16 varied.  Sometimes it was 10,000, sometimes it
17 was -- it would have been more or less.
18 Q.          When Special Master Gentle sent you
19 an invoice, in essence, and said pay --
20 A.          Right.
21 Q.          -- whatever amount that was,
22 according to the special master's order, Gordon
23 was to pay what amounted to one-sixth of that?
24 A.          Had he not withdrawn, yes.
25 Q.          Withdrawn from what?

Page 199

1 A.          From paying money to the MDL common
2 benefit fund.
3 Q.          Well, did you keep track of what he
4 did or didn't pay directly to the fund?
5 A.          I didn't have to keep track of it.
6 Ed Gentle did, and it was on every cash call.
7 There was a chart.  Every one of them it showed
8 exactly how much each firm owed for that cash
9 call, and then the second chart was how much each
10 firm had contributed totally to that point in
11 time, and Gordon was getting those, so he could
12 look immediately and see that Pat Pendley was
13 assessed $63,870 or whatever the amount was.
14 Q.          So you -- if I'm following what
15 you're saying, you would get reports or things
16 that you would see over time that Gordon was in
17 arrears?
18 A.          Oh, I knew he was in arrears, sure,
19 immediately.
20 Q.          And you never called him and said,
21 Hey, what's up, you need to do this?
22 A.          I did not, I did not.
23          MR. BIENERT: Let's go ahead and
24 locate whatever is the next exhibit.
25

Page 200

1          (Exhibit 14 was marked
2          to this deposition.)
3
4 BY MR. BIENERT:
5 Q.          Before we get to this, let me go
6 back and just -- I'm going back to the 2020 time
7 frame when you said you talked to Gordon when he
8 offered to pay what was owed.
9 A.          When I say 2020 time frame, I'm
10 giving you a real broad area because I do not
11 remember -- I remember getting the call, but I
12 just don't remember when it was.
13 Q.          What you know is it was after you
14 got the State Farm money?
15 A.          It was definitely after the State
16 Farm money, because in the call Gordon alluded to
17 the fact that now that I've gotten the State Farm
18 money -- I want to paraphrase it -- I want to
19 catch up.
20 Q.          At the time though you had to call,
21 you still didn't know the results of the Blue
22 Cross case, did you?
23 A.          Oh, no.
24 Q.          In fact, you were still in a very
25 uncertain time where you didn't know if you would

Page 201

1 lose everything, right?
2          MR. COFFIN: Object to the form.
3 BY MR. BIENERT:
4 Q.        And if I understood what you said
5 to us earlier, you were almost a million dollars
6 out, right?
7 A.        I think we were something in that
8 area in -- I say a million dollars.  That was
9 money that was just paid, order of the special
10 master.
11 Q.        So why wouldn't you accept Gordon's
12 money to put, money back in you and your firm's
13 pocket to reduce your risk?
14 A.        Because we had paid hundreds and
15 hundreds and hundreds of thousands of dollars
16 between 2016 and 2020, when we had the call, and,
17 you know like any plaintiff firm, you get a cash
18 call for $100,000, and 60 days later you get a
19 cash call for 80,000, and you've got 30 days to
20 put it up, it was --
21          You know, it was blood, sweat and
22 tears trying to keep up with these cash calls and
23 just -- we had a ton of money in the case.
24 Q.        Right.  I'm trying to understand.
25 Tell me where I'm wrong.  I would think that

Page 202

1 would make you welcome getting that money so that
2 you don't have a ton of money expended?
3 A.        No.  My position was that when
4 Gordon basically withdrew from the case, was my
5 understanding, appreciation at that time.  He
6 didn't do any work that I'm aware of, that I'm
7 aware of.  He didn't put up his $10,000
8 assessments.  He didn't contribute half of my
9 assessments, that he had breached the oral
10 agreement that we had to put up 50 percent of his
11 assessment, each assessment.
12          I would put up 50 percent of that,
13 he would put up 50 percent of mine, and then at
14 the end of the day, whatever, we'd get our money
15 back, whatever the bump was, we would get the
16 bump.  But he just -- he bailed on me, and he
17 just -- he left us in a very difficult position
18 financially.
19          I mean, we spent 42 million
20 dollars, the plaintiffs did as a group,
21 litigating this case, and our firm -- our firm
22 contributed the eighth largest amount of money to
23 the common cost.  The only people that paid more
24 money in than PBC were the two co-leads, the five
25 people on the PSC and the local liaison counsel.

Page 203

1          Those eight people who were in the
2 top tier -- they were the top tier leadership.
3 We were immediately under them to a greater or
4 lesser degree because the more important your
5 position was, the more you had to pay, if you
6 will notice from the assessments and we -- of all
7 the other firms we were the eighth -- I'm sorry,
8 yeah, the eighth or ninth, ninth most
9 contributing firm.
10 Q.        The contributions that you made
11 were all pursuant to the order of the special
12 master telling you what to pay, right?
13 A.        That's the money we were talking
14 about.
15 Q.        You never went in and paid more
16 than that, did you?
17          MR. COFFIN: Object to the form.
18          THE WITNESS: Yes.
19 BY MR. BIENERT:
20 Q.        To the special master's orders?
21 A.        Yes.
22 Q.        When did you pay more than what the
23 special master ordered you to pay?
24 A.        When you had firms who were
25 supposed to pay and didn't pay, he would then --

Page 204

1 Ed would then reallocate that assessment among --
2 Q.        Among the other firms?
3 A.        Among the firms that were willing
4 to meet that assessment, and they weren't --
5 generally, they weren't that much money, and we
6 were -- we did that every time.  Every cash call
7 that was made that there was unpaid assessments,
8 we helped cover for whoever didn't pay.
9 Q.        Collectively, the we of --
10 A.        We as in anywhere from -- sometimes
11 it was four firms.  Sometimes it was eight or
12 nine firms.  It varied.
13 Q.        You used the term a couple of
14 moments ago, that in your view he breached your
15 alleged oral agreement to pay you 50 percent.
16 When is it your view that he breached that?
17 What's the time frame we're talking about?
18 A.        The third assessment.
19 Q.        Did you give him a notice of the
20 breach?
21 A.        You mean like wrote him a certified
22 letter saying you're in breach?
23 Q.        Well, that would be one way to do
24 it.
25 A.        I didn't do that.

Page 205

1 Q.        Did you take any other methods to
2 say you were in breach?  Like how about just an
3 email saying, Hey, you need to get me that money?
4 A.        I don't remember.  I don't recall
5 anything like that.  I mean, we got the call,
6 Gordon got the cash call.  He saw -- I didn't
7 have to call him and say, Hey, Gordon.  This was
8 the third call.  I don't know what it was.  Let's
9 say it was $45,000, send me twenty-two five.  I
10 didn't have to do that because he could see on
11 the paper.
12 Q.        If you had written some sort of an
13 email like, Hey, Gordon, you owe money, you got
14 to pay it, that would be in this file that your
15 counsel keeps referencing, and we would have had
16 it, right?
17 A.        Oh, yeah.
18 Q.        I'll represent you we haven't seen
19 it.
20 A.        I never saw one either.
21 Q.        Because you never wrote one?
22 A.        I never wrote one.
23 Q.        Did you ever pick up the phone and
24 say, Hey, Gordon, man, you're behind your thing?
25 A.        No.

Page 206

1 Q.        So when you gave us an example of
2 not informing him of the breach and you said,
3 Well, you mean did I send a certified letter, not
4 only did you not send a certified letter, but you
5 didn't give him any kind of a notice of a breach,
6 did you?
7 A.        No, I didn't.
8 Q.        To your knowledge no one at your
9 firm did, right?
10 A.        No.  Nobody at the firm did.
11 Q.        In the same vein you never then put
12 him on notice and gave him an opportunity to cure
13 the breach, did you?
14 A.        No, because that's when he had open
15 heart surgery.
16 Q.        Then when he called you and said,
17 in essence, Hey, I want to pay you what I owe,
18 you declined?
19 A.        That was years later.  That's right,
20 I did decline.
21 Q.        But you didn't say there was an
22 issue.  You just said, We'll deal with it later?
23 A.        We'll deal with it later.
24 Q.        All right.  Let's go ahead and look
25 at Exhibit 14.

Page 207

1 A.        Yes, I have it in my hand.
2 Q.        If you look at the bottom of this,
3 which would be the first email, September 6,
4 2019, this is an email exchange that you and
5 Gordon had after you would have gotten the nine
6 million dollars on the State Farm case, right?
7 A.        Yes.
8 Q.        And there's just a question here.
9 "Gordon, are you going to Chicago on October 23
10 and 24 for the award?"  What's that a reference
11 to?
12 A.        That is -- this email deals with
13 State Farm, and that is a reference to the
14 Illinois -- I think it was the Illinois Trial
15 Lawyers Association or some Illinois association,
16 and they wanted to recognize the lawyers in the
17 Hale case, the result that we had gotten as a
18 result of, what, 22, 23 years -- 22 years of
19 litigation, and they were going to make an award
20 at a dinner in Chicago on the 23rd or 24th.
21 Maybe the 24th.  One of those days.
22 Q.        The State Farm case was a big deal,
23 right?  It was a great result?
24 A.        Oh, yeah; oh, God, yeah.
25 Q.        And the resurrection of the case

Page 208

1 that led to the result was Gordon, right?
2          MR. COFFIN: Object to the form.
3          THE WITNESS: No doubt about it.
4 Nobody will -- I don't believe anybody would
5 quibble with that.
6 BY MR. BIENERT:
7 Q.        And then Gordon basically says he
8 was thinking about whether to go, but that he is
9 going to spend a few weeks in Sarasota.  Do you
10 see that?
11 A.        Right.  My understanding he has a
12 house in Sarasota.
13 Q.        So, in essence, this would be R and
14 R in Sarasota for him?
15 A.        I would think going to Sarasota for
16 a couple of weeks would be R and R.
17 Q.        Then you write back to him, "I am
18 out of debt for the first time in 58 years"?
19 A.        Right.
20 Q.        Was that a true statement?
21 A.        Absolutely.
22 Q.        So this meant a lot to you getting
23 the nine million dollars?
24 A.        Well, of course.
25          MR. COFFIN: Object to the form.

Page 209

1        THE WITNESS: Besides -- besides
2 all the years of fighting with State Farm.
3 BY MR. BIENERT:
4 Q.        Then Gordon responds to you on
5 September 6, "I couldn't be happier for you.  You
6 deserve it, and you have been a good friend."
7 A.        Yes, he did.
8 Q.        And that was the way that Gordon
9 would talk with you about your relationship,
10 right?
11 A.        Sure, sure, absolutely.
12 Q.        And you believe he was always
13 sincere with you in that regard, right?
14 A.        Oh, yeah, I think so, I think so.
15 Let me say this.  As far as -- you asked me about
16 -- I think at one point about how long Gordon and
17 I have known each other or been involved.  I said
18 1991, and that was because of the litigation, the
19 dioxin litigation.  Gordon was trying a case in
20 Wichita, Kansas in about --
21        I forget, '96, '97, and,
22 unfortunately, had a massive heart attack during
23 that litigation.  In fact, I even flew to
24 Wichita.  I had a plane at that time before '21.
25 I flew to Wichita because he was in the hospital

Page 210

1 and had been in the hospital, just to go and see
2 how he was doing and say hello, but I never got
3 in the room because he was in ICU, and they will
4 only let one lawyer in.
5        Don Barrett had gone with us, and
6 Don went in and talked to Gordon.  And at that
7 time I offered -- I offered that whenever Gordon
8 got out of the hospital, to his wife, I said,
9 Look, I will send my plane to get Gordon and fly
10 y'all back to Knoxville, because it's a long
11 drive from Wichita to Knoxville, and the man just
12 came out of the hospital.
13        And Gordon at that time, as he'll
14 tell you, was nervous about flying in anything.
15 Subsequently, I think I was a bit helpful in
16 getting him more accustomed to flying, but
17 offered the plane to bring him back to Knoxville
18 so he wouldn't have to drive for hours and hours
19 and hours, but he preferred to ride.
20 Q.        So if I'm understanding your
21 testimony, as of, say, 2020, although you didn't
22 say this to Gordon, you were thinking internally
23 that the reason you rejected his offer to pay
24 what was owed on contributions in the Blue Cross
25 case was, in essence, you were so annoyed,

Page 211

1 disgusted, whatever the right word is, with his
2 leaving you in the lurch on the Blue Cross case?
3        MR. COFFIN: Object to the form.
4        THE WITNESS: Right.  That, and
5 because in 2017, he said how much do I owe?  I
6 will catch up.  We sent the information to him.
7 Never heard another word.  He didn't call me back
8 and say, Hey, that's too much, that's not enough,
9 nothing.  We never heard another word for, what,
10 four years went by and so --
11 BY MR. BIENERT:
12 Q.        Well, when sent him in 2017, he was
13 up to date up until a couple of months before
14 that, right?
15 A.        No.  He owed money.  He owed me
16 money when I sent that accounting to him, and I
17 was willing to accept it at the time, but he
18 never sent it.
19 Q.        So after this time that you
20 explained that you had the call with Gordon,
21 where you didn't say much, but you told us what
22 you were thinking internally, you continued to do
23 cases with Gordon, right?
24        MR. COFFIN: Object to the form.
25        THE WITNESS: The -- we only had

Page 212

1 that one case involving the arrest warrants.  It
2 didn't really go anywhere.
3 BY MR. BIENERT:
4 Q.        Well, did you talk to Gordon about a
5 case involving CPAP machines?
6 A.        I probably called him and tried to
7 -- tried to see if he could file some CPAP cases
8 in Tennessee.
9 Q.        That was in 2021?
10 A.        And SoClean cases --
11 Q.        So in other words --
12 A.        -- in 2021, yes.
13 Q.        In fact, if we look at Exhibit
14 19 ...
15 A.        Nineteen?  I don't have 19.
16        THE COURT REPORTER: You mean 15.
17        MR. BIENERT: Yes, ma'am.
18
19        (Exhibit 15 was marked
20        to this deposition.)
21
22 BY MR. BIENERT:
23 Q.        So this is an example of the CPAP
24 cases that you were talking to Gordon about,
25 correct?

Case 2:25-cv-00014-RDP    Document 2    Filed 01/06/25    Page 71 of 105

IN RE: BLUE CROSS BLUE SHIELD    Video Deposition of Patrick W. Pendley
ANTITRUST LITIGATION, (MDL NO.: 2406)    October 18, 2023

Page 213

1  A.        Yes.
2  Q.        This was in 2021 --
3  A.        Right.
4  Q.        -- within a year of when you
5  claimed that you didn't even want him to pay you
6  back the money he owed you because you were so
7  upset with him over not, in your view, being
8  there for you in the Blue Cross case, right?
9          MR. COFFIN: Object to the form.
10          THE WITNESS: Yes, that's right.
11  BY MR. BIENERT:
12  Q.        And yet here you are asking him to
13  join you in cases, right?
14  A.        Well, yes, because -- because I
15  thought the CPAP case was going to make a lot of
16  money, and if Gordon could get involved and make
17  a lot of money, that was fine with me. I didn't
18  have a problem with that.
19  Q.        And after you asked him to come
20  into the cases with you, he, in fact, was part of
21  a filing of one of the cases in Tennessee?
22  A.        I believe he did. I think that's
23  right. And, by the way, the CPAP economic damage
24  cases just recently settled for like 400 and
25  something million.

Page 214

1          MR. BIENERT: Let's take a two-
2  minute break because I think I'm done, just to
3  make sure there's nothing else.
4          THE VIDEOGRAPHER: Going off the
5  record. The time is now 3:20.
6          (Recess was taken at 3:20 p.m.)
7          THE VIDEOGRAPHER: We're back on
8  the record. The time is now 3:28.
9          MR. BIENERT: We have taken a
10  little break and come back, and we are finished,
11  so thank you.
12          THE WITNESS: Thank you.
13
14  EXAMINATION BY MR. COFFIN:
15  Q.        Mr. Pendley, I just have a couple
16  of follow-up questions.
17  A.        Sure.
18  Q.        The first one related to Exhibit
19  13. Can you please pull out Exhibit 13?
20  A.        I've got it.
21  Q.        What is Exhibit 13?
22  A.        This is the letter that I wrote to
23  Gordon at his request to give him the amount he
24  needed to send to the firm to equalize the
25  payments.

Page 215

1  Q.        Okay, wait a second. The
2  videographer is telling me that your mike is not
3  on.
4          THE VIDEOGRAPHER: I think I picked
5  that up.
6          THE WITNESS: Did you get it?
7          THE VIDEOGRAPHER: Yes.
8          THE WITNESS: No court reporter has
9  ever said they had trouble hearing me.
10  BY MR. COFFIN:
11  Q.        So this is May 3rd, 2017 letter,
12  correct?
13  A.        Correct.
14  Q.        And you did send this to Mr. Gordon
15  Ball, correct?
16  A.        Absolutely.
17  Q.        In response to the letter that you
18  sent on May 3rd, 2017, did Mr. Ball provide
19  Pendley, Baudin & Coffin with any payments that
20  you outlined in this letter?
21  A.        No.
22  Q.        Did you ever receive any
23  correspondence from Mr. Ball, or did you hear
24  from Mr. Ball with regard to the May 3rd, 2017
25  letter?

Page 216

1  A.        No.
2  Q.        Let me have you turn to the second
3  page of Exhibit 13.
4  A.        The second page.
5  Q.        With the chart that you had gone
6  over prior. Yeah. I think that's it.
7  A.        All right.
8  Q.        At the top it says Blue Cross Blue
9  Shield Plaintiffs' Common Benefits Subscriber
10  Fund. Do you see that?
11  A.        I do.
12  Q.        Do you recall being asked questions
13  about the dollar figures under the column labeled
14  Patrick W. Pendley?
15  A.        Yes.
16  Q.        And do you recall being asked
17  questions about the dollar figures under the
18  column labeled Gordon Ball?
19  A.        Yes.
20  Q.        Under Gordon Ball there's 30,000,
21  and then there's 900 -- excuse me, 9,804, and
22  then there's 19,608, correct?
23  A.        Mine is 10,000 -- nine thousand --
24          MR. GOLDMAN: He was looking at the
25  wrong page.

Page 217

1  THE WITNESS: I was on the wrong
2 page. It's on the last page, is it not?
3  MR. COFFIN: Oh, okay. That might
4 be my fault.
5  THE WITNESS: Okay. All right. So
6 the answer is yes. I see the $30,000 -- I see the
7 $9,804, and then I see the 19,000 -- I see the
8 nine thousand eight "o" four, and then I see the
9 19 thousand six "o" eight. So ...
10 BY MR. COFFIN:
11 Q.  All right. Mr. Pendley, we're on
12 Exhibit 13, right?
13 A.  Yes.
14 Q.  You've looked at the column labeled
15 Gordon Ball with the various dollar amounts,
16 correct?
17 A.  Yes.
18 Q.  Do you see the comments section?
19 A.  Yes, I do.
20 Q.  Next to the comment -- or next to
21 the number $9,804, can you read what the comment
22 says?
23 A.  It says payment made by Gordon Ball
24 sent to BCBS, not PBC.
25 Q.  Okay. Now do you understand which

Page 218

1 payments listed in the Gordon Ball column were
2 sent to PBC and which were sent -- which were not
3 sent to PBC by Mr. Ball?
4 A.  Yes.
5 Q.  Can you explain?
6 A.  It indicates that 30,000 was sent
7 to PBC by Gordon, and the 19 thousand six "o"
8 eight was sent to PBC by Gordon.
9 Q.  Okay.
10 A.  And the ninety-eight "o" four was
11 paid directly by Gordon to Ed Gentle.
12 Q.  Okay. And does that -- do you now
13 have an understanding that what you testified to
14 earlier was incorrect in that Mr. Ball had not
15 actually paid to PBC the 59,412 at the bottom of
16 that column?
17 A.  Right. No. You're correct.
18 Q.  I just wanted to clarify your
19 testimony. Thank you. Can you pull out Exhibit
20 10, please?
21 A.  All right. Ten? Okay, ten?
22 Q.  Yes, sir.
23 A.  Got it.
24 Q.  And this is the letter agreement
25 that you signed November 26, 2016, correct?

Page 219

1  MR. BIENERT: November 18. Oh,
2 sorry, my bad.
3  MR. COFFIN: No problem.
4 BY MR. COFFIN:
5 Q.  Counsel is partially correct. This
6 was dated November 18th, but, Mr. Pendley, you
7 signed this on November 26, 2016?
8 A.  That's correct.
9 Q.  What was the purpose of you signing
10 this letter agreement?
11 A.  My purpose is the letter indicates,
12 was to memorialize the agreement, the oral
13 agreement that Gordon and I had made in May of
14 2012, that we would share equally the attorney
15 fees awarded in the state cases that we were
16 going to file concerning the Blue Cross Blue
17 Shield Antitrust Litigation. That was -- it was
18 just a written confirmation of what we orally
19 agreed to.
20 Q.  And did that oral agreement or this
21 written confirmation have anything to do with
22 fees that you might obtain in the MDL?
23  MR. BIENERT: Objection, speculative
24 and moves perspective.
25  THE WITNESS: The answer is it did

Page 220

1 not because there was no MDL pending and may never
2 be one pending.
3 BY MR. COFFIN:
4 Q.  You mean in 2012, when you had the
5 original agreement, correct?
6 A.  When we had the original agreement
7 in 2012, that's right.
8  MR. COFFIN: Thank you. That's all
9 I have.
10
11 REEXAMINATION BY MR. BIENERT:
12 Q.  By the way, when you -- just to
13 follow up on that, when you had the original
14 agreement in 2012, there were no cases pending
15 that you had filed?
16 A.  There were no cases pending, but the
17 plan was to file in all these other states.
18 Q.  As you described before lunch?
19 A.  As I described. That's right.
20 Q.  Just to clarify on that, there were
21 no cases that you were involved in filing when
22 you -- by the time you had spoken with Mr. Ball
23 in May of 2012, but there was a case that Mr.
24 Ball and another lawyer had filed in another
25 jurisdiction, right?

