# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **GORDON BALL, et al.,** | } |
| **Plaintiffs,** | } |
| v. | } Case No.: 2:25-CV-14-RDP |
| **PATRICK W. PENDLEY, et al.,** | } |
| **Defendants.** | } |

## MEMORANDUM OPINION

This matter is before the court on Defendants Patrick W. Pendley and Pendley, Baudin & Coffin, LLC's Motion to Dismiss Amended Complaint. (Doc. # 18-1). The Motion has been fully briefed (Docs. # 25, 31), and is ripe for decision.

### I.   Background

Plaintiff Gordon Ball and Defendant Pendley are experienced class action attorneys who have litigated class action matters in jurisdictions all over the country. (Doc. # 2 at ¶¶ 10–11). They have worked together in cases (other than this one) for years. (*Id*. at ¶ 10). Ball is licensed and practices law in Tennessee. (*Id*. at ¶ 5). Pendley is licensed and practices law in Louisiana. (*Id*. at ¶ 6).

On May 11, 2012, Ball filed an antitrust class action against Blue Cross Blue Shield of Tennessee, Inc. and Blue Cross and Blue Shield Association ("BCBSA") in the United States District Court for the Western District of Tennessee styled *Morrissey v. Blue Cross Blue Shield of Tennessee, Inc., et al*. (Doc. # 2 at ¶ 9; W.D. Tenn. Case No. 2:12-cv-02359-JTF-CGC, Doc. # 1).[1]

---

[1] A district court may take judicial notice of online court dockets. *See Paez v. Sec'y, Fla. Dep't of Corr.*, 947 F.3d 649 (11th Cir. 2020) (addressing state court dockets).

*Morrissey* was not the first related antitrust class action filed against the Blue Cross Blue Shield ("BCBS") entities. (Case No. 2:12-cv-04169-RDP, Doc. # 1). The first case, *Cerven, et al. v. Blue Cross and Blue Shield of North Carolina, et al*., was filed three months earlier, on February 7, 2012. (*Id*.).

A few days after Ball filed *Morrissey*, on May 12 or 13, 2012, Ball and Pendley met in Ball's office in Knoxville, Tennessee. (Doc. # 2 at ¶ 14). During the meeting, Ball and Pendley discussed *Morrissey* and developed a plan to file additional state class actions against BCBS. (*Id*. at ¶ 14). At that time, both Ball and Pendley believed that filing these various class actions against BCBS would likely result in the consolidation of the lawsuits into a single federal MDL in one jurisdiction. (*Id*. at ¶ 10). During this May 2012 meeting, "Pendley and Ball strategized that they should quickly file many state class action cases against BCBS in order to increase the likelihood that one of them would be assigned a senior role in litigating the expected MDL."[2] (*Id*.). Ball alleges that "Pendley and Ball orally agreed they would split costs equally and split equally any fees that they and their firms might eventually be awarded from the BCBS cases, regardless of whether the cases proceeded in state or federal court, whether the cases proceeded in federal court in the expected MDL, and what roles, if any, the respective firms were assigned in the expected MDL." (*Id*.). Thereafter Ball, Pendley, and numerous other class action lawyers filed additional antitrust actions against the BCBS entities. (*Id*. at ¶ 17).

On September 6, 2012, Plaintiffs GC Advertising, LLC and CB Roofing, LLC, parties who had initiated another antitrust class action against Blue Cross and Blue Shield of Alabama and BCBSA in this court, filed a Motion for Transfer of Actions Pursuant to 28 U.S.C. § 1407 for Coordinated or Consolidated Pretrial Proceedings with the United States Judicial Panel on

---

[2] Section 1407 only permits centralization of federal actions.

Multidistrict Litigation ("JPML").  (JPML Case MDL No. 2406, Doc. # 1). That Motion sought centralization before the undersigned. (*Id.*). The Schedule of Actions filed with that Petition listed seven cases filed in Alabama, *Cerven* from North Carolina, and *Morrissey* from Tennessee. (JPML Case MDL No. 2406, Doc. # 1-2).