Page 221

1  A.         Right.  The Morrisey case in
2  Tennessee, Gordon and somebody I don't know had
3  filed.  That was in existence.  I had at that
4  point no cases filed.
5              MR. BIENERT:  Okay.
6              MR. COFFIN:  That's all we have.
7  Thank you.
8              THE VIDEOGRAPHER:  This concludes
9  the video deposition.  The time is now 3:36.
10 FURTHER DEPONENT SAITH NOT:
11              _____
12                    PATRICK W. PENDLEY
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 222

1                 ERRATA SHEET
2
3              I, PATRICK W. PENDLEY, having read
4  the foregoing deposition, pages 1 - 221, do hereby
5  certify said testimony is a true and accurate
6  transcript, with the following changes (if any):
7  Page  Line     Reason for change
8  _____  _____  _____
9  _____  _____  _____
10 _____  _____  _____
11 _____  _____  _____
12 _____  _____  _____
13 _____  _____  _____
14 _____  _____  _____
15 _____  _____  _____
16 _____  _____  _____
17 _____  _____  _____
18 _____  _____  _____
19 _____  _____  _____
20
21  _____        _____
22    Date              Patrick W. Pendley
23 _____
24 Notary Public
25 My Commission Expires: _____

Page 223

1              REPORTER'S CERTIFICATION
2              I, Susan Murillo, LCR, Licensed
3  Court Reporter in and for the State of Tennessee
4  do hereby certify that the above deposition was
5  reported by me and that the foregoing 221 pages of
6  the transcript is a true and accurate record to
7  the best of my knowledge, skills and ability.
8              I further certify that I am not
9  related to nor an employee of counsel or any of
10 the parties to the action, nor am I in any way
11 financially interested in the outcome of this
12 case.
13              I further certify that I am duly
14 licensed by the Tennessee Board of Court Reporting
15 as a Licensed Court Reporter as evidenced by the
16 LCR number and expiration date following my name
17 below.
18              _____
19              Susan D. Murillo, LCR #224
20              Expiration Date:  6-30-22
                118 Wheaton Hall Lane
21              Franklin, Tennessee  37069
22
23
24
25

IN RE: BLUE CROSS BLUE SHIELD
ANTITRUST LITIGATION, (MDL NO.: 2406)

Video Deposition of Patrick W. Pendley
October 18, 2023

## $

**$10,000 (3)**
95:15;96:12;202:7
**$100,000 (2)**
180:22;201:18
**$117,092.50 (1)**
166:20
**$19,608 (1)**
166:9
**$19,804 (1)**
178:22
**$22,000 (3)**
168:6,18;169:19
**$3,000 (1)**
181:4
**$30,000 (2)**
166:8;217:6
**$35,000 (1)**
98:24
**$45,000 (1)**
205:9
**$5,000 (1)**
100:17
**$50,000 (2)**
94:1;95:10
**$59,412 (1)**
166:22
**$60,000 (4)**
167:4,9,17;169:21
**$63,870 (1)**
199:13
**$717,000 (1)**
194:9
**$9,804 (3)**
166:8;217:7,21

## A

**abided (1)**
187:21
**ability (9)**
55:15,19;107:15;
135:8,24;136:18;
138:6,24;162:11
**able (7)**
30:21;31:2;37:4;
59:9;107:4;113:17;
184:17
**above (4)**
19:18;59:1;70:17;
144:8
**Absolutely (10)**
12:24;17:9;22:13;
23:4;36:15;153:3;
155:19;208:21;209:11;
215:16
**accept (3)**
194:2;201:11;211:17
**accepting (1)**
178:3
**according (6)**

68:15,25;93:25;
111:25;178:13;198:22
**account (5)**
92:10;100:18,19;
144:20;173:1
**accounted (1)**
190:25
**accounting (4)**
134:1;140:12,14;
211:16
**accuracy (3)**
147:23;148:10,19
**accurate (4)**
12:22;15:8;20:4;
21:13;22:24;31:11;
32:6,14;59:13;77:5;
81:11;90:4;91:20;
102:14;145:9;174:17;
196:4
**accurately (1)**
149:6
**accustomed (1)**
210:16
**achieve (1)**
131:20
**acknowledge (1)**
183:20
**across (1)**
78:16
**Act (3)**
38:8,11,22
**Action (36)**
7:9;14:2,7;35:22,25;
36:3,10,11;37:21;38:4,
7,10,20,21;39:3;42:13,
25;46:9;47:21;53:18,
21;54:4,14,15;57:25;
59:9;77:7;78:19;79:23;
80:14,24;82:12;113:4;
162:24,25;163:2
**active (1)**
15:18
**activity (2)**
15:11;16:5
**actual (5)**
26:10;120:24;
124:18;170:6;191:23
**actually (16)**
37:3;45:24;58:24;
60:3;63:24;70:17;
90:20;112:1,9;117:11;
146:3;147:18;149:12;
189:9;195:2;218:15
**ad (1)**
161:21
**adamant (1)**
192:9
**add (1)**
9:8
**adding (1)**
57:12
**addition (2)**
28:22;177:13

**additional (1)**
59:9
**address (5)**
7:3;68:5;101:1;
155:6;195:16
**addressed (1)**
29:18;51:10;105:23
**addressing (1)**
40:23
**adds (1)**
177:16
**adjust (1)**
76:20
**admitted (1)**
20:11
**Aetna (1)**
39:7
**afoul (2)**
174:24;179:17
**again (17)**
8:12;12:17;29:5;
32:5;73:13;81:16;
109:15;123:6;127:1;
129:19;131:2;150:9;
156:7;173:6;181:9;
183:10;197:9
**against (31)**
16:24;17:2;20:18;
21:8,15;29:13;30:7,22;
31:2;32:18;35:15;37:2;
39:16;41:4;42:13;
46:10,13;51:17;52:2;
59:10;71:11;78:14,15,
25;114:20;115:9,19,
24;126:21;131:6;189:2
**ago (7)**
14:1;16:21;20:6;
34:20;154:5;171:2;
204:14
**agree (8)**
18:10;26:21,24;
56:21;140:17;142:13,
17;170:17
**agreed (12)**
29:21,24;34:21;47:8;
72:24;121:20;122:20;
153:11;157:24;176:22;
192:5;219:19
**agreement (129)**
31:6,17;32:16;35:2;
40:9,11;41:8,9,14,14,
18;47:16;48:7,9,15,17;
49:1;56:22;61:1;62:14;
63:1,13,17;64:5;65:14;
67:6;76:6;99:24;
103:24;104:10;105:2,
3;106:12,21;107:2,5,9;
109:9;110:8;112:19;
114:3;118:3,6,8,18,21;
119:5,8;122:5;123:11;
124:24;126:2,2,23;
128:7;130:18;134:10,
16,20;135:23;140:9;

141:2,11,16,20;142:5,
7,14;143:20;144:15,
24;150:18,23;152:4,5,
24;153:13;155:24;
156:2,15,17,22;157:4,
4,6,14;159:8,21;
161:13;162:6,10,19,22;
172:2;173:14,25;
174:21,23;180:13;
182:1,6,10,13,15,18;
183:3,5,8;187:21;
192:1,8,10,12,17;
195:24,25;196:24;
197:1;198:11;202:10;
204:15;218:24;219:10,
12,13,20;220:5,6,14
**agreements (7)**
135:1;141:19,24;
142:3;176:9,17;180:3
**ahead (24)**
17:16;25:14;27:4,11,
21;43:20;44:22;73:18,
25;75:23;76:12;79:21;
83:6,12,14;84:3;93:3;
108:3;146:14;150:8;
151:2;162:4;199:23;
206:24
**Alabama (24)**
7:11;27:9;28:9;
59:25;63:23;79:24;
80:15,25;81:24;82:14,
17;84:6,7;85:20;86:9;
87:1,5;103:2,5,11,12;
108:20;109:18;147:1
**Alaska (4)**
82:3;84:10,12,17
**alive (1)**
185:9
**allegation (2)**
52:17,23
**allegations (11)**
17:2;20:7;29:12;
31:2,4;52:12,16,22;
78:23;87:2;111:4
**allege (2)**
52:8;78:18
**alleged (3)**
13:2;52:16;204:15
**alleging (1)**
52:7
**alliance (2)**
54:5,18
**allocated (7)**
59:18;99:10;143:22;
144:1;176:2,3;183:2
**allocation (2)**
177:1,22
**allowed (1)**
179:19
**Allstate (1)**
39:8
**alluded (1)**
200:16

**almost (4)**
96:10,11;106:10;
180:18;201:5
**alone (1)**
180:9
**along (5)**
19:5;67:24;71:22;
133:2;135:19
**alternative (1)**
175:25
**alternatively (1)**
181:24
**although (6)**
25:11;35:21;41:6;
45:3;86:10;210:21
**altogether (1)**
165:8
**always (8)**
12:24;39:1;47:21;
51:20;122:11;137:17;
160:19;209:12
**AMA (1)**
22:7
**among (9)**
33:17;41:15;78:20;
95:6;132:7;167:19;
204:1,2,3
**amongst (2)**
69:11;128:23
**amount (18)**
15:11;67:21;88:10;
97:24;99:16,18;
113:18;165:4;168:6;
173:20;174:15;189:4;
193:8;198:15,21;
199:13;202:22;214:23
**amounted (1)**
198:23
**amounts (2)**
87:19;217:15
**analysis (2)**
54:12;157:18
**and/or (3)**
90:8;108:23;176:16
**anecdotally (1)**
194:19
**annoyed (1)**
210:25
**annual (1)**
163:20
**annually (1)**
22:8
**Anthem (2)**
84:15,19
**Antitrust (16)**
7:13;9:22;16:24;
34:13;46:12;108:14,
19;109:13,16;110:9,20,
24;111:3,11;139:19;
219:17
**anxiety (1)**
158:3
**apart (2)**

66:21;100:16
**APLC (1)**
    157:15
**apologize (1)**
    187:1
**apparently (3)**
    27:2;85:22;150:14
**appear (1)**
    109:2
**appeared (1)**
    133:2
**appears (7)**
    45:9,10,13;94:25;
    141:5,7,25
**applied (5)**
    59:16,23;100:10,12;
    183:9
**apply (8)**
    31:7,13,17;32:17;
    92:18;144:6;182:10;
    183:8
**apportioned (1)**
    182:3
**apportionment (2)**
    42:4;176:15
**appreciation (1)**
    202:5
**apprise (1)**
    173:12
**approach (1)**
    121:4
**approached (1)**
    96:6
**appropriate (1)**
    171:4
**approval (2)**
    107:4;134:25
**approximate (1)**
    129:25
**approximately (2)**
    132:25;133:10
**April (3)**
    19:2;21:21;23:6
**Aptly (2)**
    54:7;138:10
**area (2)**
    200:10;201:8
**areas (1)**
    53:7
**arise (1)**
    34:5
**Arizona (1)**
    85:13
**Arkansas (6)**
    59:25;84:23;85:3,5,
    9,14
**around (11)**
    17:17;58:19;96:21;
    102:21;106:3;121:3;
    142:6;149:10,23;
    150:22;185:23
**arrangement (4)**
    123:23;124:8;

130:24;174:6
**arrears (2)**
    199:17,18
**arrest (1)**
    212:1
**arrested (2)**
    15:6,22
**arrived (2)**
    76:6;91:9
**Article (1)**
    35:22
**aside (1)**
    92:17
**assessed (1)**
    199:13
**assessment (13)**
    97:25;98:1;178:7,8;
    180:20;181:7;197:25;
    198:13;202:11,11;
    204:1,4,18
**assessments (13)**
    179:8,13;180:9,15,
    18,20;181:2;198:6,8;
    202:8,9;203:6;204:7
**associated (1)**
    73:7
**Association (3)**
    116:1;207:15,15
**assume (9)**
    9:4,15;10:14;11:8;
    12:18;38:7;78:23;
    106:22;160:11
**assuming (4)**
    158:20;159:3;
    161:22;193:12
**assumption (1)**
    61:6
**Atlanta (1)**
    28:8
**Attached (3)**
    21:21;94:3;98:6
**attachment (4)**
    165:23,24,25;166:1
**attack (1)**
    209:22
**attempting (1)**
    160:16
**attempts (1)**
    55:15
**attention (3)**
    18:1;100:23;103:23
**attesting (3)**
    147:23;148:9,18
**attorney (8)**
    100:5;133:8;141:12,
    24;144:9;176:15;
    182:9;219:14
**attorney-client (2)**
    125:21;128:17
**attorneys (3)**
    7:16;177:23;183:2
**attorneys' (11)**
    29:18;109:10;

121:20;133:9;140:9;
141:20;143:20;176:1,
9;180:12;181:24
**authored (1)**
    43:6
**authority (4)**
    56:13;57:4;107:15;
    173:7
**available (2)**
    49:22;148:22
**Avenue (1)**
    7:6
**awaiting (1)**
    97:17
**award (8)**
    72:16;133:8,10;
    134:3;172:20;174:16;
    207:10,19
**awarded (3)**
    109:11;161:15;
    219:15
**awards (1)**
    176:3
**aware (10)**
    35:3,21;36:24;70:12;
    106:8;158:23,24;
    172:15;202:6,7
**away (3)**
    159:17;160:7;161:1

## B

**back (71)**
    13:17;18:7,10,10,12;
    21:9;47:15;51:1;60:21;
    61:18;69:11;74:25;
    75:10;87:11;88:2,23;
    99:25;101:3;103:7;
    106:17,23;107:2;
    108:1;109:6;110:6;
    112:9,13;113:22,25;
    118:18;120:16;123:10;
    124:16;126:14;128:3;
    133:19;140:7;143:5;
    144:9;147:17;149:20;
    150:2,5;151:21;
    152:16;155:24;156:21;
    161:7,10;163:5;173:3;
    177:9,20;180:23;
    181:8;184:5;189:19,
    24;190:22;197:6;
    200:6,6;201:12;
    202:15;208:17;210:10,
    17;211:7;213:6;214:7,
    10
**backdrop (1)**
    189:2
**background (1)**
    30:17
**bad (7)**
    48:22;52:8;54:6;
    73:23;111:7;143:8;
    219:2

**bailed (1)**
    202:16
**Ball (153)**
    7:25;9:20;10:17;
    13:18;14:6,23;15:11;
    16:4;18:22;19:9,13;
    20:5,17;21:20;22:1;
    23:7;24:19;28:2;39:19;
    42:11;45:22;47:5,9,16,
    25;53:11,22;61:1;
    62:15;63:3;64:7;65:5,
    8,10,18;67:7,12,20,23;
    70:9;76:6;79:15;81:1;
    82:8;85:19;86:17;87:3,
    13;88:17,19;90:9,19;
    96:12,20;98:24;99:2,7,
    12,19,22,24;100:17;
    101:8;102:21;105:2,
    14,18,23;107:5;
    108:24;110:18;111:9;
    113:12;119:15;121:3,
    11,19;122:12,20;
    123:24,24;124:24;
    126:3,13,20;128:8;
    130:18,24;131:10;
    132:18;134:17;135:23;
    140:8;141:10,16,21;
    142:7,14;143:19;
    150:17;153:22;156:3,
    5,10,16,18;157:7,14,
    15,23;162:9;165:11;
    166:4,7;167:17,25;
    168:17,21;169:5;
    170:1,14;171:10;
    172:2;173:14,25;
    174:21;176:1,18,22;
    179:3;181:10,18;
    184:16;185:17;188:18,
    22;190:3,12;195:14;
    196:6;215:15,18,23,24;
    216:18,20;217:15,23;
    218:1,3,14;220:22,24
**Ball's (32)**
    11:21;21:3;22:2,25;
    23:14,22;33:17;35:11;
    36:17;40:7,13;41:7,10,
    18;42:24;49:3;55:1;
    56:11;59:14;71:20;
    79:9,19;88:21;105:15,
    16;129:23;156:8,9,11;
    174:18;183:4;192:22
**Bank (1)**
    98:23
**bar (2)**
    20:11;24:1
**Barrett (26)**
    24:10,12,14;28:3;
    32:25;33:6,7,8,18;34:6,
    8,18;35:2,3,9;42:11;
    45:23;48:1;53:11;
    69:12;76:8;104:18;
    122:8,10;192:1;210:5
**Barrett's (7)**

40:13;41:8,9,19;
    49:2;55:2;56:11
**based (13)**
    21:9;70:5;90:6,20;
    95:2;98:11;107:11,12;
    116:3;119:6;158:3;
    169:14;171:13
**bases (1)**
    139:16
**basically (7)**
    70:14;146:9;162:11;
    164:24;165:1;202:4;
    208:7
**basing (1)**
    96:6
**basis (4)**
    32:4;48:17;116:23;
    163:21
**Baudin (7)**
    7:19,20,22,22,23;
    8:16;215:19
**BC (1)**
    121:4
**BCB (1)**
    116:1
**BCBS (12)**
    14:15;27:2;28:13;
    46:10,13;49:8;59:10;
    116:1;127:16;176:10;
    186:6;217:24
**Bear (1)**
    101:13
**became (1)**
    135:10
**become (1)**
    180:5
**beginning (3)**
    71:21;92:10;111:10
**behalf (6)**
    7:25;99:17;107:16;
    136:19;167:20;193:23
**behind (1)**
    205:24
**being's (1)**
    158:13
**belief (1)**
    71:25
**believes (1)**
    94:15
**benchmark (1)**
    127:4
**benefit (8)**
    165:19;170:1;172:3,
    8,9,13,25;199:2
**Benefits (1)**
    216:9
**benign (1)**
    137:22
**Benson (1)**
    21:20
**besides (2)**
    209:1,1
**best (11)**

10:5;25:11;35:25;
40:18;52:11;106:21;
108:2;115:22;131:12;
191:22;192:13
**better (6)**
11:13;54:17;56:12;
57:2;58:1;160:22
**beyond (5)**
41:7;88:13;157:13;
185:8,9
**BIENERT (214)**
7:24,24;8:11,13;
12:13,20;13:11,14,16;
16:13;17:18,24;19:17;
20:15;21:12;23:18;
25:21;26:13,23;29:6;
30:15;31:19;32:13,22;
34:23;36:8,25;37:6,22;
38:17;39:13,23;42:9,
22;43:9;44:1;47:1,12;
49:17;50:2,6,12,18,22;
51:1,5;53:14;55:17;
56:17;57:23;58:6;
60:14,18;61:7,16,17;
62:6,24;63:9;68:24;
69:7;70:19;71:2;72:19;
73:4,12;75:4,12;76:11,
18,25;77:4;80:5;81:8,
18;82:7,11,18,24;83:4,
8,15;84:4;85:24;87:8;
88:5,8;89:5;90:16,25;
91:14;93:14;97:8;
98:21;100:6;101:16,
25;104:5;109:4,25;
110:13;111:5,23;
113:7,16,24;115:7;
117:21;118:7;119:2;
120:2,11;121:1,15,24;
122:14,18,25;123:5,21;
124:21;125:25;126:19;
129:19;130:1,10,15;
134:14;136:12;139:4,
10;141:8;142:11;
146:1,21;148:6;
149:17;150:4;151:10,
19;152:1,10;153:9;
154:3,13,20,24;155:9,
14,17,19,22,23;158:9;
159:2;160:12;161:19;
162:15;163:22;164:13,
14;167:2,7,15,23;
168:5,11;169:9;171:5;
172:23;173:8,22;
174:8;175:6,18;
177:18;178:1,10;
179:9,22;181:16;
182:12,23;183:24;
189:12,20;191:1,8;
193:3,21;194:18;
195:9,21;196:23;
198:5;199:23;200:4;
201:3;203:19;208:6;

209:3;211:11;212:3,
17,22;213:11;214:1,9;
219:1,23;220:11
**big (2)**
129:21;207:22
**billed (5)**
140:5,7,18;150:16;
153:1
**billing (7)**
140:16,25;141:1;
142:19;143:13;148:19;
150:14
**Birmingham (1)**
69:19
**bit (6)**
73:5;87:9;91:15;
101:2;157:20;210:15
**black (1)**
90:24
**blacked-out (1)**
144:8
**blew (1)**
197:2
**blood (1)**
201:21
**Blue (175)**
7:13,13;9:21,22;
14:15,15;15:13,14;
16:6,6,9,10,14,22,25;
17:3,3;18:22;19:4,5,9;
20:2,6,18,20;21:5,8,9,
15;22:12,17;23:2,8,12;
24:19,23;26:6,6;27:8;
28:4,7,20;29:1,14,14,
19;30:7,22;31:3;32:19;
33:24;34:11;35:15;
37:2;39:5,5,16,16;
40:23;42:1,4,14;48:2;
51:17,17;52:2,2,7,8,10,
17,18;53:6,6;54:23;
60:8,8;61:2;62:19;
63:4;72:22,22;77:9;
78:14,15,20;79:1;
81:24,24;82:3,3,16,16;
84:6,6,7,7,10,12,12,12,
17,17,23,24;85:3,3,5,5,
9,9,11,13,13;86:5,5;
93:24,24;100:1;
103:12;106:13,13;
108:14,14,19,19;
109:12,12,15,16;110:8,
9,20,20,23,23;111:11,
11;114:20,20;115:2,10,
15,19,25;118:10,10;
121:17;127:12;131:11,
15;139:18,18;140:23,
23;144:6,6,18,19;
147:1;161:9,10;
165:13,13,18,19;196:8;
200:21;210:24;211:2;
213:8;216:8,8;219:16,
16
**Bob (2)**

116:11;194:16
**body (1)**
110:7
**bookkeeper (1)**
100:22
**booklet (4)**
21:22;22:4,7,16
**both (13)**
70:12;71:19;81:3,22;
82:2;84:5,21;86:2;
100:10;107:15;157:3,
3;161:21
**bottom (19)**
18:25;27:12;39:14;
45:17;58:8,21;59:7;
61:23;62:2;77:24;
85:25;95:7,10;96:4;
103:18;105:7;147:19;
207:2;218:15
**bound (1)**
171:13
**box (1)**
58:1
**bracket (1)**
64:19
**Brannan (2)**
18:20;22:15
**breach (6)**
204:20,22;205:2;
206:2,5,13
**breached (3)**
202:9;204:14,16
**break (20)**
50:8,18;51:2;63:10;
65:4;74:12;75:1,5;
113:17;149:20;150:5;
157:22;161:25;163:24;
168:2;177:7;183:18;
192:16;214:2,10
**bring (13)**
29:13,15;30:21;31:2;
32:18;37:2,3,4;39:16;
53:5;67:5;182:20;
210:17
**bringing (5)**
21:8,15;35:14;51:17;
71:10
**brings (1)**
129:5
**broad (1)**
200:10
**brought (3)**
36:11;87:4;100:22
**bump (15)**
69:21,23;70:2,4,5;
72:17;88:1,12;169:16;
170:5;172:8;176:24;
177:3;202:15,16
**bunch (7)**
53:24;54:5,8;71:10;
94:13;121:6;149:9
**business (6)**
7:2;53:18,22;71:12;

137:8;138:6
**businessman (2)**
160:20;161:1

## C

**CA018 (1)**
140:15
**cahoots (1)**
52:9
**calculation (1)**
91:4
**call (64)**
8:19;9:21;11:15;
14:10,15;16:16;17:11;
34:9;64:9,14,16,22;
65:4,7,11,13;66:13,14;
67:17,19;68:7;69:21;
70:6;87:12;89:7,11,19,
21,24;93:23;94:24;
95:9;96:24;97:1,15;
99:25;106:2,20;
126:16;137:22;138:12,
22;167:3,8;170:5;
171:1;185:2;186:3;
194:4;199:6,9;200:11,
16,20;201:16,18,19;
204:6;205:5,6,7,8;
211:7,20
**called (7)**
16:18;64:10;106:4;
194:23;199:20;206:16;
212:6
**calling (2)**
102:15;126:15
**calls (18)**
64:11,24;65:1,21,24;
66:1,3,4,18;67:3,18;
68:6;70:13;87:16;90:2;
125:2;188:22;201:22
**came (15)**
17:10;42:2;59:15;
63:20;64:1;89:7,21;
90:5;91:9;94:25;96:24;
134:16;161:9;169:2;
210:12
**can (54)**
8:5;11:12;15:4;
17:16;18:9,15;25:11,
24;26:2,13;34:6,16;
37:1,2;38:12;50:6,7,9,
19,23;57:15,16;61:14;
62:22;72:10;79:4;
83:11,17;86:3;101:1;
115:12;117:2;123:6;
125:4;127:14;129:6;
141:19;142:9;149:11,
23;150:21;151:1,3,23;
171:3;173:5;178:19;
183:10;186:12;192:18;
214:19;217:21;218:5,
19
**cancel (1)**