As Ball and Pendley had anticipated, in December 2012, *Morrisey* and the other listed antitrust class action lawsuits against BCBS were centralized in an MDL in this court under the case name *In Re Blue Cross Blue Shield Anti-Trust Litigation, MDL 2406* (the "BCBS MDL"). (Doc. # 2 at ¶ 18). On April 5, 2013, Ball filed an Application to Serve As Interim Co-Lead Counsel for Subscriber Plaintiffs, Membership on Plaintiffs' Steering Committee, and/or Leadership Committee Positions on the Settlement and/or Litigation Committees. (Case No. 2:13-cv-20000-RDP, Doc. # 33). On April 26, 2013, the court appointed David Boies and Michael Hausfeld as Interim Co-Lead Class Counsel, Chris Hellums as Local Facilitating Counsel, and Kathleen Chavez, Greg Davis, Bill Isaacson, Meghan Jones, and Cy Smith to serve on Plaintiffs' Steering Committee. (Case No. 2:13-cv-20000-RDP, Doc. # 61). On June 4, 2013, the court issued Case Management Order No. 3 – Order Appointing Interim Committee Chairs and Committee Members for the Plaintiff Subscriber and Provider Tracks, which adopted (after overruling one objection) the Special Master's Rule 53 Report Recommending Interim Committee Chairs and Committee Members for the Plaintiff Subscriber and Provider Tracks. (Case No. 2:13-cv-20000-RDP, Docs. # 62, 82). Pendley was appointed to serve as co-head of the Damages Committee. (Case No. 2:13-cv-20000-RDP, Doc. # 62-1). Ball was appointed to serve as a member of the State Liaison Committee. (*Id.*).

On October 24, 2013, the attorneys in Subscriber Leadership in the MDL entered into the MDL 2406 Joint Venture Agreement ("JVA").[3] (Doc. # 18-2 at 5-8). Both Plaintiff Ball and Defendant Pendley, who are experienced class action attorneys, were signatories to the JVA. (Doc. # 2 at ¶ 10; Doc. # 18-2 at 25, 49). The JVA became effective upon its execution on October 24, 2013 and the parties to the JVA agreed that its terms would "continue until such time as the Litigation is concluded and all Contributions (defined below), Held Expenses (defined below) and Attorneys' Fees have been distributed." (*Id*. at 5). The JVA detailed the parties' agreement regarding how any recovery in the MDL would be allocated among counsel. (*Id*. at 7). The JVA contains certain provisions that are relevant to the Ball's and Pendley's current dispute.

First, the term "VENTURERS" is defined in the introductory paragraph to the JVA. (*Id*. at 5). That paragraph specifies that Defendant Pendley's firm, Pendley, Baudin & Coffin, L.L.P. ("PBC"), and Plaintiff Ball's firm, Gordon Ball, Esq., are VENURERS. (*Id*. at 5). The JVA also contains the following provisions:

> 9.  Modification of the Agreement. This document contains the *entire agreement* between the VENTURERS and may only be modified in writing by an agreement acknowledged by the signatures of the VENTURERS.
>
> []
>
> 14. Prior Agreements Superseded. This Agreement constitutes the sole and only agreement of the VENTURERS and *supersedes any prior understandings or written or oral agreements* between the VENTURERS respecting the subject matter of this Agreement.

---

[3] "[W]hen resolving a motion to dismiss or a motion for judgment on the pleadings, a court may properly consider a document not referred to or attached to a complaint under the incorporation-by-reference doctrine if the document is (1) central to the plaintiff's claims; and (2) undisputed, meaning that its authenticity is not challenged." *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024). In Plaintiffs' Opposition to Defendants' Motion to Dismiss, Plaintiffs concede the validity of the JVA. (Doc. # 25 at 8 ("In October 2013, the different law firms that had filed lawsuits that were consolidated into the BCBS MDL, including Plaintiffs and PBC, entered into a joint venture agreement. (Doc. 15, p. 2; Doc. 15, Ex. 1 ("JVA")). The JVA bound these law firms, collectively defined as the "VENTURERS," to several provisions concerning the BCBS MDL. (See JVA, p. 1–4).").

(*Id*. at 7, 8) (emphasis added). Finally, the JVA makes clear that its terms "shall be construed under and in accordance with the laws of the State of Alabama." (*Id*. at 7).

Approximately two and a half years after signing the MDL 2406 JVA, in April 2016, Ball was diagnosed with heart failure and his doctors gave him less than one year to live. (Doc. # 2 at ¶ 20). Fortunately, on October 21, 2016, Ball underwent a heart transplant. (*Id*.). In November 2016, Ball sent Pendley a letter. (*Id* at ¶ 22). The letter dated November 18, 2016 from Ball, again a member of the BCBS MDL's State Liaison Committee, to Pendley states in its entirety:

> This letter will memorialize our agreement that our respective law firms will share equally in any attorneys' fees ultimately awarded to either of our firms *in the state cases* we filed concerning the Blue Cross and Blue Shield Antitrust Litigation.