183:7
**cancels (1)**
183:3
**capital (29)**
12:4;13:2;62:15;
63:2,3;64:6,9,11,16,22,
24,25;65:21,24;66:1,3,
13,14,18;67:3,11,18,
19;68:6;70:6,13;95:9;
165:13,15
**caption (2)**
77:18;109:24
**captions (2)**
110:3,4
**capture (1)**
25:12
**cardiac (1)**
106:9
**care (1)**
160:8
**career (1)**
36:9
**careful (1)**
129:20
**Carolina (5)**
16:19,23,25;29:11;
31:5
**case (185)**
10:1;12:5;13:3;
14:15,16;15:3,4,4,6,14,
15,21;16:7,7,11,11;
17:2,6,7,11;19:13;
20:18;21:5,8;26:5;
37:24;38:12,19,23;
39:25;40:9,12,21;41:6;
46:9,23;51:22;52:6;
53:17,23;54:1,23,24;
55:11,16;56:1,25;57:4;
58:2,24;60:2,8;64:3;
66:24;67:2,25;70:18;
71:8,9,22;72:17;74:2,
14;75:19;76:2,4,13;
77:23;79:5,19;81:1;
86:16,17;90:6;91:24;
94:5,11;102:4;103:1,2,
6,6,8,11;104:22;
106:14;107:20;108:17,
23;109:17;111:13,15;
113:14;114:9,13,16,19,
19,23;115:8,24,24;
116:2,6,16;117:14;
118:16,20;120:24;
123:25;126:22;127:12,
16;131:11,15,22;132:4,
14,16;133:1;142:19,
20;143:14,21,23;144:1,
2,6,19,20;145:2,3,13;
147:2;149:12,13;
150:15;152:6;160:3,7;
163:3,7,16;165:13;
169:25;182:21;186:18;
187:12,13,15;188:2,8;
189:5,16;190:7,7,8,13,

19;191:10,19,22,25;
192:3,23;193:1,4,7;
194:9;200:22;201:23;
202:4,21;207:6,17,22,
25;209:19;210:25;
211:2;212:1,5;213:8,
15;220:23
**cases (131)**
13:18,21,24,25;14:3,
6,7,23;15:10,13;16:3;
28:4,8;29:13,16,22,25;
30:3,7,8,14,16,18,21;
31:7,9,14,17;32:2,8,18;
34:22;35:15,19;36:1;
37:2,4,12;39:10;40:24,
25;42:1,5,17;46:17;
47:20;49:8,10;51:16;
53:5,9,24;54:4;58:19;
59:3,9,15,20,23;71:10,
19;72:7,23,25;74:6,8,
14,20;75:17,18,24;
77:9;86:2;101:6,6;
102:9,16;109:11,20;
110:16,19,23;111:10;
112:23,25;113:2;
114:18;115:1,9;117:2;
118:21;119:10,16,23;
121:4,6,8,17,22;
127:18;137:1,2,4,5;
159:11,12,22;161:2,10,
16,17,18;162:11;163:6,
7,15;176:10;182:19;
191:3;211:23;212:7,
10,24;213:13,20,21,24;
219:15;220:14,16,21
**cash (19)**
87:16;89:7,11,19,21,
24;90:2;93:23;94:24;
96:24;97:14;171:1;
199:6,8;201:17,19,22;
204:6;205:6
**catch (4)**
186:5;195:15;
200:19;211:6
**categorically (1)**
142:1
**cause (1)**
132:6
**caused (1)**
161:17
**cc (1)**
19:3
**cent (1)**
100:8
**cents (1)**
91:17
**certain (2)**
56:7;131:18
**Certainly (16)**
15:16;25:23;70:25;
71:23;86:4;96:11;
106:7;115:2;128:11;
132:10;133:4,21;

141:7,25;143:24;
190:17
**certified (6)**
147:22;148:8;163:5;
204:21;206:3,4
**Certifying (1)**
148:18
**cetera (2)**
52:25,25
**chairs (1)**
56:10
**chambers (5)**
10:2,20,22;11:4;12:9
**chance (13)**
18:1,3;38:22;39:1;
56:12;57:2;62:8;80:6;
97:10;139:12;146:22;
164:15;170:24
**change (4)**
135:6;136:2;137:11,
16
**changed (9)**
107:24;135:4,7,9,25;
136:3;137:6;157:10;
163:19
**changing (3)**
162:3;183:12,14
**characterization (1)**
108:4
**characterize (1)**
136:24
**Charles (6)**
24:10,12;33:4,5;
104:20,22
**chart (5)**
166:21;197:6;199:7,
9;216:5
**check (11)**
50:16;97:20,21;98:6,
11,13,13,14;100:24;
150:24;151:16
**checks (2)**
165:18;193:11
**Cheryl (1)**
7:2
**Chicago (4)**
191:15;194:16;
207:9,20
**chicken (1)**
78:10
**Chris (6)**
7:18;11:7;95:14;
97:16;127:15;137:15
**circumstances (1)**
157:21
**citizenship (1)**
116:20
**Civil (2)**
7:8,9
**claim (15)**
11:21;12:3,15;36:3;
38:20;70:8;72:3,5;
73:8;87:12;102:20;

126:14;176:22;182:14;
198:10
**claimed (2)**
173:24;213:5
**claims (13)**
16:24;17:5;30:6,21;
36:11;39:16;52:2;74:9;
119:23,25;120:5,23;
176:1
**clarification (1)**
26:9
**clarify (5)**
18:6;26:12;48:22;
218:18;220:20
**clarifying (1)**
34:24
**class (34)**
14:2,7;35:22,24;
36:3,9,11;37:21;38:4,7,
10,20,21;39:3;42:13;
46:9;47:20;53:18,21;
54:3,14,15;57:25;59:9;
77:7;79:22;80:13,24;
82:12;144:20;162:23,
25;163:2,4
**classic (1)**
155:4
**clean (5)**
75:1;88:5;101:11;
111:6;143:5
**clear (6)**
26:14,21;98:7;
125:20;145:11;163:11
**clearly (3)**
20:24;143:7;146:13
**clerks (1)**
11:9
**client (1)**
50:19
**Clifford (2)**
194:16,16
**clip (1)**
148:3
**close (1)**
186:12
**code (2)**
140:17,25
**COFFIN (208)**
7:18,19,19,20,23;
8:17;12:6,16;13:4,6;
16:12;19:15;20:13;
21:11;23:16;26:8,20;
29:2;30:10;31:15;
32:10,20;33:19,22;
34:2;36:5,22;37:5,16;
38:14,24;39:21;42:7,
20;43:8;46:24;47:10;
49:13;50:10,14,21,23;
51:4;53:12;55:13;
56:16;57:19;58:4;61:4,
14;62:21;63:6;68:21;
69:5,14;70:10,22;72:8;
73:1,9;76:9,17;81:4,

15;82:5,10,15,19;83:1,
6,12,17,21,23;84:1;
85:21;87:6;88:3,25;
90:13,22;91:11;95:14,
17,24;99:10,18;100:2;
109:1,23;110:10;
111:1,20;113:5;115:4;
117:17;118:4,24;
119:24;120:8,20;
121:13,21;122:2,13,16,
22;123:3,18;124:19;
125:1,9,13,17;128:9,
16;129:1,12,16;130:7;
134:11;136:8;141:4;
142:8;144:3;145:23;
149:22;151:3,23;
152:7;153:4,24;154:8,
17,22;155:8,12,16,18,
21;158:6,22;159:14;
160:10;161:12;162:12;
163:17;166:11,24;
167:5,11,21;168:3,8;
169:6;170:3,20;
171:18;172:6,17;
173:4,16;174:3;175:3,
16;177:15,24;178:5,
17;179:6,20;180:6;
181:14;182:8,22;
183:6,21;184:2,12;
185:20;189:6,17;
190:20;191:5;192:24;
193:19,25;195:6,18;
196:19;197:13;198:3;
201:2;203:17;208:2,
25;211:3,24;213:9;
214:14;215:10,19;
217:3,10;219:3,4;
220:3,8
**Coffin's (2)**
99:13;100:15
**co-lead (5)**
190:10,16,17;
191:15;194:15
**co-leads (2)**
191:3;202:24
**colleagues (1)**
54:17
**collectively (2)**
57:2;204:9
**Collier (1)**
144:9
**column (10)**
94:16,17;95:3;
168:24;169:2;216:13,
18;217:14;218:1,16
**com (1)**
22:1
**coming (4)**
97:22;98:4;180:20,
22
**commenced (3)**
46:5;125:12;143:2
**commensurate (1)**

177:2
**comment (3)**
67:24;217:20,21
**comments (1)**
217:18
**committee (4)**
56:10;96:1,2,2
**committees (1)**
56:2
**common (7)**
36:14;165:19;180:9;
181:5;199:1;202:23;
216:9
**communicate (1)**
196:22
**communications (1)**
105:19
**compare (1)**
80:25
**compared (1)**
81:5
**comparing (2)**
81:12;82:7
**compensation (1)**
144:7
**compilation (1)**
27:2,6
**complaint (13)**
19:5,9,14;31:5;
52:21;77:13;79:23;
80:9,11,14;86:12;
114:23;116:11
**complaints (1)**
115:12
**compound (1)**
89:3
**compromised (1)**
185:5
**conceded (1)**
184:1
**concept (1)**
193:1
**concerned (4)**
106:6;170:10,14;
186:15;187:14
**concerning (4)**
109:12;110:8;137:3;
219:16
**conclusively (1)**
176:7
**conference (5)**
10:20,22;11:5;12:9;
72:12
**confidence (1)**
149:11
**confident (2)**
21:2;189:14
**confirm (2)**
151:21,23
**confirmation (2)**
219:18,21
**confirming (1)**
119:8

Case 2:25-cv-00014-RDP    Document 2    Filed 01/06/25    Page 78 of 105

IN RE: BLUE CROSS BLUE SHIELD                                    Video Deposition of Patrick W. Pendley
ANTITRUST LITIGATION, (MDL NO.: 2406)                                             October 18, 2023

**conflict (1)**
35:4
**confuse (1)**
9:10
**confused (1)**
166:15
**confusing (1)**
103:9
**connection (1)**
106:13
**consider (1)**
73:11
**considerably (1)**
191:17
**consideration (1)**
157:13
**considering (3)**
20:18;23:2;24:18
**consolidated (1)**
42:19;46:19;49:12;
51:18;59:3;79:22;
113:3,14;120:6,10,18,
19
**conspiracy (4)**
52:2,9;78:19,25
**conspired (1)**
52:18
**constantly (1)**
57:11
**consult (3)**
107:2,3,8
**contemplated (3)**
42:5;60:9;110:17
**contemplating (4)**
40:24;51:16;71:10;
113:2
**contents (1)**
153:7
**contest (1)**
19:11
**contingent (1)**
39:19
**continue (2)**
50:7;137:3
**continued (2)**
132:13;211:22
**contract (3)**
13:25;128:21,24
**contracting (1)**
156:25
**contribute (5)**
96:13;173:25;177:5;
179:19;202:8
**contributed (10)**
70:6;88:2,10;166:20;
168:17,22;170:2;
181:3;199:10;202:22
**contributing (4)**
70:8;87:14;172:4;
203:9
**contribution (19)**
64:7;69:9;73:8,18,
20,23;88:20;89:22;

93:22,25;94:6,15,23;
95:3;100:13,14,15;
173:21;178:20
**contributions (26)**
12:4;13:2,3;62:15;
63:2,4;66:14;67:12;
73:16;74:18;87:10;
90:21;96:22;101:9;
165:12,15;166:19;
167:17;169:12,14;
172:4;182:17;184:6;
197:22;203:10;210:24
**control (2)**
138:24;160:14
**conversation (6)**
65:2;69:1;121:16;
122:1;128:5;188:10
**conversations (8)**
121:10,19;130:17,
23;132:14,21;184:7;
185:16
**cool (1)**
149:21
**copy (13)**
17:19;97:21;98:6,13;
140:8;141:11;143:19;
144:14,23;150:17;
151:20;152:17,20
**Corning (1)**
72:14
**corporation (1)**
71:11
**corrected (1)**
101:4,10;170:18
**correction (2)**
170:22,25
**correctly (3)**
63:25;64:10;102:19
**correctness (3)**
147:24;148:10,19
**correspondence (1)**
215:23
**cost (8)**
66:23;73:19,23;
174:14;176:23;180:9,
10;202:23
**costs (14)**
42:4;61:1;63:13;
65:20,24,25;66:6,7;
72:15;73:6;87:14;
177:2;181:5;182:16
**counsel (23)**
13:8,9,13;54:15;
56:9;59:8;60:13;66:10;
69:19;87:3;125:3;
136:4,24;146:4;147:2;
153:23;159:16;190:8,
12;194:12;202:25;
205:15;219:5
**country (5)**
17:4;20:8;58:19;
71:11;78:16
**County (1)**

116:25
**couple (14)**
57:11;93:4;94:3,10,
12;98:8;102:24;
106:24;139:16;146:24;
204:13;208:16;211:13;
214:15
**course (11)**
11:8;25:9,10;62:18;
93:2;99:21;177:25;
186:6,19;188:2;208:24
**Court (103)**
7:10,15;8:3,4;10:13;
28:8;35:19,24;36:4,12,
20;37:13,21,25;38:4,
12,13,21,23;39:2,2,10,
20,20;43:14;44:10;
46:22;47:3,3,13;48:25;
51:8,9,14;55:23;60:3,6,
10,11,20,22;61:10;
65:24,24;66:6,7,23;
68:8,15;69:2;72:14;
74:20;75:16;77:8,14,
20;90:8;91:21;92:13;
101:7;103:3,15,16;
108:5,21,25;113:3;
116:18,18,22,23,24;
117:4;120:5,13,19;
123:8;133:4,6;134:3;
139:24;140:4;143:13,
25;145:13,19,22;146:3,
10,11,25;148:7;149:6;
161:11;168:1;169:24;
170:16;176:25;182:2;
183:9;198:7;212:16;
215:8
**courtroom (1)**
72:12
**courts (3)**
39:4;47:21;58:19
**court's (3)**
172:15;174:24;180:5
**cover (4)**
53:7;76:14;139:16;
204:8
**covered (2)**
76:5;128:25
**covering (1)**
195:22
**CPAP (5)**
212:5,7,23;213:15,
23
**crazy (1)**
180:21
**credits (1)**
176:3
**Cross (124)**
7:13;9:21;14:15;
15:14;16:6,9,11,14,24;
17:3;18:22;19:4,5,9;
20:2,6,18,20;21:5,8,9,
15;22:12,17;23:2,8,12;
24:19,23;26:6;27:8;

28:4,7,20;29:1,14,19;
30:7,22;31:3;32:19;
33:25;34:11;35:15;
37:2;39:5,16;40:23;
42:1,5,14;48:3;51:17;
52:2,7,8,10,17,18;53:6;
54:24;60:8;61:2;62:19;
63:4;72:22;77:9;78:14,
15,20;79:1;81:24;82:3,
16;84:6,7,10,12,13,17,
23;85:3,5,9,11,13;86:5;
93:24;100:1;103:12;
106:13;108:14,19;
109:12,15;110:9,20,23;
111:11;114:20;115:2,
10,20,25;118:10;
121:17;127:12;131:11,
15;139:18;140:23;
144:6,18;147:1;
161:10;165:13,19;
196:8;200:22;210:24;
211:2;213:8;216:8;
219:16
**crossed (1)**
183:25
**Crosses (1)**
115:15
**cure (1)**
206:12

**D**

**d/b/a (2)**
84:11,16
**damage (1)**
213:23
**Dampier (1)**
103:16
**Dan (2)**
8:1;19:2
**date (11)**
64:20;111:25;
126:11;129:25;130:4,
5;150:22;166:20;
181:9;188:16;211:13
**dated (2)**
112:3;219:6
**dates (2)**
131:2;197:9
**Daugherty (3)**
19:3,19;23:20
**Davidson (4)**
79:16;86:18,22;87:2
**Davis (1)**
116:13
**day (11)**
37:15;48:10;54:3;
55:11;56:7;72:18;90:5;
112:1;171:24;174:12;
202:14
**days (8)**
98:8;100:1,4;131:18,
19;201:18,19;207:21

**de (1)**
66:22
**deal (15)**
39:18;54:18;57:21;
172:21;186:7,15;
187:1,4,5,7,22;189:1;
206:22,23;207:22
**dealing (2)**
157:9,11
**deals (1)**
207:12
**deathbed (1)**
159:20
**debt (1)**
208:18
**decade (2)**
14:24;131:23
**December (2)**
63:24;74:4;131:4
**decide (1)**
58:2
**decided (3)**
17:12;72:6,23
**decision (3)**
40:20;71:12;135:8
**decisions (7)**
71:21;135:24;
136:19;137:3,10,23;
138:7
**decline (1)**
206:20
**declined (1)**
206:18
**defendant (6)**
38:22;81:23;82:2;
84:5;86:5;116:2
**defendants (11)**
54:6;80:24;81:1,2,
11,14;85:18,20;86:1;
116:19;117:5
**defense (2)**
116:8;162:17
**defer (1)**
186:20
**deferred (1)**
60:12
**defined (1)**
125:17
**definitely (1)**
200:15
**definitive (1)**
62:23
**degree (4)**
20:16;71:18;135:7;
203:4
**demand (2)**
96:16;177:22;197:20
**demands (1)**
96:6
**demonstrates (1)**
94:9
**Depends (1)**
149:22

**deposed (1)**
  8:9
**deposit (1)**
  98:23
**deposition (20)**
  7:5,7,12,21;17:22;
  25:18;43:24;76:23;
  80:3;93:12;97:6;98:19;
  101:23;104:3;139:8;
  146:19;164:10;172:1;
  200:2;212:20
**depositions (3)**
  8:25;9:4,5
**described (3)**
  54:7;220:18,19
**describing (3)**
  31:8;45:16;74:1
**description (3)**
  110:12;140:11;
  169:10
**deserve (1)**
  209:6
**detail (2)**
  17:14;37:18
**details (1)**
  107:12
**determining (1)**
  170:16
**dictate (1)**
  38:11
**dictatorship (1)**
  137:22
**die (1)**
  157:25
**difference (1)**
  165:6
**differences (1)**
  66:2
**different (25)**
  20:8;30:25;39:16,17;
  42:13,14;46:10;52:14;
  53:5,6;59:10;66:9;
  76:19;82:21;83:13;
  96:2;109:21;110:3,4;
  121:7;137:9;173:14;
  176:25;177:3;191:11
**differentiate (1)**
  13:24
**difficult (3)**
  26:15;185:5;202:17
**diminished (1)**
  135:19
**dinner (1)**
  207:20
**dioxin (1)**
  209:19
**directed (1)**
  62:12
**directing (1)**
  18:1
**direction (1)**
  181:12
**directly (14)**

**88:22;89:13,23;**
  90:10;154:11;162:8;
  167:25;168:19;169:20;
  177:14;187:19;198:13;
  199:4;218:11
**disagree (2)**
  48:11;87:20
**discuss (9)**
  17:13;28:3;39:25;
  48:2;125:21;126:1,22;
  127:4,21
**discussed (36)**
  17:11;18:22;20:5;
  24:22;28:24;31:7;
  33:16,25;35:14,14;
  37:15;39:15;48:9,23;
  51:10,12;69:10;75:14;
  87:13;104:11;121:11,
  25;123:23;124:6;
  128:12,14;132:24;
  133:11;134:9;150:15;
  153:18,25;161:10;
  182:18;196:25;197:1
**discussing (9)**
  28:22;30:3;42:25;
  45:7;47:19;48:8;54:22;
  77:14;126:5
**discussion (24)**
  11:4;25:20;29:8;
  31:25;36:24;37:1;42:3;
  49:15;64:24;66:12;
  67:16;70:7;74:1,6,17,
  18,19;112:24;124:7;
  131:9;145:16,25;
  158:18;186:21
**discussions (17)**
  45:22;51:15;53:3;
  91:18;102:20;104:17,
  19;105:17,22;119:14;
  124:16;125:22;128:23;
  129:2;134:4,20;194:3
**disgusted (1)**
  211:1
**dismiss (1)**
  16:1
**dismissals (3)**
  74:13;102:9;114:7
**dismissed (20)**
  15:25;74:8,21;101:8;
  102:16;103:1;114:12,
  14;116:16;118:17,22,
  25;119:11,12;120:25;
  159:11,22;160:1;
  162:11;163:8
**disorganized (1)**
  60:15
**dispersed (1)**
  193:16
**dispute (10)**
  8:16;9:19,24;10:2,
  17;11:1,5;44:11;77:15;
  128:25
**disputing (3)**

**11:21;12:3,15**
**distinction (2)**
  65:23;92:17
**distinguish (1)**
  39:18
**distribute (1)**
  188:9
**distribution (1)**
  170:4
**District (15)**
  7:10,11;27:8;77:8,
  19,20;79:23;80:15;
  82:14;85:18;87:1;
  103:7,10;109:18;
  146:25
**diversity (1)**
  116:20
**divided (1)**
  89:20
**Division (2)**
  7:11;103:10
**divvied (1)**
  104:22
**doc (1)**
  108:10
**document (26)**
  25:23;27:5;43:18;
  44:8;82:6,21;83:3,14;
  84:2;101:14;102:6;
  104:9;106:16,19;
  108:7,11;112:20;
  124:12;131:1;139:17;
  140:2;147:7;152:14,
  16;174:19;176:4
**documents (9)**
  38:2;75:2;91:16;
  102:4,6,15;139:23;
  151:16;186:12
**dollar (8)**
  91:17;189:10;190:1;
  193:8,24;216:13,17;
  217:15
**dollars (10)**
  131:24;174:14;
  186:13;195:13;201:5,
  8,15;202:20;207:6;
  208:23
**Don (14)**
  19:2,19;23:11,13,19,
  20,21,23;24:8;34:10,
  17;192:9;210:5,6
**done (11)**
  25:6;33:6,7,7;47:20;
  140:21;148:13;149:13;
  152:13;172:16;214:2
**dot (1)**
  22:1
**double (1)**
  27:16
**doubt (5)**
  48:4;54:2;71:17;
  192:20;208:3
**Dow (1)**

**72:13**
**down (17)**
  13:9;18:25;28:16;
  53:8;55:9;56:25;58:2,
  7;59:6;63:10;65:4;
  71:8;74:12;85:15;
  95:14;135:21;177:7
**dozen (1)**
  89:18;94:10,12
**draft (3)**
  19:5,8,14
**drafted (6)**
  86:11;140:8;141:10;
  143:18;152:3;153:6
**drafting (2)**
  144:22;150:16
**drive (2)**
  210:11,18
**drop (1)**
  34:6
**dropped (3)**
  35:4;69:13;76:8
**duly (1)**
  8:8
**during (23)**
  11:19;14:22;15:8;
  29:19;32:6,15;33:13,
  15;39:25;40:22;41:25;
  42:3;53:2;65:2,13;
  68:25;70:7;113:12;
  153:21;183:18;192:16;
  196:5;209:22

## E

**earlier (26)**
  10:1;41:1;67:7,8;
  87:12;96:19;101:4;
  102:20;114:8;120:6;
  123:20;134:24;135:1;
  139:15,24;146:2,9;
  150:15;153:19;168:1;
  169:11;183:12,16;
  184:1;201:5;218:14
**early (8)**
  76:2,3;92:21;99:25;
  100:4;105:4;127:5;
  192:15
**earned (2)**
  100:5;196:14
**easier (2)**
  27:19;75:2
**easy (4)**
  81:20;83:9;108:11;
  185:10
**eating (1)**
  183:22
**economic (1)**
  213:23
**Ed (25)**
  10:12;11:6,7,10,12,
  14,16;26:17;66:4,14;
  67:17;89:23;93:23;