(Doc. # 2 at 96 (emphasis added)). The letter contains signature lines for Pendley and for Ball; Pendley signed the letter on November 26, 2016, and Ball on December 12, 2016. (*Id*.).

For the next few years, Ball was unable to practice law full-time due to his heart transplant and lengthy recovery. (Doc. # 2 at ¶ 21). In late April or early May, 2017, Ball and Pendley spoke about financial contributions related to the BCBS MDL. (Doc. # 25 at 134-34). Ball inquired about how much he owed to be caught up on payments. (Doc. # 2 at ¶ 31). Pendley told Ball that they could deal with the issue of any money owed later. (*Id*.).

In May 2017, Pendley emailed Ball about "mining" his client database for claimants in lawsuits against drug companies. (*Id* at ¶ 24(c)).

In October 2019, Pendley provided Ball an email update regarding settlement in the MDL. (*Id* at ¶ 25; Doc. # 2 at 102). A year later, on September 24, 2020, the Subscriber track of the BCBS MDL was tentatively settled. (Doc. # 2 at ¶ 3).

Their correspondence about the Blues litigation continued. In November 2020, Pendley and Ball exchanged emails about withdrawing from a case filed by Plaintiffs Watts, Sheridan, and Dummer. (Doc. # 2 at ¶ 25; Doc. # 2 at 103).

5

On May 28, 2021, Subscribers Counsel's filed their Motion for Approval of their Attorneys' Fees and Expenses Application. (Case No. 2:13-cv-20000-RDP, Doc. # 2733). In the Motion, Subscribers Counsel sought attorneys' fees in the amount of $626,583,372.10 and reimbursement of out of pocket costs and expenses in the amount of $40,916,627.90. (*Id*.).

Under the terms of the JVA, the recovery allocated to expenses and capital is mathematically determined under Paragraph 7. (Doc.18-2 at 7). However, under Paragraph 7(ii) the fee allocation was to be determined by Co-Lead Counsel, the Special Master, and Local Facilitating Counsel. (*Id*.).

On January 20, 2022, Court Appointed Neutral ("CAN") Edgar Gentle, III, issued a Report recommending an allocation of the anticipated recovery from the MDL settlement. (Doc. # 18-3). The CAN, in conjunction with Co-Lead Subscriber Counsel, developed a methodology for distributing that allocation. That methodology was as objective as possible. (*Id*. at 4-7). It relied on the audited timekeeping records that the CAN had maintained during the pendency of the MDL. (*Id*.). The rationale supporting the methodology included transcribed interviews with each Subscriber and ASO Law Firm in which Gentle inquired of each individual regarding each Firm's efforts to advance the litigation. (*Id*. at 5). The CAN recommended internal appellate procedures for any firm to follow that was "dissatisfied with its proposed recovery in this Report." (*Id*. at 14). Those procedures included a 30-day deadline to appeal. (*Id*.).

Based on the objective methodology developed by the CAN, and consistent with Ball and PBC's different contributions to the MDL and PBC's significant capital contributions, the CAN allocated significantly more of the MDL Recovery to PBC than to Ball. (Doc. 2, ¶ 41; Doc. # 18-3 at 115).

Ball and Pendley had previously been involved in an unrelated stand-alone class action, *Hale v. State Farm*, that was filed in May 2012. (Doc. # 2 at ¶ 13; Doc. # 18-5; Doc. # 18-6).

6

Although Ball was appointed co-lead counsel in *State Farm* (Doc. # 2 at ¶ 13), Pendley and PBC were not assigned significant roles in the case (*Id*.). In the *State Farm* case, there was a written agreement signed by the plaintiff, Hale, and ten law firms representing him in that case, including Ball and Pendley. (Doc. # 2 at ¶ 13; Doc. # 18-5; Doc. # 18-6). That agreement provided that each firm would receive an equal share of any fees awarded in the case. (Doc. # 2 at ¶ 13; Doc. # 18-5; Doc. # 18-6). The *State Farm* case settled in 2018 and, pursuant to the contract signed in that case by the plaintiff, Hale, and the ten law firms, Pendley received an equal share of the attorneys' fees (along with Ball and the other law firms involved in prosecuting that case). (*Id*.; Doc. # 18-5; Doc. # 18-6).