**97:13,19;98:13;**
  133:25;144:5;168:10,
  13;174:5;197:24;
  199:6;204:1;218:11
**effect (5)**
  32:9;36:18;67:1;
  92:1;138:16
**effort (1)**
  71:14
**efforts (1)**
  192:22
**egg (1)**
  78:10
**eight (9)**
  98:16,18,22;171:2;
  203:1;204:11;217:8,9;
  218:8
**eighth (3)**
  202:22;203:7,8
**either (15)**
  12:11;13:13;22:8;
  64:25;108:24;109:11;
  113:3;117:3;121:9;
  135:23;138:21;147:13;
  159:15;161:15;205:20
**eleven (2)**
  101:18;150:10
**else (13)**
  26:12;31:12;32:7;
  65:7;83:15;107:3;
  116:12;156:13;171:12;
  174:22;188:6;193:12;
  214:3
**email (16)**
  18:19;19:1,3,18;
  21:19;22:15;23:5;
  144:9;151:8,8;185:13;
  205:3,13;207:3,4,12
**employee (2)**
  23:23;144:9
**employees (1)**
  145:12
**encourage (1)**
  66:10
**End (22)**
  7:6;35:6;54:3;55:11;
  56:7;63:21;71:16;
  72:18;90:4,6;110:18;
  111:10;124:2;130:22;
  147:24;162:7;165:2;
  174:12;191:22;192:7;
  193:7;202:14
**enforce (1)**
  174:23
**enforceable (1)**
  187:22
**enhanced (1)**
  88:13
**enhancement (1)**
  69:24
**enough (5)**
  9:12,16;13:14;51:3;
  211:8

Case 2:25-cv-00014-RDP    Document 2    Filed 01/06/25    Page 80 of 105

IN RE: BLUE CROSS BLUE SHIELD                                    Video Deposition of Patrick W. Pendley
ANTITRUST LITIGATION, (MDL NO.: 2406)                                        October 18, 2023

**ensure (2)**
145:21
**enter (1)**
107:4
**entered (6)**
47:15;67:7;128:22,
24;135:22;198:11
**entering (1)**
157:6
**entire (4)**
50:24;71:3;118:13;
154:12
**entities (14)**
17:3;35:15;39:17;
42:14;46:13;52:10,18;
53:6;59:10;78:16,20;
79:1;115:2;117:4
**entitled (5)**
19:4;103:11;134:22;
187:11;196:7
**entity (11)**
39:5,6,8;46:10;
52:17;58:18;84:15,16;
115:10;156:24;157:8
**entries (6)**
27:22;28:1;143:13;
145:12;155:3;166:2
**entry (13)**
25:24;141:1,14;
142:25;143:8;149:11,
11,13;150:11,14;169:5,
8;176:11
**environmental (1)**
13:24
**envisioning (1)**
122:11
**equal (12)**
33:24;49:3;59:14;
107:25;121:11;122:5,
11,19;163:16;174:11;
193:18;195:4
**equalize (1)**
214:24
**equally (13)**
56:23;61:1;62:14;
63:1,17;64:6;72:25;
109:10;121:20;156:16;
192:2,6;219:14
**equation (1)**
170:15
**error (1)**
170:23
**errors (1)**
172:21
**Erwin (1)**
7:2
**especially (2)**
144:19;145:10
**essence (10)**
15:10;48:25;68:12;
138:12,23;165:3;
198:19;206:17;208:13;
210:25

**et (2)**
52:25,25
**even (19)**
21:10;37:11;38:20;
46:5;67:5;90:19;95:25;
133:24;155:6;157:5;
158:20;159:3;169:24;
171:15;172:24;173:11;
182:20;209:23;213:5
**everybody (4)**
170:11;171:12;
193:12,12
**Everybody's (1)**
135:21
**everyone (1)**
132:7
**exact (1)**
138:19
**exactly (7)**
16:22;47:17;51:21;
76:3;122:23;123:1;
199:8
**EXAMINATION (2)**
8:11;214:14
**examined (1)**
8:8
**example (7)**
52:6;60:7;91:22;
115:19;127:5;206:1;
212:23
**examples (1)**
114:23
**Except (2)**
114:10,12
**exception (1)**
118:19
**exchange (3)**
23:6;71:15;207:4
**excited (1)**
189:3
**Excuse (3)**
72:9;125:9;216:21
**exhibit (117)**
17:15,16,21;18:1,12,
14;25:15,17,22;27:5;
43:21,23;44:2;60:20,
22;61:18;76:13,17,22,
25;77:2,5,13,25;78:4;
79:22;80:2,7,8,20,20;
81:12,12,23;82:2,8,11,
12;83:7,18;84:10,11,
20;85:2,7;86:13,14,20;
93:7,11,15;94:3,4,8;
95:9;97:1,1,5;98:16,18,
22;101:16,19,22;103:2,
24;104:2,6;105:1;
113:25;114:1;122:24;
123:2,4,7,11;124:13,
17,23;128:7;139:3,5,7,
17;141:2,15,16;146:15,
15,18;150:9;152:4;
155:25;162:5;164:2,7,
9,16;175:7,8,12;177:9,

10;178:11,12;180:2;
199:24;200:1;206:25;
212:13,19;214:18,19,
21;216:3;217:12;
218:19
**exhibits (3)**
64:15;93:4;100:25
**exist (3)**
50:4,11;64:25
**existed (1)**
154:16
**existence (1)**
65:15
**expectation (1)**
118:1
**expecting (1)**
69:3
**expended (1)**
202:2
**expense (2)**
146:6;147:3
**expenses (11)**
27:6;61:2;63:14;
66:8,21,24;69:20;
72:15;170:6;174:7;
194:9
**experience (2)**
55:21,24
**experienced (1)**
57:25
**explain (2)**
89:4;218:5
**explained (3)**
93:5;105:23;211:20
**explanation (1)**
161:23
**expressed (1)**
190:3
**expressing (1)**
190:4
**expressly (1)**
32:7
**extensive (1)**
59:20
**extent (3)**
116:14;125:2;132:8
**extra (2)**
169:4,8

**F**

**face (1)**
102:4
**faces (1)**
27:18
**fact (20)**
39:4;47:19;49:21;
70:12;105:11;106:8;
108:6;113:11;121:5;
132:14;146:3,24;
149:9;159:25;194:23;
200:17,24;209:23;
212:13;213:20

**factor (5)**
90:10;157:17;
169:21;170:19;192:21
**factored (5)**
90:8;169:19;170:15;
171:8,10
**facts (1)**
171:17
**factual (1)**
78:22
**faculties (2)**
160:15,18
**failure (1)**
13:2
**Fair (20)**
9:12,16;13:14;14:5,
8;15:11;51:3;54:11;
55:18;56:5;85:17;
104:25;107:14;108:4;
110:14;111:8;113:18;
127:8;157:2;197:4
**fairly (4)**
12:8;57:15;66:22;
112:16
**Fairness (3)**
38:8,10,22
**fall (9)**
67:16;136:7,10,11,
13,15,21;137:17;138:5
**familiar (2)**
9:3;38:7
**far (11)**
16:2;22:3;107:18,19;
170:10,13;186:15;
187:14;195:7,11;
209:15
**Farm (36)**
15:3,4,15;16:7;
39:25;40:9,12,20,25;
41:4,11,21;54:23;
144:19;186:4;188:14,
15,19;189:5,16,24;
191:10,16,25;192:3,12,
22;193:2;194:8;
200:14,16,17;207:6,13,
22;209:2
**fault (2)**
73:14;217:4
**favorably (1)**
188:8
**faxed (1)**
112:12
**February (5)**
10:8;130:13,16;
132:18;179:3
**Federal (26)**
7:8;35:24;36:4,11;
37:13,21,25;38:13,23;
39:2,20;58:19;60:3,6,
10;74:20;101:7;103:3,
15;108:21,24;116:17,
18,23,24;145:8
**fee (56)**

29:23;30:9;31:6;
32:16,17,24;33:15;
34:21;35:10;36:19;
40:8,11;41:9;42:2;
47:16;48:7,9,14,16,22;
59:13;65:14;67:1,6,13;
69:11;71:3;73:6,7,16,
22;76:5;99:24;100:5,5;
121:11;123:23;124:8;
130:24;133:8,9;134:3;
142:3,5,7;176:9;
180:12;181:24;182:10,
18;183:5;189:10,16;
190:1,6;194:7
**feel (1)**
123:14
**feels (2)**
170:23;171:3
**fees (45)**
9:21;29:18;31:25;
32:3,8;47:8;56:22,23;
59:15,15,18,18;66:8;
72:24;77:15;109:10;
121:20;126:21;134:5;
140:10;141:12,21,24;
143:20;156:16;159:9;
161:8,14;174:21;
176:2,16,18;182:2;
183:2,9,9;196:8,9,10,
14,17,20,21;219:15,22
**fell (2)**
104:18;191:16
**felt (2)**
112:20;131:21
**few (4)**
20:6;34:5;131:20;
208:9
**fewer (1)**
10:23
**fiasco (1)**
72:14
**fifth (1)**
85:8
**fight (1)**
191:14
**fighting (1)**
209:2
**figure (1)**
89:1
**figures (2)**
216:13,17
**file (25)**
22:17;32:1;35:24;
36:20;37:23;38:3;39:2;
50:1,17,24;51:25;52:6;
59:9;66:10;78:14;
121:6;150:20,22;
154:12,23;192:12;
205:14;212:7;219:16;
220:17
**filed (80)**
16:23;29:22;31:18;
34:7;35:24;36:1,4;

37:13,14,19,24;38:12,
20;40:21;42:18,23;
43:3;46:18;49:8,11;
52:1;60:3,3,10;74:7,
19;75:17,19;76:2,3,
77:8;78:3,4,15,25;
79:15;80:10,12,13,14,
81:2;82:9,13;85:19;
86:17;101:6;102:9;
103:8,14,15,17;108:24;
109:12,21;110:17;
112:23,25;114:8;
115:1;116:22,25;
117:11;119:6,10;
120:6;121:23;126:20;
128:7,21;129:8,21;
130:12;131:6;161:16,
16,17;176:11;191:20;
220:15,24

**filing (21)**
30:3,13;31:10;35:18;
39:4;53:4;60:19,22;
61:10;66:8,23;77:13;
78:19;79:5;114:7;
116:6;120:19;123:8;
125:13;213:21;220:21

**filings (3)**
42:13;46:9;51:25

**final (1)**
138:7

**financially (1)**
202:18

**financing (1)**
72:17

**find (5)**
85:4;156:7,12;
164:21;175:8

**fine (6)**
64:13;106:15,18;
167:14;168:4;213:17

**finished (2)**
180:24;214:10

**firm (133)**
8:2,15;9:20,20;
20:11;21:3;22:2,25;
23:14,22;33:1,6,7,8,17,
17,18;34:6;35:2,4,9,11;
40:13,13,13;41:7,7,8,9,
10,18,19,19;49:2,2,3;
54:17,19;55:8;56:11,
11,11;57:8,12,25;59:8,
14;68:13;69:11,13;
70:17;71:20;79:9,12;
88:11,18,21,23;91:5;
94:24;95:25;97:25;
98:24;99:9,17,18;
107:3,8,13,17,21;
125:3;126:21;127:18;
128:22,24;132:7,24;
133:1,15;134:6;135:3,
25;136:4,16,19,22,25;
137:9,10,18,24;138:7,
9,14,24;139:23;

142:18;143:12;144:10;
145:5;147:14,23;
148:9,15;149:2;
157:10;166:8;167:4,
18,19;168:23;169:22;
170:15;173:20;180:11;
181:11;188:20;192:5;
193:9,10;196:10;
197:25;198:9;199:8,
10;201:17;202:21,21;
203:9;206:9,10;214:24

**firms (34)**
26:18;41:7,15;46:11;
54:20,24;55:1;56:8,21;
57:3,5,6,8,14,17;79:5,
8;94:10;96:8;109:9,11;
133:19,22;161:15;
176:9;192:5,11;
193:17;203:7,24;
204:2,3,11,12

**firm's (3)**
173:1;178:13;201:12

**first (67)**
8:8,14;16:15;17:15,
25;19:1;28:23;34:7;
35:7;44:25;61:8;63:11;
64:9,14,21;65:3;66:13;
67:17;69:18;70:3;
72:12;77:6,19;80:19;
81:10,20,21,23;82:16;
84:5;89:7,11,19;90:2;
91:20;94:8;95:8;97:14;
102:25;103:7;105:17;
107:1;108:13;110:16;
123:22;126:4,6;128:5;
132:15;139:16;146:24;
147:18;152:21;158:24;
167:3;173:17;176:6;
178:7;179:7,13;
180:15;182:14;184:7;
188:4;207:3;208:18;
214:18

**Five (19)**
79:22;80:2,7,8,20;
81:12,23;82:2,12;
83:20;84:11,16;85:7;
86:13,14,20;140:5;
202:24;205:9

**five- (1)**
113:16

**five-minute (1)**
75:5

**flag (1)**
154:15

**flat-out (1)**
51:14

**flew (2)**
209:23,25

**Florida (20)**
59:24;60:2;75:19,25;
76:1,2,4,13;77:8,20;
78:14;79:6,15;80:12;
81:2;82:9;85:18;86:5,

16;87:3

**fluid (2)**
170:10,12

**fly (1)**
210:9

**flying (2)**
210:14,16

**focus (4)**
42:12;46:8;77:18;
108:11

**focusing (1)**
42:16

**folks (1)**
22:2

**follow (1)**
220:13

**followed (2)**
146:12;147:15

**following (1)**
199:14

**follows (1)**
8:9

**follow-up (2)**
104:18;214:16

**Foot (1)**
116:11

**forget (3)**
138:19;153:14;
209:21

**forgotten (1)**
100:21

**form (146)**
12:6,16;13:4;19:15;
20:13;23:16;29:2;
30:10;31:15;32:10,20;
33:19;34:2;36:5,22;
37:5,16;38:14,24;
39:21;42:7,20;43:8;
46:24;47:10;49:13;
53:12;54:20;55:13;
56:16,20;57:19;58:4;
61:4;62:21;63:6;68:21;
69:5,14;70:10,22;72:8,
10;73:1,9;76:9;81:4,
15;85:21;87:6;88:3,25;
90:13,22;91:11;100:2;
109:1,23;110:10;
111:1,20;113:5;115:4;
117:17;118:4,24;
119:24;120:8,20;
121:13,21;122:2,13,16,
22;123:3,18;124:19;
128:9;134:11;139:14;
141:4;142:8;144:3;
145:23;152:7;153:4;
158:6,22;159:14;
160:10;161:12;162:12;
163:17;166:11,24;
167:5,6,21;168:3,8;
169:6;170:3,20;
171:19;172:6,17;
173:4,16;174:3;175:3;
177:15,24;178:5,17;

179:6,20;180:6;
181:14;182:8,22;
183:6,21;184:2,12;
185:20;187:25;189:6,
17;190:20;191:5;
192:24;193:19,25;
195:6,18;196:19;
197:13;198:3;201:2;
203:17;208:2,25;
211:3,24;213:9

**format (1)**
27:3

**forming (2)**
54:21;55:8

**formula (2)**
95:1,1

**forth (3)**
49:20;177:1;183:1

**forum (1)**
37:3

**forward (2)**
42:6;83:16

**fought (1)**
193:23

**four (28)**
76:19,22;77:2,6;
78:4;79:4,8;80:20;
81:12,23;82:2,8,11;
83:7,9,19;84:10,15,20;
85:2;147:19;175:23;
180:19;196:5;204:11;
211:10;217:8;218:10

**fourth (2)**
27:12;94:17

**four-year (2)**
159:23;196:2

**frame (21)**
15:9;40:22;96:18,21;
102:17;103:20;105:19;
129:20;131:9;138:22;
143:12,15;179:3;
196:2,15;197:6,7,11;
200:7,9;204:17

**framed (2)**
125:8,11

**frames (1)**
141:22

**frankly (2)**
100:21;139:13

**friend (1)**
209:6

**front (8)**
18:2,15;44:2;51:7;
61:20;77:3;108:21;
192:18

**fruition (1)**
16:5

**full (4)**
44:25;160:15;170:1;
194:22

**fund (17)**
66:5,18;88:22,24;
89:13;95:8;99:17;

165:20;169:20;173:10;
177:5;178:16;179:12;
181:11;199:2,4;216:10

**funding (5)**
62:14;63:2,17;64:6;
87:14

**funds (2)**
97:21;165:13

**further (3)**
21:19;62:3;85:15

**fuse (1)**
97:24

## G

**gander (1)**
81:9

**gave (5)**
91:21;123:20;
157:12;183:12;206:1,
12

**general (7)**
9:19;13:20;28:24;
65:24;66:24;127:17;
191:6

**generally (5)**
25:25;26:1;28:19;
132:25;204:5

**generation (1)**
26:11

**generic (1)**
110:11

**generically (1)**
110:15

**Gentle (36)**
10:12;11:6,11,13,14,
15,16,17;26:17;66:4;
67:17,20;89:23;93:7,
23,25;97:14;99:4;
133:25;144:5;168:10,
13,17,21;169:19;
171:21;173:12,13,20,
24;174:5;197:24;
198:7,18;199:6;218:11

**gentlemen (1)**
137:24

**Gentle's (1)**
179:11

**get-go (2)**
41:20;192:9

**gets (3)**
58:2;171:10,23

**given (7)**
55:16;94:23;151:20;
158:4;159:7;170:1;
181:23

**gives (1)**
94:16

**giving (4)**
72:3;155:9;159:19;
200:10

**God (1)**
207:24

**Godwin (1)**
103:11
**goes (3)**
62:9;189:18,24
**Goldman (23)**
8:1;26:16;50:4;
61:23;62:2,5,12;77:12;
101:18;125:7,10,15;
126:16;128:19;129:10,
14,24;130:3,13;148:2;
154:21;175:14;216:24
**golfer (1)**
160:22
**good (9)**
53:23;57:14;131:16;
145:18;150:6;160:20;
169:12;186:19;209:6
**Gordon (178)**
7:25;11:7;12:4;
13:18;15:24;16:16,18,
17:4,8,11;19:4;23:11;
24:8;29:9,21,24;32:2,
24;33:6,23;34:18,21;
36:19;64:10;67:1,11,
15;68:8,15,19;69:1,9,
10,17;70:5;89:7,9,22,
24;96:12;97:15,18;
99:7;100:13,14,23;
104:10,21;105:14;
106:2,4,9,15,22;
112:10;114:3;116:11;
119:4,7;124:8;133:25;
134:21;138:12,22;
139:2;140:8;141:10;
142:7;143:19;144:14,
23;150:17;152:17,19;
156:4,8,9,10,11,18;
157:7,9,10,11,14,15;
159:15,19;160:14,17,
19;161:5;162:21;
163:13;164:20;165:3;
166:4,7,15,21;167:4;
169:20;170:22,24;
171:12,23;172:14,21;
173:3;174:6,12;177:6,
8;178:7;179:15,16,24,
24;180:3,13;181:1;
182:4,10,15;184:9;
186:4;189:15;191:14;
192:1;193:20,22;
194:5,20;195:3;196:6,
14;197:8,10,20;
198:22;199:11,16;
200:7,16;202:4;205:6,
7,13,24;207:5,9;208:1,
7;209:4,8,16,19;210:6,
7,9,13,22;211:20,23;
212:4,24;213:16;
214:23;215:14;216:18,
20;217:15,23;218:1,7,
8,11;219:13
**Gordon's (16)**
12:3;23:23;33:11;

36:17;130:5;153:13;
168:24;177:12;178:21;
191:15,16;193:2,9;
194:2,15;201:11
**Gotcha (1)**
98:15
**graduate (1)**
23:24
**great (1)**
207:23
**greater (1)**
203:3
**Greg (1)**
116:13
**grievance (1)**
126:14
**ground (1)**
195:22
**group (4)**
30:22;55:25;74:7;
202:20
**guess (4)**
97:1;135:11;155:1;
196:13
**guy (2)**
19:2;54:6
**guys (14)**
30:17;40:24;42:16;
57:25;67:13;75:17;
110:15,17;111:9;
121:4;133:14;135:17;
147:15;149:1

## H

**Hale (2)**
193:1;207:17
**half (29)**
45:2;89:9,10,16,18,
25;90:11;97:17;99:3,8,
8,13,16;119:9;126:21;
134:22;139:17;165:5,
6;167:19;179:4,4;
181:11;196:9,13,17,20;
197:21;202:8
**half-portions (1)**
178:14
**half-share (1)**
196:7
**hand (2)**
8:4;207:1
**handled (2)**
15:24;29:19
**happen (6)**
56:24;113:12,13;
127:11;136:5;185:25
**happened (13)**
20:10;34:25;35:7,8;
51:22,24;58:24;59:1;
73:17;74:2;96:15;
101:11;195:10
**happens (1)**
28:16

**happier (1)**
209:5
**happy (3)**
50:16,25;189:25
**hard (1)**
185:11
**Hausfeld (1)**
16:23
**head (1)**
117:7
**heading (1)**
176:4
**health (1)**
21:22;22:5
**hear (1)**
215:23
**heard (4)**
127:17;194:19;
211:7,9
**hearing (1)**
215:9
**heart (10)**
106:6;158:5,11,12,
21,25;184:9;197:17;
206:15;209:22
**held (1)**
25:20
**hello (1)**
210:2
**Help (3)**
29:7;64:19;83:18
**helped (2)**
188:20;204:8
**helpful (2)**
19:20;210:15
**helping (1)**
181:2
**helps (3)**
56:3,6,6
**herculean (1)**
71:14
**here's (1)**
50:23
**hesitation (1)**
104:16
**hey (16)**
37:1;97:20;98:3,14;
127:19;186:15;188:22;
195:14;197:20;199:21;
205:3,7,13,24;206:17;
211:8
**high (1)**
170:11
**highly (1)**
142:13
**hinges (1)**
188:7
**historical (1)**
49:21
**hold (5)**
36:18;84:24;112:14;
156:12;181:9
**hopefully (2)**

39:9;117:20
**hopes (1)**
170:11
**hospital (4)**
209:25;210:1,8,12
**hours (7)**
163:12;190:18,24;
195:3;210:18,18,19
**house (1)**
208:12
**huge (2)**
131:22;189:4
**human (1)**
158:12
**hundred (2)**
133:18,18
**hundreds (4)**
174:13;201:14,15,15

## I

**ICU (1)**
210:3
**Idaho (2)**
52:25;59:24
**idea (13)**
19:12;33:12;50:10;
53:23;70:4;123:25;
127:1;130:7;133:22;
155:6,13;192:25;193:2
**Ideally (1)**
145:6
**identical (2)**
52:13,23
**identify (1)**
30:7
**II (2)**
40:20;193:2
**Illinois (20)**
52:25;59:24;114:10,
12,13;115:21,23,25;
116:4,6,15;117:1,14;
118:16,20;159:25;
160:7;207:14,14,15
**immediately (5)**
112:5;180:19;
199:12,19;203:3
**impaired (1)**
160:18
**important (3)**
12:22;56:1;203:4
**improbable (1)**
152:9
**improper (4)**
88:7;125:19;129:11,
22
**Inc (1)**
84:15
**incapacitated (1)**
158:17
**include (2)**
79:8;167:24
**included (2)**