## II.     Legal Standard

The Federal Rules of Civil Procedure require that a complaint provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, the complaint must include enough facts "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Pleadings that contain nothing more than "a formulaic recitation of the elements of a cause of action" do not meet Rule 8 standards, nor do pleadings suffice that are based merely upon "labels and conclusions" or "naked assertion[s]" without supporting factual allegations. *Id*. at 555, 557. In deciding a Rule 12(b)(6) motion to dismiss, courts view the allegations in the complaint in the light most favorable to the non-moving party. *Watts v. Fla. Int'l Univ*., 495 F.3d 1289, 1295 (11th Cir. 2007).

To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although "[t]he

7

plausibility standard is not akin to a 'probability requirement,'" the complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Id*. A plausible claim for relief requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" to support the claim. *Twombly*, 550 U.S. at 556.

In considering a motion to dismiss, a court should "1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *Kivisto v. Miller, Canfield, Paddock & Stone, PLC*, 413 F. App'x 136, 138 (11th Cir. 2011) (quoting *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010)). That task is context specific and, to survive the motion, the allegations must permit the court based on its "judicial experience and common sense . . . to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679. If the court determines that well-pleaded facts, accepted as true, do not state a claim that is plausible, the claims are due to be dismissed. *Twombly*, 550 U.S. at 570.

### III.   Analysis

Plaintiffs' Amended Complaint asserts four claims against Defendants: (1) Count 1 – Breach of Contract; (2) Count 2 – Joint Venture; (3) Count 3 – Equitable Estoppel; and (4) Count 4 – Unjust Enrichment (pled alternatively to the contract claim). (Doc. # 2 at 13-15). The court addresses the parties' arguments in the same order they addressed them, which is slightly out of order.

#### A.   Count 1 – Breach of Contract

The breach of contract claim in the Amended Complaint asserts that there was an enforceable agreement between Pendley and Ball to share fees and costs equally in the BCBS

MDL. (*Id*. at ¶ 34). Ball alleges that Pendley and his firm breached the agreement because "Pendley and his firm would not share fees equally with Ball." (*Id*. at ¶ 35).

There are three potential contracts at issue in this case: (1) a May 2012 oral agreement to split costs and fees equally (*Id*. at ¶ 14); (2) the October 2013 MDL 2406 JVA (Doc. # 18-2 at 5-7, 25, 47); and (3) the November 2016 Letter Agreement (Doc. # 2 at ¶¶ 22-23; Doc. # 2 at 96).

The May 2012 oral agreement was expressly superseded by the October 2013 MDL 2406 JVA. (Doc. # 18-2 at 8, ¶ 14). By entering into the JVA, Ball and Pendley both expressly agreed that any prior agreements, including the May 2012 agreement, were superseded:

> <u>Prior Agreements Superseded.</u> This Agreement constitutes the sole and only agreement of the VENTURERS and *supersedes any prior understandings or written or oral agreements* between the VENTURERS respecting the subject matter of this Agreement.

(*Id*.). Thus, in response to Pendley's Motion to Dismiss, Ball hangs his hat solely on the third of these writings, the November 2016 Letter Agreement.[4] (Doc. # 25 at 11).

Again, the entire 2016 Letter Agreement states:

> This letter will memorialize our agreement that our respective law firms will share equally in any attorneys' fees ultimately awarded to either of our firms *in the state cases* we filed concerning the Blue Cross and Blue Shield Antitrust Litigation.

(Doc. # 2 at 96 (emphasis added)).

### i. Choice of Law

"Alabama choice of laws rules follow the doctrine of *lex loci contractus*, which provides that contract claims are governed by the law of the place where the contract was executed." *Twin City Fire Ins. Co. v. Colonial Life & Acc. Ins. Co.*, 124 F. Supp. 2d 1243, 1247 (M.D. Ala. 2000) (citing *Brown Mach. Works & Supply, Inc. v. Insurance Co. of N. Am.*, 951 F.Supp. 988, 992 (M.D.

---

[4] As Ball does not argue that the JVA created any contract rights that Pendley breached, the court need not address the JVA.

Ala. 1996)). The contract at issue consists of a letter from Ball in Tennessee to Pendley in Louisiana. (Doc. # 2 at 96). Thus, either Tennessee or Louisiana law could apply.