34:7;75:19
**including (3)**
99:9;118:15,16
**incorrect (1)**
74:11;101:5;218:14
**increased (1)**
53:8
**incurred (1)**
180:11
**incurring (1)**
66:6
**independent (1)**
174:20
**Independently (1)**
19:10
**Indiana (1)**
59:24
**indicate (4)**
60:19,21;101:13;
138:21
**indicated (6)**
20:6;32:23;88:9;
134:24;149:12;162:8
**indicates (3)**
19:4;218:6;219:11
**indicating (1)**
22:15
**individual (4)**
52:1;96:7,7;121:8
**individually (1)**
57:2
**influence (1)**
56:9
**information (11)**
19:20;20:17,19,25,
25;21:3;22:11,25;
98:22;125:3;211:6
**informing (1)**
206:2
**initial (6)**
28:7;47:4;64:2;
93:22;95:8;104:17
**initially (4)**
41:22;55:4,5;103:14
**initiated (1)**
65:11
**initiating (2)**
42:12;46:9
**inside (1)**
184:10
**in-state (1)**
35:19
**instead (1)**
68:20
**instructions (1)**
91:22
**insurance (2)**
21:22;22:5
**intent (1)**
9:10
**intention (4)**
86:4;8;112:18;
176:20

**interest (1)**
135:11

**interested (1)**
17:4

**internally (2)**
210:22;211:22

**interpreted (1)**
161:23

**into (19)**
47:23;53:9;56:22;
58:19;70:17;71:14,22;
74:14;87:4;120:23;
128:22,24;133:23;
157:17;164:22;172:25;
178:15;179:12;213:20

**introduce (1)**
7:16

**inure (1)**
172:24

**invest (3)**
71:13,22;72:6

**investment (6)**
70:14;71:1,4,12,19,
20

**invoice (1)**
198:19

**involve (2)**
41:19;131:24

**involved (20)**
8:16;17:7;24:18;
28:13;33:11;41:6;54:1,
25;66:13,15;74:8;
94:10;96:3;115:15;
122:10;133:19;144:18;
209:17;213:16;220:21

**involvement (1)**
189:15

**involves (1)**
129:2

**involving (6)**
15:5,21;16:24;18:22;
212:1,5

**issue (7)**
65:19;68:5;73:16;
134:21;170:8;171:22;
206:22

**issued (5)**
28:11;91:25;146:3,
11;183:1

**issues (3)**
14:17;55:10;106:9

**J**

**January (7)**
63:21;130:22;131:2,
5;135:11,14,14

**JBA (1)**
90:7

**Jennifer (4)**
79:15;86:18,22;87:2

**Jessica (1)**
135:9

**join (1)**
213:13

**joined (1)**
8:1

**joy (3)**
131:19,20;132:6

**JPML (4)**
58:10,10,17,23

**Jr (1)**
7:25

**Judge (29)**
9:25,25;10:12;11:6,
9,20;12:9,15;28:11;
69:17;72:13;88:15;
91:3,7,25;92:2,12;
108:21;142:23;145:8,
10;170:7,7;171:13;
172:19,20;173:6,11;
182:25

**judges (1)**
145:2

**judge's (3)**
11:4;90:23,24

**Judicial (1)**
58:17

**July (4)**
80:14;97:14;166:2;
188:15

**jump (1)**
39:14

**jumped (1)**
73:25

**jumping (1)**
73:18

**June (4)**
66:7;93:23;96:15,17

**junior (1)**
135:10

**jurisdiction (1)**
220:25

**JVA (5)**
174:24;176:7,14,20;
182:2

**K**

**Kansas (2)**
52:25;209:20

**keep (6)**
25:2;39:10;91:23;
199:3,5;201:22

**keeping (1)**
25:12

**keeps (1)**
205:15

**Keller (1)**
116:12

**kept (1)**
152:17

**kicker (1)**
169:15

**kicking (1)**
121:3

**kind (13)**
14:10;16:20;45:1;
53:17;73:15;82:24;
102:3;105:23;149:17;
150:23;151:4;197:2;
206:5

**knew (22)**
28:14;29:9;37:19;
47:25;48:1,1,5,6;69:8,
17,17;72:3;113:8;
132:8;133:10,23;
160:25;174:13;185:4,
9;186:7;199:18

**knowing (1)**
70:15

**knowledge (7)**
52:11;73:5;77:11;
133:13;161:3;173:18;
206:8

**known (5)**
33:4;37:19;144:17;
160:19;209:17

**Knoxville (9)**
17:13;23:7;28:25;
45:14;55:6;153:22;
210:10,11,17

**Kristin (1)**
133:21

**L**

**labeled (3)**
216:13,18;217:14

**large (1)**
189:16

**largest (1)**
202:22

**last (16)**
14:20;44:7;47:18;
76:16;77:6;79:3;96:10,
11;135:14,14,16;136:3,
5;138:5,11;217:2

**late (6)**
104:11;124:12;
126:3;142:15;156:4;
185:8

**later (23)**
34:5;82:13;88:12;
101:2,11;112:4;122:6;
127:6,7;159:10;
176:16;185:19,23;
186:8;187:2,4,5;189:1;
195:17;201:18;206:19,
22,23

**latter (1)**
57:21

**law (24)**
8:1,15,23;11:9;
20:11,22;22:2;23:25;
24:14;26:18;33:5;34:8,
18;56:8;79:4;88:11;
94:10;95:25;96:7;
109:9;126:21;144:10;

**181:**25;193:17

**lawsuit (4)**
14:11;82:8,13;172:5

**lawyer (13)**
23:14,15;24:1,9,13;
36:10;94:15;95:4;
145:20;160:20;190:25;
210:4;220:24

**lawyers (25)**
10:12;28:12;41:20;
53:25;54:5,9,19;56:8;
77:7;79:4;92:9;94:5,
10;96:7;116:5,7;
117:14;131:20;141:25;
142:3,6;153:22;191:4;
207:15,16

**lay (2)**
91:7,8

**lays (1)**
94:4

**lead (7)**
56:1,9;79:18;190:7,
12,15;194:4

**leadership (6)**
46:12;49:9;53:10;
55:16;86:11;203:2

**leading (4)**
58:9,23;158:18;
192:23

**leads (1)**
191:2

**learn (1)**
131:10

**learned (3)**
131:14,22;132:16

**least (22)**
23:25;37:12;55:19;
92:20;94:9;96:4,11;
107:21;111:25;118:2,
21;129:22;132:5;
151:20;154:15;163:24;
166:7;168:2;172:1;
173:1;192:18;194:20

**leaving (1)**
211:2

**led (3)**
16:5;73:13;208:1

**left (1)**
202:17

**legal (1)**
120:22

**less (5)**
68:1;135:8;194:22;
196:2;198:17

**lesser (1)**
203:4

**letter (65)**
41:13;87:18;94:4;
96:16;97:13;98:3,12;
105:20;110:6;112:3,8,
10,14;134:20;192:10;
141:7,10,11,20,23;
143:18,20;144:13,14,

23,23;150:16,18,18,22;
151:9;152:3,4,14;
153:6,7;154:6,16;
159:20;161:7,14,22;
164:4,5,7,20;165:9;
184:8;185:14;192:10,
12;197:7,19;204:22;
206:3,4;214:22;
215:11,17,20,25;
218:24;219:10,11

**letterhead (6)**
156:4,8,9,12,18

**level (5)**
94:23;107:14;
110:20;131:20;145:25

**liaison (1)**
202:25

**liked (1)**
137:24

**likely (3)**
88:12;142:13;153:12

**limit (1)**
35:18

**limitations (3)**
32:16;48:8,12

**limited (2)**
10:23;117:3

**line (10)**
39:14;53:8;55:10;
56:25;58:2;85:25;96:4;
103:19;108:13;129:21

**lines (4)**
67:24;81:20,21;
133:2

**list (10)**
59:11,17,20;80:25;
86:1,2,4;92:16;148:23;
165:18

**listed (7)**
81:11,23;82:2;95:24;
116:11,13;218:1

**lists (4)**
85:3;95:14;166:3,4

**literally (10)**
80:23;81:13;108:17;
110:16;115:24;120:18;
150:15;152:25;158:4,
11

**litigate (1)**
69:22;72:15

**litigating (1)**
202:21

**Litigation (81)**
7:13;9:22;16:19,22;
17:13;23:12;24:24,24,
25;26:6;29:9,9,10,11;
33:11;34:11,14,15;
41:1;45:25;46:1,5,13;
47:22,23;58:15,16,17;
61:2;62:19;63:4,8;
66:5,6,16,19,20;71:1,4;
79:24;87:15;100:1;
106:14;108:14,20;

109:13,16;110:9,21,23,
24;111:11;118:11,14;
124:18;125:11,13,15,
18;128:20;129:3,4;
133:20,23;139:19,25;
140:3,24;147:1;
159:24;163:3,4;180:8,
11;186:6;192:15;
207:19;209:18,19,23;
219:17

**little (15)**
21:18;27:19;52:14;
73:15;84:14;87:9;
91:15;134:24;157:20;
158:4;165:18;166:14;
169:15;189:11;214:10

**live (1)**
158:4

**local (5)**
59:8;60:13;66:10;
159:16;202:25

**locate (1)**
199:24

**locations (2)**
20:8;121:7

**log (4)**
154:15,21;155:3,5

**logs (1)**
155:1

**long (9)**
34:20;85:25;86:1;
124:15;158:19;184:11;
197:16;209:16;210:10

**longer (6)**
136:22;138:6,23;
147:7,9;197:8

**look (88)**
12:12;17:16;18:2,3;
19:18;25:14,24;27:11,
21;38:2;43:20;44:22,
25;45:5,16;52:20;
55:23;62:11;64:11;
76:12;78:3,13;79:3,13,
21;80:7,19,20,23;
83:17;85:2,7;86:20,21;
93:4,7,15;94:2,8;95:6,
7,13;96:25;97:10;
98:15;102:1,2,24,25;
103:5;106:11;108:3;
114:22;115:11;123:6;
139:3,4,12;140:16;
141:9,15;144:7,12;
146:14,23;147:17;
150:9;151:1,3;155:15;
162:4;164:16;165:17;
166:17;175:10;177:9,
11;178:11;186:12,17;
190:22;192:17;197:9;
199:12;206:24;207:2;
210:9;212:13

**looked (8)**
18:9;97:11;132:16;
139:15,24;141:2;

178:12;217:14

**looking (14)**
58:7;70:24,25;78:22;
82:6;113:25;117:11;
149:10;152:18;153:20;
156:6;186:19;191:23;
216:24

**looks (2)**
147:7,18

**Lord (1)**
10:11

**lose (1)**
201:1

**lost (2)**
162:14;178:18

**lot (15)**
66:9;108:10;130:10;
141:23;142:2;145:7;
149:18;161:16,17;
183:19;190:18;195:22;
208:22;213:15,17

**Louisiana (14)**
19:20;20:11,12,20,
25;21:4,9,16;52:6,7,8,
9,21,24

**luckily (1)**
27:18

**lunch (10)**
149:20;150:5;
153:11;161:25;163:11,
24;168:2;183:13,18;
220:18

**lurch (1)**
211:2

## M

**ma'am (1)**
212:17

**machines (1)**
212:5

**mailed (3)**
112:11;152:14,16

**maintenance (1)**
165:12

**major (1)**
71:11

**makes (3)**
11:13;172:20;189:10

**making (6)**
37:18;71:12,20;
153:8;157:13;185:18

**man (2)**
205:24;210:11

**manage (1)**
135:24

**management (1)**
107:13

**manager (1)**
137:17

**managers (1)**
137:19

**managing (1)**

137:9

**many (27)**
8:22,25;20:7;40:25;
53:4;74:3,3;81:10,10;
95:7;100:19;103:19;
115:2,3,15;121:7;
126:9,25;127:2;128:6,
11,13;131:24,24;
143:1;158:17;190:24

**mapped (1)**
121:17

**March (3)**
166:2,7;181:10

**mark (2)**
17:18,19

**marked (5)**
17:21;25:17;43:23;
76:22;80:2;93:11;97:5;
98:18;101:22;104:2;
139:7;146:18;164:9;
200:1;212:19

**massive (1)**
209:22

**Master (44)**
11:11,17,18;27:7;
44:11;64:17;66:5;
73:17;80:9,11,13,24;
86:12,21,25;87:5,18;
90:7;91:8;93:6;96:5;
99:4;102:22;168:13,
16,20;169:25;170:16;
171:14;173:12,13,20,
24;174:1;177:1,5;
178:16;179:11;181:18;
198:7,18;201:10;
203:12,23

**master's (6)**
177:21;179:18;
180:4;181:12;198:22;
203:20

**matter (21)**
9:19;11:22;13:21;
18:21;20:2;23:3,8;
24:19;29:1;55:9;60:20;
61:11;77:14;145:18;
152:25;153:2;162:18;
181:25;184:17;191:6;
196:11

**matters (9)**
28:20;29:19;31:1;
33:25;36:10;59:16;
63:5;92:3,19

**maximize (1)**
55:15

**maximizes (2)**
55:14,19

**may (78)**
13:7;23:7;24:5;28:3,
25;29:20;30:6;33:10,
14,15,25;35:8;39:15;
40:1,16;42:12;45:7,13,
23;46:2;47:4,15;48:1,
13,14,23;49:15,21;

50:12,14,14,14,21;
51:10,13,16;56:24,24;
59:2;60:9;65:15,16;
69:12;71:9;72:21;76:6;
86:6,6;92:14,14,18,18;
104:12,13;106:7;
121:7;132:20;140:20;
151:7;153:21;155:13;
164:4,5,6,12,13;
165:10;176:9;184:8;
192:18;197:7,18;
215:11,18,24;219:13;
220:1,23

**Maybe (17)**
50:8,18;54:10;57:17;
127:25;128:1;135:13,
14;136:7;138:18;
143:3;149:19;153:20;
158:3;160:14;171:16;
207:21

**MDL (99)**
27:8;28:8;42:19;
46:19;47:20;49:12;
51:19;58:20;59:4;63:7,
18,20,23;64:1,8,24;
66:5,20;69:22;74:2,10,
14;78:7;80:10,11,13,
24;82:12;85:20;86:11,
12,21,25;87:5;91:21,
24;92:4,5,10,19,20,25;
93:1,24;101:7;108:15,
20;109:17;110:20;
113:4,14;114:9;
117:15;118:23;119:21,
23;120:7,15,23;121:8;
127:12,22;139:18,25;
140:3;142:19,20,24;
143:1,13,14,21;144:1,
2;145:2,3,13,13,14,22;
147:1;149:13;150:14;
152:6,25;153:1;
159:17;163:6,15;
164:22,23;182:11,17;
183:1,5,8;199:1;
219:22;220:1

**MDLs (1)**
26:19

**Meagan (9)**
18:19;22:15,20,22,
22;144:22;152:12,21,
25

**mean (28)**
11:10;13:25;30:22;
33:4;45:21;48:20;
82:22;107:22,25;
109:24;111:9;114:17;
116:7;123:25;142:12;
154:4,4;157:9;163:18;
171:22;184:24;188:7;
202:19;204:21;205:5;
206:3;212:16;220:4

**Meaning (3)**
86:13;162:25;163:2

**meant (2)**
178:24;208:22

**meet (3)**
23:7,11;204:4

**meeting (45)**
9:25;11:20;17:12;
24:5,7,22;28:2,7,8,24;
29:20;30:5;31:12;32:6,
15,25;33:1,4,14,15;
35:7;37:10;40:1,7;
41:25;42:4,11;45:8,14,
16;47:4;48:2,13,13,18;
49:23;53:2;55:6;60:9;
64:2;65:16;66:9;69:18;
127:20;153:21

**meetings (4)**
25:3;113:12;121:3,
19

**member (1)**
96:1

**members (1)**
193:16

**memorialize (7)**
105:3;106:12;
112:19;119:4;157:24;
159:21;219:12

**memorialized (4)**
109:8;161:5,6;
195:24

**memorializes (1)**
104:10

**memorializing (2)**
159:9;161:8

**memory (10)**
10:6;12:8,12;36:1,7;
52:22;112:13;114:24;
116:14;189:8

**mention (1)**
13:1

**mentioned (3)**
29:3;42:3;182:15

**methods (1)**
205:1

**mid (1)**
104:11

**middle (2)**
166:18;175:22

**midway (1)**
95:14

**might (22)**
13:9;26:12;30:21;
31:1;32:18;34:25;54:9,
11;70:5;113:2,17;
133:1,15;134:5;
148:23;149:10;152:23;
153:19;155:10;157:25;
217:3;219:22

**Mike (2)**
16:23;215:2

**millennium (1)**
14:10

**million (15)**
186:13;189:10;

190:1;193:8,10,11,13,
24;195:13;201:5,8;
202:19;207:6;208:23;
213:25
**millions (3)**
131:24;174:14,14
**mind (13)**
10:16;31:20;47:7;
48:4;49:8;59:2;69:16;
91:1;96:19;156:24;
162:23;183:25;192:20
**mindset (2)**
47:3,15
**mine (5)**
89:10;97:18;181:4;
202:13;216:23
**minimis (1)**
66:22
**minimum (2)**
33:23;115:15
**minute (5)**
25:13;113:17;154:5;
165:21;214:2
**minutes (1)**
140:12
**mirror (1)**
81:13
**misleading (1)**
158:3
**missed (1)**
86:6
**missing (1)**
147:4
**Mississippi (9)**
24:14;34:11;35:21;
36:6;37:9,14,20,23,24
**misspoke (1)**
178:23
**mistake (1)**
99:11
**mistaken (1)**
171:16
**mistakes (2)**
172:21,24
**misunderstood (4)**
127:25;128:1;143:3,
7
**moment (1)**
58:12
**moments (2)**
20:6;204:14
**money (71)**
55:12;67:21;69:22;
70:6,13;88:10,18,23;
89:17;90:10;97:17;
98:3,3,7;100:18;
102:22;117:25;118:9;
133:1,10,15;160:5;
161:2;164:21;165:4;
167:18,25;168:22;
170:5,5,14;171:1;
172:8,9,13,14,25;
173:2,10;179:16;

181:3;182:5;186:5;
188:9,19;189:4;
194:24;195:15;197:21;
199:1;200:14,16,18;
201:9,12,12,23;202:1,
2,14,22,24;203:13;
204:5;205:3,13;
211:15,16;213:6,16,17
**Montana (1)**
52:24
**month (1)**
126:11
**Monthly (3)**
139:19;148:22;
163:20
**months (10)**
58:9,22;64:2;74:3;
80:12;82:13;122:6,7;
158:18;211:13
**more (43)**
10:16;17:14;24:2,2;
35:5;40:10;53:5,5,7;
54:10;58:3;59:19;
62:22;68:9,23;88:2;
94:12;102:4;121:14;
122:7;142:16;149:18,
19;153:15,16;162:14;
169:15;173:25;180:16;
181:1;190:18;191:3;
192:4;194:24;196:2;
197:21;198:17;202:23;
203:4,5,15,22;210:16
**morning (1)**
183:16
**most (4)**
100:19;115:15,17;
203:8
**motion (1)**
16:1
**motions (1)**
195:3
**move (1)**
103:18
**moved (1)**
116:22
**moves (1)**
219:24
**moving (1)**
38:23
**much (27)**
55:23;68:9;70:5;
95:3;108:6;132:25;
133:10,15,22,23,24;
147:8;164:21;169:14;
170:17;179:11;181:13,
19,20;185:23;196:22;
199:8,9;204:5;211:5,8,
21
**multi-district (5)**
47:23;58:14,16,17;
79:24
**multi-paged (1)**
25:22

**multiple (2)**
174:19;175:11
**Murillo (1)**
7:16
**Murphy (1)**
116:12
**must (3)**
82:21;83:2,13
**myself (3)**
11:6;103:9;144:4

**N**

**name (14)**
7:1,18;8:13,15;
43:18;44:15;95:9;
105:8,14;109:17,20;
157:10;178:20,21
**named (5)**
19:2;21:20;115:1;
149:1;176:2
**namely (8)**
59:2;80:13;90:9;
99:23;110:6;114:25;
124:23;141:2
**names (1)**
95:7
**naming (1)**
117:4
**Nashville (3)**
7:3,6;24:16
**national (1)**
39:8
**nationwide (2)**
78:20;115:16
**nature (1)**
17:1
**nauseum (1)**
161:21
**nearly (1)**
102:10
**necessarily (4)**
73:10;127:24;
134:13,13
**need (10)**
9:4;64:23,23;101:2;
107:3;123:14;155:5;
197:21;199:21;205:3
**needed (3)**
22:16;198:2;214:24
**needs (3)**
170:22,22;172:21
**negotiating (2)**
157:5,6
**nervous (1)**
210:14
**new (4)**
14:10;22:17;135:17,
20
**news (2)**
127:18;131:16
**next (16)**
57:11;58:8,9,22;

62:10;80:20;96:25;
98:16;103:25;139:5;
146:15;162:5;164:2;
199:24;217:20,20
**Nick (1)**
24:9
**nine (19)**
101:20,22;103:2;
171:2;189:10;190:1;
192:4,11;193:8,10,11,
13,24;195:12;204:12;
207:5;208:23;216:23;
217:8
**nineteen (2)**
166:16;212:15
**ninety-eight (1)**
218:10
**ninth (2)**
203:8,8
**nobody (3)**
28:14;206:10;208:4
**nomenclature (1)**
126:15
**none (1)**
133:4
**nor (2)**
31:12;123:15
**norm (1)**
191:2
**normal (3)**
25:8,10;184:17
**normally (1)**
8:20
**North (5)**
16:19,22,25;29:11;
31:5
**Northern (12)**
7:10;27:8;77:20;
79:23;80:15;82:13;
85:18;86:25;103:7,9;
109:18;146:25
**noted (1)**
75:17
**notes (14)**
12:11;49:22,24;50:3,
7,11,19;51:3,6;153:18,
20,25;154:10,11
**notice (7)**
98:1,2;197:19;203:6;
204:19;206:5,12
**notification (1)**
134:3
**notified (1)**
198:1
**noting (1)**
165:16
**November (26)**
78:4,5;79:6;105:20;
106:3,3;107:7;109:6;
111:24;118:19;119:3,
8;124:12;130:11;
140:5;141:14,17,21;
142:25;143:9;150:13;

195:25;218:25;219:1,
6,7
**nowhere (1)**
15:23
**null (4)**
176:8;180:5;182:1,7
**Number (11)**
7:9;39:4;47:20;
100:7;101:16;108:23;
143:10;156:12;157:10;
191:17;217:21
**numbers (2)**
55:20;178:19

**O**

**Object (143)**
12:6,16;13:4,7;
19:15;20:13;23:16;
29:2;30:10;31:15;
32:10,20;33:19;34:2;
36:5,22;37:5,16;38:14,
24;39:21;42:7,20;43:8;
46:24;47:10;49:13;
53:12;55:13;56:16;
57:19;58:4;61:4;62:21;
63:6;68:21;69:5,14;
70:10,22;72:8;73:1,9;
76:9;81:4,15;85:21;
87:6;88:3,25;90:13,22;
91:11;100:2;109:1,23;
110:10;111:1,20;
113:5;115:4;117:17;
118:4,24;119:24;
120:8,20;121:13,21;
122:2,13,16,22;123:3,
18;124:19;128:9;
134:11;141:4;142:8;
144:3;145:23;152:7;
153:4;158:6,22;
159:14;160:10;161:12;
162:12;163:17;166:11,
24;167:5,6,21;168:3,8;
169:6;170:3,20;
171:18,18;172:6,17;
173:4,16;174:3;175:3;
177:15,24;178:5,17;
179:6,20;180:6;
181:14;182:8,22;
183:6,21;184:2,12;
185:20;189:6,17;
190:20;191:5;192:24;
193:19,25;195:6,18;
196:19;197:13;198:3;
201:2;203:17;208:2,
25;211:3,24;213:9
**objected (4)**
125:14,18;154:16;
155:11
**objecting (6)**
72:9;129:9;167:12;
196:12,13,17
**objection (15)**