Pendley, however, argues that the court need not conduct a choice-of-law analysis because the laws of the different potential jurisdictions are not significantly different. Ball agrees. Ball notes that if it is "plainly clear" that there is no difference in the substantive law of multiple jurisdictions, "courts may avoid [a] conflicts question altogether." (Doc. # 25 at 11 (citing *Fertilizantes Tocantins S.A. v. TGO Agric. (USA), Inc*., 599 F. Supp. 3d 1193, 1203 (M.D. Fla. 2022) (in turn citing *Fioretti v. Mass. Gen. Life Ins. Co*., o., 53 F.3d 1228, 1234 & n.21 (11th Cir. 1995)))). He further states that "[t]he principles of contract law that govern the disposition of this instant Motion do not differ between Alabama or Tennessee law." (Doc. # 25 at 10-11). Indeed, "contract law is not at its core diverse, nonuniform and confusing." *American Airlines v. Wolens*, 513 U.S. 219, 233 (1995). For this reason, the court applies Alabama law to Ball's breach of contract claim, but agrees with the parties that the same analysis would follow if the court applied Tennessee or Louisiana law.

        **ii.**    **Ball's Breach of Contract Claim Fails to State A Claim**

The elements of a breach of contract claim under Alabama law are (1) the existence of a valid contract, (2) a breach of the contract, and (3) damages resulting from the breach of contract. *Dupree v. PeoplesSouth Bank*, 308 So. 3d 484, 490 (Ala. 2020). Alabama law additionally requires the party asserting a breach of contract claim to demonstrate its own performance under the contract. *Dupree*, 308 So. 3d at 490.

"The interpretation of a contract, including whether it is ambiguous, is a question of law[.]" *S. Coal Corp. v. Drummond Coal Sales, Inc*., 28 F.4th 1334, 1341 (11th Cir. 2022). Where a breach of contract claim requires contract interpretation, a court must give the words used in the contract

10

their plain, ordinary meaning unless the contract manifests another intention. *Ex parte Dan Tucker Auto Sales, Inc*., 718 So. 2d 33, 36 (Ala. 1998). The plain, ordinary meaning of a term often is articulated as "'the meaning a person of ordinary intelligence would reasonably give it.'" *Hall v. Env't Litig. Grp., P.C*., 248 So. 3d 949, 959 (Ala. 2017) (quoting *Safeway Ins. Co. of Alabama, Inc. v. Herrera*, 912 So. 2d 1140, 1143 (Ala. 2005)).

A court must enforce an unambiguous contract as written, even if the result seems harsh. *See Dan Tucker Auto Sales*, 718 So. 2d at 35 ("General contract law requires a court to enforce an unambiguous, lawful contract, as it is written. A court may not make a new contract for the parties or rewrite their contract under the guise of construing it.") (internal citations omitted).

Ball and Pendley are both experienced attorneys. None of the rules of contract construction should come as a surprise to them. Therefore, the court begins with the fundamental proposition that it must construe a contract to give meaning to each word. That is, a construction of a contract that would render a clause meaningless would violate a foundational rule of contract interpretation. *See Equity Lifestyle Props., Inc. v. Fla. Mowing And Landscape Serv., Inc*., 556 F.3d 1232, 1242 (11th Cir. 2009) ("[This court] must read the contract to give meaning to each and every word it contains, and ... avoid treating a word as redundant or mere surplusage if any meaning, reasonable and consistent with other parts, can be given to it." (internal quotation omitted)).

The 2016 Letter Agreement entitles Ball to "share equally" in "attorneys' fees" "ultimately awarded" "in the state cases" that "[Ball and Pendley] filed concerning the Blue Cross and Blue Shield Antitrust Litigation." (Doc. # 2 at 96). These are plainly understood terms, which are not in any way ambiguous.

Despite the plain wording of the 2016 Letter Agreement, Ball seeks to share in Pendley's award in the *federal* MDL, not in *state* cases they filed. None of the cases that comprised the

Subscriber MDL were *state* cases. All of them were filed in federal court. By 2016, having signed the JVA, Ball knew that any award would come from the federal MDL proceeding, and not from any "state cases" they filed. However, when he drafted the 2016 Letter Agreement, Ball chose to only reference the "state cases" they filed.

Other pertinent language in the 2016 Letter Agreement provides that what Ball and Pendley agreed to share was only the attorneys' fees awarded in the state cases *they filed*.[5] The court notes that Pendley's award in the federal MDL was not limited to cases that he filed or that he and Ball filed.[6]

Even putting aside the contract's reference to the "state cases," and focusing on the "attorneys' fees" language of the Agreement, Pendley's MDL award also consisted of more than attorneys' fees. It was based on expenses paid, hours worked, capital contributions, and additional fees awarded to those in certain leadership positions, as specified in the JVA and in the CAN's methodology. Ball received his own separate award in the federal MDL which was based on these same factors, and the 2016 Letter Agreement does not entitle him to anything else related to the cases in the *federal* MDL.