Case 2:25-cv-00014-RDP    Document 2    Filed 01/06/25    Page 86 of 105

IN RE: BLUE CROSS BLUE SHIELD                                                    Video Deposition of Patrick W. Pendley
ANTITRUST LITIGATION, (MDL NO.: 2406)                                                              October 18, 2023

13:10;26:9;111:8;
125:2;128:17;151:5;
154:2,3,7,8,14;155:2,4;
167:12;219:23
**observation (1)**
37:18
**obtain (1)**
219:22
**obviously (7)**
8:15;9:18;16:21;
105:6;151:5;161:20;
189:9
**occasion (1)**
14:7
**occur (1)**
122:5
**occurred (9)**
64:7;103:19,20;
106:4;174:10;185:22;
188:11,12,13
**occurrence (1)**
36:14
**October (4)**
7:14;102:17;103:20;
207:9
**odd (1)**
190:2
**odds (2)**
53:8;56:7
**off (15)**
25:20;34:15;45:15;
75:7;106:14;113:19;
117:6;148:2;149:23,
24;186:16;190:15;
191:16;192:11;214:4
**offer (1)**
210:23
**offered (4)**
200:8;210:7,7,17
**offering (2)**
68:19;69:1
**office (13)**
17:13;23:24;24:10,
15;34:8,18;36:17;40:7;
73:3;89:23;139:14;
168:19;169:3
**officer (1)**
47:3
**offices (1)**
131:19
**often (1)**
54:4
**older (1)**
108:22
**once (12)**
8:12;18:3;40:19;
53:23;80:6;92:20;
93:15;110:19;127:10;
139:12;146:22;193:14
**one (102)**
9:9;15:2,4;17:16,17,
21;18:2,12,14,14;25:6;
27:13,14,18,22,23;

37:12;39:4,8;44:14;
53:1,2;54:25;55:19;
56:3,12,20;57:3;65:15;
68:23;69:16,25;70:1;
75:18,24;80:21;82:16,
20,22;83:2,5,21;84:9;
85:8,8;86:11,22;87:11;
89:18;102:4;103:8,17;
105:7;110:16;114:25;
115:9,19,19,20;116:13;
121:14;130:19;135:2;
137:19;138:11;139:17,
22,24;141:22;145:4;
149:8,21;156:23;
162:13;165:23;168:2;
169:12;171:24;174:22;
180:11;181:3;182:15;
184:10;187:18;190:14;
192:17,18;194:4;
195:1;199:7;204:23;
205:20,21,22;206:8;
207:21;209:16;210:4;
212:1;213:21;214:18;
220:2
**ones (1)**
60:8
**one-sixth (6)**
68:16,20;69:3;198:9,
14,23
**one-third (5)**
35:1,1,1;48:20,21
**only (40)**
9:8;15:17;19:12;
20:10;31:13;32:8;
35:19;36:6,19;44:14;
52:6;56:7;66:13;68:1,
16;69:2;90:8;92:3,25;
94:14;99:7;115:9,19;
117:4;142:18;143:12;
145:1,13;153:18;
160:20;169:13,19;
171:12;180:18;182:14;
198:9;202:23;206:4;
210:4;211:25
**open (3)**
92:13;147:19;206:14
**operated (2)**
24:2;114:20
**operating (1)**
46:11
**opportunity (9)**
16:14;17:6;72:22;
92:9,15;169:12;
176:24;177:2;206:12
**opposed (2)**
140:18;151:9
**opposition (5)**
42:23;43:1,3;174:18;
175:2
**oral (21)**
60:25;62:14;63:1,16;
64:5;65:14;104:10;
107:1;135:1;156:22;

157:3;172:2;173:13,
25;174:21;182:6;
195:24;202:9;204:15;
219:12,20
**orally (3)**
156:25;157:24;
219:18
**order (34)**
28:11;58:10,11,15,
23;68:8;73:15;75:18;
76:19;81:3,13;90:23,
24;91:8;92:1,13;93:6;
133:5,6;146:4,11,24,
25;170:7,8,9;176:11;
179:11,18;181:19;
183:1;198:22;201:9;
203:11
**Ordered (7)**
87:22;92:3;148:7;
173:11,15;174:1;
203:23
**Ordering (1)**
87:23
**orders (4)**
173:19;180:5;182:2;
203:20
**original (7)**
99:24;106:23;
116:10;152:14;220:5,
6,13
**originally (5)**
24:14;35:1;74:7,19;
112:11
**originated (1)**
17:7
**origination (1)**
176:2
**others (12)**
28:3;41:16,16;54:10;
78:19;82:9;107:8;
117:9,10;135:20;
167:19;194:21
**otherwise (1)**
155:5
**ours (1)**
100:16
**out (56)**
27:3;29:7;31:13;
35:4,9;37:11;38:5,6;
48:17;49:1;51:23;53:3,
24;58:1;61:9;68:12;
69:13;73:15;76:8;
87:18;89:2,7,21;90:5,
18;91:7,8;94:4;96:24;
102:19;104:18;113:3,
18;117:14;118:3;
121:17;128:5;133:15,
25;159:3,5;161:11;
164:21;169:18;172:12;
173:3;176:15;181:19;
188:20;195:2;201:6;
208:18;210:8,12;
214:19;218:19

**outlined (1)**
215:20
**outset (1)**
56:21,23;182:18
**outside (1)**
125:5
**over (24)**
10:1;13:13,25;30:25;
50:9;57:11;58:3,9,22;
70:16;71:11;77:15;
83:13;94:17;105:14;
112:12;120:15;157:22;
177:12;180:2;191:17;
199:16;213:7;216:6
**overall (2)**
133:11;196:10
**overlap (2)**
85:20,23
**owe (6)**
187:3;188:23;
195:15;205:13;206:17;
211:5
**owed (7)**
165:4;199:8;200:8;
210:24;211:15,15;
213:6
**own (2)**
145:19;178:13
**owner (2)**
136:16,22
**ownership (7)**
107:14,22;135:2,4,6,
11,24

## P

**page (53)**
18:3,10,11,12,14;
27:12,13,22;44:7,8,15,
22;45:1,2;48:24;58:8,
22;59:7,7;61:23;62:10;
76:14,16;77:6,6,24;
79:3;95:8,13,14;96:10;
102:3;120:4,4;139:17;
147:17,18,19;148:5;
165:17,22;166:18;
175:9,14,15,19,23;
178:12;216:3,4,25;
217:2,2
**pages (6)**
18:7;94:3;102:4;
146:24;147:7;175:11
**paid (69)**
28:15,15;68:6,13,17;
69:4;70:13;72:4;87:19;
88:1,24;89:13,14,15,
18,24;90:9,12,19;
92:14;99:7,8,8,9,12,17,
22;117:14,23,24;165:7,
7;166:3,4,8,15;167:4,
17,18,19;169:20,21;
170:14,17;172:14;
173:1,2,2,3;174:25;

178:7,8,13,15;179:4;
180:14,14;181:11,18;
188:13,14;192:5;
198:2;201:9,14;
202:23;203:15;218:11,
15
**Panel (1)**
58:17
**paper (4)**
118:21;148:3;
154:22;205:11
**paperwork (2)**
119:6;181:25
**paragraph (9)**
45:1,17;47:18;58:8;
61:24,25;62:2,11;
176:7
**paragraphs (1)**
59:1
**paralegal (5)**
18:20;22:23;24:2,3;
144:13
**paralegals (1)**
145:18
**paraphrase (1)**
200:18
**paraphrasing (1)**
16:20
**park (2)**
123:24;131:10
**part (39)**
9:1;30:8;55:15;74:9;
78:18;79:5;87:4;89:20,
20;90:8,9;91:21;92:25;
93:1;104:16,23;
107:21;115:8;117:19;
119:23;144:8;145:14;
147:5;158:24;170:24;
173:18;180:10,11,13;
181:6;187:13,16,18,18,
18,18;194:3,7;213:20
**partially (3)**
92:6;197:15;219:5
**participate (3)**
72:24;174:2;192:2
**participation (2)**
181:19;191:16
**particular (8)**
26:5;30:8,11;37:9;
41:8;117:5;173:21;
190:24
**parties (2)**
91:22;115:25
**partner (10)**
8:1;68:2;95:21;
132:2;135:10,17,20;
147:22;148:9,15
**partners (18)**
107:25;123:15,23;
124:6,17;126:3,23;
128:6,23;130:17,23;
132:3,10,24;134:5,21;
147:14;148:23

Case 2:25-cv-00014-RDP    Document 2    Filed 01/06/25    Page 87 of 105

IN RE: BLUE CROSS BLUE SHIELD                                          Video Deposition of Patrick W. Pendley
ANTITRUST LITIGATION, (MDL NO.: 2406)                                                      October 18, 2023

**partnership (1)**
107:14
**parts (2)**
180:7;187:15
**pass (1)**
17:17
**passed (1)**
24:1
**passing (1)**
19:5
**Pat (2)**
26:10;199:12
**patients (1)**
158:25
**Patrick (6)**
7:5;8:7;44:17;95:10;
105:8;216:14
**pay (47)**
12:4,5;13:2;64:12,
12;67:3,18,21,25;68:1,
9,16,19;69:1,3;87:24;
89:8,9,9;90:11;98:1;
118:3;176:22;179:12;
181:2,13,21;187:3;
188:23;196:13;198:10,
19,23;199:4;200:8;
203:5,12,22,23,25,25;
204:8,15;205:14;
206:17;210:23;213:5
**paying (16)**
65:19;88:18;99:2,4,
13;165:11;169:11;
177:6,9;178:2;179:4,
25;182:4,16;197:10;
199:1
**payment (4)**
96:7;144:7;181:5;
217:23
**payments (11)**
88:20;90:6;168:2;
177:11,19,21;180:17;
181:17;214:25;215:19;
218:1
**payors (1)**
181:20
**payout (4)**
170:1;193:8,18,24
**payouts (1)**
169:25
**PBC (19)**
8:19;25:15;26:5,11;
27:2;59:8;134:23;
144:10;164:22;176:3;
186:11;196:14;202:24;
217:24;218:2,3,7,8,15
**pending (10)**
14:23;108:20;
109:17;119:21;160:1,
2;220:1,2,14,16
**Pendley (28)**
7:5,19,20,23;8:3,7,
12,16;13:6;26:25;
44:17;62:15;63:2;64:7;

72:9;75:13;82:9,22;
95:10;105:8;125:6;
150:6;199:12;214:15;
215:19;216:14;217:11;
219:6
**people (19)**
10:23,25;15:6,21;
53:9;54:9;66:15;69:21;
72:17;88:1;132:8;
137:9,12,14;149:10;
174:25;202:23,25;
203:1
**percent (36)**
64:12;65:20;67:3,25;
68:1,20;69:2,8,25;
70:1;72:3,6;99:3,21,
23;100:3,8,9,10;
165:11;172:4,11;
176:23;178:3,7,8;
179:25;180:14,14;
187:11;197:10;198:10;
202:10,12,13;204:15
**percentage (8)**
68:10;69:10;94:16,
21;99:23;107:23;
135:18,21
**percentages (1)**
95:2
**Perez (1)**
135:9
**perfect (1)**
55:25
**perhaps (2)**
92:13;191:21
**person (4)**
67:2;140:19;157:7;
193:22
**personnel (1)**
10:13
**perspective (3)**
17:8;187:21;219:24
**pertinent (1)**
14:11
**petition (14)**
42:24;126:17,18,20;
128:7,21;129:8,21,23;
130:6,12;131:6;
132:18;174:18
**petitions (1)**
117:11
**phobia (1)**
158:3
**phone (9)**
23:1;122:8;138:12;
184:6;185:2;186:3,25;
194:4;205:23
**phrase (1)**
152:15
**physically (1)**
185:6
**pick (2)**
185:1;205:23
**picked (1)**

215:4
**picking (1)**
75:13
**picture (1)**
35:9
**place (6)**
40:16,17;54:25;
92:21,22;118:23
**places (1)**
53:4
**plaintiff (10)**
72:16;79:14,14,18;
86:16,17;116:7,9;
176:2;201:17
**plaintiffs (4)**
69:20;86:21,22;
202:20
**plaintiffs' (4)**
72:15;147:2;165:19;
216:9
**plan (1)**
220:17
**plane (3)**
209:24;210:9,17
**Plaquemine (1)**
98:23
**play (3)**
51:9;113:2;193:15
**played (1)**
161:11
**players (1)**
40:6
**playing (1)**
56:6
**pleading (7)**
45:6,6;47:14;48:25;
49:19;51:15;108:5
**pleadings (1)**
120:5
**please (5)**
7:16;8:4,5;214:19;
218:20
**pleased (4)**
188:18;189:3,11,25
**PLLC (4)**
156:5,10,18;157:15
**PLLC's (1)**
156:11
**plural (1)**
102:6
**plus (3)**
40:10;57:5;69:21
**pm (3)**
113:21;150:1;214:6
**pocket (2)**
195:13;201:13
**point (25)**
9:10;10:19;28:14;
34:20,20;60:1;64:22;
100:7;106:10;128:4;
134:4,8;135:16;
137:20,21;138:11;
140:5;153:8;159:23;

162:6;171:15;186:10;
194:4;199:10;209:16
**pointed (1)**
102:19
**pool (1)**
148:24
**poorly (1)**
21:10
**portion (2)**
62:22;181:24
**position (48)**
42:24;43:15;46:12,
23;53:10;54:18;55:22;
56:13;57:3;58:1;60:23;
61:9,9;63:11,12;119:3,
7;128:22;129:1,17,18;
135:2,7;159:8,13,18;
162:16;163:5,19;
169:11;171:7;172:15,
18;174:20,25;175:1;
176:14;180:1,3;
181:23;182:4,24,25;
185:5;193:17;202:3,
17;203:5
**positions (3)**
49:9;56:9;176:16
**possibility (2)**
47:22;51:20
**possible (3)**
33:20;113:6;151:8
**post (1)**
182:17
**potential (9)**
21:4;24:24;30:6,20;
39:15;40:23;42:1;
58:25;121:4
**potentially (4)**
21:8,15;65:19;
159:22
**poured (2)**
38:4,6
**power (1)**
56:9
**practical (4)**
53:17;55:9;137:4;
184:16
**practice (2)**
25:9,10
**practicing (3)**
8:23;24:15,16
**precipitated (1)**
127:9
**predate (1)**
180:4
**preferred (1)**
210:19
**prejudice (5)**
119:1,13;120:25;
159:12;163:8
**preliminarily (1)**
132:5
**pre-MDL (5)**
28:13;63:12;92:11,

14;176:9
**preparation (2)**
129:3,4
**prepare (1)**
139:23
**present (7)**
14:12,18;15:10;16:4,
15;32:15;95:17
**presided (1)**
10:1
**presumably (2)**
135:19;171:13
**pretty (5)**
63:20;108:11;122:8;
123:12;189:13
**Previously (1)**
101:18;165:7
**Primera (10)**
82:3;84:9,10,11,11,
12,16,17,20;85:11
**principle (1)**
118:3
**print (2)**
22:16;27:3
**printed (1)**
112:12
**prior (17)**
64:23;75:17;101:8;
106:3;124:17;126:13;
128:7;130:16,21;
133:9;136:15;137:16;
142:24;176:11;183:3;
195:24;216:6
**privilege (5)**
128:18,25;154:21,
25;155:3,5
**privileged (1)**
125:2,22,22;129:9
**pro (1)**
69:25
**probable (1)**
35:5;153:15,16
**Probably (17)**
9:2;10:11;11:23;
12:7,18;40:2;83:18;
98:11;122:7,8;131:20;
140:17;142:16;149:19;
179:1;186:11;212:6
**problem (9)**
9:17;60:16;82:20;
84:14;106:16;133:20;
175:12;213:18;219:3
**problematic (2)**
188:1,3
**Procedure (3)**
7:8;35:22;158:15
**proceed (1)**
83:10;121:18
**proceeding (16)**
10:16;24:25;42:19;
46:19;47:24;49:12;
58:20;59:4;64:8;80:10;
92:10;93:24;120:15,

24;129:4;159:17
**proceedings (1)**
  51:18
**process (1)**
  103:22
**Proctor (13)**
  9:25;11:20;28:11;
  69:17;72:13;88:15;
  91:25;92:2,12;108:21;
  142:23;145:10;170:8
**Proctor's (1)**
  170:7
**produce (2)**
  49:24;154:9
**produced (9)**
  18:8;49:25;50:24;
  151:4;153:25;154:9,
  12,12,22
**production (2)**
  150:25;151:15
**profusely (1)**
  189:14
**prompted (1)**
  87:17
**properly (3)**
  145:22;149:5;171:9
**proportional (1)**
  179:18
**prosecuted (3)**
  42:17;46:17;49:10
**protocol (1)**
  137:8
**protocols (3)**
  146:4;147:2,15
**provide (1)**
  215:18
**provided (3)**
  21:3;22:5;26:17
**providing (1)**
  20:17
**PSC (1)**
  202:25
**public (1)**
  133:13
**published (1)**
  22:8
**pull (2)**
  214:19;218:19
**pulled (1)**
  115:23
**purported (2)**
  74:18;176:23
**purpose (4)**
  98:2;149:16;219:9,
  11
**purposes (2)**
  54:22;129:3
**pursuant (4)**
  7:8;181:12;182:6;
  203:11
**pursue (2)**
  36:20;159:12
**pursuing (3)**

17:5;23:2,2
**put (37)**
  32:15;48:8,14;54:16,
  25;69:22,25,25;70:17;
  76:19;88:14;100:17;
  128:19;129:14;133:23,
  24,25;158:12;164:22;
  172:8,10,10,14;174:12,
  15;184:10;186:10,11,
  13;192:18;201:12,20;
  202:7,10,12,13;206:11
**puts (2)**
  55:22;57:25

**Q**

**quibble (1)**
  208:5
**quick (1)**
  113:17
**quickly (5)**
  63:21;112:16;122:9;
  123:12;146:9
**quit (2)**
  177:6,8
**Quite (2)**
  100:21;139:13
**quote (12)**
  22:17;29:24;45:17;
  46:8;47:17;62:13;
  94:21;109:15;112:11,
  11;147:24;170:25

**R**

**raise (8)**
  8:4;65:18;67:23;
  70:7,11,20,23,24
**raised (1)**
  134:21
**range (2)**
  191:21,21
**rata (1)**
  69:25
**rather (2)**
  62:13,25
**ratio (2)**
  88:14;95:2
**Ray (4)**
  79:15;86:18,22;87:2
**re (2)**
  108:13,14
**reached (3)**
  29:18;32:24;105:4
**read (9)**
  43:12;47:17;62:8,9;
  83:5;106:20;108:22;
  110:6;217:21
**readily (1)**
  161:2
**reading (1)**
  148:1
**ready (2)**

106:5;150:7
**real (4)**
  40:3;113:17;159:4;
  200:10
**reality (2)**
  53:18;152:2
**realize (2)**
  88:6;180:17
**realized (1)**
  146:10
**reallocate (1)**
  204:1
**really (15)**
  15:6,18;93:6;98:6;
  127:13;131:16;137:5;
  157:12;160:16;183:8;
  188:19;189:8;196:22;
  197:11;212:2
**reason (16)**
  11:20;13:1;19:11;
  38:3;39:12;81:6;97:22;
  119:19,22;142:4;
  149:4;155:5;157:22;
  191:9,13;210:23
**reasons (5)**
  11:21;39:3;53:1;
  56:20;149:8
**recall (39)**
  10:4,10;11:3,19,24;
  13:23;15:18;16:17;
  19:8,25;24:21;28:23;
  32:12,21;33:21;35:12,
  20;39:12;42:8,21;
  48:16;49:2,16;63:15;
  65:9,17;104:14;
  105:18,22;117:9,10;
  124:22;134:19;146:2;
  156:7;185:22;205:4;
  216:12,16
**receipt (2)**
  97:17;123:12
**receive (1)**
  134:23;215:22
**recently (6)**
  47:14;51:7;100:20;
  107:24;135:4;213:24
**Recess (4)**
  75:9;113:21;150:1;
  214:6
**recognize (25)**
  18:4,16;25:25;44:5;
  58:25;80:7;93:16,18,
  20;97:10;102:2,5,5,7;
  104:6,8;105:1,8,14,16;
  139:11;164:16,18;
  171:15;207:16
**recognized (4)**
  109:5;110:5;113:8;
  146:9
**recollection (19)**
  40:3,18;65:6;92:8;
  106:21;108:2;112:17;
  115:6,23;124:10;

126:6;127:1;130:19;
  131:12;178:6,9;
  188:14;191:23;192:13
**recommendation (2)**
  90:5;134:6
**recommended (3)**
  173:2,10,11
**recommends (1)**
  171:14
**record (13)**
  18:5;25:20;75:8,11;
  113:20,23;128:20;
  129:15;149:23,25;
  150:3;214:5,8
**recorded (3)**
  26:10;168:21;169:2
**records (1)**
  178:13
**recover (2)**
  169:14;197:16
**recovered (1)**
  194:10
**recovering (1)**
  197:12
**recovery (9)**
  16:6;71:16;88:11,13;
  158:20;159:1;161:9;
  184:11;185:11
**reduce (1)**
  201:13
**reduction (1)**
  135:10
**REEXAMINATION (1)**
  220:11
**refer (5)**
  8:20;16:11;61:14;
  110:19;111:19
**reference (18)**
  20:23,24;22:9;58:21,
  24;65:14;77:24;97:15;
  100:4;108:7,18;
  111:16;141:6;142:14;
  152:5,24;207:10,13
**referenced (6)**
  50:20;110:7;130:25;
  150:19;168:1;194:6
**references (4)**
  22:1;45:13,25;
  112:23
**referencing (1)**
  205:15
**referred (3)**
  110:22;111:9,15
**referring (4)**
  19:24;48:24;161:5;
  186:6
**refiled (1)**
  163:9
**refiling (1)**
  119:15
**reflect (1)**
  102:15
**reflected (2)**

103:1;197:24
**reflecting (2)**
  98:24;165:10
**reflects (1)**
  166:6
**refresh (1)**
  12:12
**refund (1)**
  69:20
**refunded (1)**
  100:23
**regard (5)**
  7:12;128:17;176:10;
  209:13;215:24
**regarding (6)**
  140:9;141:12,20,24;
  143:20;146:4
**regardless (6)**
  35:6;37:3;49:9;
  78:24;115:1;130:25
**rehash (1)**
  183:10
**reimburse (2)**
  88:23;167:18
**reimbursed (4)**
  89:15;166:21;
  169:13;181:10
**reimbursement (1)**
  170:6
**reiterate (1)**
  108:9
**rejected (1)**
  210:23
**relate (4)**
  28:1;93:5;142:20;
  143:13
**related (18)**
  11:4;18:8;20:1;21:4,
  7,14;23:8;28:7,20,25;
  88:17;106:25;140:2;
  145:3;152:25;153:12;
  159:23;214:18
**relates (6)**
  38:11;54:15;88:20;
  114:17;149:13;176:21
**relating (1)**
  92:3
**relation (6)**
  9:24;27:7;44:11;
  143:21;145:13;152:6
**relationship (1)**
  189:23;209:9
**relative (6)**
  9:21;10:2;23:22;
  31:2;77:8;142:5
**relevant (5)**
  11:1;14:17;22:12;
  38:19;151:16
**rely (1)**
  145:17
**remember (44)**
  12:10,14,18;16:1,21;
  21:1;24:11;32:1;33:3;