Again, and this is important in this dispute, the parties to this contract are not lay persons unfamiliar with the law. They are experienced class action lawyers. As such, they are both aware of the difference between state and federal cases. To adopt the interpretation advanced by Ball, who drafted the Agreement, would render the qualifier "state" he chose to use meaningless. The court simply cannot accept Ball's invitation to violate such a fundamental rule of contract

---

[5] The court makes no ruling on whether Ball and Pendley have a duty to split fees on any state court cases that are settled or in which there is a judgment. But, if any such cases exist, they are not before this court.

[6] Under the terms of the JVA, Pendley's award also related to numerous cases filed by other attorneys that he and Ball were not involved in filing.

interpretation and rewrite the parties' contract. *See Equity Lifestyle Props., Inc.*, 556 F.3d at 1242. Ball chose the language, and he must live with it.[7]

### iii. The State Farm Litigation is Irrelevant

The allegations of Ball's Amended Complaint regarding how the parties split costs and fees in the separate *State Farm* case are irrelevant to his contract claim against Pendley here. Ball appears to take the position that, because in 2012 there was an agreement between he and Pendley to split costs and fees in *State Farm*, that fact bolsters the alleged 2012 oral agreement to split costs and fees in the MDL. However, as discussed above, there was a written agreement in *State Farm* between the Plaintiff and the ten law firms representing him. That agreement was not a side deal between lawyers. It was a contract between a client and that client's lawyers that provided that there would be an equal split of fees. Moreover, whatever may have been agreed to between Ball and Pendley orally in 2012 related to the MDL was specifically superseded by the JVA. That agreement, signed by the parties here, "supersede[d] any prior understandings or written or oral agreements" respecting, among other things, sharing attorneys' fees. (Doc. # 18-2 at 7-8).

Evidence regarding what the Ball and Pendley agreed to in the *State Farm* case is simply irrelevant to the 2016 Letter Agreement. As discussed above, the 2016 Letter Agreement is unambiguous. And extrinsic evidence, such as what was agreed to in the *State Farm* case, "may not be used to create ambiguity in a contract that is 'complete and clear and unambiguous upon its face.'" *S. Coal Corp. v. Drummond Coal Sales, Inc*., 28 F.4th 1334, 1341 (11th Cir. 2022) (quoting *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 565 N.Y.S.2d 440, 566 N.E.2d 639, 642 (1990)); *see also CapWealth Advisors, LLC v. Twin City Fire Ins. Co*., 665 F. Supp. 3d 862, 872

---

[7] To the extent the term "state cases" could be construed as ambiguous (and, to be clear, it is not), any such ambiguity is construed against Ball as the drafter. *Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd*., 525 F.3d 409, 423 (6th Cir.2008) ("ambiguities in contracts should be construed against the drafter.").

(M.D. Tenn. 2023), *aff'd*, 2024 WL 1134647 (6th Cir. Mar. 15, 2024) ( *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 612 (Tenn. 2006) (only where the contract is ambiguous may the court may turn to extrinsic or parol evidence to guide the court in construing and enforcing the contract).

For all of these reasons, Ball's breach of contract claim is due to be dismissed for failure to state a claim.

The court next addresses Ball's Unjust Enrichment claim contained in Count 4, and then addresses his claims in Counts 2 and 3, in turn.

### B.  Count 4 – Ball's Unjust Enrichment Fails to State A Claim

Ball's unjust enrichment claim is pled in the alternative to his breach of contract claim. (Doc. # 2 at 14). Pendley moves to dismiss the unjust enrichment claim on the grounds that "'the equitable remedy of unjust enrichment cannot be imposed where . . . a valid contract exists on the same subject matter.'" (Doc. # 18-1 at 28-29 (quoting *Duke v. Browning-Ferris Indus. of Tenn., Inc.*, 2006 WL 1491547, at *10 (Tenn. Ct. App. May 31, 2006)). He points out that Ball's entire theory is premised on the 2016 Letter Agreement, a copy of which he attached to his Amended Complaint (and the separate contract in the *State Farm* case that the court addressed above). Ball seeks to enforce the 2016 Letter Agreement. He has never asserted that it is unenforceable or invalid in any way.