Case 2:25-cv-00014-RDP    Document 2    Filed 01/06/25    Page 89 of 105

IN RE: BLUE CROSS BLUE SHIELD                                    Video Deposition of Patrick W. Pendley
ANTITRUST LITIGATION, (MDL NO.: 2406)                                              October 18, 2023

34:6,9;35:20;37:17;
  39:11;41:24;63:25;
  64:10;76:3;91:12;
  92:12;98:10;100:17;
  103:14;112:10;126:4,
  11;127:14;131:8,19;
  132:21;133:7;139:15;
  147:8;156:20;185:3;
  187:14;190:4,23,24;
  192:15;200:11,11,12;
  205:4
remove (2)
  116:19;158:12
removed (5)
  39:1;103:15;138:13;
  163:6;184:9
rephrase (1)
  9:12
replicate (1)
  20:7
replied (1)
  11:24
report (2)
  148:22;168:15
reported (3)
  168:9,17,21
reporter (4)
  7:15;8:5;212:16;
  215:8
reports (2)
  171:22;199:15
represent (5)
  7:20;34:10;150:21;
  154:25;205:18
representation (1)
  19:11
represented (1)
  43:14
request (7)
  51:2;68:8;155:8,10;
  164:21;177:4;214:23
requesting (6)
  66:15;140:8;141:11;
  143:19;150:17,23
required (1)
  12:5
requires (1)
  125:21
resolution (1)
  117:15
resolve (1)
  118:13
resolved (4)
  118:20;171:8,10;
  188:8
respect (7)
  31:25;70:13;72:14;
  94:24;137:5
respective (2)
  26:17;109:9
respond (2)
  13:1;29:4
responded (1)

29:4
responds (1)
  209:4
response (4)
  97:14;125:20;194:7;
  215:17
restart (1)
  159:22
restate (1)
  167:12
result (8)
  35:6;106:19;192:3,
  22;207:17,18,23;208:1
resulted (1)
  193:5
results (1)
  200:21
resurrect (1)
  159:11
resurrecting (1)
  119:15
resurrection (2)
  192:23;207:25
rethought (1)
  183:15
retire (2)
  138:18,18
retrospect (1)
  113:15
return (3)
  70:15,15,16
review (1)
  108:12
reviewed (2)
  44:19;147:10
reviewing (1)
  145:21
revisit (1)
  87:11
ride (1)
  210:19
Ridge (1)
  7:3
right (333)
  8:4,22;9:6,22;11:1;
  14:12,18,20;15:15;
  18:23;20:2,8,12;22:2;
  24:4,6;26:20;27:9;
  30:1,18,19,23,24;31:3,
  4;35:16;36:12,14,21;
  37:4,7,13;38:8;40:14;
  41:1,4,10;42:14,25;
  43:4,6,15,18;44:8,12,
  15,20;45:6,8,11,23;
  46:6,23;47:5,9,18;
  48:3;49:4,12;51:11,19,
  22;52:3,10;53:11,19;
  54:1,6;55:2;57:9,13,
  18;58:1,3;59:4,11,21,
  25;60:4;61:3,8,12;
  62:20;63:5,23;64:1,3,4,
  17,20;66:17,23,24;
  68:10,13,14,17,18,20;

69:4,13;71:4,6,16,22;
  72:25;73:8,24;74:3,10;
  75:19,20;77:9;78:1,8,
  16,21;79:6,9,16,19;
  80:22;81:3;83:21,22,
  24;84:6,13,18,21;85:3;
  86:15,18,23;87:9,15,
  17;88:2;90:17;92:22;
  93:3;94:11,18;95:1,11,
  21;96:9,13;99:5;100:1,
  11;102:12;103:3,12,
  13;105:20;108:8,12;
  109:6,13,18;110:3,9;
  112:21,22;113:4,9,14;
  114:9;115:16,20;
  118:23;119:11;120:7,
  13,19;121:12;122:15,
  21;123:12,17;124:3,4,
  13,14;125:16;130:10;
  131:4,16,25;132:3,11,
  19;133:12;134:6;
  135:4,5;136:16,17,19,
  22;137:11;140:25;
  141:3,12;142:6,17;
  143:2,9,14,21;144:2;
  145:5,9,14,22;146:6,
  12;147:11,15,20;148:2,
  11,13;149:2,6,7,14;
  150:10;151:12,17;
  153:2;155:10;156:1,
  11,18;157:25;158:5,13,
  21;159:10;160:6,21;
  161:11;162:1,19,20;
  163:25;164:1,6,25;
  165:9,14;166:4,22;
  167:20;168:18;169:16,
  17,23;170:2;172:5;
  176:18;177:14,23;
  178:16,24;179:5,12;
  181:13,21;182:17,21;
  183:20;184:11,18;
  185:6,15;188:11,20,24;
  189:16;190:10,13,16;
  191:4,11;192:3,7;
  193:5,9;195:5,20;
  196:2,18;197:12;
  198:12,13,15,20;201:1,
  6,24;203:12;205:16;
  206:9,19,24;207:6,23;
  208:1,11,19;209:10,13;
  211:1,4,14,23;213:3,8,
  10,13,23;216:7;217:5,
  11,12;218:17,21;220:7,
  19,25
rightfully (1)
  192:10
risk (1)
  201:13
risks (1)
  73:6
River (1)
  7:3
road (3)

28:17;158:20;184:11
Rockforte (1)
  24:9
role (1)
  125:3
room (3)
  37:11;72:20;210:3
rotely (1)
  144:21
rough (1)
  40:22
roughly (2)
  192:14;196:5
routinely (1)
  27:3
Rules (1)
  7:8
ruminate (1)
  112:6
ruminated (1)
  113:11
run (6)
  40:25;41:3;56:1;
  162:13;174:24;179:17

## S

safe (1)
  85:16
same (31)
  8:1;14:22;40:6,22;
  41:25;67:21;69:10,16;
  81:2,3,13,14,17;84:2;
  95:25;99:22;100:7,15;
  113:1;121:10,16,18,25;
  123:19;137:12;153:17;
  161:25;174:15;183:4;
  193:8;206:11
sand (1)
  129:21
sandwich (1)
  183:23
Sarasota (4)
  208:9,12,14,15
sat (2)
  37:10;104:21
satisfy (1)
  146:23
saw (3)
  187:25;205:6,20
saying (17)
  10:15;34:10;45:12;
  55:23;73:17;98:3;
  135:18;150:16;162:17;
  163:10;171:3;189:1,
  24;197:20;199:15;
  204:22;205:3
schedule (2)
  160:4;184:17
school (2)
  23:25;33:5
Scott (2)
  21:20;22:1

scratch (1)
  103:8
second (30)
  60:14;61:24;62:12;
  82:1,20,22;83:2,5;84:9,
  15,16,25;89:21;94:2;
  95:13;103:5,6;110:7;
  117:19;165:17;173:18;
  178:8,12;180:20;
  181:3;193:1;199:9;
  215:1;216:2,4
section (2)
  175:23;217:18
seeing (1)
  91:13
seeking (1)
  126:21
seem (1)
  72:2
seemed (2)
  40:4;127:10
Seems (4)
  83:10;90:15,17,18
semi-retire (2)
  138:18,20
send (15)
  50:9;99:14,14;
  106:16,17;152:19;
  155:8;197:19,21;
  205:9;206:3,4;210:9;
  214:24;215:14
sending (2)
  87:18;145:19
sends (1)
  19:3
senior (1)
  58:12
sense (1)
  152:23
sent (40)
  19:13;20:19;21:14;
  67:20;89:17,22,24;
  90:10,11,20;97:20;
  98:6,10,12,13;100:17;
  105:2;106:23;112:9,
  13;133:25;145:21;
  167:25;177:14,22;
  181:19;185:13,14;
  198:18;211:6,12,16,18;
  215:18;217:24;218:2,
  2,3,6,8
sentence (3)
  47:18;61:24;62:13
separate (9)
  39:6;41:18;66:21;
  73:11;100:16;167:24;
  180:10,13;198:11
separately (4)
  42:17;46:17;49:10;
  95:24
September (2)
  207:3;209:5
series (2)

IN RE: BLUE CROSS BLUE SHIELD
ANTITRUST LITIGATION, (MDL NO.: 2406)

Video Deposition of Patrick W. Pendley
October 18, 2023

114:17;115:9
**session (2)**
　30:17;46:4
**set (4)**
　49:20;107:13;
　176:15;177:1
**setting (2)**
　92:17;183:1
**settle (3)**
　132:16;163:4;185:18
**settled (8)**
　131:11,15;132:5;
　133:1;160:3;186:18,
　20;213:24
**settlement (11)**
　118:5,8;127:11;
　132:3;133:11,16;
　134:23;160:4,9;193:5,
　15
**settling (3)**
　131:23;132:15;133:3
**seven (9)**
　64:2;80:12;81:10;
　82:13;93:7,15;97:2,3,5
**several (12)**
　11:9;58:9,22;59:11;
　61:21;75:17;78:1;
　108:7;109:21;133:17,
　18,19
**shall (2)**
　147:22;148:8
**shape (1)**
　187:25
**share (39)**
　32:24;33:24;35:10;
　36:19;42:2;48:7,9,14,
　23;49:3;56:22,23;57:1;
　59:13;61:1;62:14;63:1,
　17;64:6;65:14;67:2,6,
　13;71:3;73:6,7,8;76:5;
　109:10;121:12,20;
　122:11,19;163:16;
　183:5;187:11;194:22;
　195:4;219:14
**shared (1)**
　63:14
**sharing (13)**
　30:9;31:6;32:16,17;
　33:16;40:8,11;41:9;
　48:16;69:11;122:5;
　156:16;159:8
**Sheet (2)**
　139:19;150:11
**sheets (4)**
　25:3,6,12,15
**Shield (49)**
　7:13;9:22;14:15;
　15:14;16:6,25;17:3;
　26:6;29:14;39:5,17;
　51:17;52:2;53:6;60:8;
　72:22;81:24;82:3,17;
　84:6,7,12,17,24;85:3,6,
　9,13;86:5;93:24;

106:13;108:14,19;
　109:12,16;110:9,20,23;
　111:11;114:20;118:10;
　139:19;140:23;144:6,
　19;165:13,19;216:9;
　219:17
**shook (1)**
　49:1
**short (7)**
　12:9;97:24;108:6;
　110:8;117:18;149:21;
　159:4
**shortly (5)**
　35:2;40:19;96:24;
　184:8;195:13
**show (3)**
　64:16;175:5,5
**showed (1)**
　199:7
**shows (3)**
　96:12;140:4;166:19
**shrewd (2)**
　160:20,25
**sic (1)**
　104:6
**sick (1)**
　197:11
**side (2)**
　86:16;170:2
**sided (1)**
　27:16
**sign (8)**
　105:11,12;106:17;
　107:9,16;123:16;
　135:1;148:22
**signature (5)**
　44:14;105:7,9,13,16
**signatures (1)**
　105:6
**signed (38)**
　43:10,11;45:15;
　47:14;106:22;111:24;
　112:1,5,8,13;114:4;
　123:11,16,24;124:3,5,
　12;126:2;127:4;131:5;
　140:9;141:11,15,20;
　142:7,15;143:19;
　144:14;150:17;152:15,
　16;156:3,4,16,17;
　192:11;218:25;219:7
**significant (3)**
　158:25;192:21;194:6
**signing (4)**
　43:18;112:7;123:11;
　219:9
**similar (3)**
　29:13;156:23;182:4
**similarly (2)**
　107:7;197:5
**simpatico (1)**
　57:17
**simply (1)**
　186:14

**sincere (1)**
　209:13
**single (2)**
　114:25;115:18
**singled (1)**
　31:13
**sit (8)**
　15:18;71:8;103:16;
　115:14;119:5;120:22;
　189:13;191:9
**sitting (9)**
　36:16;40:7;72:11,20;
　73:2;121:2;142:12;
　149:10;195:12
**situation (2)**
　90:15;170:12
**situations (1)**
　73:11
**six (19)**
　44:23;48:24;58:8,22;
　59:7;75:20,22;77:24;
　81:10;89:18;93:8,9,11,
　17,18;120:4;166:16;
　217:9;218:7
**skim (2)**
　25:25;61:22
**slash (2)**
　144:9;176:3
**slip (1)**
　98:23
**slips (1)**
　191:24
**slow (1)**
　13:8
**smaller (1)**
　68:9
**so-called (1)**
　182:6
**SoClean (1)**
　212:10
**solely (1)**
　117:3
**somebody (6)**
　11:7;24:17;50:8;
　53:22;140:6,13
**somehow (2)**
　182:24;183:3
**someone (8)**
　9:5;21:19;22:20;
　32:25;54:11;145:20;
　150:16;194:23
**Sometime (12)**
　10:5;35:8;40:19;
　51:7;96:21;100:24;
　104:24;130:9;131:13;
　159:10;185:8;196:1
**sometimes (8)**
　13:7;36:3;57:13,16;
　198:16,16;204:10,11
**Somewhat (3)**
　38:9;85:23;158:17
**somewhere (2)**
　26:11;50:1;106:2;

134:8;150:20;181:6;
　191:20;192:12
**sorry (22)**
　15:3;23:17;28:9;
　31:22;33:14;47:11;
　62:22;68:22;82:6;83:1;
　93:18;111:2;130:1;
　140:7;144:16;146:5;
　151:1;178:25;187:1;
　194:13;203:7;219:2
**sort (6)**
　14:11;54:4;106:25;
　138:13;154:7;205:12
**sought (1)**
　99:18
**sound (4)**
　10:7;24:4;80:17,18
**Sounds (4)**
　24:6;64:4;128:5;
　195:19
**Southern (2)**
　7:11;103:10
**speak (2)**
　123:15;129:6
**speaking (4)**
　23:1;38:6;124:22;
　156:21
**speaks (1)**
　118:6
**Special (43)**
　11:10,17,18;27:7;
　44:11;64:17;66:4;
　73:17;87:18;90:7;91:8;
　93:6;96:5;99:4;102:22;
　168:13,16,20;169:25;
　170:16;171:14;173:12,
　13,19,24;174:1;
　176:25;177:5,21;
　178:15;179:10,17,17;
　180:4;181:12,18;
　198:7,18,22;201:9;
　203:11,20,23
**specialist (2)**
　20:12;54:14
**specific (10)**
　12:8;53:16;66:4;
　91:4,25;111:13,15;
　131:9;132:21;141:6
**specifically (4)**
　40:12;49:16;76:4;
　121:5
**speculative (1)**
　219:23
**spend (2)**
　191:3;208:9
**spent (4)**
　92:3;190:18,25;
　202:19
**split (10)**
　29:22;32:3,8;34:21;
　47:8;72:24;99:23;
　112:24;174:6,21
**spoken (2)**

184:25;220:22
**sporadically (1)**
　132:15
**spring (1)**
　10:5
**staff (3)**
　10:12;26:5;171:21
**stage (7)**
　45:18,21,24,25;
　46:1,8
**stages (1)**
　105:4
**stamp (1)**
　80:16
**Stan (4)**
　7:22;11:7;127:16;
　137:15
**stand (2)**
　44:19;180:9
**standard (1)**
　148:12
**standpoint (8)**
　120:22;122:4;137:4,
　7,8;138:6;157:3;
　172:16
**start (8)**
　13:18;57:22;63:11;
　83:9;124:11;145:8,19;
　182:11
**started (5)**
　14:17;150:8;180:20,
　22;190:15
**Starting (2)**
　62:3;124:2
**Starts (1)**
　45:3
**State (120)**
　15:3,3,15;16:7;
　29:22,25;30:4,4,4,14,
　14,14;31:10,14,17;
　32:2,2,8;34:22;35:21,
　23;36:1,3,4,11,20;38:4,
　12,20,21;39:2,4,9,10,
　20,25;40:9,12,20,25;
　41:4,11,21;42:14;
　46:11;47:21;52:12,12,
　17,18,22,23;54:23;
　59:2,9;60:10;66:11;
　74:6,13,20;77:23;
　101:6,7;102:9,16;
　103:15;108:22,24;
　109:11;112:23,25;
　113:2,3;114:13,16,19,
　21;115:10,20;116:21,
　22;117:4,5,12;119:10;
　120:5,24;121:8,22;
　125:1;142:2;144:19;
　161:16,16,17;176:10;
　183:9;186:4;188:13,
　15,19;189:4,16,24;
　191:10,16,25;192:3,12,
　22;193:2;194:8;
　200:14,15,17;207:6,13,

Case 2:25-cv-00014-RDP    Document 2    Filed 01/06/25    Page 91 of 105

IN RE: BLUE CROSS BLUE SHIELD                                           Video Deposition of Patrick W. Pendley
ANTITRUST LITIGATION, (MDL NO.: 2406)                                   October 18, 2023

22;209:2;219:15
**state-by-state (1)**
52:16
**stated (3)**
106:20;138:10;159:7
**statement (2)**
62:25;208:20
**statements (1)**
197:24
**States (24)**
7:10;17:5;29:13,14;
35:16,25;39:17;42:13,
18;46:10,18;49:11;
52:10,19;59:10,19;
66:9;77:19;108:23;
109:21;115:3;124:24;
159:12;220:17
**stating (1)**
60:23
**status (2)**
51:9;72:12
**stay (1)**
87:23
**stayed (2)**
100:18;116:21
**Steen (1)**
133:21
**Steve (1)**
103:16
**Still (9)**
93:9;95:20;136:25;
160:1;170:9,12;185:9;
200:21,24
**stood (1)**
195:4
**stop (1)**
158:5
**strange (1)**
40:4
**strategic (1)**
53:17
**strategizing (1)**
182:20
**strategy (4)**
30:17;46:4;53:2;
121:18
**strength (1)**
55:20
**strike (15)**
39:24;48:13;53:1;
60:21;63:21;65:16;
67:7;85:17;87:1;88:19;
171:9;182:24;185:13;
197:5,8
**strong (1)**
38:22
**structure (1)**
161:8
**stuck (1)**
156:13
**subgroups (1)**
54:9
**subject (6)**

9:19;13:20;154:1,6,
14;170:7
**submission (7)**
75:16;77:1,25;
120:13;146:5;147:24;
148:10
**submissions (5)**
146:6;147:3,22;
148:8,20
**submit (10)**
28:6,13,16,19;91:23;
139:24;142:24;143:25;
144:5;145:2
**submitted (10)**
26:18;27:7;44:10;
51:8;92:4,24;140:4;
149:6;150:14;173:10
**submitting (5)**
92:25;142:18;
143:12;145:9;146:5
**subscriber (3)**
95:8;165:20;216:9
**subsequent (6)**
23:5;69:12;76:7;
182:2;185:12;194:5
**Subsequently (1)**
210:15
**substance (2)**
162:9;187:20
**substantially (1)**
153:12
**subsumed (1)**
120:23
**successful (3)**
69:20;72:16;88:11
**sue (1)**
53:7
**suffice (1)**
16:3
**suggest (1)**
32:17
**suggested (1)**
169:25
**suggesting (3)**
69:9;87:19,21
**suggestion (1)**
93:5
**suing (1)**
34:13
**suit (7)**
21:15;34:7;77:7;
79:14;80:13,25;85:19
**suits (2)**
52:1;66:11
**sum (2)**
162:8;187:20
**supersede (1)**
176:17
**superseded (1)**
176:8
**support (1)**
172:5
**supposed (3)**

99:12;172:3;203:25
**sure (44)**
14:13;16:12;26:13,
15;29:8;30:12;34:16;
38:15;51:4;53:13;
61:16;75:3,6,15;77:16;
81:22;84:2;89:5;
101:15;102:2;113:10;
115:12;125:20;132:4;
133:21;145:4;147:13;
148:8;149:5;150:12;
151:25;155:16;163:11;
170:11;184:24;188:21;
189:18,21;193:23;
199:18;209:11,11;
214:3,17
**surgery (5)**
106:6;184:23;185:1,
7;206:15
**surprised (3)**
33:3,9,10
**survived (1)**
158:20
**Susan (1)**
7:15
**swear (1)**
8:5
**sweat (1)**
201:21
**sworn (1)**
8:8
**system (3)**
151:11,13,16

## T

**Tabbatha (1)**
21:20
**table (1)**
106:14
**talk (18)**
13:13;29:10;50:19,
25;61:13;87:9;91:15;
101:8;110:15;126:8;
127:16,20;129:7;
133:14;157:20;195:14;
209:9;212:4
**talked (30)**
24:23;30:20;34:19;
42:1;45:8;65:19;77:25;
87:11;89:8;96:21;
113:13;114:8;121:5;
126:10,12;127:23;
132:2;146:2,8;161:7,
20,21;163:20,23,25;
184:20,22,24;200:7;
210:6
**talking (29)**
14:16;29:11;30:6,13,
16;34:4;41:11;44:12;
59:1;61:15;62:18;63:3;
67:11;73:19;74:17;
111:12,14;127:9;

154:6;156:3;158:2;
165:21;166:14;175:9;
182:13;196:1;203:13;
204:17;212:24
**Talks (1)**
175:25
**tallied (2)**
164:24;165:1
**task (1)**
71:15
**tasked (2)**
145:20;148:16
**tears (1)**
201:22
**technical (1)**
137:7
**telephone (3)**
16:16;65:4;106:20
**telling (11)**
47:2;51:9;96:20;
105:1;138:3;179:11;
189:3,9;194:5;203:12;
215:2
**ten (8)**
14:20;68:11,12,13;
114:2;156:13;218:21,
21
**tend (1)**
191:3
**Tennessee (7)**
7:4,6;15:5,21,25;
212:8;213:21
**tenor (1)**
98:12
**tens (1)**
133:19
**tentative (1)**
160:4
**term (8)**
87:20;114:16;
128:13;153:10,13;
154:5;169:16;204:13
**terms (8)**
45:4;66:7;105:3;
125:8,11;171:6;177:1;
190:6
**Terrace (1)**
7:3
**testified (1)**
218:13
**testify (2)**
50:16;171:20
**testimony (13)**
129:2,14,17;134:15,
18,19;156:23;172:1;
183:12,15;196:5;
210:21;218:19
**Texas (1)**
59:24
**thanked (1)**
189:14
**thanks (1)**
194:11

thereafter (4)
35:3,8;96:20;180:16
**therefore (2)**
135:17;177:2
**thinking (10)**
72:2,5;152:13,16;
157:21;162:2;191:20;
208:8;210:22;211:22
**third (10)**
33:16,17,17;45:17;
95:10;122:21,21,21;
204:18;205:8
**Thomas (2)**
7:24;8:13
**though (6)**
28:18;31:11;95:25;
104:15;151:12;200:20
**thought (16)**
31:1;87:25;113:13;
114:24;152:23;153:19;
157:13,25;160:15,17;
162:3;171:21;180:1,2;
183:19;213:15
**thoughts (1)**
183:20
**thousand (7)**
68:11,12;166:16;
216:23;217:8,9;218:7
**thousands (2)**
174:13;201:15
**three (35)**
41:15;43:21,23;44:2;
55:1,6,21,24;56:10,12;
57:3,5,25;60:20,22;
61:19;77:25;81:20,21;
85:8;107:23,25;123:2,
4,7;148:25;149:1;
163:12;175:7,8,13;
180:2,7;187:14,18
**throughout (1)**
17:4
**thrown (1)**
47:23
**tie (1)**
101:3
**tier (2)**
203:2,2
**Tim (1)**
116:12
**timekeepers (1)**
26:7
**timekeeping (1)**
26:4
**times (9)**
61:21;78:1;108:7;
126:9,25;127:2;157:3,
11;174:19
**timewise (2)**
177:8;195:23
**timing (6)**
75:1;101:4,13;107:1;
123:10;184:7
**today (15)**