Ball's only response to the inconsistency in pleading this claim and his theory of the case is that he is entitled to plead in the alternative. He explains, that "[u]nder Tennessee law, a plaintiff can plead unjust enrichment in the alternative to a contract claim even if the plaintiff alleges that an enforceable contract exists."[8] (Doc. # 25 at 21 citing *Ethnix Grp., LLC v. Jiminez Distributors,*

---

[8] Out of deference to Plaintiff Ball, and consistent with the law cited in both parties' briefing on Defendants' Motion to Dismiss, the court applies Tennessee law to the claims in Counts 2-4. In any event, however, the court is not convinced Alabama or Louisiana law would lead to a different result.

*Inc.*, 2024 WL 3331639, at *2 (M.D. Tenn. July 3, 2024) (citing *Solo v. United Parcel Service Co.*, 819 F.3d 788, 796 (6th Cir. 2016)). He argues that Pendley's denial that there is a valid contract to share equally PBC's allocation awarded from the BCBS MDL raises a dispute about the agreement and allows the alternative pleading.

In reply, Pendley asserts that there is not a dispute over the existence or validity of a contract between the parties; rather, there is only a dispute about the meaning of that contract. (Doc. # 31-2 at 11-12).

"Tennessee courts dismiss unjust-enrichment claims in the presence of an enforceable contract." *Vaughn v. Taylor*, 2021 WL 6428005, at *8 (E.D. Tenn. June 15, 2021) (citing *Saunders v. Y-12 Fed. Credit Union*, 2020 WL 6499558, at *6 (Tenn. Ct. App. Nov. 5, 2020) ("[I]nasmuch as the parties maintained a valid and enforceable contract, the trial court properly dismissed [the plaintiff's] claim for unjust enrichment."); *Daugherty v. Sony Elecs., Inc.*, 2006 WL 197090, at *6 (Tenn. Ct. App. Jan. 26, 2006) ("[O]ne of the underlying requirements for stating an unjust enrichment claim is that there be no valid and enforceable contract between the parties.")).

In *Vaughn*, because the plaintiffs had alleged that there was a valid and enforceable contract between the parties and sought to enforce it through their breach-of-contract claims, the court held that the plaintiffs "ha[d] not pled a claim sounding in unjust enrichment." 2021 WL 6428005, at *8 (citing *Daugherty v. Sony Elecs., Inc.*, 2006 WL 197090, at *6 (Tenn. Ct. App. Jan. 26, 2006)). Therefore, that court dismissed the plaintiffs' unjust enrichment claim. (*Id.*).

Here, Ball has alleged the existence of a valid and enforceable contract between himself and Pendley. He has produced a copy of that contract. (Doc. # 2 at 96). The parties do not dispute the validity of that contract, only its meaning. Therefore, Ball has not plausibly pled his unjust enrichment claim and that claim is due to be dismissed.

15

### C. Count 2 – Ball's Joint Venture Claim Fails to State A Claim

Ball's joint venture claim, it its entirety, alleges that "Plaintiffs and Defendants created a joint venture and as such the parties owed each other fiduciary duties, including the duty of utmost good faith, fairness and honesty. Defendants' conduct violated all of their fiduciary duties." (Doc. # 2 at ¶ 37).

In Tennessee, the elements necessary to establish a joint venture are "(1) a common purpose; (2) some manner of agreement among the parties; and (3) an equal right on the part of each party to control both the venture as a whole and any relevant instrumentality." *Bowman v. Benouttas*, 519 S.W.3d 586, 599 (Tenn. Ct. App. 2016). Ball contends that, "[i]n the Amended Complaint, Ball alleges that he and Pendley had an agreement to share equally the costs and fees awarded in the BCBS MDL" and "Ball has thus pled sufficient facts to allow the Court to infer that a joint venture existed." (Doc. # 25 at 22).

In response, Pendley argues that "The joint venture claim fails as a matter of law, because the purported requirement of the venture—that they share fees awarded in the BCBS MDL—is contradicted by their 2013 Joint Venture Agreement and 2016 Letter." (Doc. # 18-1 at 28). Ball replies that "the Fee-Splitting Agreement was outside the scope of the JVA" and that "there was no requirement" that Ball "preserve their joint venture in that agreement." (Doc. # 25 at 23).