7:4,14;8:14;14:16,
17;15:15;42:25;54:23;
78:1;95:18;96:19;
120:22;129:5,8;184:1

**together (7)**
13:22;33:8;40:8;
55:22,25;74:7;186:25

**told (27)**
12:2;46:22;47:13;
51:14;72:21;99:3;
114:24;132:4;138:17;
139:1;146:10;162:16,
18;163:24;165:3;
174:5;185:17;186:22,
24;187:1;189:8;
193:20;196:6,12,16,21;
211:21

**Tom (3)**
8:13;13:10;26:8

**ton (2)**
201:23;202:2

**took (4)**
175:1;176:14;
193:17;197:16

**top (11)**
22:14;27:22;45:1;
78:4;117:6;139:18;
147:21;148:5;203:2,2;
216:8

**topic (4)**
35:13;67:6;87:11;
153:17

**topics (1)**
28:24

**total (4)**
94:24;99:16;166:17,
19

**totally (4)**
100:15;129:10,15;
199:10

**tough (1)**
57:16

**towards (3)**
165:12;175:22;
191:21

**track (2)**
199:3,5

**traditional (1)**
151:9

**Transfer (8)**
58:10,11,18,23;64:1;
75:18;78:7;176:11

**transferred (2)**
63:22;87:4

**transplant (5)**
106:6;158:11,21,25;
197:17

**travel (3)**
23:6,10;66:8

**traveling (1)**
66:9

**treat (1)**
57:14

**treated (1)**
68:2

**trial (2)**
146:5;207:14

**tried (2)**
212:6,7

**trip (1)**
66:22

**Trish (1)**
116:11

**trouble (2)**
145:8;215:9

**true (25)**
12:2,25;33:13,14;
41:17;42:10;52:15;
74:13,16;81:22;82:1;
88:18,19;92:2,6;
117:13;138:2;165:3;
166:25;168:7;184:6;
185:12;190:22;193:14;
208:20

**trust (4)**
54:16;98:23;100:18,
19

**try (11)**
9:12;25:4;49:9;
53:25;54:10,16;74:7;
138:18;143:5;155:6;
197:9

**trying (21)**
13:23;26:14;39:11;
49:8,20;53:9;54:6,25;
68:5;83:13;85:4;89:1;
91:5;100:16;130:3;
154:4;156:7;194:21;
201:22,24;209:19

**Tuesday (1)**
19:2

**turn (2)**
103:23;216:2

**turns (5)**
51:23;90:18;169:18;
172:12;173:3

**Twenty (1)**
131:12

**Twenty-three (2)**
175:16,17

**Twenty-two (2)**
76:18;205:9

**two (35)**
15:10,13,16,17;16:3;
22:8;25:15,17,22;27:5,
22;39:3;55:19;59:1;
66:2;69:16;73:11;82:6;
83:23,25;84:20;85:8;
90:2;135:17;137:24;
155:3;163:12;178:21;
179:7,13;180:15,18;
187:18;190:14;202:24

**two- (1)**
214:1

**type (4)**
13:24;32:18;140:18,

21

**typed (1)**
166:1

**types (7)**
13:21;25:3;30:8,11;
31:1,7;54:13

**typically (1)**
14:2

**U**

**ultimate (2)**
173:6;192:21

**ultimately (6)**
59:20;109:10;
117:13;121:7;161:15;
193:4

**umbrella (1)**
111:16

**uncertain (3)**
71:15;184:11;200:25

**uncertainty (1)**
56:24

**unclear (1)**
9:11

**under (16)**
38:21;68:8;167:4,9,
13,16;168:24;169:2,21,
24;178:19,20;203:3;
216:13,17,20

**undergoing (1)**
185:11

**understandable (1)**
106:8

**understandings (1)**
29:17

**understood (7)**
9:15;24:17;143:11;
157:23;158:10;161:4;
201:4

**unfortunately (2)**
97:23;209:22

**unholy (2)**
54:5,18

**unilaterally (1)**
135:8

**Union (1)**
116:25

**United (2)**
7:10;77:19

**Unless (3)**
111:12;151:4;154:1

**unpaid (1)**
204:7

**unquote (4)**
29:25;46:19;62:16;
109:16

**unrelated (3)**
18:11,13;34:12

**up (76)**
13:17;21:9,18;26:14,
21;38:12;42:2;51:18;
53:22;54:4;55:10;

58:10,23;60:10,22;
62:9;67:5;69:22;75:1,
13;88:5;91:9;94:25;
101:3,12;103:7;
104:22;107:13;111:7;
120:6,17;124:16;
126:14;128:3;132:17;
134:16;143:6;147:19;
158:18;161:2;162:5;
164:24;165:1;166:2;
172:9,10,10,14;174:12,
15;177:17,20;185:1,
19;186:5,11,11,13;
194:6;195:15,25;
197:3;199:21;200:19;
201:20,22;202:7,10,12,
13;205:23;211:6,13,
13;215:5;220:13

**upon (4)**
90:6,20;123:12;
155:15

**upset (2)**
34:12;213:7

**use (8)**
66:17;111:22;
114:16;120:10;128:12;
153:13

**used (8)**
95:1;120:12,16;
138:19,25;153:10;
169:16;204:13

**using (1)**
127:3

**V**

**valid (1)**
176:1

**varied (3)**
198:15,16;204:12

**various (5)**
35:15,16;59:8;114:7;
217:15

**vehicle (1)**
120:25

**vein (1)**
206:11

**venue (1)**
39:9

**versus (2)**
103:10,11

**video (1)**
7:5

**VIDEOGRAPHER (13)**
7:1,2;75:7,10;
113:19,22;149:24;
150:2;214:4,7;215:2,4,
7

**view (19)**
9:6;66:2;88:10;
97:24;114:11;117:22;
165:10;176:24;180:8;
183:4;187:6,10,22;

191:17;196:7;198:2;
204:14,16;213:7

**viewed (6)**
12:21;23:13;156:23;
162:18,19,22

**views (1)**
94:6

**virtual (6)**
54:20,21,24;55:8;
56:21;57:24

**virtually (1)**
52:13

**virtue (1)**
57:8

**void (4)**
176:8;180:5;182:1,7

**voluntary (2)**
102:8,8

**W**

**Wait (6)**
82:5,5,5;143:3;
165:21;215:1

**walk (1)**
161:1

**warrants (1)**
212:1

**Washington (2)**
84:13;85:12

**way (45)**
8:20;16:10;21:25;
25:2;32:23;35:12;
39:24;45:20;51:21;
53:15;54:22;56:3,6;
57:24;60:2;63:20;
67:19;71:3,21;73:13;
95:2;96:5;98:5;110:18;
114:15;121:8,9;
130:19,22;131:5;
132:17;160:2;161:14;
165:16;176:15;187:19,
24;188:17;189:19;
190:6;195:25;204:23;
209:8;213:23;220:12

**ways (2)**
39:15;55:19

**Wednesday (1)**
7:14

**weeks (7)**
34:5;69:12;76:7;
122:6,7;208:9,16

**welcome (2)**
125:5;202:1

**weren't (5)**
111:14;143:24;
145:9;204:4,5

**West (1)**
7:6

**what's (8)**
58:10;82:19;94:20;
101:19;168:9;199:21;
204:17;207:10

**whenever (2)**
67:16;210:7
**whereas (1)**
84:15
**where's (1)**
127:17
**wherever (1)**
161:11
**white (1)**
90:24
**whole (11)**
50:1;53:24;71:10;
73:16;99:9;121:6;
147:6;185:18;188:7;
196:5;197:2
**who's (5)**
55:10,12;82:21;
95:17;173:6
**Wichita (4)**
209:20,24,25;210:11
**wife (1)**
210:8
**willing (5)**
56:25;71:13;196:13;
204:3;211:17
**wind (3)**
38:12;51:18;54:4
**wire (1)**
98:22
**wise (1)**
126:15
**withdrawn (2)**
198:24,25
**withdrew (2)**
34:18;202:4
**within (2)**
54:8;213:4
**Without (9)**
78:22;86:7;117:10;
118:25;119:12;120:25;
159:11;163:8;191:23
**WITNESS (163)**
12:7,17;13:5,12;
19:16;20:14;23:17;
29:3;30:11;31:16;
32:11,21;33:20;34:3;
36:6,23;37:17;38:15,
25;39:22;42:8,21;
46:25;47:11;49:14;
53:13;55:14;57:20;
58:5;60:16;61:5,25;
62:3;63:7;68:22;69:6,
15;70:11,23;72:11;
73:2,10;75:6;76:10;
77:2;81:5,16;83:19,22,
25;85:22;87:7;88:4;
89:1,6;90:14,23;91:12;
93:9;97:3;100:3;
101:20;109:2,24;
110:11;111:2,21;
113:6;115:5;117:18;
118:5,25;119:25;
120:9,21;121:14,22;
122:3,17,23;123:4,19;
124:20;126:18;128:10;
130:2,5,8;134:12;
136:10;141:5;142:9;
144:4;145:24;148:4;
151:7,25;152:8;153:5;
158:7,23;159:15;
160:11;161:13;162:13;
163:18;164:12;166:12,
25;167:13,22;168:4,9;
169:7;170:4,21;
171:20;172:7,18;
173:5,17;174:4;175:4,
15,17;177:16,25;178:6,
18;179:7,21;180:7;
181:15;182:9;183:7,
22;184:3,13;185:21;
189:7,18;190:21;
191:6;192:25;193:20;
194:1;195:7,19;
196:20;197:14;198:4;
203:18;208:3;209:1;
211:4,25;213:10;
214:12;215:6,8;217:1,
5;219:25
**witness' (1)**
17:19
**wondering (2)**
34:4,17
**word (8)**
78:25;120:10,12,16;
194:2;211:1,7,9
**worded (1)**
21:10
**words (24)**
32:8;36:2,18;39:7;
45:15;52:5;66:18,25;
89:12;108:10,12;
111:22;115:22;120:3;
124:25;138:16,19,19,
24;141:9;178:2;179:2;
186:23;212:11
**work (28)**
9:4,5;33:6,7,7;55:24;
57:15;92:11;104:24;
137:3;140:21;142:24;
143:13,25;144:1,5,17,
18;145:14;149:13;
159:5;163:3;176:1;
184:17;194:8;195:2,3;
202:6
**worked (4)**
13:21;14:6;48:17;
89:6
**working (5)**
13:18;55:22;131:23;
137:1,2
**workload (1)**
176:16
**works (2)**
22:20;159:3
**worry (4)**
160:14;185:17;

188:25;195:16
**wound (2)**
60:10;120:6
**wrap (1)**
162:5
**write (3)**
49:18;58:9;208:17
**writing (2)**
105:2;161:6
**written (16)**
41:14;43:1;97:20;
98:14;124:23;126:2;
130:25;151:9;157:4;
161:14;164:21;174:22;
196:25;205:12;219:18,
21
**wrong (5)**
52:19;83:3;201:25;
216:25;217:1
**wrote (8)**
97:13;119:4;123:1;
183:19;204:21;205:21,
22;214:22

## Y

**y'all (37)**
13:21;33:16,25;
35:13,14;37:23;39:25;
40:8;41:3;42:1,5;48:5;
51:25;53:16;55:21;
56:23;60:3,9;63:22;
64:2;71:9;95:25;
111:19;121:4;148:13;
149:21;157:24;161:7,
8,10;163:23,25;
182:19;185:18;187:7;
192:2;210:10
**y'all's (1)**
42:12
**year (19)**
10:1;51:8;67:7;
100:23;126:11;130:8,
12,14,16;131:6;135:12,
13,15,16;136:3,6;
138:5,12;213:4
**years (26)**
8:22;13:25;14:20;
16:21;22:9;41:1;57:11;
100:19;106:10;124:1;
137:2;143:1;149:9;
170:25;171:2;180:19;
190:2;191:17,18;
196:6;206:19;207:18,
18;208:18;209:2;
211:10

## 0

**0.5 (1)**
140:12

## 1

**1:07 (1)**
149:19
**1:08 (2)**
149:25;150:1
**10 (14)**
104:2;105:1;114:1;
122:24;123:11;124:13,
17;128:7;141:3,15,16;
152:4;155:25;218:20
**10,000 (9)**
97:15,16;99:9,13;
178:21,24;198:14,16;
216:23
**101 (2)**
162:24,25
**1013 (1)**
7:3
**11 (9)**
14:20;16:21;97:14;
124:1;139:5,7,17;
143:10;150:9
**11:04 (2)**
75:8,9
**11:22 (1)**
75:11
**12 (7)**
35:8;48:13;65:15;
104:6;113:25;146:16,
18
**12:09 (2)**
113:20,21
**12:27 (1)**
113:23
**12th (1)**
63:24
**13 (12)**
164:4,7,9,16;177:9,
10;178:12;214:19,19,
21;216:3;217:12
**14 (6)**
45:7;48:14,23;65:16;
200:1;206:25
**14th (3)**
24:5;45:14,23
**15 (3)**
78:5;212:16,19
**16 (3)**
130:11;131:3;185:8
**17 (3)**
19:2;147:7;182:5
**17th (1)**
179:3
**18 (2)**
105:20;219:1
**18th (5)**
7:14;106:3,4;112:4;
219:6
**19 (4)**
212:14,15;217:9;
218:7

**19,000 (3)**
177:12;186:13;217:7
**19,608 (2)**
178:14;216:22
**1967 (1)**
8:24
**1991 (2)**
13:19;209:18
**1997 (2)**
189:19,24

## 2

**2:08 (1)**
150:3
**2:13-CV-2000 (1)**
7:9
**20 (2)**
106:10;190:1
**2012 (87)**
14:12,18;15:9;16:4;
19:2;21:21;23:6,7;
24:5;27:23,23;28:3,25;
29:20;33:15;34:1;
36:17;37:10;39:15;
40:1,16;42:12;45:8,14,
23;46:2;47:4,15;48:2,
14,23;51:11,13,16;
59:2;60:9;63:22,24;
65:16;66:7;67:8;71:9;
72:21;74:4;76:7;78:5,
5;79:6;99:25;104:11,
12,14,24;105:4;107:2,
5,16;108:1;112:19,24;
113:9,11;121:2,18;
122:20;124:1;135:23;
138:2;153:21;156:21,
25;157:4;161:7,11,21;
162:7;163:14,23,25;
183:20;191:20;196:24;
219:14;220:4,7,14,23
**2013 (18)**
28:11;33:14;64:9;
67:16;70:9;73:18;
80:14;87:13;92:21;
93:23;96:15,17;
102:17;166:2;171:1;
176:7;177:23;192:14
**2014 (2)**
171:1;191:21
**2015 (1)**
191:21
**2016 (46)**
103:24;105:20;
107:7,16;108:1;109:6;
110:6;114:4,6;118:19;
119:4,8;123:11;124:2,
8,9,12,15;126:3;127:3,
5;130:22;131:4;140:5;
141:15,17,21;142:6,15;
143:1,9;150:13;156:4,
16,24;157:5;159:19;
161:4;163:14;179:3;

182:5;195:25;197:1;
201:16;218:25;219:7
**2017 (19)**
  127:5;164:7,12,13;
  165:10;166:2,7;
  181:10;184:8;185:4,
  13,14,23;197:19;211:5,
  12;215:11,18,24
**2019 (2)**
  188:15;207:4
**2020 (14)**
  131:13,14,21;
  132:17;162:7,8;186:1;
  188:11,12;196:1;
  200:6,9;201:16;210:21
**2021 (4)**
  132:18;212:9,12;
  213:2
**2022 (5)**
  136:13,15,21;
  137:17;197:3
**2023 (3)**
  7:14;10:8;130:22
**21 (2)**
  181:5;209:24
**21st (1)**
  130:13
**22 (4)**
  76:13;181:5;207:18,
  18
**22,000 (1)**
  177:13
**23 (6)**
  35:23;175:14,19;
  197:3;207:9,18
**2300 (1)**
  7:6
**23rd (2)**
  21:21;207:20
**24 (1)**
  207:10
**2406 (3)**
  108:15,20;139:18
**24th (2)**
  207:20,21
**25 (1)**
  93:23
**25th (1)**
  96:17
**26 (4)**
  111:25;141:17;
  218:25;219:7
**28 (4)**
  140:5;141:14;
  142:25;150:13

---

### 3

**3 (2)**
  164:12,13
**3:20 (2)**
  214:5,6
**3:28 (1)**

214:8
**30 (3)**
  13:25;140:12;201:19
**30,000 (6)**
  166:15;177:12;
  178:14,24;216:20;
  218:6
**30b6 (1)**
  7:21
**35,000 (1)**
  99:15
**37 (1)**
  61:23
**37221 (1)**
  7:4
**3rd (6)**
  164:6;197:7,18;
  215:11,18,24

---

### 4

**400 (1)**
  213:24
**42 (1)**
  202:19
**43 (7)**
  44:8,8,15,23;48:24;
  61:23;175:16
**43-page (3)**
  43:3;44:8;174:18
**49 (2)**
  27:13,14
**49,000 (1)**
  186:13

---

### 5

**5,000 (1)**
  9:2
**50 (36)**
  64:12;65:19;67:3,25;
  68:1,19;69:1,8;72:3,6;
  99:3,21,23;100:3,8,8,9,
  10;165:11;172:4,10;
  176:22;178:2,7,8;
  179:25;180:14,14,21;
  187:11;197:10;198:10;
  202:10,12,13;204:15
**50,000 (1)**
  97:16
**50/50 (18)**
  29:23;32:3,24;34:5,
  19,22;35:10;47:8;
  48:17;67:1,13;70:8;
  76:5;89:20;104:22;
  112:24;122:21;174:7
**5-13 (1)**
  27:23
**5-14 (1)**
  27:23
**58 (1)**
  208:18
**59,412 (1)**

218:15

---

### 6

**6 (2)**
  207:3;209:5
**60 (4)**
  68:12;167:13;
  180:21;201:18

---

### 8

**80 (2)**
  10:11;180:21
**80,000 (1)**
  201:19

---

### 9

**9,804 (2)**
  178:14;216:21
**9:50 (1)**
  7:15
**900 (1)**
  216:21
**96 (1)**
  209:21
**97 (1)**
  209:21
**9800 (3)**
  166:15;177:12;
  178:21

EXHIBIT 2

*Blue Cross*

## *Gordon Ball PLLC*

*550 West Main Street, Suite 600*
*Knoxville, TN 37902*

*Telephone: (865) 525-7028*
*Facsimile: (865) 525-4679*
*gball@gordonball.com*

November 18, 2016

Patrick W. Pendley, Esq.
PENDLEY, BAUDIN & COFFIN
P.O. Drawer 71
24110 Eden Street
Plaquemine, LA 70765

Re:    *In re Blue Cross Blue Shield Antitrust Litigation*, MDL 2406

Dear Pat:

This letter will memorialize our agreement that our respective law firms will share equally in any attorneys' fees ultimately awarded to either of our firms in the state cases we filed concerning the *Blue Cross Blue Shield Antitrust Litigation*.

Yours truly,

Gordon Ball

Gordon Ball

Date: 26 Nov, 2016                    Date: Dec 13/16

Patrick W. Pendley                     Gordon Ball

EXHIBIT 3



**From:** **Gordon Ball** gball@gordonball.com
**Subject:** Re: Clients
**Date:** May 11, 2017 at 10:51 AM
**To:** Pat Pendley pwpendley@pbclawfirm.com

Pat, i will think about that call me what happened to the inside wire case ? do they have an arbitration clause

On May 11, 2017, at 11:27 AM, Patrick Pendley <pwpendley@pbclawfirm.com> wrote:

Gordon; I am writing to ascertain your possible interest in "mining" your client database for claims in MDL drug cases. We are doing this with other law firms currently. This is how it works---we prepare a letter describing one or more drug cases with symptoms from taking that particular drug. The letter is from your office on your letterhead. We print letter and send you as many copies as you need (2,000 or 5,000 or whatever). Your office duffs and mails envelopes (although we would do that task if you requested). We would provide your office with intake sheets for people that call in. Once intake sheet filled out, your staff sends to us to review. If claim appears to be viable we send you a claim form and contract for client to fill out and sign. We review claim form to further evaluate viability of the claim. If viable we do all work to either file suit or otherwise process a claim. Each firm pays 50% of out of pocket expenses and any earned fee divided between firms on basis of 1/3 to you and 2/3 to us. Each firm reimbursed "off the top" of any Atty fees for expenses incurred in obtaining the clients less any reimbursement from clients. Since these are your clients we strive to have as much contacts emanate from your office, especially at the beginning of the process. I would be happy to discuss with you at your convenience. Hope you are feeling well. Pat

Sent from my iPad

EXHIBIT 4



**From:** Patrick Pendley pwpendley@pbclawfirm.com
**Subject:** Re: Airplane purchase 25%
**Date:** April 12, 2022 at 11:36 AM
**To:** Gordon Ball gball@gordonball.com

Confirmed. Pat

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

**From:** Gordon Ball <gball@gordonball.com>
**Sent:** Tuesday, April 12, 2022 11:24:21 AM
**To:** Patrick Pendley <pwpendley@pbclawfirm.com>
**Subject:** Airplane purchase 25%

Pat and John, this e mail will confirm our conversation that I will purchase 25% of the King Air plane. Further that considering my health issues that if I die or become unable to use the plane in my business the remaining partners will buy my interest back for the purchase price I have paid. As Pat and I have discussed Gina would have no use for an airplane and would not be able to fund the expenses.  Pat , please send me an e mail confirming this issue.

EXHIBIT 5



**From:** **Patrick Pendley** pwpendley@pbclawfirm.com
**Subject:** BCBS
**Date:** October 22, 2019 at 9:20 PM
**To:** Gordon Ball (gball@gordonball.com)  gball@gordonball.com

Gordon:  no meaningful news on BCBS front. Conf call lasted 2 minutes the parties adjourned to separate conf rooms. Judge was shuttling back and forth apparently trying to iron out last few glitches.  I will let you know about award ceremony.  You were going to send me a petition took at when you finished with it. Keep me posted on that front. Tell your bride hello from Helen and I. Pat

Get Outlook for Android

**From:** Patrick Pendley  pwpendley@pbclawfirm.com
**Subject:** Re: Bcbs
**Date:** November 26, 2020 at 3:48 PM
**To:** Gordon Ball  gball@gordonball.com

Yes I have it. Thx

Get Outlook for Android

---

**From:** Gordon Ball <gball@gordonball.com>
**Sent:** Thursday, November 26, 2020 3:03:24 PM
**To:** Patrick Pendley <pwpendley@pbclawfirm.com>
**Subject:** Re: Bcbs

I have and it's good.  Did you get draft complaint in  arrest warrant case     Happy Thanksgiving to you guys

Sent from my iPhone

On Nov 26, 2020, at 2:21 PM, Patrick Pendley <pwpendley@pbclawfirm.com> wrote:

Gordon: have you had a chance to review the docs withdrawing us as counsel for Watts Sheridan and Dummer?  Happy Thanksgiving to you and Gina. Pat

Get Outlook for Android

EXHIBIT 6