Ball's argument ignores the explicit language of the 2013 MDL 2406 JVA. The MDL 2406 JVA provides that "[t]his document contains the *entire agreement* between the *VENTURERS* and may only be modified in writing" and that the MDL 2406 JVA "*constitutes the sole and only agreement of the VENTURERS and supersedes any prior understandings or written or oral agreements* between the VENTURERS respecting the subject matter of this Agreement." (Doc. # 18-2 at 7-8) (emphasis added).

The only obligations existing between Ball and Pendley related to the cases filed against Blue Cross and Blue Shield that are before this court arose under either the MDL 2406 JVA (that superseded the parties' 2012 oral agreement) or the separate 2016 Letter Agreement regarding fee splitting (but only in state cases). Ball's joint venture claim does not allege otherwise. In fact, the claim is virtually devoid of factual allegations. For example, although Ball's joint venture claim makes the conclusory allegation that Pendley and his firm "violated all of their fiduciary duties," nowhere does he specify what those duties were, how they arose, or how Defendants' conduct breached them.

The pleading of this claim is woefully insufficient, and it is also contradicted by contracts existing between the parties. Therefore, this claim is due to be dismissed for failure to state a claim.

### D.  Count 3 – Equitable Estoppel Is Not a Standalone Claim

Ball's equitable estoppel claim, it its entirety, alleges "[t]he facts presented indicate that Pendley's conduct, assuring Ball that everything was fine, was misleading communication. This conduct led Ball to believe that the agreement with Pendley would be honored, causing him to rely on this belief to his detriment." (Doc. # 2 at 14). Again, the claim is virtually devoid of factual information. In his opposition to Pendley's Motion to Dismiss, Ball explains that this claim is based on Pendley's response to his inquiry about capital contributions that "we'll deal with it later." (Doc. # 25 at 23-24). Again, Ball relies on Tennessee law in asserting this claim. (*Id.*).

Under Tennessee law, "equitable estoppel is not a cause of action, and standing alone it will not entitle the party to affirmative relief." *Smith v. Hi-Speed, Inc*., 536 S.W.3d 458, 482 (Tenn. Ct. App. 2016) (quoting *Deal v. Tatum*, 2016 WL 373265, at *8 (Tenn. Ct. App. Jan. 29, 2016)). "[E]quitable estoppel is a shield a plaintiff can raise against the defense of the statute of frauds when the defendant has knowingly misrepresented a fact." *Smith*., 536 S.W.3d at 482 (quoting

*Seramur v. Life Care Ctrs. of Am., Inc.*, 2009 WL 890885, at *5 (Tenn. Ct. App. Apr. 2, 2009)). "Because equitable estoppel is not a sword that can be asserted as a stand-alone cause of action," such a claim is properly dismissed here. *Smith.*, 536 S.W.3d at 483; *Deal*, 2016 WL 373265, at *8.

Therefore, Ball's equitable estoppel claim is due to be dismissed for failure to state a claim.

### E. Ball's Amended Complaint is a Shotgun Pleading

The Eleventh Circuit has "identified four rough types or categories of shotgun pleadings":

> The most common type—by a long shot—is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint.[] The next most common type, at least as far as our published opinions on the subject reflect, is a complaint that does not commit the mortal sin of re-alleging all preceding counts but is guilty of the venial sin of being replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action.[] The third type of shotgun pleading is one that commits the sin of not separating into a different count each cause of action or claim for relief.[] Fourth, and finally, there is the relatively rare sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against.[] The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests.[]

*Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015) (internal citations omitted). The Sixth Circuit has cited *Weiland*'s discussion of shotgun pleadings with approval. *Lee v. Ohio Educ. Ass'n*, 951 F.3d 386, 393 (6th Cir. 2020).

Ball's Amended Complaint is the first type of shotgun pleading: it contains four counts, each of which adopts all of the allegations of all of the preceding counts such that they are a combination of the entire complaint. *Weiland*, 792 F.3d at 1323. "This type of 'shotgun pleading' violates Rule 10(b)." *Lee*, 951 F.3d at 393 (citing *Weiland*, 792 F.3d at 1323 n.13 (collecting cases) and *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 947 (7th Cir. 2013)).

The entirety of Ball's Amended Complaint is due to be dismissed for this alternative and additional reason.

IV. **Conclusion**

For all of the foregoing reasons, Defendants' Motion to Dismiss is due to be granted, and Plaintiffs' Amended Complaint is due to be dismissed. A separate order will be entered.

**DONE** and **ORDERED** this May 1, 2025.

_____
**R. DAVID PROCTOR**
CHIEF U.S. DISTRICT JUDGE